**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| *In re* Guantanamo Detainee Cases | ) Civil Action Nos.<br>) 02-CV-299 (CKK), 02-CV-828 (CKK),<br>) 04-CV-1130 (CKK), 04-CV-1136 (JDB),<br>) 04-CV-1137 (RMC), 04-CV-1144 (RWR),<br>) 04-CV-1194 (HHK), 04-CV-1227 (RBW),<br>) 04-CV-1254 (HHK), 04-CV-2035 (GK),<br>) 04-CV-2046 (CKK)<br>)<br>) |

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONERS'
MOTION FOR LEAVE TO TAKE DISCOVERY AND FOR PRESERVATION ORDER**

Respondents hereby respond to petitioners' motion for leave to take discovery, filed with

the Court Security Officers on January 6, 2005, and publicly on January 10, 2005. The motion

should be denied because discovery is premature at the present stage while a motion to dismiss is

pending; because discovery, as a general matter, is wholly improper in a habeas case seeking

review of the military detentions of enemy combatants during wartime; and because there is not

good cause to authorize the various discovery requests petitioner seeks to propound, which are

objectionable on a multiplicity of grounds. Moreover, there is no basis for a "preservation order"

of the sort that petitioners seek.

**BACKGROUND**

**A.      Procedural Status**

The instant motion is filed in ten or eleven[1] of the fifteen cases coordinated before this

Court seeking writs of habeas corpus for individuals detained as enemy combatants by the United

---

[1]  The operative motion filed with the Court Security Officers on January 6 was made in ten cases; however, the copy of the motion placed on the ECF public record on January 10 adds the O.K. case (Civil Action No. 04-CV-1136 (JDB)) to the caption and signature block.

States Department of Defense at Guantanamo Bay, Cuba.[2]  On October 4, 2004, respondents filed

a global response to the petitions for writs of habeas corpus and motion to dismiss or for

judgment as a matter of law in all of the above-captioned cases except Al-Marri (Civil Action

No. 04-CV-2035 (GK)) and Zemiri (Civil Action No. 04-CV-2046 (CKK)), which had not yet

been filed.  Briefing on that motion was complete on November 16, 2004, and it is presently

under submission to the Court.  On December 28, 2004, respondents filed responses to the

petitions for writs of habeas corpus and motions to dismiss or for judgment as a matter of law in

Al-Marri and Zemiri.  Respondents have also filed, on a rolling basis, factual returns consisting

of the administrative record of the Combatant Status Review Tribunal ("CSRT") for each

petitioner herein, which reveal the particular factual basis for the finding that each detainee is an

enemy combatant.

**B.    The Instant Motion**

Apparently late in the day on January 6, 2005, petitioners filed their Motion for Leave to

Take Discovery and for Preservation Order.[3]  Petitioners seek leave to serve discovery on

respondents and, potentially, a number of other federal agencies.  Exactly what those discovery

requests would be, however, seems to be constantly and still evolving.

When petitioners' counsel called to meet and confer before filing the motion, the only

---

[2]  Although certain of the petitioners purport to bring "non-habeas" claims as well, the discovery
requests that are the subject of the instant motion are pursued only under the auspices of their
habeas claims and petitioners disclaim any reliance on their non-habeas claims for purposes of
the instant motion.  See Petrs' Mot. at 4 n.2.

[3]  Respondents' counsel did not receive the motion until Friday, January 7, 2005.  The Court sua
sponte entered an order expediting briefing, with respondents' opposition due by noon on
Wednesday, January 12, 2005.

proposed discovery they mentioned was production of unredacted versions of documents recently disclosed by a number of agencies in response to certain FOIA requests (discussed further herein). Likewise, the opening paragraph of petitioners' motion alludes to "recently produced records in a Freedom of Information Act ('FOIA') suit," and calls for discovery of "this information in full and unredacted form." Petrs' Mot. at 1. The interior pages of petitioners' motion focus entirely on a subset of specific documents disclosed by non-party the Federal Bureau of Investigation ("FBI"), one of fourteen agencies that was a recipient of those FOIA requests. Petrs' Mot. at 2-4, 5-6. By the end of the motion, however, petitioners are resisting being tied down to any particular requests, asking broadly for "leave to take discovery from the government regarding torture, mistreatment, and abuse of detainees at the Guantanamo Bay detention facility"; the proposed order they have submitted is similarly open-ended. Petrs' Mot. at 9, Proposed Order. Their exhibits contain a "Draft of Potential Discovery Requests," containing seven broad and open-ended categories of documents each beginning with "All records relating to . . .," "all documents concerning . . .," or similar language. See Petrs' Mot., Ex. I; see also Petrs' Mot. at 7 n.4. These seven requests, on the other hand, may be contrasted with the two document requests set forth in their motion at page 7 ("all documents relating to the torture, mistreatment, or abuse of the detainees now at Guantanamo while they were in the custody of the United States, and a list of all documents containing such information" and "all documents relating to recommendations by government agencies regarding the continued imprisonment or the release and repatriation of the detainees").

Although petitioners' motion predominantly discusses document requests, a careful reading reveals that the discovery in which they seek to engage actually would take multiple

forms.  In addition to requesting production of documents, they seek to serve interrogatories on

respondents – though they do not attach the proposed interrogatories – and seek an unspecified

number of depositions of unspecified government officials.  Petrs' Mot. at 7.

## C.    FOIA Litigation in the Southern District of New York

In their motion, petitioners repeatedly mention a FOIA case pending in the Southern

District of New York,[4] seemingly trying to portray the instant discovery requests as a modest bid

to efficiently and conveniently piggyback on what has already been done in that case.  To set the

record straight, some clarifications are in order.

