UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| )<br>IN RE:                                    )<br>                                           )<br>PETITIONERS SEEKING               )<br>HABEAS CORPUS RELIEF           )<br>IN RELATION TO PRIOR            )<br>DETENTIONS AT                      )<br>GUANTANAMO BAY                  )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           )<br>                                           ) | Misc. No. 08-0444 (TFH)<br><br>Civil Action Nos.<br>02-cv-1130, 04-cv-1135, 04-cv-1144, 04-cv-1194,<br>04-cv-1227, 04-cv-1254, 05-cv-0023, 05-cv-0345,<br>05-cv-0490, 05-cv-0520, 05-cv-0526, 05-cv-0584,<br>05-cv-0586, 05-cv-0640, 05-cv-0665, 05-cv-0714,<br>05-cv-0723, 05-cv-0764, 05-cv-0765, 05-cv-0878,<br>05-cv-0833, 05-cv-0887, 05-cv-0888, 05-cv-0891,<br>05-cv-0998, 05-cv-1001, 05-cv-1009, 05-cv-1124,<br>05-cv-1237, 05-cv-1242, 05-cv-1243, 05-cv-1246,<br>05-cv-1311, 05-cv-1487, 05-cv-1493, 05-cv-1505,<br>05-cv-1509, 05-cv-1635, 05-cv-1667, 05-cv-1678,<br>05-cv-1714, 05-cv-1779, 05-cv-1806, 05-cv-1864,<br>05-cv-1894, 05-cv-2029, 05-cv-2104, 05-cv-2197,<br>05-cv-2216, 05-cv-2336, 05-cv-2367, 05-cv-2369,<br>05-cv-2384, 05-cv-2385, 05-cv-2386, 05-cv-2452,<br>05-cv-2458, 05-cv-2466, 05-cv-2479, 06-cv-1675,<br>06-cv-1677, 06-cv-1678, 06-cv-1679, 06-cv-1683,<br>06-cv-1687, 06-cv-1763, 06-cv-1768, 06-cv-1769,<br>08-cv-0864, 08-cv-0987, 08-cv-1104, 08-cv-1185,<br>08-cv-1221, 08-cv-1223, 08-cv-1628, 08-cv-1733 |

**PETITIONERS' CONSOLIDATED SUPPLEMENTAL BRIEF REGARDING
JURISDICTION OVER HABEAS PETITIONS OF PETITIONERS
TRANSFERRED FROM GUANTANAMO BAY**

The Court ordered the parties in these coordinated cases to file a single "consolidated supplemental brief addressing whether petitioners' habeas rights are statutor[il]y based and how such a statutor[il]y based habeas right affects the parties' previously advanced arguments." Order, Dkt. 104 (Oct. 9, 2009).

Throughout their initial briefing before this Court, Petitioners argued that the habeas statute governed the disposition of these cases. *See* Petitioners' Consolidated Br., Dkt. 89, at 2 n.2; Petitioners' Consolidated Reply Br., Dkt. 94, at 2-3. Only a small portion of Petitioners' Reply brief was dedicated to the proposition that the jurisdictional standard at issue here would be no different were Petitioners' cases to be adjudicated based on common law standards, both as they existed at the time of the founding, *see id*. at 4-7, and as they should be taken to have evolved over time, *see id*. at 7-10.

Since the initial consolidated briefing before this Court in February 2009, several cases before Judge Sullivan involving transferred detainees have been coordinated with the others in 08-mc-444.[1] In two such cases, *Zuhair v. Obama*, No. 08-cv-864, and *Al Habashi v. Obama*, No. 05-cv-765, the individual Petitioners had (prior to coordination of their claims before this Court) briefed the issue of whether transfer rendered their habeas petitions moot. Petitioner's opposition brief in *Zuhair* is appended as Exhibit A; the opposition brief in *Al Habashi* was filed through the CSO in May and has not yet been cleared.[2] Finally, as noted in Petitioners' Consolidated

---

[1]     *See, e.g.*, Minute Order, *Al Habashi v. Obama*, No. 05-cv-765 (Oct. 8, 2009).

[2]     The opposition brief in *Zuhair* sets forth the circumstances of Petitioner Zuhair's continuing detention in Saudi Arabia, *see id*. at 17-19, the particular stigmatic harm occasioned by the repetition of baseless allegations against him in the media and Congress, *see id*. at 13-14 and n.17, and the fact that his son lives in the United States, making the immigration consequences of his putative enemy combatant status particularly harmful, *see id*. at 10; *cf*. Gov't Response Br., Dkt. 92, at 14 ("allegations of potential denial of [petitioners'] future admission to the United States are simply too speculative" to support jurisdiction), *inter alia*.

The opposition brief in *Al Habashi* "sets out various of the collateral consequences of his imprisonment" suffered by Petitioner, Dkt. 150, No. 05-cv-765 (public notice of filing), and the practical consequences of a favorable habeas adjudication (as supported by the unclassified declarations of Petitioner Binyam Mohammed al Habashi and his solicitor Catherine Robinson). It also notes the (public) fact that of the fourteen Guantanamo detainees returned to the UK, the nine sent there with a CSRT enemy combatant designation in place have all been subjected to restrictions on their liberty, whereas the five sent back without such a designation were set free without conditions. *Cf*. Petitioners' Consolidated Br., Dkt. 89, at 11-13 (noting differential

Brief, Dkt. 89, at 2 n.1, counsel for Salah Al Salami, a Petitioner who died in custody, separately briefed the issue of mootness before Judge Friedman. *See* Dkt. 61, *Al Salami v. Bush*, No. 05-cv-2452 (filed July 25, 2008), appended as Exhibit B.

One new development has occurred since all of the aforementioned briefs were submitted that affects the rights of all transferred and released Guantanamo detainees. On October 28, 2009, the President signed into law the Department of Homeland Security Appropriations Act, 2010, section 553 of which mandates that "[t]he Assistant Secretary, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies. For purposes of this clause, the term 'detainee' means an individual in the custody or under the physical control of the United States as a result of armed conflict." P.L. 111-83, Title V, § 553, 123 Stat. 2179 (Oct. 28, 2009) (codified at 49 U.S.C. § 44903(j)(2)(C)(v)). At the very least, this new statute gives every former Guantánamo detainee a stake in the question whether they were in fact properly in the custody or control of respondents "as a result of armed conflict," a matter already necessarily at issue in every habeas case as a result of the government's current position on its detention authority.[3] Read most broadly, Congress has legislated a collateral consequence imposed by operation of law based on prior detention.

---

treatment of transferred detainees cleared of the enemy combatant designation by their CSRTs, and those found to be enemy combatants by their CSRTs). Counsel for *Al Habashi* will submit a copy of the brief to this Court through the CSO.

Both briefs reinforce the notion that many of the jurisdictional issues being debated in the abstract here are in fact highly case- and fact-specific.

[3]    The government has consistently described its detention authority as cabined by the scope of the "armed conflict" against Al Qaeda and the Taliban that it maintains was authorized by the AUMF. *See* Memorandum Regarding the Government's Detention Authority Relative to

For the reasons set forth in Petitioners' consolidated briefs and the additional briefs cited above, the federal courts continue to have jurisdiction over the claims of transferred and released detainees, and the Court should confer with counsel for the parties to establish an orderly process for litigating the claims of those transferred and released detainees who wish to proceed with their claims.

Dated: November 10, 2009

Respectfully submitted,

_____/s/ sdk_____

Shayana D. Kadidal (D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Tel: (212) 614-6438
Fax: (212) 614-6499
kadidal@ccrjustice.org

*On behalf of Petitioners* [*]

---

Detainees Held at Guantanamo Bay, Dkt. 1689, *In re Guantanamo Detainee Litigation*, No. 08-mc-442 (filed Mar. 13, 2009) at 1 ("The laws of war have evolved primarily in the context of international armed conflicts between the armed forces of nation states. This body of law, however, is less well-codified with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban. Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict."); *id*. at 2 ("the concept of 'substantial support,' … may require the identification and analysis of various analogues from traditional international armed conflicts"); *id*. at 4 ("nations lawfully can use military force in an armed conflict against irregular terrorist groups such as al-Qaida").

[*]     Reserving objections to the requirement to file a single consolidated brief, *see* Petitioners' Consolidated Br., Dkt. 89, at 2 n.1.

**EXHIBIT A**

Petitioner's Opposition to Respondents' Motion to Dismiss as Moot the Petition for Writ of Habeas Corpus, Dkt. 210, *Zuhair v. Obama*, No. 08-cv-864 (D.D.C. filed Aug. 3, 2009)

CLEARED FOR PUBLIC FILING BY THE CSO

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AHMED ZAID SALEM ZUHAIR, | |
| *Petitioner*, | |
| v. | Civil Action No. 08-864 (EGS) |
| BARACK H. OBAMA, ROBERT GATES, REAR ADM. DAVID M. THOMAS, and ARMY COL. BRUCE VARGO, | |
| *Respondents*. | |

## PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION TO DISMISS AS MOOT THE PETITION FOR WRIT OF *HABEAS CORPUS*

Petitioner Ahmed Zaid Salem Zuhair respectfully submits this memorandum of law in opposition to Respondents' Motion to Dismiss as Moot the Petition for Writ of *Habeas Corpus* (dkt. no. 207).  Mr. Zuhair respectfully requests oral argument on this Motion.

On June 12, 2009, after more than seven years in U.S. custody and a mere two weeks before this Court was set to rule on the lawfulness of his detention, Respondents repatriated Mr. Zuhair to the Kingdom of Saudi Arabia.  *See* Notice of Transfer (dkt. no. 202).  Although Mr. Zuhair is no longer in the direct custody of the United States, the collateral consequences which he continues to suffer as a result of his improper imprisonment as an "enemy combatant" can only be remedied by this Court and are sufficient to preserve his habeas petition from mootness.[1]

Mr. Zuhair suffers from four collateral consequences stemming from his unlawful detention as an "enemy combatant" at Guantánamo and in other U.S. sites, each of which is

---

[1] Because a Traverse has been filed and the factual issues are ready for disposition, proceeding to the merits would impose a minimal burden on the Court's resources.

CLEARED FOR PUBLIC FILING BY THE CSO

independently sufficient to sustain this Court's continuing jurisdiction over his habeas petition. First, absent a judicial determination that there was no basis for his detention as an enemy combatant, Mr. Zuhair is likely barred by statute from launching a civil damages action to seek reparation for years of unlawful detention and mistreatment.  Second, absent a judicial finding that, contrary to the determination of the Combatant Status Review Tribunal (CSRT), he did not participate in terrorist activities, Mr. Zuhair is statutorily barred from seeking entry into the United States, where one of his children permanently resides.  Third, Mr. Zuhair continues to suffer the stigma of having been deemed an international terrorist by the U.S. government—a stigma that only this U.S. court can erase.[2]  Finally, as a direct consequence of Mr. Zuhair's imprisonment at Guantánamo, he continues to be subject to incarceration and other restrictions on his freedom by Saudi authorities, burdens which his counsel have reason to believe would be lifted upon a judicial finding that Mr. Zuhair never participated in any of the alleged terrorist activities and was unlawfully held by the United States.

## I.  THIS COURT RETAINS JURISDICTION OVER MR. ZUHAIR'S HABEAS PETITION

It is indisputable that habeas jurisdiction attaches where, at the time of a petition's filing, the petitioner is in custody.  *See* 28 U.S.C. § 2241(c);[3] *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("[Petitioner] was incarcerated . . . at the time the petition was filed, which is all the 'in custody'

---

[2] A disposition of Mr. Zuhair's habeas petition is the only remaining vehicle to challenge the legality of his detention as an enemy combatant.  He can no longer revisit his enemy combatant designation through Detainee Treatment Act review, *see* Detainee Treatment Act 2005 ("DTA"), § 1005(e)(2), Pub. L. No. 109-148, 119 Stat. 2680 (2005), because the D.C. Circuit has found that *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), struck down DTA review.  *See, e.g., Bismullah v. Gates*, 551 F.3d 1068 (D.C. Cir. 2009); *Basardh v. Gates*, 545 F.3d 1068, 1071-72 (D.C. Cir. 2008); *see also* Order, *Zaid v. Gates*, No. 07-1221 (D.C. Cir. Mar. 26, 2009) (dismissing Mr. Zuhair's DTA petition in light of *Bismullah*) (attached as Ex. 1).  In any event, setting aside the question of DTA review's survival, the DTA provides that the court of appeals loses jurisdiction upon a detainee's release from custody.  *Id.* § 1005(e)(2)(D).

