# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SUHAIL ABDU ANAM,** *et al.*, | |
| **Petitioners,** | |
| v. | **Civil Action No. 04-1194 (TFH)** |
| **BARACK H. OBAMA,** *et al.*, | |
| **Respondents.** | |

## MEMORANDUM OPINION

Petitioner Musa'ab Omar Al Madhwani ("Al Madhwani" or "Petitioner") has been detained by the United States Government at the United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo") since October 2002. Respondents ("Government") maintain Al Madhwani's detention is justified under the Authorization for the Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224 (2001) ("AUMF"), which authorizes the President to use force against members of certain terrorist organizations, including al-Qaida. In particular, the Government alleges Al Madhwani intentionally traveled to Afghanistan to receive weapons training, received weapons training at an al-Qaida training camp, traveled and associated with al-Qaida members, and engaged in a two-and-one-half hour firefight with Pakistani authorities. Al Madhwani denies each of these allegations and filed a petition for a writ of habeas corpus on July 15, 2004.

The Government filed a Factual Return in 2004, which they amended on September 29, 2008. In response, Al Madhwani filed a Traverse on July 23, 2009. The parties also filed

Prehearing Statements and 260 exhibits in the weeks preceding the Merits Hearing.  On October

26, 2009, the Court began a four-day hearing on the merits of Al Madhwani's habeas petition.

The parties made unclassified and classified opening statements, presented evidence and

arguments on the contested issues relevant to Al Madhwani's detention, and delivered classified

closing statements.  With the advice of counsel, Al Madhwani testified at the hearing over the

course of two days.  Al Madhwani's counsel also called an expert witness, Dr. Stephen N.

Xenakis, who discussed Al Madhwani's psychological state.

Upon consideration of the record, the four-day Merits Hearing, the accompanying

exhibits, the parties' extensive legal briefing, and Al Madhwani's two days of live testimony, on

December 14, 2009, the Court issued a ruling from the bench, part of which was classified.  As

detailed in that ruling, the Government's allegations are primarily derived from twenty-six

documents containing statements Al Madhwani provided at Guantanamo.  The Court observed

that twenty-three of those documents are tainted by the coercive interrogation techniques to

which Al Madhwani was subject and lack sufficient indicia of reliability.  Nevertheless, the

Court held that the remaining three documents, which detail Al Madhwani's statements to the

Combatant Status Review Tribunal and the Administrative Review Board, are reliable.  Based on

his statements during those two proceedings and the remaining reliable evidence in the record,

the Court found that Petitioner trained, traveled, and associated with members of al-Qaida,

including high-level operatives.  The Court concluded that these facts are sufficient to find that

Petitioner is lawfully being detained under the AUMF.  Therefore, for the reasons set forth

during the bench ruling, and for those that follow, the Court will deny Al Madhwani's petition

for habeas corpus.

## LEGAL STANDARDS

A.    Standard of Detention

The Court previously ruled on the scope of the Government's detention authority that governs this habeas proceeding. *See* Mem. Op. (Sept. 14, 2009) [Dkt. No. 563]. As reflected in that opinion, the Court adopted Judge John D. Bates's decision in *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009), and concluded that:

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. *The President also has the authority to detain persons who were part of* Taliban or *al-Qaida forces* or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act in aid of such enemy armed forces.

Mem. Op. at 3 (emphasis added).[1] As elucidated by Judge Bates, being "part of" al-Qaida requires "some level of knowledge or intent." *Hamlily*, 616 F. Supp. 2d at 75. The "key inquiry . . . [is] whether the individual functions or participates within or under the command structure of the organization – i.e., whether he receives and executes orders or directions." *Id.*

Absent from the above framework is mention of the threat the individual poses to the national security of the United States. Though recognizing its normative appeal, the Court

---

[1] On January 5, 2010, the United States Court of Appeals for the District of Columbia Circuit issued an opinion clarifying the scope of the Government's detention authority. The circuit court held that in addition to an individual who was "part of" enemy forces, the Government may lawfully detain an individual who "substantially supported" such forces. *Al-Bihani v. Obama*, No. 09-5051, slip op. at 8-11 (D.C. Cir. Jan. 5, 2010). This Court need not address whether Petitioner "substantially supported" al-Qaida since it holds that Petitioner was "part of" al-Qaida.

declines to adopt in this case Judge Ellen S. Huvelle's conclusion in *Basardah v. Obama*, 612 F.

Supp. 2d 30, 34 (D.D.C. 2009), that "the AUMF does not authorize the detention of individuals

beyond that which is necessary to prevent those individuals from rejoining the battle." *See Awad*

*v. Obama*, 646 F. Supp. 2d 20, 24 (D.D.C. 2009) (Robertson, J.) (declining to follow *Basardah*,

though acknowledging "the power of Judge Huvelle's argument"). Under the AUMF, the

President possesses "the authority to detain for the duration of the relevant conflict . . . based on

longstanding law-of-war principles." *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004). That

conflict has not ended. Therefore, the Court's hands are tied. Under the law as written, the

Government is authorized to detain an individual who was a "part of" al-Qaida, even if that

individual does not presently pose a threat to the security of the United States. *Cf. Al-Bihani v.*

*Obama*, No. 09-5051, slip op. at 13 (D.C. Cir. Jan. 5, 2010) ("release is only required when the

fighting stops").

