IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUHAIL ABDU ANAM, *et al.*, ) | |
| ) | |
| Petitioners, ) | Civil Action No. 04-1194 (TFH) |
| ) | |
| v. ) | Honorable Judge Thomas F. Hogan |
| ) | |
| BARACK OBAMA, *et al.*, ) | |
| ) | |
| Respondents. ) | |

MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY MOTION OF PETITIONER MUSA'AB OMAR AL MADHWANI
<u>FOR HUMANITARIAN AND LIFE-SAVING RELIEF</u>

April 10, 2013

Darold Killmer
Mari Newman
Lauren Fontana
KILLMER, LANE & NEWMAN, LLP
1543 Champa St., Suite 400
Denver, CO 80202
(303) 571-1000 phone
(303) 571-1001 fax

Patricia A. Bronte
BRONTE LAW LLC
915 West Gunnison St., Suite 3
Chicago, IL 60640
(312) 388-7890 phone
(312) 254-3242 fax

*Attorneys for Petitioner Musa'ab Omar Al Madhwani*

## Table of Contents

**Page**

Table of Authorities ................................................................................................. ii

Exhibit List .......................................................................................................... v

Factual Background ............................................................................................. 1

    The Toll of Indefinite Detention ................................................................... 3

    The Hunger Strike ........................................................................................ 4

Federal Courts Have Jurisdiction to Enforce the Constitutional Right
To *Habeas Corpus* by Prohibiting Interference with or Retaliation
Against Detainees Exercising Those Rights ..................................................... 13

    I. This Court Has the Authority to Order the Government to Provide
       Drinkable Water to Musa'ab ................................................................... 13

        A. This Court's Denial of Habeas Relief Three Years Ago Does Not
           Diminish the Court's Jurisdiction to Order the Government to
           Preserve Musa'ab's Life .................................................................... 16

        B. The Government Cannot Trivialize the Emergency Motion
           as a Mere Attempt to Upgrade the Conditions of Musa'ab's
           Detention .......................................................................................... 18

       II. Musa'ab Can Satisfy Each of the Three Requirements for a
         Preliminary Injunction ........................................................................... 23

Conclusion .......................................................................................................... 24

Certificate of Service .......................................................................................... 26

# Table of Authorities

**Page**

CASES

*Al Adahi v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009) ........................................ 22

*Al Ansi v. Bush*, No. 08-1293, 2009 U.S. Dist. LEXIS 58389
 (D.D.C. July 9, 2009).................................................................................. 21, 22

*Al Janko v. Gates*, 831 F. Supp. 2d 272 (D.D.C. 2011).......................................... 21

*Al-Joudi v. Bush*, 406 F. Supp. 2d 13 (D.D.C. 2005) .............................................. 17

*Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012)................................... 18, 21

*Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) ............................................. 20, 24

*Bell v. Wolfish*, 441 U.S. 520 (1979) ...................................................................... 15

*Boumediene v. Bush*, 553 U.S. 723 (2008) .......................................................*passim*

*Carafas v. LaVallee*, 391 U.S. 234 (1968) .............................................................. 14

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) . 24

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)............................................................. 13

*Harris v. Nelson*, 394 U.S. 286 (1969).................................................................... 14

*Husayn v. Gates*, 588 F. Supp. 2d 7 (D.D.C. 2008) ................................................ 22

*In re Guantanamo Bay Detainee Continued Access to Counsel*, Misc. No.
 12-398, 2012 U.S. Dist. LEXIS 126833 (D.D.C. Sept. 6, 2012) ......................... 17

*In re Guantánamo Bay Litigation*, 570 F. Supp. 2d 12 (D.D.C. 2008).................. 21

*In re Guantánamo Bay Litigation*, 577 F. Supp. 2d 312 (D.D.C. 2008)........... 21, 22

*In re Navy Chaplaincy v. United States Navy*, 697 F.3d 1171 (D.C. Cir. 2012).... 24

*Khadr v. Bush*, 587 F. Supp. 2d 225 (D.D.C. 2008)............................................... 21

*Kiyemba v. Bush*, 561 F.3d 509 (D.C. Cir. 2009) ............................................. 14, 21

*Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan*, 111 U.S. 379 (1884).... 16

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F. 3d 36 (D.C. Cir. 2000)..... 23

*Preiser v. Rodriguez*, 411 U.S. 475 (1973)................................................................ 15

*Ramirez v. District of Columbia*, No. 99-803, 1999 U.S. Dist. LEXIS
15964 (D.D.C. Oct. 14, 1999) ....................................................................... 24

*United States v. Hayman*, 342 US. 205 (1952) ....................................................... 23

*United States v. Shipp*, 203 U.S. 563 (1906)........................................ 14, 15, 16, 21

*United States v. Shipp*, 214 U.S. 386 (1909)........................................................... 16

UNITED STATES CONSTITUTION

U.S. CONST., Art. I, § 9, cl. 2 ................................................................................... 14

U.S. CONST., amend V .............................................................................................. 13

U.S. CONST., amend VIII .......................................................................................... 13

STATUTES

28 U.S.C. § 1651....................................................................................................... 14

28 U.S.C. § 2241(e)............................................................................................*passim*

RULES

FED. R. CIV. P. 60(b) ............................................................................................ 3, 17

OTHER AUTHORITIES

Ben Fox, *US Now Naming Force-Fed Guantánamo Prisoners*, AP,
Apr. 8, 2013, http://bigstory.ap.org/article/us-now-naming-force-fed-
guantanamo-prisoners............................................................................................ 5

*By the Numbers*, THE MIAMI HERALD (updated Mar. 26, 2013),
   http://www.miamiherald.com/2007/11/27/322461_p2/by-the-numbers.html ...... 4

Carol Rosenberg, *Navy ruling ends commercial flights to Guantánamo from
   South Florida*, MIAMI HERALD, Mar. 17, 2013,
   http://www.miamiherald.com/2013/03/17/v-print/3291679/navy-ruling-ends-
   commercial-flights.html ..................................................................................... 12