Between October 2003 and May 2004, the American Civil Liberties Union and several

other organizations, including the Center for Constitutional Rights (co-counsel for petitioners in

this case), submitted omnibus FOIA requests to 14 federal agencies and agency components

(hereinafter the "FOIA Requests"), only some of whom are parties or under control of a party

herein:  the Department of Defense, the Department of the Army, the Department of the Navy,

the Department of the Air Force, the Defense Intelligence Agency, the Department of Homeland

Security, the Department of Justice, the Civil Rights Division, the Criminal Division, the Office

of Information and Privacy, the Office of Intelligence Policy and Review, the Federal Bureau of

Investigation, the Department of State, and the Central Intelligence Agency.[5]  An October 2003

---

[4]  ACLU et al. v. Dep't of Defense et al., Civ. Action No. 04-CV-4151 (AKH) (S.D.N.Y.).

[5]  See Amended Complaint for Injunctive Relief, ACLU et al. v. Dep't of Defense et al., Civil
Action Docket No. 04-CV-4151 (AKH) (S.D.N.Y.) (attached hereto as Ex. A; also available at
http://www.aclu.org/torturefoia/04_CV_4151_Amended.pdf); Oct. 7, 2003 FOIA Request
(attached hereto as Ex. B; also available at http://www.aclu.org/Files/OpenFile.cfm?id=13963);
May 25, 2004 FOIA Request (attached hereto as Ex. C; also available at
http://www.aclu.org/torturefoia/request.pdf).

FOIA request called for disclosure of 21 broad categories of documents relating to the treatment

of "Detainees," which the letter defined as "individuals apprehended after September 11, 2001,

and held by the United States at military bases or detention facilities outside the United States," a

category that transcends Guantanamo and also includes, for example, detainees in the war in Iraq.

See Ex. B.  A May 2004 FOIA request used the same overarching definition of "Detainee" and

broadly requested "[r]ecords concerning the treatment of Detainees in United States custody,"

"[r]ecords concerning the deaths of Detainees in United States custody," and "[r]ecords related to

the rendition of Detainees and other individuals to foreign powers . . . ."  See Ex. C.

   In June 2004, the requesting organizations sued the 14 agencies and agency components,

alleging that, inter alia, they violated FOIA by failing to process the requests expeditiously.  The

defendant agencies in ACLU have been engaged in a rolling production of documents responsive

to the FOIA Requests, and as of this date have collectively disclosed approximately 28,000 pages

(hereinafter the "FOIA Documents").  The ACLU has posted the FOIA Documents on its

website, see "Records Released in Response to Torture FOIA Request,"

http://www.aclu.org/torturefoia/released, and their index reveals that, consistent with the breadth

of the FOIA Requests, the majority of the FOIA Documents involve United States Military

detention operations other than at Guantanamo (e.g., detentions in Iraq).  The rolling production

remains ongoing, with thousands of pages of documents yet to be processed.

   Petitioners observe that many of the FOIA Documents have been redacted.  Such

redactions may be for any one or more of an array of reasons, including without limitation that

the information is classified, that it is protected by the deliberative process privilege, that it is

protected by attorney-client privilege, that it is protected by the Privacy Act, that it is protected

by a law enforcement privilege, that it might reveal intelligence sources or methods, or for various other reasons permitted by the FOIA.

## ARGUMENT

**A.    If Ever Appropriate, Discovery is Premature at this Juncture**

On October 4, 2004, respondents filed a global response to the petitions for writs of habeas corpus and motion to dismiss or for judgment as a matter of law.  As respondents explained in the course of briefing a prior, similar discovery motion in one of the cases in which the present motion is filed, it is customary and appropriate, even in an ordinary case, for any discovery to await resolution of preliminary dispositive motions.[6]  But compared to an ordinary case, the considerations that disfavor accelerating discovery are greatly magnified in the instant case, where discovery raises core separation-of-powers concerns about judicial interference with the Executive's exercise of war powers.  It is in light of those very separation-of-powers concerns that the plurality in Hamdi urged lower courts hearing cases testing enemy combatant detentions to "proceed with the caution that is necessary in this setting."  Hamdi, 124 S. Ct. at 2652; see also Kremens v. Bartley, 431 U.S. 119, 128 (1977) (stressing the importance of avoiding premature and potentially unnecessary decision of constitutional questions of "great gravity and delicacy" (internal quotation marks omitted)).

---

[6]  See, e.g., Petrus v. Bowen, 833 F.2d 581, 583 (5th Cir. 1987) ("[a] trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined"); Transunion Corp. v. Pepsico, 811 F.2d 127, 130 (2d Cir. 1987) (stay of discovery was appropriate where discovery was unnecessary to decide motion to dismiss, and would have, if allowed, defeated purpose of motion).  See Respondents' Mem. of Points & Auth. In Opp. to Petr. Bisher al Rawi's Motion for Discovery, filed Nov. 24, 2004, in El-Banna, at 7-9 & nn.6, 7.

On December 8, 2004, this Court denied that prior motion for leave to take discovery,

without prejudice to renew if and when it became appropriate to do so, noting that there is a

motion to dismiss presently under consideration.  Dec. 8, 2004, Order in <u>El-Banna</u> (Civil Action

No. 04-CV-1144 (RWR).  The procedural posture today is indistinguishable from that which

existed at the time the previous motion was denied without prejudice.  Respondents' motion to

dismiss or for judgment as a matter of law remains pending, and the Court's resolution of it will

shape the nature of further proceedings, if any.  Inexplicably, petitioners fail even to mention this

prior order of the Court, or to address why discovery would be appropriate during the pendency

of a dispositive motion.  In short, petitioners have not presented any grounds why the instant

requests should be treated differently than the prior request that was the subject of the Court's

December 8, 2004, Order.[7]

**B.     Discovery is Neither Necessary Nor Appropriate in a Proceeding Seeking
         Judicial Review of the Military's Detention of Alien Enemy Combatants**

Not only is discovery premature, it is inappropriate <u>per se</u>.  In these proceedings,

petitioners ask the Court to review the United States Military's determination that they are enemy

combatants who must be detained pursuant to the President's war powers.  In this context,

---

[7]  Respondents' October 4, 2004, global motion was not originally filed in <u>Al-Marri</u> (Civil
Action No. 04-CV-2035 (GK)) or <u>Zemiri</u> (Civil Action No. 04-CV-2046 (CKK)), because those
cases were not then yet in existence.  However, similar motions (which, among other things,
incorporate the October 4, 2004, global motion by reference) were filed in those cases on

[footnote continued on next page]

discovery is wholly improper because it inserts the Judiciary further into the province of the Executive than is constitutionally permissible and thereby violates core separation-of-powers principles.