[3] The Court of Appeals has held that, in the wake of *Boumediene*, Guantánamo detainees' habeas corpus rights are governed by the federal habeas statute, 28 U.S.C. § 2241.  *See Kiyemba v. Obama*, 561 F.3d 509, 512 n.2 (D.C. Cir. 2009) ("[T]he Court necessarily restored the status quo ante, in which detainees at Guantanamo had the right to petition for habeas under § 2241.").

provision . . . requires.").  Where that statutory precondition for habeas jurisdiction is met at the time of filing, the Court's power to grant relief does not vanish simply because the petitioner is released from physical custody.  *See Carafas v. LaVallee,* 391 U.S. 234, 238-39 (1968) (noting that 28 U.S.C. § 2243 "contemplate[s] the possibility of relief other than immediate release from physical custody" and holding that "once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application").  Rather, a case or controversy persists and the habeas petition is not moot as long as there is "some concrete and continuing injury . . . some collateral consequences" flowing from the unlawful detention.  *Id.* at 237.

Respondents' contention that "[b]ecause Petitioner has been released from U.S. custody, he already has secured the remedy that this Court could provide," Resp'ts' Mot. 3, erroneously suggests that release is the *only* remedy available under habeas.  The only support Respondents offer for this position is a string of unhelpful quotations from *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), in which the Supreme Court affirmed that Guantánamo detainees may challenge their "detention."  *Id.* at 2-3.  But it is sheer nonsense to suggest that *Boumediene*'s affirmation of the detainees' right to challenge their detention is a disavowal of the Court's jurisdiction to grant through habeas anything but release from detention.  Such a view is irreconcilable with— and would require the reversal of—the multitude of cases holding that release from custody does not automatically moot a habeas petition and that courts retain jurisdiction over such petitions where adverse collateral consequences result.  *See, e.g., Spencer*, 523 U.S. at 7.[4]

---

[4] Moreover, this notion is foreclosed by several passages of *Boumediene* itself.  *Cf.* 128 S. Ct. at 2266 ("[R]elease need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted."); *id.* at 2267 (holding that writ "ought to be granted to every man that is committed or detained in prison or *otherwise* restrained of his liberty") (emphasis added); *id.* (holding that "common-law habeas corpus was, above all, an adaptable remedy"); *id.* (noting that "cases of bail and impressment" were included in scope of common-law writ).

CLEARED FOR PUBLIC FILING BY THE CSO

## II. RESPONDENTS BEAR THE BURDEN OF ESTABLISHING THE ABSENCE OF COLLATERAL CONSEQUENCS FROM DETENTION AT GUANTÁNAMO

While Petitioner establishes herein the existence of four distinct sets of collateral consequences, it is worth noting that the burden rests on the Government to disprove their existence.  As a general rule, all litigants asserting mootness bear a "heavy burden."  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000).  But where a habeas petitioner is challenging a past criminal conviction, it is *presumed* that there are collateral consequences sufficient to preserve the petition from mootness even after release from custody.  *See Sibron v. New York*, 392 U.S. 40, 55 (1968) ("[I]n *Pollard* v. *United States*, 352 U.S. 354 (1957), the Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed.").  It is the Government's burden to demonstrate that there is "no possibility" of adverse collateral consequences, *id.* at 57, including "collateral consequences that are remote and unlikely to occur."  *Spencer v. Kemna*, 523 U.S. 1, 8 (1998).  The Government has not even attempted to meet that burden here, as it indeed cannot.

The status determination and ensuing detention that Mr. Zuhair challenges here are the equivalent in every relevant respect to a criminal conviction and, in fact, are far worse than many types of convictions in the collateral consequences that they carry.  Courts have extended the presumption of collateral consequences to misdemeanor criminal convictions for infractions as pedestrian as filing a false complaint for police misconduct.  *See, e.g., Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005) (holding that argument that habeas petitioner who served two-day sentence "is no longer suffering any significant collateral consequences as a result of his misdemeanor criminal conviction" was "foreclosed" because "any criminal conviction" triggers

---

Finally, as the Supreme Court recognized, the writ of habeas corpus enables detainees to "challenge the *legality* of their detention," not merely the *fact* of detention.  *Id.* at 2262 (emphasis added); *see also id.* at 2227.

CLEARED FOR PUBLIC FILING BY THE CSO

*Sibron* presumption), *cert. denied*, 547 U.S. 1128 (2006). Courts have also presumed collateral consequences to flow from convictions for other relatively minor offenses such as disregarding movement restrictions imposed on civilians by a military commander. *See Hirabayashi v. United States*, 828 F.2d 591, 605 (9th Cir. 1987) ("The government contends that 'ordinary misdemeanors have no 'collateral consequences' and therefore are not subject to post-conviction attack absent some special legal disability.' . . . [W]e find no support for such a per se rule and conclude that the case is not moot."). The range of collateral consequences flowing from such unexceptional convictions pale in comparison to what Guantánamo detainees in general, and Mr. Zuhair in particular, suffer.

To be clear, Mr. Zuhair was held for seven years in the world's most notorious maximum-security prison because an executive tribunal—kangaroo court though it may be, *see, e.g., Boumediene v. Bush*, 128 S. Ct. 2229, 2260, 2269-71 (2008)—deemed him a seasoned international terrorist. He was cavalierly declared, by the Secretary of Defense no less, to be "among the most dangerous, best-trained vicious killers on the face of the earth."[5] Against the backdrop of these and other statements, Respondents' claim that Guantánamo Bay detention is not a criminal conviction, but merely a preventative measure, rings hollow. It is also perverse: respondents' refusal to ever charge Mr. Zuhair with a crime, let alone their failure to properly convict him of one, is part of the travesty of his detention, not a basis for denying him relief from its continuing consequences.

Respondents rely on *Spencer* and *Lane v. Williams*, 455 U.S. 624 (1982), for the proposition that courts will not presume that adverse collateral consequences flow from determinations other than criminal convictions. But both of those cases challenged parole

---

[5] Department of Defense News Briefing - Secretary Rumsfeld Media Availability en route to Guantanamo Bay, Cuba (Jan. 27, 2002), *available at* http://www.defenselink.mil/transcripts/ transcript.aspx?transcriptid=2320.

CLEARED FOR PUBLIC FILING BY THE CSO

revocations based on proven conduct subsequent to release, not designation and detention as a prolific terrorist with no process worthy of the name.  Respondents' reliance on *Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006), to argue that the burden is on Mr. Zuhair to show continuing collateral consequences is similarly misplaced.  All of the petitioners in *Qassim* had already been designated "no longer enemy combatants" (NLEC's) prior to their transfer from Guantánamo, a formal finding that dramatically mitigated any collateral consequences stemming from their detention.  The district court recognized that "the government has not stated that these petitioners were ever suspected of having engaged in armed conflict against the United States," *Qassim v. Bush*, 407 F. Supp. 2d 198, 200 (D.D.C. 2005) (Robertson, J.), and the judge further declared that their "indefinite imprisonment at Guantanamo Bay is unlawful."  *Id.* at 201.  Having received two exonerating judgments—first, from the executive's Combatant Status Review Tribunal (CSRT) and then from the district court—the *Qassim* petitioners's cases were dismissed upon transfer because they failed to identify *any* collateral consequence flowing from their detention.[6]  Mr Zuhair's situation, however, is the inverse: he has never received such an exonerating determination and he affirmatively alleges concrete disabilities he suffers as a result.

Just as with a criminal conviction, it is an "obvious fact of life that" seven years of detention in a prison widely touted as a facility for hardened terrorists will "in fact entail adverse collateral legal consequences."  *Sibron*, 392 U.S. at 55.  If there is one class of non-convicts to whom the presumption of collateral consequences should be extended, it is Guantánamo

---

[6] The *Qassim* petitioners advanced only two arguments as to why their habeas petitions were not mooted by transfer. First, they invoked the doctrine that "voluntary cessation" by defendants of their illegal conduct does not moot an action.  *See Qassim v. Bush*, 466 F.3d 1073, 1075 (D.C. Cir. 2006).  But it is well-established that a necessary element of the "voluntary cessation" exception is that the conduct in question have some chance of recurrence against the specific plaintiffs themselves; where there is "no reasonable expectation that the [illegal] conduct will recur," the mootness exception will not apply.  There was no such risk with respect to the petitioners because they had been deemed NLECs.  *Id.* at 1076.  Second, petitioners argued that their claims for injunctive and declaratory relief survived.  *Id.* at 1077.  But, having been designated NLECs, they failed to articulate an ongoing injury that would keep the claim for such relief alive.  *Id.*

CLEARED FOR PUBLIC FILING BY THE CSO

detainees.  That said—and although he does not need to—Mr. Zuhair can affirmatively establish the existence of collateral consequences stemming from his imprisonment at Guantánamo.

### III.  MR. ZUHAIR SUFFERS FROM MULTIPLE COLLATERAL CONSEQUENCES ARISING FROM HIS UNLAWFUL DETENTION AT GUANTÁNAMO

To be cognizable, a collateral consequence must satisfy the twin requirements of causality and redressability.  In the matter at hand, Mr. Zuhair must first "have suffered, or be threatened with, an actual injury traceable" to his designation and detention as an enemy combatant and, second, the injury must be "likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 8 (1998) (quoting *Lewis* v. *Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).  The range of collateral consequences that historically have been recognized as sufficient to sustain post-custodial habeas jurisdiction is broad.  Courts have recognized the sufficiency of collateral consequences ranging from criminal disabilities as part of the parole process (address registration requirements, periodic reporting requirements, and restrictions on travel), *see, e.g.*, *Jones v. Cunningham*, 371 U.S. 236, 241-43 (1963), to civil disabilities (disenfranchisement, disqualification from jury service, disqualification as a union official), *see, e.g.*, *Carafas*, 391 U.S. at 237, to purely stigmatizing status determinations.  *See Demjanjuk v. Petrovski*, 10 F.3d 338, 355-56 (6th Cir. 1993) (stigma of district court finding that petitioner was concentration camp guard was sufficient to preserve habeas petition from mootness).

The doctrine of collateral consequences is not so stringent as to require absolute certainty of injury, nor total susceptibility to judicial correction.  On the contrary, the "mere possibility" that adverse collateral consequences will flow from Mr. Zuhair's unlawful detention is enough to preserve his habeas petition "from ending ignominiously in the limbo of mootness." *Sibron*, 392

CLEARED FOR PUBLIC FILING BY THE CSO

U.S. at 55; *see also DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir. 1993)

(holding that "mere possibility that [collateral] consequences could exist is sufficient to preserve

a live controversy"). Similarly, Mr. Zuhair need only show that a favorable ruling "would at

least partially redress" his injury. *Meese v. Keene*, 481 U.S. 465, 476 (1987). Mr. Zuhair can

show that such a ruling would correct his inability to launch a civil action for damages and to

travel to the United States, as well as erase the stigma of being branded a terrorist and relieve the

restrictions on his liberty that he continues to suffer in Saudi Arabia as a result of his detention at

Guantánamo.

### A. Mr. Zuhair's detention as an enemy combatant statutorily precludes him from bringing a damages action

After more than seven years of unlawful detention and mistreatment, Mr. Zuhair has a

basis for bringing a number of claims against the United States in an action for damages.[7]

However, Petitioner would almost certainly face the argument from the Government that his

"enemy combatant" detention strips courts of jurisdiction to hear any civil damages action he

chooses to pursue. Section 2241(e)(2) of the habeas corpus statute as amended by the Military

Commissions Act, Pub. L. No. 109-366, 120 Stat. 2600, states:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other
> action against the United States or its agents relating to any aspect of the
> detention, transfer, treatment, trial, or conditions of confinement of an alien who

---

[7] Mr. Zuhair's abduction, unlawful detention, mistreatment and torture in custody found multiple causes of action against the United States for violations of the laws of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350; for violations of his constitutional rights, pursuant to *Bivens v. Six Unknown Named FBI Agents*, 403 U.S. 388 (1971); and for violations of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* Such claims need only be colorable and do not require a high probability of success to overcome a motion to dismiss. *See, e.g., Broudy v. Mather*, 460 F.3d 106, 116 (D.C. Cir. 2006) ("In reviewing the dismissal of a complaint under Rule 12(b)(6), we are to accept the allegations of the complaint as true, [and] draw[] all inferences in the plaintiff's favor . . . .") (internal quotation marks omitted). In any event, the level of detail in facts presented over the course of this litigation—in Mr. Zuhair's habeas petition, in the traverse in support thereof, and in emergency motions—is more than sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

> is or was detained by the United States and *has been determined by the United States to have been properly detained as an enemy combatant* or is awaiting such determination.

(emphasis added).[8]  Only a finding by this Court that Mr. Zuhair was not properly detained as an enemy combatant could eliminate this jurisdictional barrier.