B.    Burden of Proof

        Pursuant to the Amended Case Management Order that the Court adopted in this case on

February 10, 2009, "the government bears the burden of proving by a preponderance of the

evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-

0442, CMO § II.A (Nov. 6, 2008). Under well-settled case law, a party burdened by the

preponderance-of-the-evidence standard must prove that a proposition is "more likely than not"

true. *See,e.g., Tellabs, Inc. v Makor Issues & Rights*, 551 U.S. 308, 329 (2007). Applied here,

the standard requires the government to prove that it is more likely than not that Al Madhwani

was a "part of" al-Qaida. Accordingly, if the Government comes forward with reliable evidence

4

demonstrating that such membership is more likely than not, the Court must deny Petitioner's habeas petition.

## ASSESSMENT OF THE EVIDENCE

With limited exceptions, the evidentiary issues in the habeas proceedings of Guantanamo detainees are left to "the expertise and competence of the District Court to address in the first instance." *Boumediene v. Bush*, 128 S. Ct. 2229, 2276. Accordingly, in an effort to afford Petitioner a "prompt habeas corpus hearing," *id.* at 2275, the Court indicated it would determine "the accuracy, reliability, and weight, if any, of each piece of evidence after considering the evidence as a whole and the arguments presented during the Merits Hearing, including arguments concerning the reliability of hearsay evidence." Merits Hearing Procedures Order at 4 (Aug. 28, 2009) [Dkt. No. 553]. The burden is on the party submitting the evidence to establish that it is reliable. *See In re Guantanamo Bay Litig.*, Misc. No. 08-0442, CMO § II.C ("Merits Judges may admit and consider hearsay evidence . . . if the movant establishes that the hearsay evidence is reliable."). The parties, in turn, submitted 260 exhibits as part of their Prehearing Statements, each of which the Court reviewed. Based on its review, including the arguments presented during the four-day Merits Hearing, the Court has identified which of the 260 exhibits are material. Of those material exhibits, the majority are documents containing Petitioner's statements, and only a minority of those statements are reliable.

A.    Petitioner's Statements

Most of the material evidence in the record consists of Petitioner's statements. The Government primarily relies on twenty-six documents containing statements Petitioner made at

Guantanamo, twenty-three of which are classified interrogation reports or summaries. The remaining three documents detail Petitioner's statements to the Combatant Status Review Tribunal ("CSRT") and the Administrative Review Board ("ARB"). Since the Government is relying on these twenty-six documents, the Government has the burden of establishing that they are reliable. For the reasons discussed below, the Court finds that the Government has only established that Petitioner's statements to the CSRT and ARB are reliable.

i.        *Twenty-three interrogation reports and summaries*

The Government's primary evidence is twenty-three reports and summaries of interrogations of Petitioner that occurred between March 3, 2003, and September 27, 2004.[2] The twenty-three documents are reliable, the Government contends, because the interrogations at issue occurred at Guantanamo, where the conditions were not coercive, and the documents possess sufficient indicia of reliability. Petitioner responds that his statements during this period are not reliable because he was tortured prior to his arrival at Guantanamo and subject to coercive conditions while at Guantanamo.

The Court cannot assess Petitioner's Guantanamo statements without first exploring his treatment prior to his arrival at Guantanamo. At the Merits Hearing, Petitioner provided extensive testimony describing the harsh treatment he endured before he was transferred to

---

[2] Petitioner includes in his exhibit list reports and summaries of his interrogations that are not included in the Government's exhibit list. It is unclear which of those documents Petitioner relies on and which were submitted in response to allegations the Government later withdrew. In any event, Petitioner's interrogation reports from 2002 to 2004 suffer from the same reliability issues as the twenty-three interrogation reports submitted by the Government. As for the reports of interrogations that took place after 2004, their content is not material.

Guantanamo, which the Court finds to be credible.[3]  On September 11, 2002, Petitioner was captured by Pakistani officials in a Karachi apartment.  At the time, he was approximately twenty-two years old, with a high school education.  Petitioner testified that after five days in a Pakistani prison, he was handed over to United States forces.  He was flown to a pitch-black prison that he believes was located in Afghanistan.  *See* Gov't's Ex. 63 (ISN 839 Summary of ARB Proceedings (Dec. 14, 2005)) at 10.  At this dark prison, Petitioner claims he was subject to a variety of harsh interrogation techniques, such as being suspended in his cell by his left hand.  To this day, he suffers from pain in his left arm.  Petitioner also alleges the guards blasted his cell with music twenty-four hours a day.  The sole respite from the deafening noise was the screams of other prisoners.  Under these harsh conditions, Petitioner contends that he confessed to whatever allegations his interrogators made.  Approximately thirty days later, Petitioner was transferred to another prison in Afghanistan, where the harassment and threats continued.