DEP'T OF JUSTICE, DEP'T OF DEF., DEP'T OF STATE, DEP'T OF HOMELAND SEC.,
   OFFICE OF THE DIR. OF NAT'L INTELLIGENCE, JOINT CHIEFS OF STAFF, GUANTÁNAMO
   REVIEW TASK FORCE FINAL REPORT (2010), *available at*
   http://www.justice.gov/ag/guantanamo-review-final-report.pdf ...................... 3, 4

Geneva Convention for the Amelioration of the Condition of the Wounded
   and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3, 6 U.S.T.
   3114, 3116, 75 U.N.T.S. 31, 32 (entered into force Oct. 21, 1950) ................... 13

Geneva Convention for the Amelioration of the Condition of Wounded,
   Sick and Shipwrecked Members of Armed Forced at Sea, Aug. 12, 1949,
   art. 3, 6 U.S.T. 3217, 3220, 75 U.N.T.S. 85, 86
   (entered into force Oct. 21, 1950) ....................................................................... 13

Geneva Convention Relative to the Treatment of Prisoners of War,
   Aug. 12, 1949, art. 3, 6 U.S.T. 3316, 3318, 75 U.N.T.S. 135, 136
   (entered into force Oct. 21, 1950) ....................................................................... 13

Geneva Convention Relative to the Protection of Civilian Persons in Time
   of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3516, 3518, 75 U.N.T.S. 287, 288
   (entered into force Oct. 21, 1950). ...................................................................... 13

*Hydration, one bottle at a time*, THE WIRE, Mar. 19, 2010, at 5,
   http://www.jtfgtmo.southcom.mil/wire/pdf/v11/issue6.pdf ..................................... 9

*Posture Statement of General John F. Kelly, United States Marine Corps,
   Commander, United States Southern Command Before the 113th
   Congress Senate Armed Servs. Comm.,* 113 Cong. 23 (Mar. 19, 2013),
   *available at*
   http://www.southcom.mil/newsroom/documents/southcom%202013%20posture%
   20statement%20final%20sasc.pdf .................................................................... 10

iv

**Exhibit List**

1.      Declaration of Clive Stafford Smith Regarding Yunus Chekkouri

2.      Declaration of Clive Stafford Smith Regarding Shaker Amer

3.      Declaration of Carlos Warner

4.      Declaration of Lt. Col. Barry Wingard

5.      Declaration of Cindy Pánuco

6.      Statement of Musa'ab

7.      Declaration of Jennifer Cowan

8.      Declaration of Pardiss Kebriaei

9.      Declaration of Derek A. Poteet

10.     Declaration of Daniel Lakemacher

## MEMORANDUM OF LAW IN SUPPORT OF
## EMERGENCY MOTION FOR HUMANITARIAN AND LIFE-SAVING RELIEF

Four years after promising to close Guantánamo, and in the face of the worst crisis in the prison's history, President Obama has defiantly restated the mantra of his predecessor's Administration: American courts cannot touch Guantánamo Bay. This is wrong as a matter of law. The Supreme Court has repeatedly rejected the Government's attempts to deny the federal *habeas* rights of Guantánamo prisoners and to make Guantánamo a legal black hole. For at least a century, federal courts have exercised their jurisdiction to prevent the jailer from interfering with a prisoner's ability to seek *habeas* relief in federal court. The Military Commissions Act of 2006 does not and cannot mandate a different result here.

This Emergency Motion addresses the fundamental right to *habeas corpus*. Far from being limited to issues regarding the conditions of confinement, this Emergency Motion seeks critical relief that is necessary if Petitioner Musa'ab Omar Al Madhwani ("Musa'ab") is to remain alive to exercise his *habeas* rights.

### Factual Background

Musa'ab Al Madhwani is a Yemeni citizen in his eleventh (11th) year of imprisonment at the U.S. Naval Station in Guantánamo Bay, Cuba. Before bringing him to Guantánamo, the United States subjected Musa'ab to "forty days of solitary confinement, severe physical and mental abuse, malnourishment, sensory deprivation, anxiety, and insomnia" in the Dark Prison and at Bagram Air Base. (Dkt. 696 at 11; Transcript of Dec. 14, 2009 Hg. at 17-20, 25.) The United States

1

also held Musa'ab in solitary confinement when he initially arrived at Guantánamo. (Dkt. 696 at 12; Transcript of Dec. 14, 2009 Hg. at 26.)

After a four-day evidentiary hearing in which the Government presented no live witnesses, this Court rejected virtually all of the evidence offered by the Government to support Musa'ab's detention, because that evidence consisted of statements extracted from Musa'ab through torture and coercion by agents of the United States. (Dkt. 696 at 5-13; Transcript of Dec. 14, 2009 Hg. at 17-29.) As this Court found:

> Although the names in Afghanistan and Guantánamo changed, the use of threats, that is coercion, did not. As described in petitioner's classified testimony about his conditions of confinement, which I find to be credible, the United States was involved in the prisons where he was held, and believe to have orchestrated the interrogation techniques, the harsh ones to which he was subject.

(Transcript of Dec. 14, 2009 Hg. at 21.) Based upon credible expert testimony of Dr. Stephen N. Xenakis, a retired Brigadier General, this Court determined that Musa'ab suffers from post-traumatic stress disorder as a result of his treatment by U.S. personnel. (Dkt. 696 at 8, 11-12; Transcript of Dec. 14, 2009 Hg. at 25.)