In Hamdi v. Rumsfeld, 124 S. Ct. 2633 (2004), five Justices of the Supreme Court held that detention of enemy combatants is a fundamental and accepted incident to war. See id. at 2640 (plurality opinion), 2679 (Thomas, J., dissenting). The President, of course, is Commander in Chief of the Armed Forces, U.S. Const. art. II, § 2, cl. 1, and the "Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." See Hamdi, 124 S. Ct. at 2647 (plurality opinion) (citing Department of Navy v. Egan, 484 U.S. 518 (1988); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)). Likewise, that power to detain enemy combatants is vested in the Executive is confirmed by Congress's Authorization for Use of Military Force passed in the wake of the September 11, 2001 attacks. Hamdi, 124 S. Ct. at 2639-43 (plurality opinion).

Given this demonstrable commitment of a quintessentially military function to the Executive Branch, the nature and scope of appropriate judicial inquiry is necessarily limited. In particular, there should be no evidentiary hearing in this Court, whose role is solely to confirm that the detention of petitioners is not "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). This function does not require – indeed, the

_____

December 28, 2004. Thus, the same prematureness is present in Al-Marri and Zemiri.

constitutional balance does not permit – this Court to engage in the type of original fact finding

on a blank slate that is characteristic of ordinary civil or criminal cases.  For instance, it is not the

Court's role to develop or weigh in the first instance the mix of facts that tend to show or not to

show that an individual is an enemy combatant, or to authorize a roving examination of the

Military's files in search of related information.  Rather, that inquiry and factual determination

already have been made by those to whom the Constitution entrusts those responsibilities.

Indeed, in no case we are aware of has a court undertaken substantive judicial review of

whether the Military has correctly interpreted the facts in classifying an alien as an enemy

combatant.  Even in cases involving not mere preventive detention as an enemy combatant, but a

more severe deprivation, i.e., a death sentence following conviction by a military commission,

the courts have uniformly eschewed such inquiry.  Cf. Ex parte Quirin, 317 U.S. 1, 25 & n.4

(1942) (refraining, in case reviewing conviction and death sentence by military commission,

from considering petitioners' defense that they "had no intention to obey the [sabotage] orders

given them by the officer of the German High Command," because "[w]e are not here concerned

with any question of the guilt or innocence of petitioners"); Application of Yamashita, 327 U.S.

1, 8 (1946) (holding, in context of conviction and death sentence by military commission:  "If the

military tribunals have lawful authority to hear, decide and condemn, their action is not subject to

review merely because they have made a wrong decision on disputed facts.  Correction of their

errors of decision is not for the courts but for the military authorities which are alone authorized

to review their decisions."); Johnson v. Eisentrager, 339 U.S. 763, 786 (1950) ("It is not for us to

say whether these prisoners were or were not guilty of a war crime, or whether if we were to retry

the case we would agree to the findings of fact or the application of the laws of war made by the

Military Commission.").  It naturally follows that whether the Military has made an accurate

determination of enemy combatant status for a given petitioner, based on an intensive review of

the facts surrounding his circumstances of capture and the best available intelligence, is a

decision properly left to the Executive.  As set forth in our prior briefs, see Response to Petitions

and Motion to Dismiss or for Judgment as a Matter of Law at 46; Reply Memorandum at 19-20,

even with respect to detainees fully possessed of constitutional protections (unlike the petitioners

here), the judicial function in appraising the facts – if there is one at all – is, at most, to confirm

that "some evidence" supports the Military's enemy combatant classification, taking into account

the constitutionally sensitive nature of such confirmation.[8]  Cf. Superintendent v. Hill, 472 U.S.

445, 455 (1985); United States ex rel. Vajtauer v. Comm'r, 273 U.S. 103, 106 (1927).[9]

Because this function places the Court in a fundamentally appellate capacity, there is no

need for independent or de novo fact-finding or factual development.  Consequently, there is no

_____

[8]  Although their separation-of-powers implications set these cases apart from garden variety
habeas cases collaterally attacking a criminal conviction, even in those types of habeas cases the
Court's role is not to reweigh de novo the merits of the original conviction, but only to ascertain
that no constitutional error occurred.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972) ("The
writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases de novo
but, rather, to review for violation of federal constitutional standards."); Burns v. Wilson, 346
U.S. 137, 144 (1953) ("[I]t is not the duty of the civil courts simply to . . . re-examine and
reweigh each item of evidence of the occurrence of events which tend to prove or disprove one of
the allegations in the applications for habeas corpus.  It is the limited function of the civil courts
to determine whether the military have given fair consideration to each of these claims.").