As a disability that operates by law and is entirely susceptible to judicial correction, the bar to judicial relief erected by section 2241(e)(2) constitutes a concrete collateral consequence even by Respondents' own pinched definition.  In fact, courts have uniformly held that where establishing the unlawfulness of detention is a prerequisite to pursuing a claim for damages, the habeas petition will not be treated as moot upon release.  *See Bradley v. Evans*, No. 98-5861, 2000 U.S. App. LEXIS 22403, at *13-14 (6th Cir. Aug. 23, 2000) (release from administrative segregation does not moot habeas petition where disposition of petition is necessary to sustain damages action); *Mercer v. Jordan*, No. 94-2639, 1995 U.S. App. LEXIS 36623, at *1 n.1 (7th Cir. Dec. 20, 1995) (where prison discipline board's finding may foreclose damages action, habeas petition contesting finding survives release from custody); *Leonard v. Nix*, 55 F.3d 370, 373 (8th Cir. 1995) (holding that petitioner's release did not moot habeas petition because "if [Petitioner] wins this habeas action, the state becomes vulnerable to his section 1983 damages claim").[9]

---

[8] While Mr. Zuhair maintains that *Boumediene* invalidated all of Section 2241(e), the Government has vigorously disagreed and no Court has yet adopted Petitioner's position.  *See, e.g.*, Resp'ts' Opp. to Pet'r's Emergency Mot. to Compel Immediate Medical Relief 12-16 (dkt. no. 94); *see also Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 117-18 (D.D.C. 2009) (Kessler, J.) (rejecting argument that *Boumediene* invalidated § 2241(e)(2)); *Khadr v. Bush*, 587 F. Supp. 2d 225, 233-36 (D.D.C. 2008) (Bates, J.) (same); *In re Guantanamo Bay Detainee Litigation*, 570 F. Supp. 2d 13, 17-19 (D.D.C. 2008) (Urbina, J.) (same).

[9] *Spencer v. Kemna*, 523 U.S. 1 (1998), is not to the contrary.  The majority in that case did not hold that the inability to sue for damages was not an adequate collateral consequence.  Rather, it disagreed with the petitioner's premise that success on the habeas petition was a prerequisite to filing a § 1983 claim at all.  *Spencer*, 523 U.S. at 17.  The petitioner, whose habeas petition alleged denial of due process in his parole revocation proceeding, attempted to invoke the rule, articulated in *Heck v. Humphrey*, 512 U.S. 477 (1994), that a plaintiff could not launch a damages action where success would render the conviction—or in his case, parole revocation—invalid.  But, as

CLEARED FOR PUBLIC FILING BY THE CSO

**B.  The untested allegations underlying Mr. Zuhair's imprisonment as an "enemy combatant" statutorily bar him from entering the United States**

Respondents' baseless allegations that Mr. Zuhair, *inter alia*, committed terrorist attacks and trained in Al Qaeda-affiliated camps would, if unchallenged, likely bar him from admission into the United States on statutory grounds.  *See* 8 U.S.C. § 1182(a)(3)(B) ("Any alien . . . who has engaged in a terrorist activity . . .  [or] is a member of a [listed] terrorist organization . . .  [or] has received military-type training . . . from or on behalf of [the same] . . . is inadmissible.").[10] There is nothing speculative about this injury: Mr. Zuhair has a son in the United States, *see* Traverse in Support of Ahmed Zuhair's Petition for Writ of Habeas Corpus 10 (dkt. no. 116), and therefore has a compelling reason to seek entry into the United States.

Courts have uniformly found that exclusion from the United States is a sufficient collateral consequence to keep a habeas petition alive.  *See Spencer*, 523 U.S. at 8 (collateral consequences of conviction sufficient to avoid mootness include risk of deportation, exclusion, or denial of naturalization); *Zalawadia v. Ashcroft,* 371 F.3d 292, 298 (5th Cir. 2004) (alien's

---

the majority noted, if the petitioner "were to seek damages for using the wrong procedures, not for reaching the wrong result, and if that procedural defect did not necessarily imply the invalidity of the revocation, then *Heck* would have no application all" and the petitioner would still have a valid claim that survived the dismissal of his habeas action.  *Id.* (internal citations and quotes omitted).

[10] While the grounds for exclusion listed in INA § 212(a)(3)(B) are broader than the conduct necessary to qualify as an enemy combatant, *see* 8 U.S.C. § 1182(a)(3)(B)(i), there would be no basis for exclusion if the Court found that the Government never adduced evidence sufficient to substantiate existing allegations that Mr. Zuhair engaged in terrorist activity.  The hypothetical possibility that the Government may in the future "find" such grounds or other grounds for exclusion does not alter the fact that a favorable judgment by this Court would eradicate an absolute statutory barrier to entry that presently exists.  Again, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original), nor does he need to show that such favorable decision would preclude future exclusion on other, speculative grounds.

Finally, while the Secretary of State or Secretary of Homeland Security, in consultation with each other and the Attorney General, may exempt an individual from the exclusion in the aforementioned statute, *see* 8 U.S.C. § 1182(d)(3)(B)(i), relying on the remote possibility of that intervening discretionary act to argue for the lack of statutory consequence would be akin to invoking the hypothetical possibility of a presidential pardon to defeat the presumption of collateral consequences flowing from a criminal conviction.  *See, e.g. ,Peralta-Cabrera v. Gonzales*, 501 F.3d 837, 843 (7th Cir. 2007) (possibility that Attorney General might waive exclusion rule too speculative and remote to defeat collateral consequences claim).

CLEARED FOR PUBLIC FILING BY THE CSO

dismissed habeas petition presented live case or controversy and was not moot even though he was removed while his appeal was pending, where his removal barred him from seeking reentry into United States for five years); *Zegarra-Gomez* v. *INS.,* 314 F.3d 1124, 1127 (9th Cir. 2003) (custody continued based on inability to return to United States following deportation).[11]

Respondents may argue that Mr. Zuhair's injury is speculative until his application for entry is submitted and denied.  But such an argument would misapprehend the nature of this collateral consequence.  As an initial matter, to suggest that Mr. Zuhair must apply for a visa that he is presently excluded from obtaining before he can claim injury is as absurd as arguing that an ex-convict must travel to and be turned away from the polls before he can claim that a felon-disenfranchisement law is a sufficient collateral consequence to contest his conviction. Moreover, where the collateral consequences are ones that operate by law, courts do not require a petitioner to demonstrate that he had pursued or imminently would claim a privilege that he was statutorily precluded from obtaining.  In *Carafas*, for example, the Supreme Court found that the petitioner's inability to "engage in certain businesses"—including work as a veterinarian, bail enforcement agent, and real estate broker, *see* 391 U.S. 234, 238 & n.4—was a cognizable collateral consequence.  At no point did the petitioner show—nor did the Supreme Court require a showing—that petitioner aspired to work in any of those professions, much less that his application for a license had been denied.  Rather, the Supreme Court found that the statutory bars triggered by his conviction were sufficient to give the petitioner "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him."  *Id.* at 238.

---

[11]  *See also Garcia-Flores v. Gonzales*, 477 F.3d 439, 441 n.1 (6th Cir. 2007); *Alwan v. Ashcroft*, 388 F.3d 507, 511 (5th Cir. 2004); *Leitao v. Reno*, 311 F.3d 453, 456 (1st Cir. 2002); *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002); *Chong v. Dist. Dir., I.N.S.*, 264 F.3d 378, 385-86 (3d Cir. 2001); *Tapia Garcia v. I.N.S.*, 237 F.3d 1216, 1218 (10th Cir. 2001).

CLEARED FOR PUBLIC FILING BY THE CSO

It does not matter that entry into the United States is "a privilege . . . granted to an alien only upon such terms as the United States shall prescribe," as opposed to a constitutional right. *Kiyemba v. Obama*, 555 F.3d 1022, 1027 (D.C. Cir. 2009). Nor does it matter that, unlike the petitioners in the aforementioned court of appeals cases, Mr. Zuhair has never resided in the United States and cannot claim a right of reentry. The relevant question here is not whether the petitioner is denied a "right," but whether he suffers a disability that is imposed by law and can be redressed by court order. Thus, a legally prescribed denial of a privilege is no less of a collateral consequence than the legally prescribed denial of a right for the purposes of satisfying the continuing case-and-controversy requirement. This conclusion follows inexorably from the Court's judgment in *Carafas*. That case did not hold that the aforementioned civil disabilities were collateral consequences because the petitioner had a statutory or constitutional right to possess a veterinary or real estate broker license, but because the fact of conviction erected an immovable statutory barrier that disqualified him from ever obtaining one. Similarly, it is the fact that Mr. Zuhair's detention categorically forecloses any possibility that he might obtain a visa to visit his son that evinces his "personal stake in the outcome" of his habeas petition and saves his petition from mootness. *Spencer*, 523 U.S. at 7.

## C. Mr. Zuhair continues to suffer from the stigma of having been imprisoned as an "enemy combatant"

The stigma attached to Mr. Zuhair as a result of his detention as an enemy combatant is profound and far-reaching. The acts of which he was publicly accused by the U.S. government—detonating a car bomb in a civilian area, participating in the U.S.S. Cole bombing, involvement in the murder of a U.S. national, and training in Al-Qaeda-affiliated camps in Afghanistan—carry an opprobrium incomparably greater than most garden-variety felonies. For

CLEARED FOR PUBLIC FILING BY THE CSO

seven years, ostensibly based on those accusations, he was detained in the world's most infamous prison, a place consistently characterized by the highest-ranking U.S. government officials as filled with dangerous terrorists:

> "[Guantánamo detainees are the] worst of the worst;"[12]

> "[The prisoners are] among the most dangerous, best-trained vicious killers on the face of the earth;"[13]

> "[T]hese are people that would gnaw through hydraulic lines in the back of a C-17 to bring it down . . . these are very, very dangerous people, and that's how they're being treated;"[14]

> "These are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others;"[15]

> "Keep in mind that these are hardened terrorists picked up overseas since 9/11 . . . I think the President will find, upon reflection, that to bring the worst of the worst terrorists inside the United States would be cause for great danger and regret in the years to come."[16]

Mr. Zuhair in particular has continued to have his reputation damaged in the media due to these baseless allegations. *See, e.g.*, Henry Chu, *Europeans Balk at Taking Guantanamo Inmates for Unwilling U.S.*, L.A. TIMES, June 13, 2009 (attached as Ex. 2) (repeating allegations that Mr. Zuhair murdered U.S. national William Jefferson and participated in U.S.S. Cole bombing).[17]  These allegations have continued to circulate and fester online. *See, e.g.*, Thomas

---

[12] Katharine Seeley, *Some Guantanamo Prisoners Will Be Freed, Rumsfeld Says,* N.Y. TIMES, Oct. 23, 2002, *available at* http://query.nytimes.com/gst/fullpage.html?res= 9800EFD7143CF930A15753C1A9649C8B63.

[13] Department of Defense News Briefing - Secretary Rumsfeld Media Availability en route to Guantanamo Bay, Cuba (Jan. 27, 2002), *available at* http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=2320.

[14] Department of Defense News Briefing - Secretary Rumsfeld and Gen. Myers (Jan. 11, 2002), *available at* http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=2031.

[15] Department of Defense News Briefing - ASD PA Clarke and Rear Adm. Stufflebeem (Jan. 28, 2002), *available at* http://www.defenselink.mil/transcripts/transcript.aspx?transcriptid=1041.

[16] Richard Cheney, Remarks at the American Enterprise Institute, May 21, 2009 at 10, available at http://www.aei.org/docLib/Vice%20President%20Cheney%20Remarks%205%2021%2009.pdf

[17] The parties in this case filed a joint stipulation publicly disclosing that Respondents withdrew the allegations concerning the Jefferson murder in October 2008. *See* Joint Stipulation Regarding Withdrawn Allegation (dkt. no.

CLEARED FOR PUBLIC FILING BY THE CSO

Joscelyn, *Convicted Car Bomber and Likely Murderer Transferred from Gitmo to Saudi Arabia*, THE WEEKLY STANDARD (online ed.), June 12, 2009 (attached as Ex. 3); *Why Does Obama Hate Our Troops?*, THELOUDTALKER.COM, June 14, 2009 (attached as Ex. 4).   And far from remaining on the fringe of the internet, the allegations have been repeated in the United States Senate.  *See Oversight of the Justice Department: Hearing Before the S. Judiciary Comm.,* 111th Cong. (2009) (statement of Sen. Sessions) (excerpts attached as Ex. 5) ("Zuhair is allegedly responsible for the murder of William Jefferson, a U.S. citizen and diplomat, in 1995, planting a car bomb in the Mostar, Bosnia in 1997, and the involvement with the attack on the U.S.S. Cole.").

Respondents are simply incorrect in arguing that non-statutory consequences such as reputational injury do not constitute legally cognizable collateral consequences.  To keep the habeas petition alive, Mr. Zuhair need only show a "mere possibility" that he will suffer a collateral consequence, *Sibron*, 392 U.S. at 55, and that a favorable outcome "would at least partially redress" his injury.  *Meese*, 481 U.S. at 476.  Thus, while any statutory consequences— or "civil disabilities"—which flow from detention *automatically* qualify as cognizable collateral consequences, *see Lane,* 455 U.S. at 631-33; *Carafas*, 391 U.S. at 237-38, courts have also found that non-statutory injuries that might be ameliorated by judicial order are sufficient to preserve a habeas petition after release.  *See, e.g., Minnesota v. Dickerson*, 508 U.S. 366, 371 n.2 (1993) (possibility that Department of Public Safety might consider dismissed charge in determining whether to bring future charges against petitioner preserves petition from mootness); *Evitts v. Lucey*, 469 U.S. 387, 391 (1985) (possibility that challenged conviction could be "used to impeach [convict's] testimony . . . in a future proceeding" preserves petition from mootness);

---

206).  Nevertheless, this stipulation was filed over two weeks after Mr. Zuhair's repatriation—after much of the damage to his reputation was exacerbated by the media.