The Government made no attempt to refute Petitioner's descriptions of his confinement conditions in Pakistan and Afghanistan.  To the contrary, the Government's records provide corroboration.  Petitioner submitted uncontested government medical records describing his debilitating physical and mental condition during those approximately forty days in Pakistan and Afghanistan, thereby confirming his claims of harsh treatment.  *See* Pet'r's Ex. 26.  A medical report dated October 22, 2002, approximately six days before he was transferred to Guantanamo, indicates Petitioner weighed 104 pounds.  *Id.* at 2.  Petitioner, who is five feet five inches tall,

---

[3] At the time this opinion was filed, a complete transcript of Petitioner's testimony was unavailable.

testified that he weighed close to 150 pounds when he left Yemen in August 2001. That same medical report lists his diastolic blood pressure as 36, *id.*, a sign of severe dehydration that would normally require hospitalization in the United States, *see* Testimony of Stephen N. Xenakis, MD (Oct. 28, 2009).[4] Incredibly, the medical report indicates that Petitioner "Appears well." Pet'r's Ex. 26 at 2. The records also convey that Petitioner arrived at Guantanamo with a severe mental disorder. A document titled "Psychological Evaluation," dated October 30, 2002, states that Petitioner "reported a month and a half period of increasing sleep disturbance . . . . He stated that when he attempts to sleep he experiences recurring thoughts of his family and that during the night he frequently awakens while hearing 'screaming voices.' He also noted feeling 'jittery,' occasional dizziness, and having a 'heavy head.'" *Id.* at 4. According to both parties' experts, Petitioner likely was suffering from post-traumatic stress disorder. *See* Gov't's Ex. 10 (Decl. of Ricky D. Malone, MD); Testimony of Dr. Xenakis. It therefore is clear from the record that the statements Petitioner provided in Afghanistan were coerced.

Having found that Petitioner's Afghanistan confessions were the product of coercion, the Court must consider the effect of that coercion on Petitioner's statements at Guantanamo. The Government stresses that the twenty-three reports only detail Petitioner's statements from Guantanamo. Those statements are reliable, the Government argues, because the circumstances in which they were provided are distinct from the conditions that Petitioner was subject to in Afghanistan. The premise of the Government's position has merit. In criminal law, previously

---

[4] At the time this opinion was filed, a complete transcript of Dr. Xenakis's testimony was not available.

coerced confessions do not automatically render all subsequent confessions unreliable. *See United States v. Bayer*, 331 U.S. 532, 541 (1941) (holding that a "confession [obtained] under circumstances which preclude its use," does not "perpetually disable[] the confessor from making a usable one after those conditions have been removed"). Criminal courts consider the "totality of the circumstances" to determine whether "there exists a 'break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before.'" *United States v. Karake*, 443 F. Supp. 2d 8, 87 (D.D.C. 2006) (quoting *Clewis v. State of Texas*, 386 U.S. 707, 710 (1967)). Factors guiding a court's inquiry include "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Oregon v. Elstad*, 470 U.S. 298, 310 (1985). Military commissions consider identical factors to determine whether a military prisoner's coerced statements are admissible. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84 § 1802, 123 Stat. 2190, 2580 (2009) (In determining the admissibility of an accused's statement, a military judge shall consider "[t]he lapse of time, change of place, or change in identity of the questioners between the statement sought to be admitted and any prior questioning of the accused."). Additionally, criminal counts "may take into consideration the continuing effect of the prior coercive techniques on the voluntariness of any subsequent confession." *Karake*, 443 F. Supp. 2d at 87. The burden is on the government to demonstrate that each subsequent confession was not a product of coercion. *See id.* at 51.

Though the maltreatment of Petitioner in Afghanistan does not automatically render his subsequent Guantanamo statements unreliable, based on the above factors, the Court finds that

the Government failed to establish that Petitioner's twenty-three statements to interrogators are untainted. The threats and use of coercion by Petitioner's interrogators were constant during the relevant time period. As detailed in Petitioner's classified testimony about his conditions of confinement, which the Court finds to be credible, United States forces were involved in both Afghanistan prisons where he was held. He believed the United States government orchestrated the harsh interrogation techniques to which he was subject. It thus should come as no surprise that during Petitioner's first Guantanamo interrogation, which was conducted by a United States official on the day Petitioner arrived at Guantanamo, he was gripped by the same fear that infected his Afghanistan confessions. His Guantanamo interrogators did little to assuage that fear. According to the reliable evidence in the record, multiple Guantanamo interrogators on multiple occasions threatened Petitioner when he attempted to retract statements that he now claims were false confessions.[5] Therefore, from Petitioner's perspective, his interrogators and custodians did not change in any material way during the period in question.

The Court is particularly concerned that the interrogators at Guantanamo relied on, or had access to, Petitioner's coerced confessions from Afghanistan. The logical inference from the record is that the initial interrogators reviewed Petitioner's coerced confessions from Afghanistan with him and asked him to make identical confessions. Far from being insulated from his coerced confessions, his Guantanamo confessions were thus derived from them. The Government maintains that the Court cannot assume the Guantanamo interrogators had notes from prior interrogations. Such unsubstantiated claims are no substitute for evidence.

---

[5] Though disputing that Petitioner was threatened by his Guantanamo interrogators, the Government chose not to call those interrogators as witnesses and even moved to quash Petitioner's subpoena to call one of the interrogators who was available to testify.