In its ruling of January 6, 2010, this Court found that Musa'ab is not a threat to the United States and suggested the Government release him. (*Id.* at 26.) Repeatedly questioning whether there is any real basis for his continued detention, the Court found that Al-Madhwani's record, including the Government's own documents, "do[es] not give any basis for his continued detention" but instead shows he "does not presently pose a threat to the United States," and is "a lot less threatening" than scores of detainees the government had recently released. (*Id.*;

Transcript of Dec. 14, 2009 at 10-11, 13.) Nevertheless, the Court felt its "hands [were] tied" by the "law as written" and it had no choice but to deny Musa'ab's petition for habeas corpus. (Dkt. 696 at 4.)[1]

## The Toll of Indefinite Detention

On January 22, 2010, shortly after this Court's ruling, the Guantánamo Review Task Force released its Final Report.  DEP'T OF JUSTICE, DEP'T OF DEF., DEP'T OF STATE, DEP'T OF HOMELAND SEC., OFFICE OF THE DIR. OF NAT'L INTELLIGENCE, JOINT CHIEFS OF STAFF, GUANTÁNAMO REVIEW TASK FORCE FINAL REPORT (2010), *available at* http://www.justice.gov/ag/guantanamo-review-final-report.pdf.  The Final Report reflects the unanimous agreement of senior officials in the Departments of Justice, Defense, State, and Homeland Security, the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Counterterrorism Center. (Final Report at i-ii.) After a "comprehensive interagency review" and "rigorous examination of information" – classified and unclassified – pertaining to each detainee, the Review Task Force determined that, in the interests of national security, the Government should:  repatriate or resettle in other countries more than half (126) of the detainees; release thirty (30) other detainees, all Yemenis, if security conditions in their homeland improved; prosecute thirty-six (36) detainees; and indefinitely detain forty-eight (48) prisoners who could not be prosecuted but were "too dangerous" to release. (Final Report at i-ii, 3-9.)

---

[1] This Court's ruling was affirmed on appeal, No. 10-5172, and the Supreme Court denied certiorari. A Rule 60(b) motion remains pending before this Court.

The Government informed the 126 men that they were unconditionally approved for transfer, initially designating that information as "protected." (Dkt. 960-1.) The remaining prisoners, including Musa'ab, were not informed whether they were conditionally approved for release or slated for indefinite detention because they were "too dangerous." Eighty-six (86) men remain imprisoned at Guantánamo today, despite having been unanimously approved for release or transfer. (Dkt. 960-2; Final Report at 12.)  In the past two years, only six prisoners have left Guantánamo: two died in what the Pentagon called suicides, two Uighurs were belatedly released pursuant to court order, and two men left the prison under the terms of their plea bargains. (*By the Numbers,* The Miami Herald (updated Mar. 26, 2013), [http://www.miamiherald.com/2007/11/27/322461_p2/by-the-numbers.html](http://www.miamiherald.com/2007/11/27/322461_p2/by-the-numbers.html).) In total, nine men have died at the Guantánamo prison, while only seven  have been convicted or have pleaded guilty before military commissions. (*Id.*)

Musa'ab has never been charged with any crime, much less tried or convicted. Nonetheless, he is in his 11th year of imprisonment, with no indication that he will ever be released.  In the three years since this Court's ruling, both of Musa'ab's parents have died.

## The Hunger Strike

At the beginning of this year, a new commander assumed control of the prison at Guantánamo. At the same time, the conditions imposed on the prisoners reverted to the harsh conditions that existed in the early years of Musa'ab's imprisonment. In early February, intrusive searches of the prisoners' Qur'ans and

other increasingly harsh treatment by the new regime sparked a protest that led to a widespread hunger strike among the Guantánamo prisoners. (Ex. 1 – Declaration of Clive A. Stafford Smith Relating to Younus Chekkouri, at 1-2; Ex. 2 – Declaration of Clive A. Stafford Smith Relating to Shaker Amer, ¶¶ 5-6; Ex. 3 – Declaration of Carlos Warner, 1; Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶ 7; Ex. 5 – Declaration of Cindy Pánuco, ¶ 4.)  The parties dispute the number of prisoners who are participating in the hunger strike. Musa'ab and other detainees (through their respective counsel) report that virtually all of the 166 Guantánamo prisoners are protesting their indefinite detention through the hunger strike. (Ex. 6 – Statement of Musa'ab, ¶ 17; Ex. 2 – Declaration of Clive A. Stafford Smith Relating to Shaker Amer, ¶45; Ex. 1 – Declaration of Clive A. Stafford Smith Relating to Younus Chekkouri, 2-3; Ex. 7 – Declaration of Jennifer Rose Cowan, ¶ 7.) As of Monday, April 8, 2013, the military claimed that only 42 prisoners are on hunger strike. (Ben Fox, *US Now Naming Force-Fed Guantánamo Prisoners*, AP, Apr. 8, 2013, http://bigstory.ap.org/article/us-now-naming-force-fed-guantanamo-prisoners.)

Whatever the exact number, it is clear that scores of prisoners feel hopeless enough to resort to this extreme form of protest. (Ex. 1 – Declaration of Clive A. Stafford Smith Relating to Younus Chekkouri, 4; Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶ 7; Ex. 5 – Declaration of Cindy Pánuco, ¶ 8.)

Musa'ab has been consuming no food, only water, for an extended period of time. (Ex. 6 – Statement of Musa'ab, ¶ 18.) On March 25, 2013, Musa'ab informed his lawyers by telephone that guards had refused to provide him, and the other men

on his and a second cell block, with drinkable water for the past three days. (*Id.* at

¶ 22.) This report was corroborated by other detainees. (Ex. 8 – Declaration of

Pardiss Kebriaei, ¶ 4.) When Musa'ab and his fellow prisoners requested drinking

water, the guards told them to drink from the taps attached to the backs of the

toilets in their cells. (Ex. 6 – Statement of Musa'ab, ¶ 27; Ex. 8 – Declaration of

Pardiss Kebriaei, ¶ 8.) These instructions came despite the ICRC's long history of

advising the detainees not to drink the tap water. (Ex. 8 – Declaration of Pardiss

Kebriaei, ¶ 5; Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶ 10.) The tap water at

Guantánamo Bay Naval Station is widely regarded as not drinkable, and residents

of the Naval Station drink only bottled water. (Ex. 3 – Declaration of Carlos

Warner, 2; Ex. 9 – Declaration of Derek A. Poteet, ¶¶ 5-12; Ex. 10 – Declaration of

Daniel Lakemacher, ¶¶4-8; Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶¶ 11-

15.) In fact, local fast food restaurants, including McDonald's, do not use the tap

water to prepare food or coffee. (Ex. 8 – Declaration of Pardiss Kebriaei, ¶ 6.)