[9]  Importantly, the fact that habeas jurisdiction exists over these cases pursuant to 28 U.S.C.
§ 2241, as held in Rasul v. Bush, 124 S. Ct. 2686 (2004), does not mean that discovery is
appropriate.  As discussed further below, the norm in habeas corpus cases is that discovery is not
permitted.  Harris v. Nelson, 394 U.S. 286 (1969).  While petitioners opaquely refer to 28 U.S.C.
§ 2246 as if it provided a right to discovery, Petrs' Mot. at 5, the Supreme Court in Harris made
clear that that section relates to the taking of evidence in an evidentiary hearing, not discovery.
See Harris, 394 U.S. at 299.

place for discovery, which, of course, serves no purpose except in the context of preparation for fact-finding.  Of course, notwithstanding the many unique considerations in these cases, this procedural posture is hardly unusual for courts reviewing actions by agencies of the United States on an administrative record.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971) (court must confine its review to "the full administrative record that was before the [agency] at the time [it] made [its] decision"); Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenge of agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); United States v. Morgan, 313 U.S. 409, 422 (1941) ("inquiry into the mental processes of the administrative decisionmakers is usually to be avoided"); Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998) (discovery not allowed in case where review is on administrative record); Sierra Club v. Costle, 657 F.2d 298, 390 n.450 (D.C. Cir. 1981); Neuma Corp. v. Small Bus. Admin., 713 F. Supp. 1, 6 (D.D.C. 1989) (same).

Again, while these are far from ordinary habeas cases, even in an ordinary habeas case the Supreme Court has commented that the type of discovery contemplated by the Federal Rules of Civil Procedure is "ill-suited to the special problems and character of [habeas] proceedings." Harris v. Nelson, 394 U.S. 286, 296 (1969).  In particular, the Supreme Court has observed that ordinary discovery procedures tend to be "be exceedingly burdensome and vexatious" in the habeas corpus setting.  Id. at 297.  "The burden upon courts, prison officials, prosecutors, and police, which is necessarily and properly incident to the processing and adjudication of habeas

11

corpus proceedings, would be vastly increased; and the benefit to prisoners would be

counterbalanced by the delay which the elaborate discovery procedures would necessarily entail."

Id.[10]   Of course, the governmental interests in avoiding such burdens are many times magnified

here, where the burdens and intrusions that are "vastly increased" by discovery would fall not on

domestic police and prison officials, but on servicemembers and commanders carrying out the

U.S. Armed Forces' constitutionally entrusted function of providing for the national defense.  It

cannot be seriously argued that what the Supreme Court called a "considerable tactical

advantage" in litigation and accordingly denied except in narrow circumstances to domestic

habeas litigants should be conferred on members and supporters of terrorist organizations with

whom the Nation is at war.

The propriety of discovery in cases involving enemy combatant detentions is an issue that

has profound significance beyond the particular motion currently before the Court.  Accordingly,

when considering the degree of encroachment and interference with the Military's assigned

mission, the Court should take into account not just the discovery requests – extensive and far-

reaching though they are – that the Court is presently asked to authorize, but the deluge of future

discovery requests that will likely be forthcoming if the Court opens the floodgates.  Indeed,

petitioners foreshadow in footnote 2 of their motion that they foresee serving many more

discovery requests in the future.  A ruling from the Court approving discovery in this instance

---

[10]   The Harris Court held, in the end, that limited discovery might be appropriate in narrow
circumstances in ordinary habeas cases, upon a showing of good cause.  Harris, 394 U.S. at 300.
In the context of military detention of alien enemy combatants, however, there is never good
cause for allowing discovery, because of the core separation-of-powers considerations and the
military exigencies at stake.

would inevitably be seen as a green light to other petitioners' counsel, and perhaps enemy

detainees in future conflicts, to propound scores of discovery requests collectively intruding into

every nook and cranny of the Military's detainee operations.[11]  This intrusion is constitutionally

impermissible, and discovery should be barred altogether.

Contrary to petitioners' suggestion, see Petrs' Mot. at 4, Judge Kollar-Kotelly did not rule

in her August 13, 2004, opinion that discovery was appropriate in these actions.  Al Odah v.

United States, 329 F. Supp. 2d 106 (D.D.C. 2004).  To the contrary, the Court granted

respondents' motion to quash the deposition notice and document requests at issue there.  In

particular, the Court found that the discovery requests were improper because petitioners did not

comply with the applicable law, and that even if petitioners had so complied, the discovery

sought was "inappropriate and unnecessary at this stage of the instant proceedings."  Id. at 107.

## C.    These Particular Discovery Requests Are Not Supported
         By Good Cause And Should be Denied

Even if discovery was permissible as an abstract matter, and not premature while

respondents' dispositive motion is pending, the discovery requests petitioners seek to have

---

[11]  The precedent that the Court's ruling on this issue could set should be considered against the backdrop of our nation's historical experience in armed conflicts, in particular, the indispensability of detention of enemy combatants to the success of the war effort, and the orders of magnitude of enemy combatants detained.  The United States Military has detained huge numbers of enemy combatants in every major armed conflict in our Nation's history, including over two million in World War II.  George G. Lewis & John Mewha, History of Prisoner of War Utilization by the United States Army, Dep't of the Army Pamphlet No. 20-213, at 244 (1955).  If, in such previous conflicts, our Armed Forces had been bogged down with civil-court discovery demands from even a fraction of those detainees, their ability to effectively coordinate and maintain such detentions – a vital component of the war effort – would have been greatly hampered, to say nothing of the burden on the courts of refereeing thousands of discovery issues that would inevitably crop up.

13

authorized – to the extent we can discern what exactly they are[12] – are not supported by good

cause. Although the opening sentence of petitioners' motion gratuitously calls the discovery they

seek "limited" (Petrs' Mot. at 1), in reality it is anything but. Petitioners essentially seek to

engage in a fishing expedition in hopes of finding lurid tales that they can spin to paint the

United States' military detention operations in a negative light, but that have zero relevance to

the controlling issue of whether they have been properly classified as enemy combatants who

must be held in order to defend the Nation, its troops, and its allies against harm. Moreover,

under any of petitioners' varying formulations, the proposed discovery is overbroad and unduly

burdensome.