CLEARED FOR PUBLIC FILING BY THE CSO

*McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. of the United States*, 264 F.3d 52 (D.C. Cir. 2001) ("[I]njury to reputation can . . . suffice for purposes of constitutional standing.").[18]

In particular, courts have found that a stigma resulting from status determinations of similar enormity is sufficient to maintain standing and warrant relief in habeas. For example, in *Demjanjuk*, the Sixth Circuit Court of Appeals relied on established habeas law in ruling that Demjanjuk's acquittal and release in Israel did not moot his claim of unlawful extradition from the United States. *See Demjanjuk*, 10 F.3d at 355-56. Specifically, the Court of Appeals recognized the stigma that inhered to the district court's finding that Demjanjuk had been a brutal Nazi prison guard. *Id.* Courts have also found that a stigma arising from standing accused of certain types of crimes can constitute a "collateral consequence" sufficient to keep a case alive. *See, e.g., White v. White*, 925 F.2d 287, 290 (9th Cir. 1991) (habeas case not moot because of prospect of "possible employment discrimination" in future resulting from "stigma of a sexual contact with a minor charge"). The stigmatizing consequences of imprisonment at Guantánamo—which manifest themselves in myriad ways, from reputational injury to damage to

---

[18] *See also Meese v. Keene*, 481 U.S. 465, 475 (1987) (film distributor had standing to challenge law requiring that he label certain movies "political propaganda" because doing so carried "a risk of injury to his reputation and of an impairment of his political career"); *Riggs v. City of Albuquerque*, 916 F.2d 582, 585 (10th Cir. 1990) (finding standing where government surveillance program could result in "injury to [plaintiffs'] personal, political, and professional reputations"); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 552 (9th Cir. 1989) (holding that because of government surveillance "support for the [plaintiff] churches has declined" and they "have suffered harm analogous to the 'reputational' or 'professional' harm that was present in *Keene*. . . . Clearly, this [type of] injury to the churches can 'fairly be traced' to the INS' conduct."); *Clark v. Library of Cong*., 750 F.2d 89, 93 (D.C. Cir. 1984) (worker had standing to sue government employer for triggering FBI investigation into worker's political associations where investigation cost him employment opportunities); *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975) (high school student had standing to seek expungement of FBI file linking her with "subversive material" because of mere potential that file would harm her future educational and employment opportunities); *Airline Pilots' Assoc. Int'l v. DOT*, 446 F.2d 236, 240-42 (5th Cir. 1971) (FAA administrative determination that planned highrise buildings posed air hazard, which had no impact in law other than "moral suasion," was justiciable on grounds of stigmatic impact).

CLEARED FOR PUBLIC FILING BY THE CSO

future employment prospects to continued restrictions on freedom—more than meet this standard.

None of the authority cited by the Government establishes the contrary.  Respondents rely on *St. Pierre v. United States*, 319 U.S. 41, 43 (1943) (per curiam) for the notion that "the moral stigma of a judgment which no longer affects legal rights does not present a case or controversy."  Resp'ts' Mot. 6.  That statement is patently incompatible with the many cases cited herein and, in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the Supreme Court declared it dead-letter, recognizing that "this Court has long since departed from the rule announced in *St. Pierre*."  *Id.* at 109 (citing *Sibron v. New York*, 392 U.S. 40 (1968); *Street v. New York*, 394 U.S. 576 (1969); *Carafas v. LaVallee*, 391 U.S. 234 (1968); and *Ginsberg v. New York*, 390 U.S. 629 (1968)).  Indeed, within three years of *St. Pierre*, the Supreme Court had noted that an alien in similar circumstances could suffer cognizable immigration consequences as a result of his conviction, and naturalization consequences as a result of what a conviction implied about his "good moral character."  *Fiswick v. United States*, 329 U.S. 211, 222 (1946).

Respondents' reliance on *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. of the United States*, 264 F.3d 52 (D.C. Cir. 2001), is equally inapposite.  Contrary to Respondents' contention that reputational injury is insufficient, the D.C. Circuit Court of Appeals explicitly acknowledged that "injury to reputation can . . . suffice for purposes of constitutional standing."  *Id.* at 57 (citing *Meese,* 481 U.S. at 475).  That case involved a censured judge who was challenging both his reprimand and two suspensions that had expired.  The Court dismissed the judge's challenge to the two suspensions on the grounds that the real injury to reputation—and the only one susceptible to judicial correction—resulted from the reprimand itself and that the marginal "continuing reputational effects

CLEARED FOR PUBLIC FILING BY THE CSO

[imposed by the suspensions] *on top of* the defendants' express reprimand" were insufficient to preserve standing. *Id*. at 58 (emphasis added). Respondents cherry-pick language from the portion of the decision dismissing the judge's challenge to the two suspensions, but they conveniently gloss over the court's ultimate finding: that the reprimand—which, like the accusations against Mr. Zuhair, was easily accessible online—inflicted enough damage to the judge's "reputation [to] preserve[] . . . [it] from mootness and afford[] standing." *Id*.

The Government also interprets *Idema v. Rice*, 478 F. Supp. 2d 47 (D.D.C. 2007), to mean that reputational harm can never suffice as a collateral consequence. But that case differed in one crucial respect from the instant matter: the petitioner in that case was convicted by an Afghan court, and alleviating the damage to his reputation would have required this Court to reach beyond its authority and declare void the judgment of the foreign tribunal. *Id.* at 52. Mr. Zuhair does not ask this Court to second-guess or pass judgment on a foreign sovereign's determination. The designation which Mr. Zuhair seeks to have declared void was one rendered by the Executive branch of the U.S. government and is well within the Court's authority to invalidate.

### D. Mr. Zuhair remains in indefinite detention in Saudi Arabia because of his imprisonment at Guantánamo

Mr. Zuhair remains detained without charge in Saudi Arabia, with no clear sign of when he will be freed, more than seven years after his original abduction in Pakistan. Although the pressure exerted by this Court's deadline for a merits hearing undoubtedly sped Mr. Zuhair's transfer to improved conditions of detention in Saudi Arabia, he is far from free. Respondents claim that Mr. Zuhair's disposition is at the "sole discretion of the Saudi authorities." Resp'ts' Mot. 9. Even if this were true, Respondents do not and cannot deny that Mr. Zuhair would not

17

CLEARED FOR PUBLIC FILING BY THE CSO

be detained by Saudi authorities at all, but for his detention at Guantánamo and the conditions imposed by U.S. authorities as part of his transfer.

Mr. Zuhair's ongoing detention by Saudi authorities is not a causally separate event, akin to the subsequent rejection of a job application or even the revocation of parole. Rather, it is a condition imposed by the U.S. government *as part of his transfer*.[19]  Moreover, but for Mr. Zuhair's detention as an enemy combatant at Guantánamo, the government of Saudi Arabia would not have placed Mr. Zuhair in its custodial program established for returning detainees. Continued indefinite detention is hardly a hypothetical or speculative harm: Mr. Zuhair has already spent seven weeks in detention and, on information and belief, the previous group of Saudi returnees sent home from Guantánamo in December 2007 remains in Saudi custody. A judicial finding that Mr. Zuhair should never have been held at Guantánamo to begin with will persuade Saudi authorities that there is no reason to continue to hold him in their custody.

The Court has jurisdiction to cure this injury.  As another member of this bench recognized in *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) (Bates, J.), any "analysis of the 'in custody' language of the habeas statute must start with the proposition that the Supreme Court has 'very liberally construed the 'in custody' requirement for purposes of federal habeas.'" *Id.* at 49 (quoting *Maleng v. Cook*, 490 U.S. 488, 492 (1989)); *see also Peyton v. Rowe*, 391 U.S. 54, 65 (1968) (holding that "in custody" requirement of habeas statute "should be liberally construed" because of remedial goals of statute).  In *Abu Ali*, the petitioner alleged that he was

---

[19] Conditions imposed on transfer are indistinguishable from the sorts of conditions of supervised release that the Supreme Court has repeatedly held to constitute "custody" for purposes of establishing habeas jurisdiction. *See Hensley v. Municipal Court, San Jose-Milpitas Judicial Dist.*, 411 U.S. 345, 349 (1973) (pre-trial release); *Jones v. Cunningham*, 371 U.S. 236, 241-43 (1963) (parole conditions including address registration requirements, periodic reporting requirements, and restrictions on travel); *United States v. Trotter*, 270 F.3d 1150 (7th Cir. 2001) (possibility of shortening period of supervised release sufficient to support jurisdiction); *Barry* v. *Bergen County Prob. Dep't,* 128 F.3d 152, 159 (3d Cir. 1997) (community service conditions as form of custody).  Conditional release is, for purposes of determining whether habeas jurisdiction continues, the equivalent of no release at all.

detained in a foreign prison due to the actions of the United States.[20]   The U.S. government

argued that jurisdiction could only attach if a U.S. official was the "immediate custodian" or,

alternately, where the petitioner was in the "actual physical custody of a United States official."

350 F. Supp. 2d at 42, 46.     The Court rejected this view, finding it "as striking as it is

sweeping.  The full contours of the [Government's] position would permit the United States, at

its discretion and without judicial review, to arrest a citizen of the United States and transfer her

to the custody of allies overseas in order to avoid constitutional scrutiny . . ."  *Id.* at 40.   The

Court found that the Government's "immediate custodian" arguments were foreclosed by

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004), and *Rasul v. Bush*, 542 U.S. 466 (2004), *see Abu Ali*,

350 F. Supp. 2d at 42-45, and found the "actual physical custody" argument foreclosed by the

terms of the habeas statute itself, *id.* at 46-47, and the tradition of broad judicial interpretation of

that statute:

> In summary, then, given the accepted breadth of the habeas statute, the imperative
> to construe the "in custody" requirement expansively in favor of the petitioner and
> without regard for formalisms, the absence of any language in the text that carves
> out an exception where the physical custodian is a foreign body, the many
> circumstances in which habeas jurisdiction has been found where the individual
> was not in the immediate possession of the respondent, and the decisions in which
> habeas jurisdiction was found when the executive or some other government
> official was working through the intermediary of a State (*Braden*), a private
> individual (*Jung Ah Lung*) or a private corporation (*Stokes*), the Court cannot find
> any basis in the habeas statute for denying jurisdiction merely because the
> executive is allegedly working through the intermediary of a foreign ally.

*Id.* at 49.

---

[20]  Although, unlike Mr. Zuhair, the petitioner in *Abu Ali* was a U.S. citizen, the Court did not consider his
citizenship status in analyzing whether he was *in custody* for purposes of the Great Writ.  That question turned on
evidence of the conduct and agreements between the United States and Saudi Arabia.  To the extent that there was
any doubt at the time the *Abu Ali* decision issued whether habeas extended to non-citizens outside the sovereign
United States, that issue was subsequently resolved by *Boumediene*.

CLEARED FOR PUBLIC FILING BY THE CSO

Respondents claim that *Al Joudi v. Bush*, No. 05-cv-0301, 2008 U.S. Dist. LEXIS 23374 (D.D.C. Mar. 26, 2008) (Kessler, J.), *Munaf v. Geren*, 128 S. Ct. 2207 (2008), and *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), establish that continued detention as a result of U.S. government actions or conditions is "beyond the control of this Court." Resp'ts' Mot. 7-9.   Mr. Zuhair respectfully submits that the district court erred in *Al Joudi*.   That ruling is inconsistent with the aforementioned cases and—perhaps because the petitioner in that case never briefed the issue—it fails to treat detention as an enemy combatant as analogous to a criminal conviction, thereby shifting the burden onto the Government to disprove the existence of collateral consequences.

This Court, however, is not bound by *Al Joudi* because "[d]istrict [c]ourt decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district."   *In re Executive Office of the President,* 215 F.3d 20, 24 (D.C. Cir. 2000) (internal citations omitted). As for *Munaf* and *Kiyemba*, neither remotely establishes that detention by a foreign sovereign resulting from U.S. actions or conditions is not a collateral consequence.   Respondents are correct that *Munaf* precludes courts from second guessing foreign justice systems, but Mr. Zuhair seeks no such declaration.   Rather, he seeks a determination by this Court that the *U.S. government* improperly detained him.   *Kiyemba* is similarly inapposite.   The Court of Appeals' judgment that there was no reason to suspect that transfer was a "ruse—and a fraud on the court—designed to maintain the control over the detainees beyond the reach of the writ," 561 F.3d at 515 n.7, was limited to affidavits submitted in that particular case.   Importantly, the petitioners in that case were the Uighurs whom, unlike Mr. Zuhair, the Executive had long-since conceded were improperly detained and, consequently, presumably had no incentive to impose further liberty-restricting conditions on them.