Nor can the Court assume, as the Government does, that a six-month break in time was sufficient for Petitioner to have recovered from his prior abuse. The earliest interrogation on which the Government relies took place on March 3, 2003, almost six months after Petitioner arrived at Guantanamo. *See* Gov't's Ex. 47 (ISN 839 SIR (Mar. 3, 2003)). Thus, the Government contends, even if Petitioner was tortured in Afghanistan, the effects of that torture were cleansed by the passage of time. But the critical question "is not the length of time between a previously coerced confession and the present confession, it is the length of time between the removal of the coercive circumstances and the present confession." *Karake*, 443 F. Supp. 2d at 89. The record does not indicate that the coercive circumstances were removed during those six months. Though Petitioner testified that the conditions at Guantanamo were less coercive than in Afghanistan, the Government failed to describe with any specificity Petitioner's condition and treatment during his Guantanamo interrogations. The Government's reticence is disconcerting given Petitioner's credible allegations that he was threatened by interrogators during his first year of detention at Guantanamo, among other claims of coercion. Underscoring these concerns is the fact that Petitioner's confinement at Guantanamo did not occur in a vacuum. Before Guantanamo, he had endured forty days of solitary confinement, severe physical and mental abuse, malnourishment, sensory deprivation, anxiety, and insomnia. The Government fails to establish that months of less-coercive circumstances provide sufficient insulation from forty days of extreme coercive conditions.

Petitioner's post-traumatic stress disorder seemingly exacerbated the taint from any harsh treatment. Dr. Stephen N. Xenakis, an expert in psychiatry, testified that Petitioner still suffers from post-traumatic stress disorder ("PTSD"). According to Dr. Xenakis, the passage of time

does not necessarily purify the taint from harsh treatment for an individual suffering from PTSD.

Dr. Xenakis concluded that because of the earlier harsh treatment, all of Petitioner's statements

from Guantanamo are unreliable.  In rebuttal, the Government submitted the declaration of Dr.

Ricky D. Malone.  Dr. Malone, an expert in forensic psychiatry, declared that "[a]lthough Mr.

Madhwani had clinically significant anxiety symptoms during the first few weeks after his arrival

at Guantanamo, they did not appear to be severe enough to inherently impair his reliability as an

informant."  Gov't's Ex. 10 at 5.  Dr. Malone's conclusions, however, are incomplete.  Dr.

Malone focused on Petitioner's first few weeks of detention instead of the period beginning six

months later.  The record also is unclear as to whether Dr. Malone was aware of the extensive

mental and physical abuse Petitioner endured prior to his detention at Guantanamo.  Dr. Malone

nonetheless affirmed that Petitioner suffered from "significant anxiety symptoms during" his

initial time at Guantanamo.  The Court is skeptical that subjecting Petitioner to circumstances

mirroring the cause of his "significant" anxiety disorder, such as solitary confinement, facilitated

his recovery.  In any event, Petitioner's "significant" anxiety disorder of indeterminate length

suggests that he continued to suffer from the effects of the harsh treatment during some, if not all,

of the interrogations on which the Government relies.

    In addition to being tainted by coercion, the Court finds that the Government failed to

establish that the twenty-three interrogation reports bear sufficient indicia of reliability.  The

Government argues that the interrogation reports and summaries are reliable because they were

recorded for intelligence purposes.  This line of reasoning was soundly rejected by the D.C.

Circuit in *Parhat v. Gates*, as it "comes perilously close to suggesting that whatever the

government says must be treated as true."  532 F.3d 834, 849 (D.C. Cir. 2008).  Directly

undermining such deference to interrogation reports, the record shows that multiple interrogators at Guantanamo threatened Petitioner. The documents themselves are no more suggestive of reliability. Petitioner's reliability is repeatedly described as having "not been determined." *See, e.g.,* Gov't's Ex. 42; Gov't's Ex. 43. And though Petitioner was administered a polygraph in 2003, *see* Gov't's Ex. 49, the Government did not offer as evidence, or even locate, the results of that polygraph. The Government also touts the consistency of Petitioner's past statements. Since Petitioner repeated certain inculpatory statements they must be true, or so the argument goes. The Court is not persuaded. The fact that Petitioner "has 'said it thrice' does not make an allegation true." *See Parhat*, 532 F.3d at 848 (quoting LEWIS CARROLL, THE HUNTING OF THE SNARK 3 (1876)). As noted *supra*, it appears that the interrogators at Guantanamo had access to and relied on Petitioner's coerced confessions from Afghanistan. That the Government continued to drink from the same poisoned well does not thereby make the water clean.

Accordingly, the Court finds that the twenty-three interrogation reports and summaries of Petitioner's statements submitted by the Government are not reliable. The Government established neither that the taint from Petitioner's prior coercive confinement was removed nor that those documents bear sufficient indicia of reliability.

  *ii.*    *Three documents detailing Petitioner's statements to the CSRT and ARB*

Though the Court finds that the majority of Petitioner's past statements are unreliable, there are two exceptions for which the Court identifies a sufficient "break" from past coercive conditions. The circumstances surrounding Petitioner's statements to the Combatant Status Review Tribunal ("CSRT") on September 23, 2004, and the Administrative Review Broad ("ARB") in December 2005, are fundamentally different from those affecting Petitioner's

interrogations on which the Government relies.  By the fall of 2004, and certainly by the end of

2005, Petitioner's mental and physical condition had improved since arrival at Guantanamo in

October 2002.  At the time of the CSRT proceeding, two years had elapsed since harsh

interrogation techniques were used on Petitioner; the break was over three years when the ARB

proceeding commenced.  As for the coercion that occurred at Guantanamo, all but one of

Petitioner's complaints concern interrogations before 2004.  The coercive circumstances had thus

been removed months, if not years, before Petitioner spoke to the ARB and CSRT.