Musa'ab reported that the lack of drinkable water had already caused some

prisoners kidney, urinary, and stomach problems. (Ex. 6 – Statement of Musa'ab,

¶ 31.) Musa'ab also reported that, for the previous 10 days, prison authorities had

maintained the air conditioning at frigid temperatures, much colder than ever

before. (*Id.* at ¶¶ 43-46.) These allegations are corroborated by other detainees who

have reported the same temperature manipulation. (Ex. 3 – Declaration of Carlos

Warner, 1; Ex. 8 – Declaration of Pardiss Kebriaei, ¶ 9; Ex. 4 – Declaration of Lt.

Col. Barry Wingard, ¶ 21; Ex. 5 – Declaration of Cindy Pánuco, ¶ 9.) The cotton

clothing provided to Musa'ab is insufficient to keep him warm under these super-cooled conditions. (Ex. 6 – Statement of Musa'ab, ¶ 47.) Other detainees have also reported blankets and clothing have been confiscated, leaving the detainees with only one set of thin, cotton clothing to keep them warm against the cool temperatures. (Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶¶ 20-21.)

After Musa'ab informed his lawyers of the lack of drinkable water, some – but not all – guards began providing drinkable water again, at their sole discretion. (Ex. 6 – Statement of Musa'ab, ¶ 24.) Other detainees likewise report that drinkable "water was severely restricted," guards refused to replenish the supply of water, and the detainees "only got it back because one of the prisoners' lawyers made a fuss about it in the media." (Ex. 1 – Declaration of Clive A. Stafford Smith Regarding Younus Chekkouri; Ex. 8 – Declaration of Pardiss Kebriaei, ¶ 7.) While detainees used to be permitted an unlimited quantity of drinkable water, they are now limited to just one bottle of drinkable water per day. (Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶ 9. Some detainees report being denied access to medically ordered bottled water. (Ex. 2 – Declaration of Clive A. Stafford Smith Regarding Shaker Amer, ¶ 42.) Prison officials also repeatedly admonished Musa'ab and others that the hunger strikers had lost all privileges, and that drinkable water is a "privilege," not a right. (Ex. 6 – Statement of Musa'ab, ¶ 26.) In telephone discussions before the Emergency Motion was filed, counsel for the Government was unwilling to commit to providing Musa'ab with drinkable water without first consulting with the Department of Defense. The Government denies depriving

Musa'ab of drinkable water "during the time period in question," but still declines to commit to providing Musa'ab with drinkable water going forward. (Dkt. 976-1 ¶ 4.)

It is undisputed that, until its recent retaliation against prisoners expressing their desperation through the hunger strike, the Government has supplied prison guards, staff, and detainees with bottled drinking water continuously for the past several years. The Government's provision of drinkable water changed for Musa'ab on March 23, 24, and 25, when guards refused to give him drinkable water. The Emergency Motion alleges that the tap water available to Musa'ab in his cell is not drinkable. (Dkt. 974 at 3; Ex. 6 – Statement of Musa'ab, ¶28.) Musa'ab has always been told it is undrinkable, and he has never seen a guard or interrogator drink the tap water. (Dkt. 974 at 3; Ex. 6 – Statement of Musa'ab, ¶29.) While the Government claims that the tap water in Musa'ab's cell is drinkable and "is checked at least once a month in each camp by the personnel from the Joint Medical Group to ensure that it is potable," (Dkt. 976-1 at 1.), the Government has refused to provide any records of such water quality tests of water from the cellblock.  At counsel's request, the Government agreed on April 3, 2013, to produce the water quality test reports that would substantiate this claim of potability. The Government retracted that agreement on April 9, 2013. As a result, Petitioner's counsel have been forced to rely on publicly available information and reports from fellow *habeas* lawyers and their clients.

Instead of providing actual evidence of testing indicating that the water on the cellblock is drinkable, the Government relies on the self-serving declaration of

Colonel Bogdan claiming that the water in the cellblock is the "same water that runs throughout the entire base at Guantánamo" and "the same water that I drink on a daily basis." (Dkt. 976-1 ¶ 3.) Undersigned counsel have repeatedly requested that Col. Bogdan be made available at the scheduled hearing for cross-examination, but the Government has refused to produce him (by phone, videoconference, or otherwise).  Accordingly, his assertions should be given little weight, particularly since the government also refuses to produce any objective evidence to support the assertions, such as the water quality test results.

Indeed, Col. Bogdan's assertions stand in sharp contrast with the overwhelming weight of the evidence.  The tap water at many facilities on the base is not drinkable, according to *The Wire: A JTF Journal*, the "official news magazine of Joint Task Force Guantánamo" and "an authorized publication for the members of the Department of Defense:"

> "Water is life," said Army Spc. Johanna Bravo, a supply clerk with Joint Task Force Guantánamo's Joint Detention Group. "You need it to live, and it's our responsibility to make sure everyone gets it – Troopers and detainees alike."
>
> Bottled water is the main source of drinking water for JTF Guantánamo Troopers and the detainees. . . .
>
> While bottled water may seem to many a luxury rather than a necessity, it's important to know that many of the facilities at JTF Guantánamo don't have running potable water.

*Hydration, one bottle at a time*, THE WIRE, Mar. 19, 2010, at 5,

http://www.jtfgtmo.southcom.mil/wire/pdf/v11/issue6.pdf.

General John F. Kelly, Commander of the United States Southern Command, recently warned the Senate Armed Services Committee that the infrastructure at Guantánamo is "rapidly deteriorating," in part because it was never built to last eleven years:

> Mr. Chairman, Members, to paraphrase a former JTF-GTMO commander, we haven't been at Guantánamo for 11 years; we've been there for *one* year, *eleven* times. A temporary detainee operation has now lasted over 11 years, and the expeditionary infrastructure at JTF-GTMO is rapidly deteriorating, placing assigned personnel and operations at increasing risk. Regardless of policy disputes, we must make pragmatic decisions to protect our troops from unsafe and unsanitary living conditions and to ensure the continued safe and humane care of the detainee population. We have been relying on a patchwork of temporary fixes, but there is an urgent need for immediate refurbishment of degraded expeditionary infrastructure at JTF-GTMO.