      1.      <u>The Discovery Sought is Not Relevant to Petitioners' Enemy Combatant Status</u>

      Petitioners claim they need the requested discovery "so they may properly support their

habeas corpus petitions and achieve the objective of these proceedings." Petrs' Mot. at 5-6.

However, the issue in a habeas corpus proceeding is the legality of detention. Here, the reason

for the detention is that petitioners have been determined to be enemy combatants. Thus, the

central issue in these habeas cases is whether there is some evidence to support the Military's

---

[12] Petitioners fall short of the appropriate procedure for seeking leave to serve discovery by not attaching a complete and definitive copy of the document requests they would propound, by not attaching any version of the text of the interrogatories they would propound, and by not revealing the number or identity of government officials whom they seek to depose. By failing adequately to specify the discovery in which they seek to engage, petitioners essentially seek a blank check from this Court to engage in whatever discovery they deem appropriate. This approach is contrary to the letter of Rule 6(b) of the Rules Governing § 2254 Cases; contrary to the spirit of the requirement, declared in <u>Harris v. Nelson</u>, 394 U.S. 286 (1969), to seek leave before engaging in discovery; and even inconsistent with petitioners' prior practice in these cases (when petitioner Bisher al Rawi moved for leave to serve discovery, the proposed discovery requests were submitted with his motion papers).

determinations of enemy combatant status.  In the event that evidence emerges indicating that a detainee has been mistreated while in United States custody, every effort is made to remedy the situation and to punish and discipline the perpetrators.  But such mistreatment, even if proven, would not alter the facts that made the detainee an enemy combatant in the first place and would certainly not constitute grounds for releasing the detainee, enabling him potentially to return to the fight or to terrorism.[13]

Grasping at straws, petitioners boldly speculate that "[e]vidence that the statements presented to the CSRTs were the product of torture and therefore are intrinsically unreliable would refute one of the government's principal justifications for petitioners' continued imprisonment."  Petrs' Mot. at 6.  The non sequitur in this bootstrapping is that none of the FOIA Documents that petitioners parade before the Court so much as suggests that any statement implicating a petitioner as an enemy combatant and relied upon as such by the CSRT considering his status was somehow the "product of torture" or "intrinsically unreliable."  The CSRTs, of course, typically rely on multiple pieces of evidence that tend to corroborate each other, and are duty-bound to discount any information that is unreliable because of its questionable provenance.[14]  The documents petitioners have cherry-picked from the FOIA Documents,

---

[13]  Although some petitioners have purported to bring separate claims addressed to their treatment and conditions of confinement – as opposed to the legitimacy of the detention itself – petitioners disclaim any intent to base the instant proposed discovery on those "non-habeas" claims.  See Petrs' Mot. at 4 n.2.  The sole issue in a habeas claim is the legitimacy of the detention.

[14]  The CSRT panel, consisting of senior officers including a judge advocate, is instructed to take into account the "reliability" of the evidence "in the circumstances."  See, e.g., CSRT Implementation Memorandum Encl. (1) ¶ G(7).  And, importantly, the members of the CSRT are bound by oath to examine the evidence before them "impartially" and in light of their

[footnote continued on next page]

interpreted most generously to petitioners, indicate that a tiny minority of FBI agents over a

several-year period reported observing what they perceived as "aggressive interrogation

practices" or "extreme interrogation techniques" (Petrs' Mot., Ex. B) in a tiny minority of cases

of individual detainees, prompting respondents to initiate investigations aimed at enforcing

discipline, punishment, or other corrective action where appropriate.[15]

     Of course, even a single incident of mistreatment of detainees, however isolated, is

absolutely unacceptable, will not be (and has not been) tolerated, and will be punished

appropriately; indeed, a number of investigations are underway to this end.[16]  The point,

however, is that the documents petitioners cite completely fail to bear out their sensationalistic

portrait of pervasive, universal, or institutionally sanctioned abuse of detainees at Guantanamo,

do not suggest that any mistreatment was other than aberrational, and do not provide good cause

to suspect that a generalized fishing expedition into all aspects of detainee operations is likely to

---

"professional knowledge, best judgment, and common sense," and to be guided by their "concept
of justice."  See CSRT Implementation Memorandum Encl. (8), p. 2.  See also, e.g., Response to
Petition for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law,
filed Dec. 28, 2004, in Zemiri, at 2-6.

[15]  Among the FOIA Documents, but conveniently not mentioned by petitioners, are records
indicating that, out of 530 FBI personnel who have served at some capacity at Guantanamo and
were polled in an inquiry by headquarters, 26 out of 478 who responded reported back that they
had observed what they perceived to be mistreatment, a rate of about 5%.  See Aug. 17, 2004
email, attached as Ex. D.  In other words, 19 out of 20 FBI agents at Guantanamo reported not
observing any mistreatment.  Even assuming each of those 26 positive responses reflects alleged
mistreatment of a unique detainee, 26 detainees out of 747 whom the FBI interviewed at
Guantanamo (see Petrs' Mot. at 2, Ex. A) is a little under 3.5%.

[16]  Examples of such investigations and corrective actions or punishments taken are available at
http://www.defenselink.mil/news/detainee_investigations.html, or have been reported in the
media, see http://news.orb6.com/stories/ap/20041105/guantanamo_abuse.php (Associated Press
story); Military to Investigate FBI Prison Abuse Charges, N.Y. Times (Jan. 5, 2005).

yield evidence proving that any petitioner was actually an "errant tourist, embedded journalist, or

local aid worker" (Hamdi, 124 S. Ct. at 2649) captured by mistake.