CLEARED FOR PUBLIC FILING BY THE CSO

At a minimum, if this Court finds that the evidence in the record is insufficient to establish that Mr. Zuhair's detention continues as a result of U.S. determinations or conditions, it should order jurisdictional discovery. Courts have ordered such discovery to ascertain the extent of U.S. control over the continued custody of individuals held overseas. *See Abu Ali,* 350 F. Supp. 2d at 30 (petitioner entitled to "expeditious jurisdictional discovery . . . to further explore [his] contentions" that he was held at "the behest and ongoing supervision" of American officials); *accord United States v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (Huvelle, J.) (finding non-citizen defendants "entitled to evidence that may demonstrate cooperation between the United States and Rwandan governments sufficient to reveal an agency relationship"); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 155 (D.D.C. 1976) (holding, in case where U.S. citizens in Germany alleged that U.S. Army induced West German authorities to wiretap them, that plaintiffs were "entitled to discovery of facts which would demonstrate that the [West German government] simply carries out the suggestions of the United States Army without meaningful review"); *see also Prakash v. American Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984) (district court possesses "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction").

CLEARED FOR PUBLIC FILING BY THE CSO

## CONCLUSION

For the reasons set forth above, this Court should deny Respondents' Motion to Dismiss forthwith and reschedule a merits hearing in this case.

Dated: August 3, 2009

Respectfully submitted,

_____/s/_____
Ramzi Kassem
*Supervising Attorney*

Immigrant & Refugee Rights Clinic
CUNY School of Law
65-21 Main Street
Queens, NY 11367
(718) 340-4558
ramzi.kassem@mail.law.cuny.edu

Anand Balakrishnan
Jessica Chen
Darryl Li
Joseph Pace
Garth Schofield
*Law Student Interns*

National Litigation Project
Allard K. Lowenstein International Human
    Rights Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511

*Counsel for Petitioner*

CLEARED FOR PUBLIC FILING BY THE CSO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 3, 2009, I caused a true and accurate copy of Petitioner's Opposition to Respondents' Motion to Dismiss as Moot the Petition for Writ of *Habeas Corpus* to be served upon the following counsel for Respondents by electronic filing via the Court's ECF system:

Timothy Laffredi, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530

___/s/_____
RAMZI KASSEM
Immigrant & Refugee Rights Clinic
CUNY School of Law
65-21 Main Street
Queens, NY 11367
(718) 340-4558
ramzi.kassem@mail.law.cuny.edu

23

Exhibit 1

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 07-1221                              **September Term 2008**

**CSRT-ISN-669**

**Filed On:** March 26, 2009

Ahmed Zaid, et al.,

    Petitioners

    v.

Robert M. Gates, U.S. Secretary of Defense,

    Respondent

    **BEFORE:**   Ginsburg, Rogers, and Garland, Circuit Judges

## O R D E R

Upon consideration of the motion to dismiss and the response thereto, and the unopposed motion for leave to proceed in forma pauperis, it is

**ORDERED** that the motion for leave to proceed in forma pauperis be granted.  It is

**FURTHER ORDERED** that this petition be dismissed without prejudice for lack of subject matter jurisdiction.  See Bismullah v. Gates, 551 F.3d 1068 (D.C. Cir. 2009).

The Clerk is directed to note on the docket that all remaining matters pending in this case are terminated.  Any information submitted to the court for designation as protected information will remain under seal in accordance with § 7.A. of the Protective Order entered in this case.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc.  See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/ Ken R. Meadows
       Deputy Clerk

Exhibit 2





http://www.latimes.com/news/nationworld/world/la-fg-eu-guantanamo13-2009jun13,0,6313483.story
From the Los Angeles Times

## Europeans balk at taking Guantanamo inmates for unwilling U.S.

**U.S. officials trying to relocate detainees face skepticism from EU nations, who want to know why the U.S. can't taken them itself if they pose no risk.**
By Henry Chu

June 13, 2009

Reporting from London — If you won't take them, why should we?

That question has ricocheted across Europe as the Obama administration tries to fulfill its promise to shut down the detention center at Guantanamo Bay, Cuba. Though Europeans laud that goal, many countries in the region remain skeptical about taking in former inmates, especially as the United States appears increasingly unwilling to allow any within its borders.

That unwillingness is apparent as the U.S. and the European Union engage in delicate talks over the issue, negotiations that some observers say could produce procedural guidelines on resettling detainees and a joint announcement as early as Monday.

Last week, Martin Pecina, the interior minister of the Czech Republic, which holds the EU presidency, said that the 27-nation bloc might admit "several dozen" former prisoners, with decisions left up to each country. Because of freedom of movement across the EU, governments would share intelligence and coordinate security to ensure that none of the detainees pose a threat.

But comments by German Interior Minister Wolfgang Schaeuble illustrate just what a hard sell it is for Washington.

"If none of the U.S. states are ready to take in Guantanamo inmates, then you will have to explain to the European public why the rules for Europe should be different from those in the U.S.," Schaeuble said last week.

Germany, the most populous country in the union, has proved to be one of the most resistant to accepting prisoners from Guantanamo, although it has been one of the most vocal in saying that the facility ought to be shuttered. More than 200 people are still being held at the detention center, which became a symbol for many Europeans of what they perceived as the Bush administration's disregard for human rights and international norms of justice and due process.

German news media reported Friday that the government of Chancellor Angela Merkel had turned down, at least for now, a U.S. request to accept two detainees, identified as a Syrian and a Tunisian.

Information provided by the U.S. about the two men was too scanty for Germany to accede to the request, the Sueddeutsche Zeitung newspaper reported. It said Germany had three tests for admission: the person is not deemed a security threat, he can't be repatriated to his home country or sent to the U.S., and there is a good reason for him to be relocated to Germany.

Berlin had already declined to allow in a group of Uighur detainees, despite a large Uighur population in southern Germany.

The Uighurs are a Muslim, Turkic-speaking people of western China; any of the prisoners sent back there are liable to face prosecution by the Beijing government for alleged separatist activity. Some of the Uighurs from Guantanamo are being resettled on islands: in Bermuda in the Atlantic and in the Pacific archipelago nation of Palau.

In Washington, the Justice Department said Friday that three more Guantanamo detainees had been transferred.

The detainees were sent back to Saudi Arabia, their home country, where officials will review their cases before sending them to a rehabilitation program. One of them was identified as Ahmed Zuhair, a relatively high profile detainee who, has been protesting his detention since 2005 through a hunger strike and has been force-fed liquid nutrients.

During a hearing in Guantanamo in October 2004, Zuhair was accused of involvement in the 1995 killing in Bosnia-Herzegovina of William Jefferson, a U.S. official with the United Nations. At the tribunal, U.S. officials said Jefferson's watch was found on Zuhair.

Zuhair also was convicted in absentia by a Bosnian court in a 1997 car bombing in the town of Mostar. He also allegedly told another detainee he was involved in the bombing of the U.S. destroyer Cole in 2000, according to evidence presented at a Guantanamo proceeding.

European countries such as Britain, France and Spain have already taken in former Guantanamo detainees, who were often citizens or residents of those nations. Italy, Portugal and Belgium have also said that they would consider taking former inmates.

"Thanks to its experience with mafia bosses detained in maximum-security prisons, Italy can guarantee appropriate structures," said Paola Severino, a professor of criminal law at LUISS Guido Carli University in Rome.

After last week's meeting of EU interior ministers, Pecina of the Czech Republic emphasized that "the primary responsibility for finding solutions to

this problem and for the placement of the persons released lies above all with the United States."

Also under discussion is whether Washington will contribute toward the cost of resettling the former inmates.

And London complained that it was not consulted in the decision to send four Uighurs to Bermuda, which comes under British control in the realm of defense and foreign policy.

henry.chu@latimes.com

Janet Stobart of The Times' London Bureau and Times staff writers Maria de Cristofaro in Rome and Julian E. Barnes in Washington contributed to this report.

---

If you want other stories on this topic, search the Archives at latimes.com/archives.

**TMSReprints**

Article licensing and reprint options

Copyright 2009 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help
partners:

Exhibit 3

Log-In Email:
Password:
LOG IN    ☑ Remember me
Register | Forgot Password?
Change Password | Update Email

**CONTRIBUTORS**

Editor (on leave):
**Michael Goldfarb**

Deputy Editors:
**John McCormack**
**Samantha Sault**

Contributors:
**Jennifer Chou**
**Brian Faughnan**
**Ulf Gartzke**
**Mary Katharine Ham**
**Reuben F. Johnson**
**Thomas Joscelyn**
**Stuart Koehl**
**John Noonan**
**Bill Roggio**

**SEARCH**

Search this blog:
[        ]  Search

**ARCHIVES**

- June 2009
- May 2009
- April 2009
- March 2009
- February 2009
- January 2009
- December 2008
- November 2008
- October 2008
- September 2008
- August 2008
- July 2008
- June 2008
- May 2008
- April 2008
- March 2008
- February 2008
- January 2008
- December 2007
- November 2007
- October 2007
- September 2007
- August 2007
- July 2007
- June 2007
- May 2007
- April 2007
- March 2007
- February 2007
- January 2007
- December 2006
- November 2006
- October 2006
- September 2006
- August 2006
- July 2006
- June 2006
- May 2006
- April 2006
- March 2006
- February 2006
- January 2006
- December 2005
- November 2005
- October 2005
- September 2005





« Nominee for Army's Top Lawyer, Tied to Fannie Mae, Withdraws | The Blog home page | AP Not Reading Their Own Files »

## Convicted Car Bomber and Likely Murderer Transferred from Gitmo to Saudi Arabia

Early Friday evening, the Obama administration announced the transfer of Ahmed Zuhair and two other native Saudis into the custody of the Saudi Kingdom. The Department of Justice's press release did not say why Zuhair was transferred. But, then again, there is much missing from the DOJ's off-hours announcement.

The DOJ press release did not point out that Zuhair is, in all likelihood, an al Qaeda-affiliated terrorist who murdered an American. Also missing from the DOJ's press release is the fact that Zuhair has already been convicted in absentia by the Bosnian Supreme Court for his involvement in a 1997 car bombing. There is also some evidence, based on the U.S. government's files created at Gitmo, that Zuhair played a role in the October 2000 USS *Cole* bombing. There is much less certainty about Zuhair's role in the *Cole* bombing, however.

Zuhair was one of hundreds, perhaps thousands, of mujahedin who traveled to Bosnia to wage jihad in the 1990s. In 1995, he was one of two terrorists who, according to U.S. intelligence authorities and at least one other top expert, murdered an American named William Jefferson.

At the time, Jefferson was working for the UN as a diplomat. Jefferson's watch was found in Zuhair's possession when he was eventually captured and shipped to Gitmo. Bosnian authorities, who were duplicitous in their dealings with the mujahedin, did not arrest anyone for Jefferson's murder. And the Clinton administration reportedly did not pursue it with any great urgency either.

Nevertheless, as John R. Schindler notes in his book *Unholy Alliance*, Zuhair was "was at least an accomplice" in Jefferson's murder. One of Zuhair's fellow terrorists may have been the actual triggerman in the operation, but Zuhair certainly participated in the shooting. Schindler's assessment is important because he was one of the National Security Agency's top Balkan experts for years, before leaving to become a professor of strategy at the Naval War College.

U.S. intelligence authorities at Guantanamo also think that Zuhair was responsible for Jefferson's murder. Zuhair "is believed to be responsible for the firearm murder of a U.S. person, William Jefferson, on 21 November 1995 in Tuzla, Bosnia-Herzegovina," one memo prepared for Zuhair's case at Guantanamo notes.

Zuhair's reign of terror did not begin in 1995. Schindler reports:

> [Zuhair] was reported to have participated in massacres of Croatian civilians during the war, and a witness fingered [Zuhair] as one of the mujahidin who had attacked her village in September 1993; the Saudi had threatened to kill her fourteen-year-old son with a knife.

Zuhair's terror spree did not end in 1995 either.

According to Evan Kohlmann's book *Al Qaida's Jihad in Europe*, Zuhair was arrested and detained by Bosnian authorities for "possessing three illegal machine-guns" in January 1996. Kohlmann notes that Zuhair was "inexplicably" pardoned for this offense on May 27, 1997.

Then, just a few months later in September 1997, Zuhair masterminded a car bombing in Mostar, Bosnia. The bomb "damaged many buildings and injured dozens of people," according to the U.S. government's files created at Guantanamo. According to Kohlmann, the bombing was attributed to Al Gama'at al Islamiyya, the al Qaeda-affiliated terrorist organization run by Sheikh Omar Abdel Rahman (aka "the Blind Sheikh"). Thus, Zuhair worked with known al Qaeda-affiliated terrorists to execute the attack.

On April 18, 2000, Zuhair was sentenced in absentia to 12 years in prison by the Bosnian Supreme Court for the car bombing. Zuhair was a fugitive at the time, so he served no time for the bombing.