> The taint from prior coercion is also attenuated by the format of the CSRT and ARB

proceedings.  They were conducted in a formal manner.  Far from being forced into an

interrogation room, Petitioner was given the option of participating in both proceedings.  Both

times Petitioner agreed to answer questions.  As opposed to fending for himself against

interrogators, during both proceedings Petitioner was assisted by a personal representative.

Providing transparency, both proceedings were recorded.  There also is no evidence that coercive

techniques were employed at either proceeding.  According to the record, no individual who may

have previously threatened Petitioner was present at the proceedings.  Petitioner claims that he

nonetheless feared that if he did not make false confessions at the proceedings he would be

tortured.  Belying those representations, however, Petitioner felt free to attack his prior

statements.  He specifically stated that he participated in the ARB proceeding because he was

"not afraid" of "Americans."  Gov't's Ex. 63 at 9.  The unrestrained tone and content of his

remarks are key to judging their reliability.

> Therefore, the Court finds reliable Petitioner's statements to the CSRT on September 23,

2004, and to the ARB in December 2005.  The coercive conditions that Petitioner had been

subject to did not infect his statements during either proceeding.

    *iii.*    *Petitioner's testimony*

    Petitioner's live testimony differs in some respects from his statements at Guantanamo during his first few years of detention.[6] The Court finds that Petitioner's testimony was in part reliable, especially with respect to his conditions of confinement. Nevertheless, considering his demeanor, his personal stake in the proceedings, and the reliable evidence in record, there are portions of Petitioner's testimony that the Court cannot accept, in particular his explanations for certain actions. For these reasons, to the extent his current narrative is inconsistent with his statements to the CSRT in 2004 and ARB in 2005, the Court defers to the latter statements.

B.    <u>Other Direct Evidence</u>

    The record suffers from a dearth of third-party witnesses and direct evidence, few of which are material. Based on the Government's own standards for assessing the credibility and reliability of intelligence sources, the Court finds that those few material documents are not reliable. Because the evidence is classified, the Court offers only an overview of its determinations.

    The Government cannot justify Petitioner's detention based on the reports alleging Petitioner trained to use explosives. *See* Gov't's Ex. 33 at 7; Gov't's Ex. 39 at 5. The reports contain triple hearsay and do not indicate the circumstances in which the reports' source obtained

---

[6] Petitioner submitted a February 23, 2007, letter from counsel to the ARB, a declaration from July 1, 2008, another declaration dated February 3, 2009, and a letter to Judge Henry H. Kennedy dated February 2, 2009, all of which are materially consistent with his live, sworn testimony. For the purposes of this opinion, the Court will only refer to Petitioner's comprehensive testimony because there is no reason to doubt that Petitioner provided his complete version of relevant events during his two days of testimony.

the information.  A report describing the two-and-one-half hour firefight at the Karachi apartment where Petitioner was arrested similarly is unreliable.  *See* Gov't's Ex. 58.  The source (or sources) of the report is unknown.  Nor does the report "provide any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting."  *Parhat*, 532 F.3d at 846-47.  The Government also cannot rely on a report concerning a document directly linked to Petitioner.  *See* Gov't's Ex. 68.  The report lacks any indicia of reliability.

Therefore, with the exception of some circumstantial evidence and background information, the reliable evidence in the record consists of Petitioner's live testimony in part, his September 23, 2004, statements before CSRT, and his December 2005 statements to the ARB.  In a case largely dependent on Petitioner's past statements, the Court is forced to base its decision on a severely truncated body of evidence.

## FINDINGS OF FACT

To justify Petitioner's detention, the Government presents four primary allegations: Petitioner (i) traveled to Afghanistan with the intention of receiving weapons training; (ii) trained to use firearms at an al-Qaida training camp; (iii) traveled and associated with al-Qaida members; and (iv) engaged in a two-and-one-half hour firefight with Pakistani authorities.  Based on the reliable evidence in the record, the Court finds that the Government failed to prove the first and last allegations by a preponderance of the evidence.  As for the accusations that Petitioner trained, traveled, and associated with al-Qaida members, Petitioner's incriminating words provide sufficient proof.

A.    Travel to Afghanistan

The first allegation, that Petitioner traveled to Afghanistan with the intent to receive

weapons training, is based entirely on circumstantial evidence.  The Government posits that

Petitioner intended to receive military training because he ultimately received such training.  He

must have known about the training ahead of time, the Government argues, because the offer by

recruiters to send him to Afghanistan for free was otherwise too good to be true.

Far from an Islamic extremist, Petitioner describes himself as a hapless individual who

did not realize what he was signing up for.  Petitioner consistently has stated that he traveled to

Afghanistan with no intention of training or fighting.  *See* Gov't's Ex. 63 at 2.  According to his

testimony and past statements, the two men who recruited him to travel to Afghanistan never

mentioned military training.  *See* Gov't's Ex. 65 (ISN 839 Summary of CSRT Proceedings (Sept.