*Posture Statement of General John F. Kelly, United States Marine Corps, Commander, United States Southern Command Before the 113th Congress Senate Armed Servs. Comm.,* 113 Cong. 23 (Mar. 19, 2013)*, available at*

http://www.southcom.mil/newsroom/documents/southcom%202013%20posture%20statement%20final%20sasc.pdf.

Consistent with Respondents' public statements about non-potable tap water and deteriorating infrastructure at Guantánamo, Petitioner's counsel could not locate a single person who visited the base within the past few years and regarded the tap water as safe enough to drink.  (Ex. 4 – Declaration of Lt. Col. Barry Wingard, ¶¶ 11-15; Ex. 9 – Declaration of Derek A. Poteet, ¶¶ 5-12; Ex. 10 – Declaration of Daniel Lakemacher, ¶¶ 4-8; Ex. 5 – Declaration of Cindy Pánuco, ¶ 10.) Indeed, even the McDonald's restaurant on the base regards the tap water as

10

unsafe and, therefore, does not use it in preparing food, including coffee. (Ex. 8 – Declaration of Pardiss Kebriaei, ¶ 6.)  In addition, staff at the Navy Gateway Inn and Suites warn that, "[n]o one drinks the water in Guantánamo."  (Ex. 5 – Declaration of Cindy Pánuco, ¶ 10.) In short, *all* of the available evidence supports Musa'ab's allegations except for Colonel Bogdan's conclusory declaration, which the Government has refused to substantiate or subject to cross-examination.

In addition to refusing to provide drinkable water and attempting to freeze the detainees into breaking the hunger strike, the government has retaliated against hunger-striking detainees in a variety of other ways.  Each of these retaliatory tools has been used against the detainees in order to interfere with the detainees' habeas rights under the Suspension Clause, as pronounced by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008). For example, hunger strikers have been transferred to Camp 5, known for solitary confinement, cell extractions, and force-feeding.  The guards are now conducting "Forcible Cell Extractions" ("FCEs," formerly known as Emergency Reaction Forces, or "ERFs") against hunger-striking detainees in ways that have resulted in serious injuries. (Ex. 2 – Declaration of Clive A. Stafford Smith Regarding Shaker Amer, ¶¶ 7, 18, 19.)  Guards have also been disrupting the detainees' "prayer time by playing loud music or banging on doors."  (Ex. 3 – Declaration of Carlos Warner, 2.)  Detainees are also being denied access to medically necessary items.  (Ex. 2 – Declaration of Clive A. Stafford Smith Regarding Shaker Amer, ¶¶ 41-42; Ex.5 – Declaration of Cindy Pánuco, ¶ 6.)

In what appears to be a blatant attempt at interfering with the detainees'
rights to the assistance of counsel, the Government halted commercial air passenger
service from southern Florida to Guantánamo Bay.  (Carol Rosenberg, *Navy ruling
ends commercial flights to Guantánamo from South Florida*, MIAMI HERALD (Mar.
17, 2013), *available at* http://www.miamiherald.com/2013/03/17/v-
print/3291679/navy-ruling-ends-commercial-flights.html), though that decision has
apparently now been rescinded, at least for the time being.  Further, while
detainees used to be permitted attorney-client visits in Camp 6, they are now
required to be transported to another location for all attorney-client visits.  (Ex. 4 –
Declaration of Lt. Col. Barry Wingard, ¶ 17.)  This transport is difficult or
impossible for many of the hunger-striking detainees, resulting in the inability of
detainees to meet with their attorneys.  (*Id.*)  Prison officials are now confiscating
attorney-client mail and other items that detainees have always been permitted to
keep in their cells, further interfering with their ability to pursue their legal claims.
(*Id.* at ¶ 19; Ex. 5 – Declaration of Cindy Pánuco, ¶¶ 5-6.)  Prison officials have
stopped informing detainees when they have attorney meetings, instead telling a
detainee that he has an "appointment," which would be a medical appointment, a
family phone call, or a meeting with an interrogator.  (Ex. 8 – Declaration of Pardiss
Kebriaei, ¶ 10.)  Guards have likewise stopped giving detainees pens, preventing
them from writing letters to their attorneys.  (*Id.* at ¶ 11.)  These clear efforts to
interfere with the relationship between the detainees and their lawyers inhibits the

detainees' ability to access the courts to challenge the legality of their indefinite detention.

## **FEDERAL COURTS HAVE JURISDICTION TO ENFORCE THE CONSTITUTIONAL RIGHT TO *HABEAS CORPUS* BY PROHIBITING INTERFERENCE WITH OR RETALIATION AGAINST DETAINEES EXERCISING THOSE RIGHTS**

I.    **This Court Has the Authority to Order the Government to Provide Drinkable Water to Musa'ab.**

Water is the human body's most essential nutrient. Even if Musa'ab were not participating in the hunger strike, he would still require drinkable water to survive. Depriving him of this nutrient constitutes inhumane treatment forbidden by the Due Process Clause of the Fifth Amendment, the Eighth Amendment, and the Geneva Conventions, including Common[2] Article 3.[3] The Emergency Motion seeks to preserve Musa'ab's life and his physical and psychological ability to participate in *habeas* proceedings.

---

[2] "Common Article 3" refers to Article 3 in each of the four Geneva Conventions. Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3, 6 U.S.T. 3114, 3116, 75 U.N.T.S. 31, 32 (entered into force Oct. 21, 1950); Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forced at Sea, Aug. 12, 1949, art. 3, 6 U.S.T. 3217, 3220, 75 U.N.T.S. 85, 86 (entered into force Oct. 21, 1950); Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3316, 3318, 75 U.N.T.S. 135, 136 (entered into force Oct. 21, 1950); Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3516, 3518, 75 U.N.T.S. 287, 288 (entered into force Oct. 21, 1950).