Thus, the logical gaps in petitioners' theory of relevance are many and profound:  it is

assumed through leaps of faith (1) that the witness's perception was accurate and complete and

that there were not other facts outside the witness's cognizance that clarify what transpired; (2)

that "aggressive interrogation practices" or "extreme interrogation techniques" are synonymous

with mistreatment or torture; (3) that the observed mistreatment occurred in the course of an

interrogation; (4) that such interrogation resulted in the mistreated detainee revealing

information; (5) that the mistreatment was of a caliber that would call the reliability of the

revealed information into question; (6) that the revealed information directly implicated as an

enemy combatant one of the fewer than 10% of Guantanamo detainees who constitute petitioners

joining in this motion; and (7) that the statement was submitted to the CSRT as evidence; (8) that

the CSRT actually relied on that statement; and (9) that there was not other sufficient evidence

before the CSRT showing the petitioner's enemy combatant status (e.g., a statement by the

subject detainee himself, or non-testimonial evidence placing the detainee with Taliban troops on

battle lines in Afghanistan).  Without minimizing any allegations of mistreatment, which if

confirmed are troubling and have been or will be thoroughly investigated, a remote possibility

that the scenario petitioners hypothesize could occur if all the stars in the sky lined up just so

simply does not warrant the burdensome, intrusive, and overbroad discovery petitioners seek.

     2.      However Petitioners' Motion is Interpreted, the Proposed Discovery
            Requests Would Be Grossly Overbroad and Unduly Burdensome

Petitioners are elusively imprecise about what discovery requests they seek authorization

17

to propound.  Their motion repeatedly alludes to the <u>ACLU</u> FOIA case in the Southern District of

New York, suggesting that the discovery they are presently seeking would merely follow along a

convenient path already paved by the FOIA Requests.  <u>See</u>, <u>e.g.</u>, Petrs' Mot. at 1, 8 ("The

government already has produced in the FOIA suit many of the documents petitioners seek, albeit

in heavily redacted form.  Accordingly, petitioners' discovery should not be very time-

consuming, burdensome, or expensive.").  On the other hand, the "Draft of Potential Discovery

Requests" attached to their motion as Exhibit I contains seven free-standing, broad categories of

documents that are framed entirely independently of the FOIA Requests and the FOIA

Documents.  Either way, whatever discovery is requested would be improper.

       a.      To the extent that petitioners seek production of a set of documents coextensive

with the FOIA Documents, their request is severely overbroad.  The FOIA Requests were

omnibus requests encompassing documents relating to treatment of detainees anywhere and

everywhere in the world, without limitation to the conflict against al Qaeda and the Taliban and

without limitation to Guantanamo.  <u>See</u> Ex. A, Ex. B.  As the ACLU's posting of the FOIA

Documents shows,[17] no more than a small subset of them concerns detention operations at

Guantanamo.  For example, many of the FOIA Documents deal with issues relating to detentions

in Iraq, such as at the Abu Ghraib prison.  Astonishingly, even one of the documents petitioners

attach to their motion has nothing to do with Guantanamo.  <u>See</u> Petrs' Mot., Ex. J (relating solely

to alleged abuse of detainees in Iraq).  While some subset – albeit not a readily identifiable

---

[17]  <u>See</u> "Records Released in Response to Torture FOIA Request,"
http://www.aclu.org/torturefoia/released.

subset[18] – of the FOIA Documents relates to Guantanamo matters (exemplified by Exs. A through G attached to their motion), a large proportion of them have no conceivable relevance to any issues in these cases.

Discovery coextensive with FOIA Requests would be overbroad not only in terms of subject matter, but also in terms of the recipient agencies. Only five of the 14 agencies or agency components to which the FOIA Requests were addressed are, or are under control of, a proper party in these cases, and those five do not include the FBI, in whose proprietary documents petitioners' motion expresses the greatest interest.[19] The Secretary of Defense does not have custody or control of documents belonging to other federal government agencies outside the Department of Defense. For this reason, any discovery from the FBI or other non-party agencies would have to be sought through the appropriate channels for non-party discovery.[20]

---

[18]  Because there was no need for the disclosing agencies to segregate or track Guantanamo-related documents for purposes of responding to the FOIA requests, Guantanamo-related documents are commingled and interspersed with the other documents and a burdensome manual review of tens of thousands of pages would be required to cull them out.

[19]  The proper respondents in these habeas cases are the Secretary of Defense and/or his subordinates. Rumsfeld v. Padilla, 124 S. Ct. 2711, 2718 n.9 (2004). Although some of the petitions name the President, it is well settled that the President is not a proper respondent and should not have been named, and should be dismissed, see Response to Petitions for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law, filed Oct. 4, 2004, at 5 n.4, which petitioners have not contested. Likewise, although petitioners in al Odah purport to name the United States, it is clear that the United States is not a proper respondent in a habeas case. See Padilla, 124 S. Ct. at 2718 & n.9.

[20]  Even in ordinary civil cases where discovery is had in the ordinary course, parties litigating against a particular agency or agencies of the United States government are not entitled to government-wide party discovery against any non-party agency of their choosing. See Alexander v. F.B.I., 186 F.R.D. 66, 70 & n.2 (D.D.C. 1988) (noting that in cases in which the United States is not a party, discovery from non-party federal agencies is made pursuant to "the Touhy process").

Of course, overbroad or not, discovery and court intervention are unnecessary to give petitioners access to the FOIA Documents, which have already been made public and are in the custody of counsel for plaintiffs in <u>ACLU</u>, who overlap with counsel in these cases. However, petitioners claim entitlement to "full and unredacted" versions of the FOIA Documents. They appear implicitly to assume, without foundation, that any and all redactions are for classified national security information, and reason that their security clearances entitle them to review unredacted versions of the documents at the secure facility.