Case 1:04-cv-01254-RCL   Document 676   Filed 11/10/09   Page 36 of 58

**CONTACT**

wws@weeklystandard.com

**CATEGORIES**

- 2008
  - Polling
- 2010
- 2012
- Art
- Africa
- Aviation
- Breaking News
- Bush
- Civil Rights
- Conservatism
- Cuba
- Daily Blog Buzz
- Defense
- East Asia/Pacific
  - China
  - The News From China
- Economy
- Election 2008
  - Congressional Races
- Energy
- Entertainment
- Environment
- Eurasia
- Europe
  - France
  - Germany
  - The News From Russia
- Fashion
- GWOT
  - Afghanistan
  - Iraq
  - Somalia
- General
  - Required Reading
  - Sunday Shows
- Georgia
- Giuliani
- Guantanamo
- Immigration
- Inauguration
- Intelligence
- Latin America/Caribbean
- Media
- Middle East
  - Iran
  - Iraq War News
- Minnesota Recount
- North America
- North Korea
- Obama
- Obama Transition
- Pakistan
- Palin
- Paris Air Show
- Politics
- Quotables
- Recommended Reading
- South Asia
- Sports
- Supreme Court
  - Supreme Court
- Technology
- The Hill
- Transparency
- United Nations
- Video Blog
- Wall Street

Feeds: Atom | RSS
[What is this?]

Zuhair was finally arrested in Pakistan by U.S. authorities in 2002. He was then sent to Gitmo.

At some point during his time at Gitmo, Zuhair admitted that he played a role in the USS *Cole* bombing to another detainee. "The detainee [Zuhair] admitted to another detainee that he was involved in the planning of the attack on the USS Cole," one Gitmo file reads. The summary of evidence memo prepared for Zuhair's combatant status review tribunal notes: "The detainee was involved in the USS Cole bombing."

It is not known, however, if Zuhair's admission was mere bluster, or if he really was involved in the attack on the *Cole.* The government's files do not cite any other evidence connecting Zuhair to the attack.

Nevertheless, Zuhair is a known terrorist with many ties al Qaeda. U.S. intelligence authorities believe that he is an ultra-strict Takfiri, the most radical type of zealot to serve al Qaeda. Takfiris not only hate the West, they also direct their anger at any Muslims they perceive as not living up to their radical creed.

That may explain why Zuhair, who has had multiple disciplinary problems at Gitmo, has been on a hunger strike for years. He is the type of committed jihadist who will do anything to defy the infidel U.S.

The Department of Justice says that Zuhair's transfer took place "under appropriate security measures." The DOJ reports:

> All individuals transferred to Saudi Arabia are subject to judicial review in Saudi Arabia before they undergo a rehabilitation program. While in a rehabilitation program, they will be under the control of the Saudi Government. The U.S. and Saudi Governments are working closely together on all matters related to the transfer of Saudi detainees from Guantanamo to Saudi Arabia.

But the Saudi rehabilitation program recently returned at least eleven former Gitmo detainees back into al Qaeda's ranks. The program is not nearly as effective as once claimed. And if the plan is for Zuhair to enter the program, then there are good reasons for concern.

Zuhair long ago set down his violent path. There is no reason to think that the Saudis can change his mind. And during his terror spree in Bosnia he and his co-conspirators were definitely tied to the Saudi High Commission, a charity with deep ties inside both the Kingdom and al Qaeda.

The DOJ's press release notes that Zuhair was approved for transfer by the Bush administration. But, of course, he wasn't transferred under the Bush administration, which made its own mistakes in transferring detainees. And, of course, a mistake by the Bush administration does not justify a mistake by the Obama administration.

Posted by Thomas Joscelyn on June 12, 2009 09:00 PM | Permalink

Email the article Convicted Car Bomber and Likely Murderer Transferred from Gitmo to Saudi Arabia to a friend:

Send this article to:

Your email address:

Message (optional):

Send

Back to The Blog home page

Exhibit 4

- Curmudgeons Corner
- Day By Day Cartoon
- Glenn Beck
- Gryphon's Cry
- Heritage Foundation
- Hot Air
- Jeidub's Retreat
- Laura Ingraham
- Little Green Footballs
- Michelle Malkin
- Neil Boortz
- Rightwing Nuthouse
- The Liberator Today
- The US Report
- Thoughts Aloud
- Town Hall

« Are libs/mods seeing the light now?
Paul Krugman = Liberal Ass »

# Why Does Obama Hate Our Troops?

Posted by cann0nba11 on June 14, 2009

 He must hate our military. I can think of no other reason to justify the recent release of dangerous terrorists from Gitmo. At some point this wilful neglect of our nation's security has to become a criminal act. Isn't protecting America the primary goal of the president?

> **"I do solemnly swear that I will faithfully execute the office of President of the United States, and will to the best of my ability, preserve, protect and defend the Constitution of the United States."**

In a late Friday news dump we learned that America has released a Ahmed Zuhair, a dangerous terrorist, from Gitmo. Where was he sent? The America-loving nation of Saudi Arabia, where his case will "be reviewed" and he will be sent to a rehabilitation camp. I wonder if rehab includes training on the latest bomb-making techniques. What has Zuhair done?

> Zuhair wasn't just a random Afghani or Saudi picked up by accident. By his own admission, he participated in the bombing of the USS Cole, and the Bosnians want him for a terrorist attack there, apart from his involvement in the murder of William Jefferson. Why not give him to the Bosnians instead, even if we were inclined to release him at all? (source)

In Obama's distorted reality: the killing of an American + Bosnian car bombing + participating in the USS Cole bombing = transfer to a friendly country where he will most likely be set free. Tell me Obama supporters, how does this help America? If a single person is killed by Zuhair I expect Obama's impeachment trials to begin immediately. Ed Morrissey sums it up nicely:

> The Obama administration has all but surrendered to al-Qaeda with these releases. If the murderer of an American UN worker and a participant in the USS Cole bombing can get set free, then who would Obama keep in custody? The administration is rapidly making membership in al-Qaeda and participation in terrorism against the US a no-risk proposition.

---

**Possibly related posts: (automatically generated)**

- Obama Promises 10,000 More Troops for Afghanistan
- No Change? – Obama's Inaugural Address
- Dirtied politics

This entry was posted on June 14, 2009 at 8:13 am and is filed under Middle East, National Security, Obama, Terrorism, War, crime. Tagged: Gitmo, Obama, Saudi, terrorist, Zuhair. You can follow any responses to this entry through the RSS 2.0

Exhibit 5

HEARING OF THE SENATE JUDICIARY COMMITTEE; SUBJECT: OVERSIGHT OF THE JUSTICE DEPARTMENT; WITNESS: ATTORNEY GENERAL ERIC HOLDER; CHAIRED BY: SENATOR PATRICK LEAHY (D-VT); LOCATION: 226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C. Federal News Service June 17, 2009 Wednesday

Mr. Chairman, I would just briefly note, with regard to the hate crimes legislation, that I would suggest we should have a hearing on that. It's a matter that's worthy of attention. And I would offer for the record a June 16th, 2009 letter from the United States Commission on Civil Rights.

I believe six of the eight members signed it, and they say -- they write to us and the president and vice president urging that we vote against the Hate Crimes Prevention Act. They think it will do, quote, "little good and great harm." So I'd offer that for the record, and hopefully we'll be able to do that and not just have it pop up on legislation on the floor.

Mr. Holder, on January 22nd, President Obama signed an executive order to establish procedures to close the Guantanamo detention facility and to review the case of every detainee to determine whether the detainee should be transferred, released, prosecuted or handled in some other way.

The executive order makes clear that you, as the attorney general, the person responsible for coordinating the review, and I guess the other agencies of the government too, do you agree that as the person in charge of it, this Guantanamo task force, you bear responsibility for the release or transfer of detainees from Guantanamo Bay?

ATTY GEN. HOLDER: I mean, I think I bear responsibility along with my other -- the other Cabinet members who make up the Principals Committee, but I think I am primarily responsible for it, yes.

SEN. SESSIONS: They're looking to you to coordinate at least and follow the consensus or set the agenda. The administration has released or transferred some controversial figures already without any form of military commission or criminal trial.

For example, on Friday the administration transferred Ahmed Zuhair to Saudi Arabia. Zuhair is allegedly responsible for the murder of William Jefferson, a U.S. citizen and diplomat, in 1995, planting a car bomb in the Mostar, Bosnia in 1997, and the involvement with the attack on the USS Cole. Did you approve the release of Zuhair to Saudi Arabia?

ATTY GEN. HOLDER: I did, as did the former administration. He was approved for release by the Bush administration. The determination that we made was that there was not sufficient proof to bring a case against him. And also he was transferred, not released -- transferred to Saudi Arabia, where he will be subject to judicial review, and in addition to that, to the reeducation program that they have.

SEN. SESSIONS: Was that based on a question of evidence that could not be utilized? I understand there were -- military intelligence showed that Zuhair was responsible for the shooting death of William Jefferson when he was a diplomat to Bosnia. Was there evidence that you felt were inadmissible to make this case?

ATTY GEN. HOLDER: No, the determination that we made was that there -- and I think consistent with the Bush administration -- that there was insufficient proof to tie him to those very serious and regrettable crimes. It wasn't a question of the admissibility of the evidence; it was more with regard to the sufficiency of it.

SEN. SESSIONS: Another detainee, Binyam Mohamed, reportedly received instructions directly from Khalid Sheikh Mohammed, and is believed to be Jose Padilla's accomplice in the al Qaeda plan for a second wave of attacks after 9/11. Military commission charges against Mohamed tie him to a plot to blow up high-rise apartment buildings and explode a dirty bomb in the United States. Did you approve his release?

ATTY GEN. HOLDER: The releases that have occurred have all been done with my approval. I take responsibility --

SEN. SESSIONS: And were you aware of the serious allegations that he was involved with -- facing?

ATTY GEN. HOLDER: In the determinations that we made. We made the conclusion that with regard to any charges or allegations that had been lodged against people, that there was insufficient proof to bring those cases. Anybody who poses as danger to the United States or who has committed an act against the United States or American interests will be held, will be tried, and the president has been clear about that.

This process is designed to protect the American people and that is what I have tried to do, to the best of my ability.

SEN. SESSIONS: Well, if he has been captured as part of the war on terror, is he not -- is the United States, and any government in the world, really, entitled to maintain that person in custody until the hostilities are over, until you can assure us that the suspect is not a danger?



**EXHIBIT B**

Response to Order to Show Cause, Dkt. 61, *Al Salami v. Bush*, No. 05-cv-2452 (D.D.C. filed
Aug. 5, 2008)

*PREVIOUSLY FILED WITH THE COURT
SECURITY OFFICER AND CLEARED
FOR PUBLIC FILING ON AUG. 1, 2008*

David L. Engelhardt (DC429886)
John C. Snodgrass (DC473864)
Lisa M. Kaas (DC492302)
Erin C. Wilcox (DC982059)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Tel. (202) 420-2200
Fax (202) 420-2201

*Counsel for Petitioner Salah Ali Abdullah
Ahmed Al Salami, ISN 693*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | )  **Misc. No. 08-0444 (TFH)** |
| **PETITIONERS SEEKING HABEAS** | ) |
| **CORPUS RELIEF IN RELATION TO** | )  **Civil Action No. 05-2452 (PLF)** |
| **PRIOR DETENTIONS AT** | ) |
| **GUANTANAMO BAY** | ) |
| | ) |

## RESPONSE TO ORDER TO SHOW CAUSE

Counsel for petitioner Salah Ali Abdullah Ahmed Al Salami (ISN 693) hereby submit

this response to the Court's Order[1] of July 2, 2008 to show cause why this action should not be

dismissed as moot.  Counsel for petitioner respectfully submit that, despite the death of

petitioner, issues remain that this Court can and should resolve.

### INTRODUCTION

The Court should decline to dismiss this petition as moot for two reasons.  First, the

circumstances of the instant petition present what appears to be a novel issue that this Court

should address in the interests of justice.  Respondents have not "produced the body" sufficiently

to moot this habeas proceeding.  Respondents retain important parts of petitioner's body

---

[1] Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 54 (July 2, 2008).

collected during the U.S. military's autopsy thereof.  Nor is this petition of the type that typically becomes moot upon death of the petitioner, such as when petitioner is a former prisoner seeking to overturn a wrongful conviction that negatively impacts his life after release, or when petitioner suffers an *explainable* death while challenging his unlawful detention.  Here, Petitioner died, in suspicious and unverifiable circumstances, after being held for years without charge in the custody that was being challenged, and respondents, who claim to have completed their investigation into petitioner's death – an alleged suicide that they characterized as an act of "asymmetric warfare"[2] – have refused to release any information about that investigation and indeed still retain, and refuse to share, key evidence.  That evidence includes certain organs and tissues of petitioner – *i.e.*, part of his body or "*corpus*" – essential to a medicolegal determination of the cause and manner of death.  This Court can and should, at a minimum, order the remainder of petitioner's body released.  Counsel is aware of no authority requiring dismissal of a habeas petition in the unique circumstances presented here.