23, 2004)) at 1.  They offered to pay for his flight to Afghanistan so that he could see "how the

Muslims were doing under the Taliban." *Id.* at 3.  Lacking employment, he had nothing to lose

by accepting the recruiters' offer, and left for Afghanistan in early August 2001.  According to

Petitioner, upon landing in Pakistan he was shepherded by strangers to Afghanistan.  His group

was transported to the al-Nebras guesthouse, a common gateway to an al-Qaida training camp,

where his passport and plane ticket were collected.  *See* Gov't's Ex. 63 at 2; Gov't's Ex. 65 at 5.[7]

At al-Nebras is where Petitioner claims he first learned he would receive weapons training.  One

week later, he was transported to an al-Qaida training camp.  *Id.*

_____

[7] Although Petitioner testified that he does not know if the guesthouse where he stayed
was al-Nebras, Petitioner's description is consistent with the description of al-Nebras provided
by other detainees and a government declaration.  Moreover, before the CSRT and ARB
Petitioner did not challenge that al-Nebras was the proper name of the guesthouse.  The Court
therefore finds that the guesthouse was more likely than not al-Nebras.

Both parties' narratives are lacking. There is no reliable direct evidence supporting the Government's claim about Petitioner's intent to receive training. The Government submitted no evidence about Petitioner's family, schooling, or background that suggests he possessed militant or fanatical views before he left for Afghanistan in August 2001. The Court is equally skeptical about Petitioner's description. The evidence suggests Petitioner knew before he arrived at al-Nebras that he was not going on a sightseeing trip. Yet, whenever that moment of realization occurred, Petitioner did not leave the group with whom he was traveling. Ultimately, since the burden of prove rests with the Government, the Court finds that Petitioner did not intend to receive weapons training.

B.      Training at an al-Qaida camp

Next, the Government alleges that Petitioner received firearms training at al-Farouq, an al-Qaida basic training camp. The Government's evidence directly comes from Petitioner. Petitioner concedes he attended al-Farouq for approximately twenty-five days, during which he received basic firearms training. *See* Gov't's Ex. 65 at 2. He testified that he fired a Kalashnikov rifle and a pistol, among other firearms, and received theoretical instruction on Rocket Propelled Grenades ("RPGs").[8] His training ultimately was cut short. According to Petitioner, on September 11, 2001, the trainees were told that the camp was closing. The instructors feared that the camp would be bombed because of events that had occurred in the United States.

Unable to dispute that he received firearms training in Afghanistan, Petitioner instead argues that he did not intend to train at an al-Qaida camp. He testified that he was forced to

---

[8] Though the Government also alleges Petitioner trained to use explosives, there is no reliable evidence in the record supporting such a claim. Petitioner has consistently denied training with explosives. *See, e.g.,* Gov't's Ex. 63 at 4.

attend the camp. On three occasions he tried to leave, he claims, but was rebuffed each time. Petitioner also suggested that the camp may not have been al-Farouq. At the Merits Hearing, Petitioner claimed that he did not hear the name al-Farouq until he was told that was the name of the camp he attended by an interrogator. He thus does not know if the camp was actually al-Farouq or even associated with al-Qaida.

The Court finds that Petitioner's testimony about his attempts to leave al-Farouq is not credible. The record shows that Petitioner was not conscripted. By his own admission, it was not impossible to leave the camp. He testified that he knew detainees who successfully dropped out. The veracity of his claims is further undermined by his previous silence on his efforts to leave. If Petitioner had in fact tried to leave, he would have had every incentive to discuss his attempts with the ARB and CSRT. Yet when asked at the CSRT proceeding whether he was "forced to take the training," Petitioner made no mention of even a single attempt to quit. Gov't's Ex. 65 at 9. Before the ARB, when asked why he did not leave the camp, he again did not discuss any attempts to prematurely leave. *See* Gov't's Ex. 63 at 7.

As for the name of the training camp, the Court finds that more likely than not it was al-Farouq. Once again, Petitioner's previous silence on the matter is telling. During proceedings before the CSRT and ARB, Petitioner did not dispute that the camp was named al-Farouq. As recently as February 23, 2007, in a submission to the ARB, Petitioner referred to the camp as al-Farouq. *See* Pet'r's Ex. 159 (ISN 839 ARB Statement (Feb. 27, 2007)) at 2. His description of the camp is also consistent with the descriptions of al-Farouq provided by other detainees and a government declaration. As perhaps the ultimate corroboration, Petitioner admitted at the CSRT and ARB proceedings that he saw Usama bin Laden at the camp. *See* Gov't's Ex. 65 at 2;

19

Gov't's Ex. 63 at 4. At the Merits Hearing, Petitioner unconvincingly refuted his earlier statements about bin Laden. He testified that during the CSRT and ARB proceedings he feared that he would be tortured if he tried to change his prior confessions about seeing bin Laden. The record suggests otherwise. As discussed earlier, the CSRT and ARB proceedings occurred years after Petitioner had been subject to harsh interrogation techniques. He was comfortable enough during both proceedings to deny certain allegations to which he had previously admitted, including those with respect to bin Laden. When confronted at the CSRT with his earlier statement about seeing bin Laden at various training facilities, Petitioner clarified that "I only saw Bin Laden once at that training camp." Gov't's Ex. 65 at 2. Therefore, the Court finds that the Government proved by a preponderance of the evidence that Petitioner voluntarily received weapons training at al-Farouq for approximately twenty-five days.