[3] The Eighth Amendment prohibits "cruel and unusual punishments." Common Article 3 requires that the Government treat Musa'ab "humanely" and prohibits "cruel," "humiliating and degrading treatment." *See Hamdan v. Rumsfeld*, 548 U.S. 557, 629-32 (2006) (holding that Common Article 3 of the Geneva Conventions applies to persons captured in conflict with Al Qaeda).

The writ of *habeas corpus* is a broad equitable remedy that may extend beyond simply ordering the petitioner's release from physical custody. *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968). Preserving the petitioner's ability to participate in *habeas corpus* proceedings is a traditional form of *habeas* relief within the power of this Court. *Kiyemba v. Bush*, 561 F.3d 509, 513 (D.C. Cir. 2009) ("a potential transfer out of the jurisdiction of the court is a proper subject of statutory habeas relief"); *e.g.*, *United States v. Shipp*, 203 U.S. 563, 573 (1906) (where Supreme Court directed sheriff to retain petitioner in protective custody and stay his execution pending *habeas* action).  Indeed, the All Writs Act explicitly authorizes the Court to intervene to preserve the life of a habeas petitioner. 28 U.S.C. § 1651 (federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). As the Supreme Court explained more than 50 years ago:

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.  Its pre-eminent role is recognized by the admonition in the Constitution that: "The Privilege of the Writ of Habeas Corpus shall not be suspended . . . ." U.S. Const., Art. I, § 9, cl. 2.  The scope and flexibility of the writ -- its capacity to reach all manner of illegal detention -- its ability to cut through barriers of form and procedural mazes -- have always been emphasized and jealously guarded by courts and lawmakers.  The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Harris v. Nelson*, 394 U.S. 286, 290-91 (1969).

The Supreme Court has repeatedly left open the propriety of *habeas* relief in forms other than release from detention. *E.g., Boumediene v. Bush*,

553 U.S. 723, 792 (2008) ("we need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal."); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."). In *Preiser* and *Bell*, the availability of alternative remedies allowed the Supreme Court to avoid delineating the outer reach of the Great Writ. Here, no such alternatives exist.

In one of the earliest federal *habeas* cases involving review of a state criminal conviction, the Circuit Court dismissed the *habeas* petition of Ed Johnson, an African American convicted and sentenced to death for raping a white woman in Chattanooga, Tennessee. *Shipp*, 203 U.S. at 571. The Supreme Court allowed an appeal and issued an order directing the sheriff to retain custody of Johnson pending the appeal. *Id.* Despite knowing the white citizenry of Chattanooga had threatened violence against Johnson, the sheriff removed the officers guarding the jail and left only one night guard. *Id.* at 571-72. That night a mob broke into the jail and lynched Johnson. *Id.*

In response to contempt charges before the Supreme Court, the defendants argued they could not be found guilty of contempt because the Supreme Court had

no *habeas* jurisdiction over the case and, therefore, they could not be held in contempt for disregarding the order to retain Johnson in protective custody. *Id.* at 572. Justice Holmes, writing for the Court, disagreed:

> But even if the Circuit Court had no jurisdiction to entertain Johnson's petition, and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law.  It and it alone necessarily had jurisdiction to decide whether the case was properly before it.  On that question, at least, it was its duty to permit argument and to take the time required for such consideration as it might need.  See *Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan*, 111 U.S. 379, 387. Until its judgment declining jurisdiction should be announced, *it had authority from the necessity of the case to make orders to preserve the existing conditions and the subject of the petition*, just as the state court was bound to refrain from further proceedings until the same time.

*Id.* at 573 (emphasis added). Accordingly, the Supreme Court found the sheriff and two deputies in contempt of the Court's order to safely retain Johnson pending the Court's determination of his *habeas* appeal. *United States v. Shipp*, 214 U.S. 386, 425 (1909).

Here, too, this Court has the authority from the necessity of the case to order the Government to take measures to preserve Musa'ab's life so that he may seek a writ of *habeas corpus*. Otherwise, the Writ is meaningless.

**A.    This Court's Denial of Habeas Relief Three Years Ago Does Not Diminish the Court's Jurisdiction to Order the Government to Preserve Musa'ab's Life.**

This Court retains the power to preserve Musa'ab's life – and hence his ability to seek *habeas* relief – even though Musa'ab's *habeas* petition was denied in

January 2010.[4] Chief Judge Lamberth recently held that the Court could and should preserve the Guantánamo prisoners' right of access to counsel, even for Guantánamo prisoners who have lost or withdrawn their *habeas* petitions or are no longer actively litigating them. *In re Guantánamo Bay Detainee Continued Access to Counsel*, Misc. No. 12-398, 2012 U.S. Dist. LEXIS 126833, *51-52 (D.D.C. Sept. 6, 2012). The court reasoned that, so long as the Government continues to hold these prisoners, they retain the right to seek *habeas* relief again in the future. Access to court and access to counsel are "inseparable concepts and must run together," in order to ensure that the prisoners have a meaningful opportunity to challenge the legality of their detention as mandated by *Boumediene v. Bush*, 553 U.S. 723, 783 (2008). 2012 U.S. Dist. LEXIS 126833 at *35. "[T]he Court's holding [is] little more than an appropriate exercise of the Court's equitable powers in pursuit of its charge to ensure detainees have adequate access to the courts." *Id.* at *48.[5]

If access to counsel is necessary to the right to seek a writ of *habeas corpus*, and it indisputably is, then the bare necessities of life – like drinkable water – are indispensable. It is difficult to file and litigate a *habeas* petition without an attorney, but it is impossible to do so without a heartbeat. *See Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 22 (D.D.C. 2005) ("Unless Petitioners' counsel can have access to

---

[4] The habeas case is still pending.  Musa'ab's post-trial Rule 60(b) Motion, based upon the discovery of scores of pieces of material exculpatory evidence that were improperly withheld by the government before the merits hearing, is fully briefed and ripe for determination.