This claim piles erroneous logic atop an inaccurate premise. There are a number of varying grounds why any given document produced pursuant to the FOIA Requests may be redacted, not merely that the redacted information is classified. For example, redactions may be made to avoid disclosing information that is privileged for a variety of reasons, such as attorney-client privilege, deliberative process privilege, or executive privilege. Not even the highest level of security clearance would justify giving petitioners' counsel access to information protected by such privileges. Since the grounds for redactions vary from document to document, and many of those grounds are valid against civil discovery, petitioners' counsel's insistence that they are entitled categorically to unredacted versions of the tens of thousands of pages of the FOIA Documents is wholly without foundation.

Moreover, even with respect to redactions that are for classified information that is not also covered by any other privilege, a security clearance does not confer a universal right to have any and all classified information in the Government's control. Rather, a security clearance enables the Government to give an individual access to information that the Executive Branch determines the holder of the clearance has a need to know. Executive Order 12958, 60 Fed. Reg.

20

19825 (Apr. 20, 1995), <u>as amended by</u> Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003), <u>reprinted in</u> Note following 50 U.S.C.A. § 435 (Supp. 2004), § 4.1(a)(3).[21]  It would be ludicrous to assert that petitioners' counsel have some sort of blanket "need to know" any and all classified information that may be present in the tens of thousands of pages of the FOIA Documents, a large proportion of which relate to detentions in Iraq or elsewhere and have nothing to do with Guantanamo.

      b.     An alternative reading of petitioners' motion is that the repeated invocations of the <u>ACLU</u> litigation and the FOIA Documents are merely a rhetorical flourish, and the operative discovery requests are, instead, the seven "draft" requests attached to petitioners' motion as Exhibit I.  If so, those requests would undoubtedly be overbroad and unduly burdensome.  The seven blunderbuss requests, several of them with multiple subparts, are framed in the broadest possible fashion, calling for "all records discussing or in any way relating to . . .," "all documents concerning . . .," "all records pertaining to . . .," and like formulations.   Incredibly, five of the seven requests are not even limited in scope to the detainees who are petitioners, and none is limited to the petitioners who are movants herein.  Rather, they use the word "detainees" apparently in the unlimited sense of anyone who is or has ever been detained at Guantanamo.

---

[21]  "'Need-to-know' means a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function."  <u>Id.</u> § 6.1(z).  Control of access to classified information, including any "need to know" determination, is exclusively an Executive Branch function, committed to the broad discretion of the Executive in the exercise of its national security responsibilities.  <u>See</u> <u>Dep't of the Navy v. Egan</u>, 484 U.S. 518, 526-30 (1988); <u>Stehney v. Perry</u>, 101 F.3d 925, 931-32 (3d Cir. 1996); <u>In re United States</u>, 1 F.3d 1251 (Table), 1993 WL 262656 (Fed. Cir. Apr. 19, 1993) (<u>see</u> Fed. Cir. Rule 47.6(c) permitting citation of unpublished opinions); <u>see also</u> Respondents' Response to Petitioners' Motion for Access to Unredacted Factual Returns (filed Nov. 22, 2004), at 10-14.

Assuming <u>arguendo</u> that any discovery would be appropriate in these actions, this sweeping, scattershot approach is surely not what the Supreme Court plurality had in mind when it emphasized the need for district courts to "proceed with the caution that we have indicated is necessary in this setting."  <u>Hamdi</u>, 124 S. Ct. at 2652.

Responding to the Exhibit I requests would be a massive undertaking, and because they overlap with the FOIA Requests only in some small, partial respect, <u>compare</u> Petrs' Mot., Ex. I, <u>with</u> October 2003 FOIA Requests (Ex. A hereto), <u>and</u> May 2004 FOIA Requests (Ex. B hereto), the efficiencies posited by petitioners would be largely non-existent.[22]  Moreover, for the reasons discussed above, <u>see</u> <u>supra</u> Section C.1, the requested discovery is irrelevant to whether any petitioner before the Court has been properly classified as an enemy combatant – an issue that hinges on the detainee's actions, history, and allegiances, not on anything respondents or their subordinates have or have not done.  Some of the requests call by their very terms for disclosures of information that would be protected by the deliberative process privilege (No. 7),[23] or for

---

[22]  Because petitioners have not provided an actual, final set of definitive discovery requests; because their Exhibit I "draft" requests fail to specify any of the usual parameters that appear in discovery requests such as definitions, temporal limitations, scope of search, and timing; and because respondents had only three-and-one-half business days – well short of the usual fourteen days to respond to a motion or thirty days to respond to a discovery request – to prepare this memorandum in opposition, respondents reserve the right to formally assert burden, overbreadth, and other appropriate objections by way of evidentiary declaration or otherwise, should discovery proceed and petitioners come forward with their final, operative set of discovery requests.

[23]  <u>Compare</u> Petrs' Mot. at 7 (requests would seek "all documents relating to recommendations by government agencies regarding the continued imprisonment or the release and repatriation of the detainees"), <u>with</u> <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 150 (1975) (deliberative process protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" and rests on the rationale that "the frank discussion of legal or policy matters in writing might be inhibited if the discussion were made public; and that the decisions and policies formulated

[footnote continued on next page]

information relating to an ongoing law enforcement investigation (No. 5).  As such, there is not good cause for authorizing these discovery demands.

3.     Interrogatories and Depositions are Likewise Unwarranted

Practically as an afterthought, petitioners also indicate they plan to serve interrogatories and notice depositions – presumably directed at obtaining the same type of information about alleged mistreatment that, as discussed above, is irrelevant to the validity of their detention as enemy combatants – but fail to attach the proposed interrogatories or to specify the number or identity of the individuals whom they seek to depose.  Petrs' Mot. at 7.  As such, they appear to be asking the Court essentially for a blank check to engage in whatever discovery they deem appropriate.  See supra note 12.  Any such open-ended discovery authorization would be wholly improper.  See 2254 Rule 6(b) (movant for leave to serve discovery must attach copy of proposed requests); Hamdi, 124 S. Ct. at 2652 (urging district courts to "proceed with the caution that we have indicated is necessary in this setting").   Respondents reserve the right to oppose any future request for leave that adequately specifies the particular discovery sought.