Second, courts have recognized an exception to the mootness doctrine in cases where there exist issues of substantial public importance or great public interest.  There can be no doubt that the real story behind the first deaths of detainees (three died that day) in U.S. military custody at Guantánamo Bay is of tremendous concern to the American public, to the families of the men who died, and indeed, to the entire international community.  If the instant petition is dismissed as moot, the Court may effectively foreclose access to the truth about what happened.[3]

---

[2] *See* Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16080 (last visited July 24, 2008) (quoting Navy Rear Adm. Harry B. Harris); *see also* U.S. Department of Defense News Transcript, June 20, 2006: Radio Interview with Deputy Assistant Secretary Stimson on the Washington Post Radio, 1500 AM, 107.7 FM, Washington D.C., at 2.

[3] On June 14, 2007, counsel for petitioner filed a Freedom of Information Act ("FOIA") request with the Department of Defense seeking information concerning the detention and death of Al

DSMDB-2475905v02

## BACKGROUND

Petitioner Salah Ali Abdullah Ahmed Al Salami, a Yemeni national, died while in

U.S. custody at Guantánamo Bay on or around June 10, 2006, purportedly by suicide.  During

petitioner's imprisonment at Guantánamo, counsel and petitioner's family received no

information about petitioner's status or the reasons for his detention.  The government never

filed a factual return.  No Combatant Status Review Tribunal ("CSRT") records that can be

linked to petitioner have been produced, and an undated one and one-half page Summary of

Administrative Review Board[4] Proceedings for an unnamed detainee listed only as "ISN 693"

cannot be definitively identified with petitioner (it reflects that the detainee in question was not

even in attendance), describes no charges against the detainee, and provides no information

about the reasons for his detention.[5]  Counsel never got a chance to meet with petitioner.  He

died at the very time counsel was making arrangements to visit the base, less than a month after

---

Salami.  To date, no documents or information have been produced in response to that FOIA
request, despite the government's representation that the investigation into petitioner's death has
officially closed.  (*See* Stipulated Mot. For Extension of Time, *Dickstein Shapiro LLP v.
Department of Defense, et al.*, No. 1:08-cv-226-PLF, ¶ 2 (D.D.C. June 12, 2008).)  Earlier this
year, counsel filed a FOIA action in this Court, *Dickstein Shapiro LLP v. Department of Defense,
et al.*, No. 1:08-cv-226-PLF (D.D.C. filed Feb. 11, 2008), which was designated as a related case
to the instant habeas proceeding.  The Court has ordered defendants to file a dispositive motion
on or before August 15, 2008.  (Minute Order, *Dickstein Shapiro LLP v. Department of Defense,
et al.*, No. 1:08-cv-226-PLF (D.D.C. June 13, 2008).  Counsel for petitioner expects defendants
in the FOIA action to resist producing the requested records.

[4] The Administrative Review Board or "ARB" "process" purportedly is designed "to assess
annually the need to continue to detain each enemy combatant," and at which the detainee may
"explain why he is no longer a threat to the United States and its allies."  Order, Administrative
Review Procedures for Enemy Combatants in the Control of the Department of Defense at
Guantanamo Bay Naval Base, Cuba (May 11, 2004), *available at* http://www.defenselink.mil/
news/May2004/d20040518gtmoreview.pdf (last visited July 24, 2008).

[5] *See* attached Ex. 1.

DSMDB-2475905v02

DOJ informed counsel they were cleared to do so,[6] and without knowing that his father (and next friend on this petition) had prepared a videotaped message asking him to cooperate with his American attorneys.

After the death of petitioner and the two other detainees who died that day, respondents made statements to the press dismissing the deaths as "clearly planned by the detainees as a way to advance their cause in the war on terror . . . not an act of desperation,"[7] and calling petitioner a "mid- to high-level al Qaeda operative with links to principal al Qaeda facilitators and senior membership."[8]  Of course, these unsupported claims cannot be officially confirmed because no ARB or CRST records or evidence summaries readily linked to petitioner contain any information about the reasons for his detention.

Respondents have claimed that petitioner was found hanging in his cell.  Following an autopsy by a U.S. military pathologist, the shell of petitioner's body (less a number of organs and tissues) was returned to Yemen five days later and identified by next of kin.  Petitioner's father vehemently disputes that his son would have committed suicide, which is viewed as sacrilege in Islam.[9]

---

[6] Email from Andrew Warden, U.S. Dept. of Justice, to John Snodgrass, Dickstein Shapiro LLP (May 16, 2006) (stating that "you have satisfied the requirements for privileged access to petitioner Al Salami") (attached hereto as Ex. 2).

[7] Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx? id=16080 (last visited July 24, 2008) (citing Navy Rear Adm. Harry B. Harris).

[8] Sgt. Sara Wood, *DoD Identifies Guantanamo Detainee Suicides*, Am. Forces Press Serv. (June 12, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16072 (last visited July 24, 2008).

[9] *See Family Disputes Guantanamo Suicide*, Aljazeera.net (June 14, 2006), attached as Ex. I to Emergency Mot. For Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006) (quoting petitioner's father: "This idea of suicide is a lie.  My son wouldn't commit suicide.  My son was among those who memorised the Quran and was

DSMDB-2475905v02

Respondents never have released the results of the autopsies or the investigation into the death of petitioner on that June day more than two years ago.[10]  A second, independent autopsy of petitioner's body was performed in Yemen by a team of pathologists led by the chief of the Institute of Legal Medicine of Lausanne University; however, because certain key organs and tissues – including specifically *the larynx, hyoid bone, and thyroid cartilage*, some or all of which uniquely can permit a pathologist to distinguish between hanging and manual strangulation (*i.e.*, homicide) – were not returned with the body, the results of this second autopsy were inconclusive.[11]  The international human rights organization that coordinated this second autopsy attempted to obtain answers to the questions raised by the second autopsy from respondents' military pathologist,[12] but received no reply.[13]  On information and belief,

---

committed to his religion.  . . . He was assassinated by American soldiers and I call on the Yemeni and American governments for an international investigation.").

[10] Shortly after learning of petitioner's death, counsel for petitioner moved the Court for an emergency order to preserve evidence relating to petitioner's detention and death.  Emergency Mot. for Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006).  The Court never ruled on that motion.

[11] Nor were and the nail clippings from petitioner's fingers and toes returned, which could contain trace evidence showing that he had scratched an attacker in self defense, for example.  *See* Letter from Rachid Mesli, Legal Director, Alkarama for Human Rights, to Dr. Craig T. Mallak, Armed Forces Medical Examiner (June 29, 2006) (attached hereto as Ex. 3).  On information and belief, the same critical samples were retained by U.S. authorities in the cases of the two other detainees who died on June 10, 2006.

[12] In a letter to Armed Forces Medical Examiner Dr. Craig T. Mallak of June 29, 2006, the Legal Director of Geneva-based Alkarama For Human Rights sought to establish communication between Dr. Mallak and the team of pathologists who conducted the second autopsy of petitioner's body in Yemen, stating that the team "needs some documents, materials and explanations from your side in order for them to finalize their report of autopsy" and requesting, among other things, the rest of petitioner's organs and tissues and the report of the investigation at Guantánamo, including the circumstances of discovery of petitioner's body, the exact nature of the ligatures purportedly used, whether and what reanimation measures were taken, photographs, and records pertaining to petitioner's emotional state.  Not surprisingly, no response was received.

5

respondents remain in possession of the numerous parts of petitioner's body[14] that were missing upon its return to Yemen, and they therefore hold the key that would unlock the truth about the circumstances of petitioner's death.

## DISCUSSION

### I.      The Standard For Dismissal On Grounds Of Mootness

The doctrine of mootness derives from Article III, § 2, of the Constitution, which requires the existence of a "case or controversy" for federal jurisdiction to lie.  *E.g.*, *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964).  In addition to Article III, discretionary components of the doctrine have developed, based upon concerns of remedial utility and judicial administration.  But, even within the federal courts' Article III decisions, there is flexibility in the application of the mootness doctrine.  *See* 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.1.  In fact, most decisions focus on the court's "ability to provide any presently meaningful remedy."  *Id.*  At the core of the various components of the mootness doctrine "is a search for the possibility that granting a present determination of the issues offered, and perhaps the entry of more specific orders, will have some effect in the real world."  *Id.*

Mootness issues that arise in cases such as this, where events or changed circumstances overtake the pace of adjudication, typically compel a "highly individualistic, and usually intuitive, appraisal of the facts of each case."  *Id.* § 3533.  In addition to revolving around

---

[13] Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 24, 2008) (attached hereto as Ex. 4).

[14] The report of the second autopsy of petitioner's body (original and English translation attached hereto as Exs. 5 and 6, respectively) lists as missing or not identifiable the following organs: larynx and pharynx, thyroid cartilage, hyoid bone, upper section of the trachea, part of the neck musculature, cervical ganglions, esophagus, renal lodges, mesentery, suprarenals, pancreas, gall bladder, prostate, testicles, appendix, and pituitary gland.

DSMDB-2475905v02

specific facts, the mootness inquiry may be "shaped by the desire to decide, or to avoid deciding, difficult issues or matters that seem affected with a public interest," thus defying any attempt to force the analytic steps into neatly carved boxes. *Id.* The central theme of cases in which mootness was rejected because something remained that the court could accomplish – regardless of the specific facts and rationale – is that "decision should not be denied if a *worthwhile remedy* can be given." *Id.* § 3533.3 (emphasis added). Thus, the Court's assessment here should turn on the general policy of granting *effective relief* whenever the Court can do so.

    A.    <u>Mootness In The Context Of Habeas Corpus</u>

Although the Great Writ of habeas corpus historically was an instrument to secure production of "the body" of the petitioner before a tribunal to test the legality of detention, *see, e.g.*, *Carafas v. LaVallee,* 391 U.S. 234, 238 (1968), the federal habeas statute contemplates the existence of some "other remedy" besides the petitioner's presentation or release. The statute broadly describes the relief that may be granted, requiring the courts to "summarily hear and determine the facts, and dispose of the matter *as law and justice require*." 28 U.S.C. § 2243 (emphasis added); *Carafas*, 391 U.S. at 239 (noting that the 1966 amendments to the statute contemplate the potential of relief other than release from custody); *Sanders/Miller v. Logan*, 710 F.2d 645, 656 (10th Cir. 1983) (holding habeas suit not mooted by parole, and remanding for vacation of conviction and "any further relief which law and justice require on further consideration of the cause by the district court").

This flexibility is exemplified by a decision of the D.C. Circuit, in a habeas proceeding brought by a petitioner who, following his conviction and confinement for robbery, was transferred from Lorton prison to the D.C. jail, while his appeal from a rejected petition was pending in the Fourth Circuit. Petitioner alleged that the government transferred him to thwart his appeal). The D.C. Circuit held that the appeal was not mooted by this illegal transfer and

DSMDB-2475905v02

continued, "whatever grounds there may have been for the transfer . . . [i]t is not too much to require that [respondent/appellee corrections officials] justify their course." *Bolden v. Clemmer*, 298 F.2d 306, 309 (D.C. Cir. 1961) (noting that the district courts have the "power in a habeas corpus proceeding to dispose of the matter as the law may require").  Suspicious of the reasons behind the transfer, the Court in that case was willing to entertain relief other than the traditional presentation or release of petitioner, implying that petitioner should promptly be returned to Lorton.  *Id.*

Several years later, in *Carafas v. LaVallee*, the Supreme Court made clear that a habeas petition is not rendered moot by the petitioner's release from custody.  391 U.S. at 238 (holding that the "in custody" requirement of 28 U.S.C. § 2254 is determined at the time the petition is filed).  Where a habeas petitioner who was in custody at the time of filing his petition is no longer in custody, and seeks to show that subsequent release has not rendered his petition moot, he must demonstrate that he continues to present a "case or controversy" for the court to decide.  *E.g.*, *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006), *citing Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004); *Kemplen v. Maryland*, 428 F.2d 169, 171 (4th Cir. 1970) (holding habeas petition not moot where petitioner was released from custody but stigmatized; "the result that we reach today will apparently mean something to the petitioner and will be more than a mere exercise in judicial futility").  While a number of courts have had occasion to consider the survival of habeas petitions following the death of the petitioner, typically finding such cases to be moot,[15] none appear to have considered a death in the unique circumstances presented here.

---

[15] *See, e.g.*, *Brooks v. Estelle*, 702 F.2d 84 (5th Cir. 1983) (petition moot after death sentence carried out); *Hann v. Hawk*, 205 F.2d 839 (8th Cir. 1953) (petitioner died before decision on appeal by warden; appeal concerning legality of petitioner's release from state prison in habeas

DSMDB-2475905v02

## II.   This Case Is Not Moot Because Respondents Still Retain A Portion Of Petitioner's Body

As explained in more detail *supra*, counsel for petitioner have reason to believe that respondents remain in possession of multiple organs from petitioner's body, including among other things his larynx and pharynx, thyroid cartilage, hyoid bone, upper trachea, and part of his neck musculature.[16]  *See* Exs. 3, 6.  Combined with other evidence apparently withheld by respondents, these organs and tissues are needed to determine how petitioner died.