C.     Travel and association with al-Qaida members

According to the Government, after al-Farouq closed Petitioner traveled and associated with al-Qaida members until he was arrested one year later. Once again, the Government relies on Petitioner's own words. Petitioner stated that once the camp closed he was transported with a group of approximately twenty other trainees from al-Farouq to various guesthouses in Afghanistan. He testified that two trainers from al-Farouq were initially part of the group. The trainers slept apart from the group and did not socialize with them. At one point, the trainers told Petitioner to grab a Kalashnikov rifle, and he complied. He was afraid to get rid of the rifle, he testified, because he thought he would get in trouble. The group, or portions thereof, traveled to various towns in Afghanistan. He was entirely dependent on others for food, shelter, transportation, and guidance. After months of wandering, Petitioner reconnected with his

passport and made his way to Pakistan.  He stayed in multiple Pakistani cities, including Karachi.

In Karachi, Petitioner was told that the safest route to Yemen was through Iran.  The advice

proved to be unhelpful, as he was detained in Iran and forced to turn back.  He returned to

Karachi and settled in an apartment with multiple roommates.  According to reliable classified

evidence in the record, a neighbor from across the hall who visited the apartment was a member

of al-Qaida.

The Government also alleges that Petitioner interacted with high-level members of al-

Qaida throughout his year-long journey.  According to Petitioner's statements to the CSRT and

ARB, while he was in Khost, Afghanistan, he again saw bin Laden.  *See* Gov't's Ex. 63 at 4;

Gov't's Ex. 65 at 2.[9]  The record further indicates that the neighbor from across the hall in

Karachi was a high-level al-Qaida member.  There is otherwise no direct reliable evidence in the

record that Petitioner associated with high-level al-Qaida members.  Although Petitioner

previously admitted to meeting with such high-placed operatives as Khalid Sheikh Mohammed,

the statements that the Government relies on are not reliable.

Petitioner provides a variety of explanations for his association with al-Qaida members

during this one-year period.  Initially he had no choice but to travel with members of al-Qaida,

Petitioner stated, because he needed his passport.  And once he located his passport and made his

way to Pakistan, he could not sever ties with al-Qaida members because he feared being arrested

by Pakistani authorities.  It is for this reason, he told the CSRT, that he could not have made it to

the Yemeni embassy in Pakistan.  *See* Gov't's Ex. 65 at 4.

---

[9] Though at the Merits Hearing Petitioner denied ever seeing bin Laden at Khost, for the
reasons already discussed at length, the Court defers to Petitioner's statements to the CSRT and
ARB about bin Laden.

Those explanations are simply not credible.  The missing passport was certainly not the tie that bound Petitioner to al-Qaida since his association with its members did not abate when he crossed into Pakistan.  As for the threat posed by Pakistani authorities, that fear did not inhibit Petitioner from traveling all over Pakistan for many months, including from Karachi to Iran and back to Karachi.  His ability to travel from Karachi to Iran and back belies his professed inability to reach the Yemeni embassy during his multiple stays in Karachi.  And though Petitioner acknowledged calling his family while in Afghanistan, Gov't's Ex. 63 at 11, he did not call them for assistance while he was supposedly trapped in Pakistan.  Accordingly, the Court finds that Petitioner voluntarily traveled and associated with al-Qaida members in Afghanistan and Pakistan.

D.     Firefight in Karachi

The Government's final and most inflammatory allegation is that Petitioner engaged in a two-and-one-half hour firefight with Pakistani authorities.  The only direct evidence of Petitioner's participation is a classified report.  As detailed in the Court's classified bench ruling, that report is not reliable.  The allegation thus has no leg to stand on.  Petitioner told the CSRT and ARB that he did not fire any weapons, he did not resist arrest, and he was arrested before the firing began.  *See* Gov't's Ex. 63 at 11; Gov't's Ex. 65 at 3.  His testimony was entirely consistent with those representations.  Even the newspaper article that the Government submitted for background information is not inconsistent with Petitioner's story.  The article states that three Yemenis from the apartment were arrested before the firefight began.  *See* Gov't's Ex. 74. The Government thus failed to establish that Petitioner participated in the firefight.

Though the Government did not meet its burden, the Court does not fully credit

Petitioner's account of his stay at the Karachi apartment. Petitioner testified that he never saw any weapons in the apartment, yet conceded that his roommate and neighbor possessed sufficient armaments to engage Pakistani authorities in a two-and-one-half hour firefight. In light of Petitioner's over one month stay at the apartment, and his self-professed travel restrictions in Karachi, his denial strains credulity.

Despite the Court's skepticism, Petitioner's account, at a minimum, reveals that he associated with members of al-Qaida at the apartment. The parties do not dispute that a firefight occurred between Pakistani authorities and individuals with whom Petitioner had been living. Petitioner concedes that one of his roommates, Ammar, resisted arrest and was killed by the Pakistanis. *See* Gov't's Ex. 63 at 10-11. An individual who lived across the hall from Petitioner also participated in the gun battle and was killed. *See* Gov't's Ex. 63 at 5. According to reliable classified evidence in the record, the neighbor was a member of al-Qaida. Petitioner testified that al-Qaida neighbor would often drop by the apartment. The Court therefore finds that Petitioner more likely than not associated and lived with al-Qaida members in Karachi, some of whom fought to the death to avoid capture.