[5] The Government filed a notice of appeal of Chief Judge Lamberth's decision, Misc. No. 12-398, Dkt. 1015, but voluntarily dismissed the appeal before filing a brief. *Abdah v. Obama*, No. 12-5350, Dkt. 1410329 (D.C. Cir. Dec. 14, 2012).

their clients, and know their true medical conditions, including whether they are in imminent danger of death, so as to counsel them in order to persuade them to stay alive, it is obvious that their ability to present their [*habeas*] claims to the Court will be irreparably compromised."); *cf.*, *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012) (holding that tort and constitutional claims for damages by fathers of two detainees who died at Guantánamo were "plainly" not *habeas* actions).

**B.      The Government Cannot Trivialize the Emergency Motion as a Mere Attempt to Upgrade the Conditions of Musa'ab's Detention.**

Relying on Section 7(a) of the Military Commissions Act of 2006 ("MCA"), the Government erroneously argues that this Court has no power to entertain the Emergency Motion because it is merely "a conditions-of-confinement complaint in this habeas case." Govt's Opposition (Dkt. 976) at 4. The Government's argument mischaracterizes the Emergency Motion and misapprehends the structure of Section 7(a), which provided:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant . . . .
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant . . . .

MCA § 7(a), codified at 28 U.S.C. § 2241(e).

18

The Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), held that Section 7 of the MCA was an unconstitutional attempt to strip the Guantánamo prisoners of the writ of *habeas corpus*, in violation of the Suspension Clause. *Id.* at 792. As the Government notes, courts in this Circuit have held that *Boumediene* invalidated Section 7(a)(1), relating to *habeas* actions, but did not explicitly disturb Section 7(a)(2) pertaining to "other action[s] . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement."[6] Because the purpose of the Emergency Motion is to ensure that Musa'ab remains alive and able to pursue *habeas* relief, the Motion falls squarely within Section 7(a)(1), which the Government concedes was invalidated in *Boumediene*. As the Court of Appeals has explained:

> Section 7(a)(2) strips the courts of their "jurisdiction to hear or consider any other action ... relating to any aspect of the ... transfer" of a detainee. It does not displace their remedial authority, pursuant to the All Writs Act, to issue an "auxiliary" writ "in aid" of a "jurisdiction already existing," . . . . Precedents of the Supreme Court compel the conclusion that the federal courts' remedial powers are intact. . . . Otherwise, Belbacha's transfer would make it impossible for the

---

[6] Petitioner respectfully disagrees. The Supreme Court in *Boumediene* was not sloppy or imprecise in holding that Section 7, and not just subsection (a)(1), violates the Suspension Clause. The Court reiterated this holding no fewer than three separate times in the opinion, each time stating that "§ 7" is unconstitutional. 553 U.S. at 733, 792, 795. Nor did the Court overlook the fact that Section 7(a) contains two subsections. On the contrary, the Court specifically examined the "structure of the two paragraphs" and held that *habeas* actions involve "detention, transfer, treatment, trial, or conditions of confinement." *Id.* at 737-38. The Court also suggested that the "reach of the writ" may extend to "claims of unlawful conditions of treatment or confinement." *Id.* at 792. If the Court determines that Section 7(a)(2) bars consideration of this Motion, then Section 7(a)(2) would be an unconstitutional and invalid suspension of the writ and bar to the assertion of Musa'ab's constitutional rights.

district court to entertain his claim to relief that the Constitution might guarantee.

*Belbacha v. Bush*, 520 F.3d 452, 458-59 (D.C. Cir. 2008) (citations omitted).

The Government ignores the intrinsic connection between the Emergency Motion and Musa'ab's right and ability to seek *habeas* relief. Because the Emergency Motion relates to the Government's withholding of drinkable water and other retaliatory conduct, all of which the Government characterizes as a mere change in Musa'ab's conditions of confinement, the Government urges that the Motion must be an "other action" barred by subsection (2). The Government's argument incorrectly assumes that *habeas* relief can never involve treatment or conditions of detention. According to the Government, Section 7(a)(1) of the MCA – held unconstitutional in *Boumediene* – applies only to requests for release from unlawful detention, and cannot include any challenge to the conditions of confinement, no matter how significantly those conditions may affect the petitioner's ability to pursue his *habeas* claim. As the Supreme Court held in *Boumediene*, however, that assumption "would have more force were it not for the phrase 'other action'" in Section 7(a)(2). 553 U.S. at 737.

> The structure of the two paragraphs implies that habeas actions are a type of action "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained . . . as an enemy combatant."

*Id.* at 737-38.

The Emergency Motion properly falls within Section 7(a)(1), not Section 7(a)(2), because it goes to the heart of Musa'ab's survival and ability to pursue

*habeas* relief. *Kiyemba*, 561 F.3d at 513; *Shipp*, 203 U.S. at 573; *Al Ansi v. Bush*, No. 08-1293, 2009 U.S. Dist. LEXIS 58389, *2-3 & n.1 (D.D.C. July 9, 2009) (Kessler, J.) (holding that medical records of seriously ill detainee were necessary for effective access to counsel and effective representation in *habeas* action and, therefore, did not "pertain to the conditions of Petitioner's confinement").