**D.     There is no Basis for a Preservation Order**

Finally, petitioners' request that the Court "issue an order compelling the government to preserve the information petitioners seek to discover" (Petrs' Mot. at 8-9) should be denied.  This case is utterly devoid of any circumstances warranting such an order.  Contrary to petitioners' allegations, there is no evidence of any document destruction in the instant case and in fact, respondents have numerous reasons – independent of any order of this Court – for ensuring the

would be the poorer as a result" (internal quotations marks omitted)).

23

preservation of the documents in question.

The only support petitioners muster for their conspiracy theory that respondents have a propensity to destroy evidence is a document they say "document[s] efforts by the military to 'cover up' evidence of the physical abuse of detainees." Petrs' Mot. at 9 (citing Petrs' Ex. D). However, the document petitioners apparently meant to cite[24] relates solely to allegations of abuse of detainees in Iraq, and has nothing to do with the subject matter of this case, which solely involves detentions at Guantanamo. Petrs' Mot., Ex. J.[25] Obviously, this document provides no basis whatsoever for suspecting an impending campaign to destroy documents relating to Guantanamo.

To the contrary, several considerations show why it makes no sense to expect that respondents will destroy the subject documents. First, petitioners agree (Petrs' Mot. at 6) that many of the documents they seek relate to pending or developing investigations that the government has initiated into possible misconduct in regard to mistreatment of detainees.[26] Such investigations have served, and will continue to serve, as the basis for prosecutions or other corrective action wherever appropriate. It strains credulity to assume that respondents would compromise those investigations or prosecutions by wantonly destroying the contents of the investigative files. Second, to the extent that what petitioners are seeking is unredacted copies of

---

[24] Petitioners cite an Exhibit D, but Exhibit D does not contain any suggestion of any "cover up." Respondents assume the intended reference is to petitioners' Exhibit J.

[25] Moreover, while the document makes reference to "cover-up efforts," when a "cover-up" is discussed in a report to the Director of the FBI, it is a fairly good sign that whoever may have sought to perpetrate a "cover-up" did not get very far in that effort.

[26] See supra footnote 16 (citing information about investigations into mistreatment of detainees).

the FOIA Documents, the <u>ACLU</u> litigation is ongoing in the Southern District of New York, and

the plaintiffs there have indicated an intention to return to court to challenge various

withholdings and redactions from the FOIA Documents.  Petitioners offer no reason for believing

that the defendant agencies in that case would destroy unredacted originals in the face of

potential imminent litigation over the validity of the redactions.  Finally, respondents are well

aware of their obligation not to destroy evidence that may be relevant in pending litigation.

Administrative agencies are entitled to a presumption that "that they will act properly and

according to law."  <u>See</u>, <u>e.g.</u>, <u>Federal Communications Comm'n v. Schreiber</u>, 381 U.S. 279, 296

(1965).  Even in a case involving private parties, "[t]o supplement every complaint with an order

requiring compliance with the Rules of Civil Procedure would be a superfluous and wasteful

task, and would likely create no more incentive upon the parties than already exists."  <u>Hester v.</u>

<u>Bayer Corp.</u>, 206 F.R.D. 683, 685 (M.D. Ala. 2001); <u>see also</u> <u>Pepsi-Cola Bottling Co. of Olean v.</u>

<u>Cargill, Inc.</u>, Civ. No. 3-94-784, 1995 WL 783610, at *3 (D. Minn. Oct. 20, 1995) ("To further

embellish the grave importance of document preservation, through an administratively

demanding mechanism, seems inordinate, at best.").

　　　For those reasons, petitioners' request for a preservation order should be denied.  Such

denial is warranted whether the Court utilizes the test in <u>Capricorn Power Co. v. Siemens</u>

<u>Westinghouse Power</u>, 220 F.R.D. 429, 433-434 (W.D. Pa. 2004 ) (focusing on "1) the level of

concern the court has for the continuing existence and maintenance of the integrity of the

evidence in question in the absence of an order directing preservation of the evidence; 2) any

irreparable harm likely to result to the party seeking the preservation of evidence absent an order

directing preservation; and 3) the capability of an individual, entity, or party to maintain the

evidence sought to be preserved . . ."), or follows the weight of authority to the effect that the

requirements for issuing an injunction must be satisfied before a preservation order may issue,

see, e.g., Madden v. Wyeth, No. 3-03-CV-0167-R, 2003 WL 21443404, at *1 (N.D. Tex. Apr.

16, 2003); Pepsi-Cola Bottling Co., 1995 WL 783610, at *3-*4; Humble Oil & Refining Co. v.

Harang, 262 F. Supp. 39, 42-43 (E.D. La. 1966).  Neither test is close to satisfied in the

circumstances here.

### CONCLUSION

For the foregoing reasons, respondents respectfully request that petitioners' Motion for

Leave to Take Discovery and for Preservation Order be denied.

Dated:  January 12, 2005                              Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

BRIAN D. BOYLE
Principal Deputy Associate Attorney General

DAVID B. SALMONS
Assistant to the Solicitor General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

ROBERT D. OKUN
Assistant United States Attorney
Chief, Special Proceedings Section

_/s/_  Robert J. Katerberg
JOSEPH H. HUNT
VINCENT M. GARVEY
TERRY M. HENRY
LISA A. OLSON
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 6112
Washington, DC  20530
Tel:  (202) 616-8298
Fax:  (202) 616-8460

Attorneys for Respondents

27