Because this Court has the power to order the production of petitioner's body via this habeas action, and because significant parts of petitioner's body have yet to be produced, the Court can grant effective relief by requiring respondents, at a minimum, to produce forthwith all organs, tissues, or other anatomical samples taken from petitioner's body.  The Court also could, in the interests of justice, require the production of all evidence and reports relating to respondents' investigation of petitioner's death while in their custody.  Because the Court can provide a remedy that comports with the principles of habeas corpus relief, would finally end the "continuing effects" of petitioner's detention (*i.e.*, by the full and complete repatriation of

---

proceeding was moot); *Parkman v. Harrison*, No. 01-7028, 2002 WL 1461799, at *1 (D.C. Cir. 2002) (no discussion of mootness finding; citing *Hann v. Hawk*); *In re Kravitz*, 504 F. Supp. 43 (M.D. Pa. 1980) (petitioner died while petition pending; neither social stigma of murder conviction nor inability to inherit from victim avoided mootness); *United States ex rel. Schwartz v. Lennox*, 320 F. Supp. 754 (E.D. Pa. 1971) (petitioner died before argument on petition; case was moot where there was no showing that retirement benefits would have been more in absence of conviction; moreover, writ not intended to be used by beneficiaries).

[16] Should respondents dispute this fact, the burden is on them to prove otherwise.  Assuming a dispute over facts, the party claiming mootness bears the burdens of production and persuasion in demonstrating that mootness has in fact occurred.  *See, e.g.*, *Firefighters Local 1784 v. Stotts*, 467 U.S. 561, 569 (1984); *In re Sokolowski*, 205 F.3d 532, 534 (2d Cir. 2000) (debtor claimed automobile creditor's appeal of injunction against repossession was moot because car was no longer in her possession; mootness rejected because debtor "failed to proffer competent evidence to support her claim * * * ").

DSMDB-2475905v02

petitioner's body to Yemen), and would serve the interests of justice, the Court should decline to find this habeas petition moot.

Indeed, a number of courts have held that an action seeking injunctive relief is not mooted by the *partial* completion of an act, the full completion of which could very well moot the case. For example, in *West v. Secretary of Department of Transportation*, the Ninth Circuit considered the mootness of a case seeking to enjoin construction of a highway and to declare that an environmental impact statement was required. Despite the completion of part of the project, the court ruled that worthwhile remedies remained available – for example, the court could address the remainder of the project via injunctive relief. 206 F.3d 920, 924-26 & n.4, 929-30 (9th Cir. 2000) (*quoting* Wright & Miller, 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.3: "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief. . . . [C]ourts must be careful to appraise the full range of remedial opportunities."); *see also San Diego Chapter of Surfrider Found. v. Dalton*, 196 F.3d 1057, 1058 n.1 (9th Cir. 1999) (action for injunction not moot where first phase of project complete but second not yet begun). Similarly, the Fifth Circuit declined to dismiss a case as moot that challenged a public housing project under the National Environmental Policy and Historic Preservation Acts, where the redevelopment project was partially complete, but where substantial work that could be addressed by an injunction remained to be done. *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 227-28 (5th Cir. 2006), *cert. denied*, 128 S. Ct. 40 (Mem.) (2007). *See also Rockford Drop Forge Co. v. Donovan*, 672 F.2d 626, 629 (7th Cir. 1982) (action to quash inspection warrant not moot where warrant was partially executed, because further inspection was desired).

DSMDB-2475905v02

Even more closely analogous to the issue here is a decision of the Second Circuit in a case where the plaintiff prisoner had been transferred to another facility, but something of his was retained by the transferring facility. *Thompson v. Carter*, 284 F.3d 411 (2d Cir. 2002). The prisoner, Thompson, brought an action seeking, *inter alia*, an order that one of the corrections officers at the original prison return medication that had been seized from him. The defendants claimed that the case was moot because Thompson had requested only injunctive relief and because he was no longer confined at the original prison where the defendants were employed. But the court held that the action was not moot, stating that, "[i]n this case, a live controversy continues between Thompson and Carter: Thompson's request for an order directing Carter to return Thompson's medications." *Id.* at 415. This was not, the court said, "the more usual [scenario] in which the inmate plaintiff seeks prospective relief . . . against employees at one facility that would be useless after his transfer to a second facility." *Id.* Rather, Thompson retained a legally cognizable interest in the injunctive relief sought.

And finally, the D.C. Circuit found a continuing controversy that avoided mootness in a case where the FBI would retain possession of certain evidence demanded by plaintiffs. In *Utz v. Cullinane*, 520 F.2d 467 (D.C. Cir. 1975), several plaintiffs who had been arrested for and charged with various crimes brought an action for injunctive and declaratory relief to enjoin the D.C. Chief of Police and the director of the police department's records division from transmitting plaintiffs' arrest records (including fingerprint cards) to the FBI, and seeking the return of the records already sent. One of the arguments asserted on appeal by defendant-appellees was that the case was moot, because the plaintiff-appellants' criminal cases had been disposed of and they therefore could not be prejudiced by pre-conviction dissemination of arrest records. But the Court found that substantial rights of the appellants remained to be vindicated,

11

because the FBI would retain the records already in their possession unless relief was granted, explaining:

> Appellants' constitutional and statutory claims are essentially grounded in the contention that routine dissemination whether preconviction or post-exoneration is improper and results in a *legally cognizable harm; in the absence of an adjudication by this court, the arrest record of appellant Bolling will remain with the FBI*, and those of appellants Utz and Boyd will be transmitted to the FBI, while an adjudication in their favor will eventuate in an order to retrieve those already sent and to refrain from sending those still in the sole possession of the Metropolitan Police. *Clearly, we are presented with a continuing live legal controversy affecting . . . substantial rights.*

*Id.* at 472-73 n.9 (emphasis added). *See also FTC v. Ernstthal*, 607 F.2d 488, 489 (D.C. Cir. 1979) (in appeal from enforcement of subpoenas in FTC proceeding, where FTC retained possession of subpoenaed documents and did not intend to return them if consent decree was reached, Judge Bazelon held that the case was not mooted by the impending disposition of the proceeding, stating "[t]here thus remains a live controversy between the parties").

Common to all of these cases is that the challenged conduct resulted in continuing harm, and the courts still could act to remedy that harm by limiting it prospectively, just as is the situation before the Court on this petition. In these circumstances, the parties retain a legally cognizable interest in the outcome of the matter, despite perhaps some piece of it being "said and done." Counsel for petitioner recognize the novelty of the position that respondent's *partial* production of petitioner's body following his death in custody is not sufficient to avoid mootness, but the case law cited above supports this position. Moreover, the unique circumstances of this case – the suspicious death of petitioner, the lack of any meaningful information or evidence from respondents, and the secretive and highly controversial nature of Guantánamo in general – warrant injunctive relief in the interests of justice.

DSMDB-2475905v02

**III.** **Substantial Public Interest Militates In Favor Of The Court Deciding This Case**

In addition to the continuing interests at stake in this petition described above that

should avoid mootness, courts have recognized an exception to mootness in cases where issues

of significant public importance are involved.  "[I]t is settled doctrine that courts go further both

to give and withhold relief in the light of consideration of public interest."  *Alton & So. Ry. v.*

*Int'l Ass'n of Machinists*, 463 F.2d 872, 880 (D.C. Cir. 1972), *citing Virginian Ry. Co. v. Sys.*

*Federation No. 40*, 300 U.S. 515, 552 (1937).  For example, the Ninth Circuit has extolled the

"public interest in having the issue now before the court resolved with some hope of finality" in

a case that the court said "affects the most sensitive of human relationships" (there, the relation

between a father and his children; here, the interest of petitioner's father in laying his son – all of

him – to rest) and "also directly involves the vital jurisdictional harmony of two sovereign

entities" (there, the State of Montana and the Blackfeet Tribe; here, potentially the U.S. and

Yemen).  *U.S. ex rel. Cobell v. Cobell*, 503 F.2d 790, 794 (9th Cir. 1974) (appeal of issuance of

writ in habeas proceeding brought by father to secure release of children from grandmother's

custody was not moot where there had been voluntary cessation of the challenged conduct).  And

the Supreme Court of California ruled, in a habeas proceeding, that "issues of grave public

concern" would be decided.  *In re M.*, 473 P.2d 737, 741 (Cal. 1970) (holding, despite that

petitioner was released from detention and effectively was granted the habeas relief sought, that

juvenile courts may not automatically order pre-hearing detention).  The court doubted that it

would have another opportunity to resolve the important issues raised and therefore declined to

declare the case moot on its unusual facts.  *Id.* at 743.

Although the recognized "desirability of judicial determinations of important

questions," standing alone, will not avoid dismissal of an otherwise moot case, *e.g.*, *Alton & So.*

*Ry.*, 463 F.2d at 880, here, petitioner's habeas case is not moot for the reasons discussed in the

DSMDB-2475905v02

section above. And while some decisions require a showing of the potential for recurrence of the challenged conduct, the D.C. Circuit has observed that, the greater the level of public interest, the lesser need for the possibility of recurrence to justify decision. *Id.*; *cf. Richardson v. Ramirez*, 418 U.S. 24, 35-36 (1974) (noting the strong practical argument that conduct "*incapable* of repetition" should be redressed in the public interest because evading review (citation omitted, emphasis added)).

The fact that the people of this nation and the world have been and remain intensely interested in the ongoing imprisonment without charge of hundreds of individuals at Guantánamo Bay, combined with the Supreme Court's recent decision in *Boumediene* and its repercussions in this Court, undeniably show that the Court is confronting issues of international notoriety. Moreover, given the significant media attention accorded the first deaths at Guantánamo in 2006, of which petitioner was one; the subsequent lack of information from the government concerning the investigation (and indeed the government's brazen efforts in this action to review and indefinitely preclude disclosure of *all evidence* concerning the deceased detainees, including everything in their cells, even privileged attorney-client communications)[17]; and the release of the independent autopsy findings concerning petitioner and public call for answers from the U.S. government,[18] there can be no doubt that this *particular action* is of substantial public importance.

---

[17] *See* Resp'ts' Mot. For Procedures Related to Review of Certain Detainee Materials and Request For Expedited Briefing, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 21 (July 7, 2006).

[18] *See, e.g.*, Letter from Santiago A. Canton, Executive Director, Inter-American Commission on Human Rights, Organization of American States, to Michael Ratner and Maria Lahood, Center for Constitutional Rights (June 12, 2006) (attached hereto as Ex. 7) (describing request that the government provide information about the alleged suicides within 10 days), Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at

DSMDB-2475905v02

Were the Court to grant injunctive relief in this action requiring respondents to produce the remainder of petitioner's body and release the evidence and records associated with the investigation of his death, it is entirely possible that the evidence could demonstrate that petitioner died of homicide, not suicide, and could even implicate his killer or killers.  The very real potential of a government cover-up of this magnitude with regard to Guantánamo strongly counsels that the Court decide this case in the interests of justice, transparency, and public understanding.

## CONCLUSION

For cause shown above, counsel for petitioner respectfully submit that the Court should decline to find the instant habeas petition to have been mooted by the untimely death of petitioner in respondents' custody.  Petitioner's body has not been fully returned and thus cannot be fully laid to rest.  Moreover, it would be a fundamental miscarriage of justice to permit the evidence concerning petitioner's death to be buried with the same callous disregard that respondents exhibited toward petitioner's rights during the last years of his life.

Dated: July 25, 2008                  Respectfully submitted,

DICKSTEIN SHAPIRO LLP

            /s/ Lisa M. Kaas
David L. Engelhardt (DC429886)
John C. Snodgrass (DC473864)
Lisa M. Kaas (DC492302)
Erin C. Wilcox (DC982059)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Tel. (202) 420-2200
Fax (202) 420-2201

---

http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 25, 2008) (attached hereto as Ex. 4).

15

*Counsel for Petitioner Salah Ali Abdullah
Ahmed Al Salami, ISN 693*

16

DSMDB-2475905v02

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of July, 2008, a true and correct copy of the

foregoing *Response To Order To Show Cause* was filed by hand-delivery with the Court Security

Officer for clearance for public filing, who served copies upon the following:

**James J. Schwartz**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001

**Judry Laeb Subar**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 833
Suite 7342
Washington, DC 20044-0833

**Terry Marcus Henry**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
P.O. Box 883
20 Massachusetts Avenue, NW
Suite 7144
Washington, DC 20044

**Andrew I. Warden**
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
FEDERAL PROGRAMS BRANCH
20 Massachusetts Avenue, NW
Washington, DC 20530

_____/s/ John C. Snodgrass_____
John C. Snodgrass

17

DSMDB-2475905v02