## ANALYSIS

The Government met its burden of proof with respect to the allegations that Petitioner voluntarily attended an al-Qaida training camp for approximately twenty-five days and then traveled, associated, and lived with members of al-Qaida over the course of one year. Those facts are sufficient to conclude that Petitioner more likely than not was "part of" al-Qaida. *Cf. Al-Bihani*, No. 09-5051, slip op. at 10 n.2 (noting that evidence supporting the government's reasonable belief that a non-citizen seized abroad during the ongoing war on terror either

"attended Al Qaeda training camps in Afghanistan [or] visited Al Qaeda guesthouses . . . would seem to overwhelmingly, if not definitively, justify the government's detention of such a non-citizen").

Petitioner's actions demonstrate a clear intent to be "part of" al-Qaida. Though his motives before arriving at al-Farouq are murky, once in Afghanistan he demonstrated an unrelenting desire to be with al-Qaida. Petitioner must have known that al-Farouq was an al-Qaida weapons training camp. Petitioner was trained to fight. He learned to use multiple firearms and received theoretical instruction on RPGs. Certainly he realized he was not being prepared for charitable work. And yet, Petitioner stayed. Towards the end of his training he heard bin Laden, the founding leader of al-Qaida, speak. He was told the camp was closing because it might be bombed by United States forces. Still, he stayed with al-Qaida. Though Petitioner finally got what he allegedly wanted, his ticket out of the camp, he chose to follow trainers from the al-Qaida training camp around Afghanistan. Though the identities of his other travel companions are not clear from the record, what is clear is that they had just received training at an al-Qaida camp and they later crossed paths with bin Laden. He moved into an apartment in Karachi where members of al-Qaida lived and visited. Yet Petitioner stayed. Petitioner's plea of ignorance is unavailing. Over the course of one year he trained with al-Qaida members, learned that United States forces might bomb his training camp, heard bin Laden speak twice, followed al-Qaida trainers, traveled with al-Qaida members, and lived with al-Qaida members. It is inconceivable that during that time Petitioner did not learn something about the people with whom he was associating. But Petitioner stayed.

The record also shows that Petitioner participated "within or under the command structure

of the organization." *See Hamlily*, 616 F. Supp. 2d at 75.  He attended the basic training camp of

al-Qaida for approximately twenty-five days.  When camp ended, he followed camp instructors

around Afghanistan.  The instructors gave him orders, and he obeyed.  When told to grab a rifle,

he picked one up out of fear that if he disobeyed he would get in trouble.  Petitioner's claim that

he was not following orders amounts to semantics.  He testified that when he picked up the rifle

he was simply following the suggestion of someone who was providing assistance.  But

Petitioner's characterization does not account for his fear that he would get in trouble if he did

not follow the trainers' instruction.  The trainers also held a special status in the group; they slept

in separate quarters and did not socialize with the trainees.  The most reasonable interpretation of

the incident is that a superior issued an order and Petitioner obeyed.  The very fact that Petitioner

was able to successfully navigate through Afghanistan and Pakistan, having never visited either

country, not speaking the language, and possessing no money, evidences that he followed the

direction of al-Qaida members.  His reunion with his passport weeks after he left al-Farouq, for

example, cannot be explained by mere happenstance.

It also is telling that al-Qaida considered Petitioner to be a member.  Al-Qaida admitted

him to their training camp and trained him to use firearms.  Al-Qaida allowed him to be in the

presence of bin Laden, twice.  Al-Qaida assigned him to the charge of two al-Qaida instructors

when the training camp closed.  Al-Qaida fed, sheltered, and protected him.  Al-Qaida sent him

to live in an apartment in Karachi frequented by al-Qaida members.  The only logical explanation

as to why al-Qaida did all of this for Petitioner is that they considered him a member.  Petitioner

must have taken some affirmative action to earn that trust and assistance from such a clandestine

organization.  Accordingly, the Government has proved by a preponderance of the evidence that

Petitioner was "part of" al-Qaida.

Though there is sufficient evidence in the record to prove Petitioner was a "part of" al-Qaida, the Court is not convinced that it is more likely than not that Petitioner is a threat to the security of the United States. As a young, unemployed, undereducated Yemeni, Petitioner was particularly vulnerable to the demagoguery of religious fanatics. The record reflects that Petitioner was, at best, a low-level al-Qaida figure. It does not appear he even finished his weapons training. There is no evidence that he fired a weapon in battle or was on the front lines. There is also no evidence that he planned, participated in, or knew of any terrorist plots. Classified documents in the record confirm the Court's assessment. As does the fact that he appears to have been a model prisoner during his seven years of detention. The Court fails to see how, based on the record, Petitioner poses any greater threat than the dozens of detainees who recently have been transferred or cleared for transfer.

## CONCLUSION

Having found that the Government demonstrated by a preponderance of the evidence that Al Madhwani was "part of" al-Qaida, the Court concludes that he is being lawfully detained by the United States Government. Accordingly, though the Court finds that Al Madhwani does not currently pose a threat to the security of the United States, his petition for habeas corpus will be denied.

An order accompanies this memorandum opinion.

January 6th, 2010

Thomas F. Hogan
United States District Judge