The cases on which the Government relies illustrate vividly its flawed interpretation of Section 7. Two of the cases sought money damages under tort and constitutional theories; neither was a *habeas* case. *Al-Zahrani*, 669 F.3d at 317; *Al Janko v. Gates*, 831 F. Supp. 2d 272, 276-77 (D.D.C. 2011). Because the actions challenged the conditions of past confinement but had nothing to do with the writ of *habeas corpus*, the courts held that Section 7(a)(2) barred the damages claims. Movants in two other cases asked to be moved to more favorable detention areas. *In re Guantánamo Bay Litigation*, 570 F. Supp. 2d 13 (D.D.C. 2008); *Khadr v. Bush*, 587 F. Supp. 2d 225 (D.D.C. 2008).[7] The Petitioner in *In re Guantánamo Bay Litigation*, 577 F. Supp. 2d 312 (D.D.C. 2008), requested an order requiring military physicians to meet with petitioner's counsel to discuss his medical condition, and requiring the Government to produce "unredacted copies of all of Petitioner's medical records . . . [and] all guard and staff reports, logs, and notes, in whatever

---

[7] In holding that Section 7(a)(2) barred the petitioner's request, *Khadr* relied on a distinction between "core" *habeas* actions seeking release from detention and "non-core" *habeas* actions seeking any other remedy. 587 F. Supp. 2d at 236. *Kiyemba* flatly rejected that distinction as inconsistent with *Boumediene*: "Accordingly, we read *Boumediene* to invalidate § 2241(e)(1) with respect to all habeas claims brought by Guantánamo detainees, not simply with respect to so-called 'core' habeas claims." 561 F.3d at 512. In any event, the Emergency Motion seeks relief that is integral to his habeas rights, not ancillary or collateral to them.

form maintained, regarding Petitioner's seizures and seizure-related episodes." *Id.*
at 315. The Court declined to "involve [itself] in Petitioner's medical treatment at
Guantánamo Bay and the decisions of officials at Guantánamo Bay relating to that
medical treatment." *Id.* at 316.[8] None of these cases involved conduct by the
Government that threatened the petitioner's life or access to the court.

Interestingly, the Government also cites Judge Kessler's decision in *Al Adahi
v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009), involving a challenge to the forced
feeding of hunger strikers to keep them alive (and capable of pursuing *habeas*
relief); *but see Al Ansi*, 2009 U.S. Dist. LEXIS 58389 at *3 n.1 (later decision by
Judge Kessler granting narrow request for medical records in light of petitioner's
serious medical condition). Here, in contrast, Musa'ab brought the Emergency
Motion because he fears the Government's actions may have the opposite effect –
killing him and depriving him of the ability to maintain his *habeas* claim.

The Government argues that the Court is powerless to order life-saving relief
in this habeas case. In other words, the Government can withhold drinkable water
from Musa'ab, or preclude him from communicating with his lawyers, or beat him to
death, and this Court has no business interfering with whatever treatment the
Government decides to inflict on Musa'ab.  Of course, the Government does not
frame its argument in those terms, because the Government denies each of the

---

[8] This decision was later reconsidered in part in *Husayn v. Gates*, 588 F. Supp. 2d 7,
12 (D.D.C. 2008), where the court ordered production of the petitioner's medical
records and permitted them to be reviewed by an independent physician, because
this was necessary to give petitioner meaningful access to counsel's assistance in his
habeas case.

factual allegations underlying the Emergency Motion. As a result, this Court cannot deny the Emergency Motion on jurisdictional grounds without first resolving these basic factual disputes – a task that must be undertaken through live witness testimony rather than weighing of sworn declarations. *See United States v. Hayman*, 342 U.S. 205, 223 (1952) (holding that district court committed reversible error in "determining the factual issues raised by respondent's motion [to vacate his criminal sentence] under Section 2255 without notice to respondent and without his presence."). Where remaining factual disputes affect a court's jurisdiction, the court must resolve those disputes before determining whether it has jurisdiction. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 41 (D.C. Cir. 2000) ("The district court was required to resolve this factual dispute material to its subject matter jurisdiction.").

The Government's jurisdictional argument cannot be reconciled with *Boumediene* or the traditional equitable powers of the Court to effect and aid its *habeas* jurisdiction. If the Government's reading of Section 7(a)(2) were correct – and it is not – then the provision is an unconstitutional suspension of the writ of *habeas corpus* and a deprivation of Musa'ab's due process and Eighth Amendment rights.

## II.   Musa'ab Can Satisfy Each of the Requirements for a Preliminary Injunction.

"In deciding whether to issue a preliminary injunction, the courts consider four factors: (1) whether the moving party has a substantial likelihood of success on the merits; (2) whether the moving party faces irreparable harm absent the

preliminary injunction; (3) whether the injunction would substantially injure the opposing party; and (4) whether the injunction furthers the public interest." *Belbacha*, 520 F.3d at 459; *In re Navy Chaplaincy v. United States Navy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *Ramirez v. District of Columbia*, No. 99-803, 1999 U.S. Dist. LEXIS 15964 (D.D.C. Oct. 14, 1999) (granting preliminary injunction requiring school district to provide disabled student with handicap-accessible bathroom and hall doors). These factors are evaluated on a sliding scale. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Belbacha*, 520 F.3d at 459 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

Each of four factors weighs in favor of granting the Emergency Motion. Petitioner requests the opportunity to present evidence in support of the relief he requests.

<u>Conclusion</u>

For all of the foregoing reasons, Petitioner Musa'ab Omar al Madhwani respectfully requests the opportunity to present evidence in support of his Emergency Motion, and grant such other and further relief as the Court deems just.

Respectfully submitted April 10, 2013,


 /s/  Mari Newman                          /s/  Patricia A. Bronte

Darold Killmer                    Patricia A. Bronte
Mari Newman                       BRONTE LAW LLC
KILLMER, LANE & NEWMAN, LLP       915 West Gunnison St., Suite 3
1543 Champa St., Suite 400        Chicago, IL 60640
Denver, CO 80202                  (312) 388-7890 phone
(303) 571-1000 phone              (312) 254-3242 fax
(303) 571-1001 fax                bronte@brontelaw.com
mnewman@kln-law.com

*Attorneys for Petitioner Musa'ab Omar Al Madhwani*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2013, I caused the foregoing Memorandum of Law in Support of Emergency Motion of Petitioner Musa'ab Omar al Madhwani for Humanitarian and Life-Saving Relief to be delivered to the below-listed counsel of record in the above-captioned matter through the CM/ECF system:

> Andrew I. Warden
> Terry Henry
> David Avila
> Ronald Wiltsie
> United States Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Avenue NW
> Washington, D.C. 20530

*/s/ Lauren L. Fontana*