**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| TOFIQ NASSER AWAD AL-BIHANI (ISN 893), | ) | Case Nos. |
|  | ) |  |
| ABDU LATIF NASSER (ISN 244), | ) | 04-cv-1194 (TFH) (ISN 569) |
|  | ) |  |
| SHARQAWI AL HAJJ (ISN 1457), | ) | 05-cv-23 (EGS) (ISN 841) |
|  | ) |  |
| SANAD AL KAZIMI (ISN 1453), | ) | 05-cv-764 (CKK) (ISN 244) |
|  | ) |  |
| SUHAIL SHARABI (ISN 569), | ) | 05-cv-1607 (RCL) (ISNs 1460,1461) |
|  | ) |  |
| SAID NASHIR (ISN 841), | ) | 05-cv-2386 (RBW) (ISNs 893, 1453) |
|  | ) |  |
| ABDUL RABBANI (ISN 1460), | ) | 08-cv-1360 (EGS) (ISN 10016) |
|  | ) |  |
| AHMED RABBANI (ISN 1461), | ) | 08-cv-1440 (CKK) (ISN 10025) |
|  | ) |  |
| ABDUL RAZAK (ISN 685), | ) | 09-cv-745 (RCL) (ISN 1457) |
|  | ) |  |
| ABDUL MALIK (ISN 10025), | ) | 10-cv-1020 (RJL) (ISN 685) |
|  | ) |  |
| ABU ZUBAYDAH (ISN 10016) | ) |  |
|  | ) |  |
| Petitioners, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DONALD J. TRUMP, in his official capacity | ) |  |
| as President of the United States, et al., | ) |  |
|  | ) |  |
| Respondents. | ) |  |

_____

**RESPONDENTS' OPPOSITION TO PETITIONERS'
MOTION FOR ORDER GRANTING WRIT OF HABEAS CORPUS**

## **TABLE OF CONTENTS**

BACKGROUND ................................................................................................. 2

   I.  DETAINEE REVIEWS ............................................................................. 2

   II.  EFFECTING DESIGNATIONS APPROVING DETAINEES FOR
       TRANSFER ............................................................................................. 5

   III.  TRANSFER AND HABEAS STATUS OF EACH PETITIONER ............................. 6

   IV.  THE TWO DETAINEES DESIGNATED FOR TRANSFER .................................. 9

ARGUMENT ................................................................................................. 10

   I.  PETITIONERS' DETENTION IS LAWFUL UNDER THE AUMF
      BECAUSE ACTIVE HOSTILITIES REMAIN ONGOING .................................... 10

      A.  Precedent and the Laws of War Establish That Unprivileged Enemy
         Combatants Held at Guantanamo Bay May Be Detained
         While Hostilities Continue ............................................................ 10

      B.  Active Hostilities Remain Ongoing ............................................... 16

      C.  Petitioners' Arguments Otherwise are Erroneous ........................... 23

         1. Continued detention under the AUMF is not "perpetual" or
            "indefinite" .......................................................................... 23

         2.  Petitioners' continued detention prevents their return to the
            battlefield ............................................................................ 24

         3.  Continued detention of Petitioners under the AUMF does not
            implicate due-process concerns ............................................ 26

         4. The conflict with al Qaeda, Taliban, and associated forces
            remains ongoing .................................................................. 27

   II. PETITIONERS' CONTINUED DETENTION DOES NOT VIOLATE DUE
      PROCESS ............................................................................................ 32

      A.  Petitioners May Not Invoke Due Process Clause Protections ........................ 33

      B. Petitioners' Continued Detention Does Not Violate Substantive Due
        Process ...................................................................................... 37

         1.  Petitioners' continued detention is not unconstitutionally
            indefinite ........................................................................... 38

         2.  Petitioners' continued detention is not arbitrary ................................. 39

      C.  The Judicially Crafted Procedures Governing Petitioners'  Habeas
        Cases Do Not Violate Due Process ................................................ 42

CONCLUSION ................................................................................................ 45

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................... 13, 37, 38
*Al-Adahi v.Obama*,
  613 F.3d 1102 (D.C.Cir. 2010) ...................................................................................... 43,44
*Al-Alwi v. Trump*,
  236 F. Supp. 3d 417 (D.D.C. 2017),
  *Appeal filed*, 17-5067 (D.C. Cir. Apr. 12, 2017) ....................................................... 11, 18, 28
*Al Bahlul v. United States*,
  767 F.3d 1 (D.C. Cir. 2014) ..................................................................................... 33, 34,35
*Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) ..................................................................................... passim
*Al-Kandari v. United States*,
  No. 15-CV-329 (D.D.C. Aug. 31,  (2015)
  *decision vacated, appeal dismissed*, No. 15-CV-5268 (D.C. Cir. Mar. 4, 2016).............. passim
*Al-Madhwani v. Obama*,
  642 F.3d 1071 (D.C. Cir. 2011) ................................................................................... 33, 36
*Al-Warafi v. Obama*,
  No, 09-CV-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015),
  *decision vacated, appeal dismissed*, No. 15-5266 (D.C. Cir. Mar. 4, 2016) ............... 11, 17, 18
*Al-Wirghi v. Obama*,
  54 F. Supp. 3d 44 (D.D.C. 2014) ................................................................................. passim
*Ali v. Obama*,
  736 F.3d 542 (D.C. Cir. 2013) .................................................................................... passim
*Almerfedi v. Obama*,
  654 F.3d 1 (D.C. Cir. 2011) ............................................................................................. 41
*Alsabri v. Obama*,
  684 F.3d 1298 (D.C. Cir. 2012) ....................................................................................... 17
*Ameziane v. Obama*,
  58 F. Supp. 3d 99 (D.D.C. 2014) ..................................................................................... 33
*Awad v. Obama*,
  608 F.3d 1 (D.C. Cir. 2010) ............................................................................................. 26
*Bahlul v. United States*,
  840 F.3d 757 (D.C. Cir. 2016) ..................................................................................... passim
*Bostan v. Obama*,
  674 F. Supp. 2d 9 (D.D.C. 2009) ................................................................................. 33, 34
*Boumediene v. Bush*,
  553 U.S. 723 (2008) .................................................................................................... passim
*Clark v. Martinez*,
  543 U.S. 371 (2005) ........................................................................................................ 39

*Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*,
  331 F.3d 918 (D.C. Cir. 2003) ................................................................. 29

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................. 29

*Ex Parte Quirin*,
  317 U.S. 1 (1942) .................................................................................... 17

*Forest Grove Sch. Dist. v. T.A.*,
  557 U.S. 230 (2009) ................................................................................ 17

*Foucha v. Louisiana*,
  504 U.S. 71 (1992) .................................................................................. 39

*Hamdi v. Rumsfeld*,
  337 F.3d 335 ........................................................................................... 16

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ........................................................................ passim

*Hussain v. Obama*,
  718 F.3d 964 (D.C. Cir. 2013) ................................................................. 44

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ................................................................................ 39

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009),
  *vacated and remanded*, 559 U.S. 131 (2010),

  *reinstated*, 605 F.3d 1046 (D.C. Cir.)

  *cert. denied*, 563 U.S. 954 (2011) ..................................................... passim

*Latif v. Obama*,
  666 F.3d 746 (D.C. Cir. 2011) ................................................................. 43

*Maqaleh v. Hagel*,
  738 F.3d 312 (D.C. Cir. 2013) ................................................................. 16

*Nat'l Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997) ................................................................. 11

*Petite v. United States*,
  361 U.S. 529 (1960) ................................................................................ 35

*Rabbani v. Obama*,
  76 F. Supp. 3d 21 (D.D.C. 2014) ................................................. 11, 16, 33

*Rasul v. Myers*,
  563 F.3d 527 (D.C. Cir. 2009) ........................................................... 34, 36

*Razak v. Obama*,
  174 F. Supp. 3d 300 (D.D.C. 2016),
  *Decision vacated, appeal dismissed*, No. 16-5074 (D.C. Cir. Apr. 12, 2017) ................. passim

*Salahi v. Obama*,
  No. 05-CV-569, 2015 WL 9216557 (D.D.C. 2015) ............................... 33, 36

*United States v. Salerno*,
  481 U.S 739 (1987) ................................................................................. 39

*United States v. Torres*,
   115 F.3d 1033 (D.C. Cir. 1997) ............................................ 32, 33, 36, 37, 43
*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ............................................................................ 34
*Uthman v. Obama*,
   637 F.3d 400 (D.C. Cir. 2011) ............................................................ 44
*Zadvydas v. United States*,
   533 U.S. 678 (2001) ............................................................................ 39

## Statutes

Pub. L. No. 107-40 ............................................................................... 2
Pub. L. No. 112-81 ......................................................................... passim
Pub. L. No. 112-87 ............................................................................... 6
Pub. L. No. 113-291 ............................................................................ 19
Pub. L. No. 114-92 ........................................................................... 5, 6
Pub. L. No. 115-91 ............................................................................... 6

## Regulations

74 Fed. Reg. 4,897 (Exec. Order No. 13,492)(Jan. 22, 2009) ........................ 3
76 Fed. Reg. 13,277 (Exec. Order No. 13,567)(Mar. 7, 2011) ............... 4, 5, 6, 40
83 Fed. Reg. 4,831 (Exec. Order No. 13,823)(Feb. 2, 2018) .................. 4, 6, 40

## Briefs

*Al Bahlul v. United States*, No. 11-1324,
   Brief of the United States, 2013 WL 3479237 (D.C. Cir. 2013) ............. 35

## Other Authoities

Christiane Shields Delessert, Release and Repatriation of Prisoners of War at the
   End of Active Hostilities: A Study of Article 118, Paragraph 1 of the
   Third Geneva Convention Relative to the Treatment of Prisoners of War 71-72 (1977) ........ 15

Geneva Convention III Relative to the Treatment of Prisoners
   Of War, art. 118, (Aug. 12, 1949), 6 U.S.T. 3316 ("GC III") ........................ 2, 4, 17

The Handbook of Humanitarian Law in Armed Conflcts
   § 732 (Dieter Fleck ed., 1995) ............................................................ 15

1 Jean-Marie Henckaerts & Louise Doswald–Beck, Customary
   International Humanitarian Law 345 (2005) .......................................... 25

3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the
    Treatment of Prisoners of War, art. 118 at 547 (J. Pictet ed., 1960) ................................. 12, 15

U.S. Dep't of Defense Law of War Manual § 8.14.3.1 (May 2015 as
    updated Dec. 2016216 (5th ed. 1967) ...................................................................................... 2

U.S. Dep't of Defense Law of War Manual § 8.14.3.1 (May 2015 as updated Dec. 2016)

2 L. Oppenheim, International Law § 275 (H. Lauterpacht 7th ed. 1952) ................................. 15

1 G. Schwarzenberger, International Law 216 (5th ed. 1967) .................................................... 15

As the Supreme Court has acknowledged, the laws of war permit the detention of enemy combatants for the duration of a conflict.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality op.) (detention "for the duration of the particular conflict in which . . . [detainees] were captured" is a "fundamental and accepted . . . incident to war.").  Thus, Petitioners are not entitled to release simply because the conflict for which they were detained—the non-international armed conflict between the United States and its coalition partners against al Qaeda, the Taliban, and associated forces—has been lengthy.  As the Court of Appeals has explained, neither the governing statute, the 2001 Authorization for Use of Military Force ("AUMF"), nor the Constitution requires the extraordinary remedy Petitioners seek here, release based solely or principally on the passage of time:

> We are of course aware that this is a long war with no end in sight.  We understand Ali's concern that his membership in Zubaydah's force, even if it justified detention as an enemy combatant for some period of time, does not justify a "lifetime detention." . . . But the 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities. . . . The war against al Qaeda, the Taliban, and associated forces obviously continues.  Congress and the President may choose to make long-term military detention subject to different, higher standards. . . . But absent a statute that imposes a time limit or creates a sliding-scale standard that becomes more stringent over time, **it is not the Judiciary's proper role to devise a novel detention standard that varies with the length of detention**.  The only question before us is whether the President has authority under the AUMF to detain Ali.  In conducting that analysis, we must apply the same standard in 2013 that we would have applied in the aftermath of Ali's capture in 2002.  [*Ali v. Obama*, 736 F.3d 542, 552 (D.C. Cir. 2013) (internal citations omitted) (emphasis added)].

Nor do the AUMF or the Constitution require release on any other basis that Petitioners assert here.  There is no Government policy barring transfer of detainees from Guantanamo Bay.  And the conflict between the United States and its coalition partners against al Qaeda, the Taliban, and associated forces continues in the Afghanistan theater and elsewhere.  That conflict has not resulted in detention of enemy combatants that is unconstitutionally indefinite; rather,

Petitioners' detention is subject to the cessation of active hostilities, although that point has not

yet been reached.  And in the meantime, Petitioners' continued detention still serves its

permissible purpose: to prevent the return of members of enemy forces to the battlefield.

Consequently, Petitioners' detention is not arbitrary.

Accordingly, the Government respectfully requests that the Court deny Petitioners'

Motion for Order Granting Writ of Habeas Corpus.

## BACKGROUND

## I.  DETAINEE REVIEWS

Petitioners are 11 detainees held at Guantanamo Bay, Cuba, under the Authorization for

Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001).  In relevant part, the AUMF

authorized the President to use "all necessary and appropriate force against those nations,

organizations, or individuals who . . . planned, authorized, committed or aided the terrorist

attacks of September 11, 2001, or harbored such organizations or persons."  *Id*. § 2(a).  Pursuant

to that authority, the Executive has detained individuals who were part of or substantially

supported al Qaeda, Taliban, and associated forces, including Petitioners.

Under the laws of war, the detention of enemy combatants, whether privileged or

unprivileged, is generally permitted while active hostilities continue.  *Cf*. Geneva Convention

(III) Relative to the Treatment of Prisoners of War, art. 118, Aug 12, 1949, 6 U.S.T. 3316 ("GC

III"); U.S. Dep't of Defense Law of War Manual § 8.14.3.1 (May 2015 as updated Dec. 2016).

And the release of enemy combatants prior to the end of active hostilities is a significant

departure from past United States practice.  Nevertheless, in the current conflict, the Executive

has, as a matter of policy, undertaken most recently two separate processes to determine whether

the United States should relinquish custody of individuals detained at Guantanamo pursuant to

the AUMF prior to the end of hostilities, subject to appropriate security conditions to prevent their return to combat.

First, in 2009, President Obama established the Guantanamo Bay Review Task Force.[1] Exec. Order No. 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009). The purpose of that task force was to evaluate, among other things, "whether [a Guantanamo Bay detainee's] continued detention is in the national security and foreign policy interests of the United States." *Id.* § 2(d), 74 Fed. Reg. 4897-99. Pursuant to that executive order, the status of each detainee at Guantanamo was reviewed, and a recommendation was made whether to transfer the detainee, to continue his detention, or to prosecute him. Final Report—Guantanamo Rev. Task Force at 1 (Jan. 22, 2010) ("GTMO Task Force Report") (available at https://justice.gov/sites/default/files /ag/legacy /2010/06/02/guantanamo-review-final-report.pdf).[2] As to those detainees designated as eligible for transfer, the Final Report noted that this designation did not imply that a detainee was not properly detainable under the AUMF. *Id.* at 17. Nor did such a designation "reflect a decision that the detainee poses no threat or risk of recidivism." *Id.* Rather, a designation as eligible for

---

[1] For several years prior to the establishment of the Guantanamo Review Task Force, the Department of Defense, as a matter of policy, provided Administrative Review Boards to "assess whether each [Guantanamo detainee] remain[ed] a threat to the United States and its allies in the ongoing armed conflict against al Qaeda and its affiliates and supporters," and to make a "determination to continue to detain, release, or seek the transfer of the [detainee] to the control of another government." Dep't of Defense Order, Admin. Rev. Procedures for Enemy Combatants in the Control of the Dep't of Defense at Guantanamo Bay Naval Base, Cuba (May 11, 2004), at ¶¶ 2(A) & 3(E)(v).

[2] Approximately 30 Yemeni detainees were recommended for a fourth designation: "conditional detention." This designation signified that these detainees were to be detained, but could be transferred if "(1) the security situation in Yemen improves; (2) an appropriate rehabilitation program becomes available; or (3) an appropriate third-country resettlement option becomes available." GTMO Task Force Report at 12-13. Consequently, this designation subordinated any future transfer of these 30 detainees to those of detainees who were designated eligible for transfer, including 29 Yemenis. *Id.* at 13. Of note, Petitioner al-Bihani was designated for conditional detention.

transfer merely reflected a judgment that the "threat posed by the detainee can be sufficiently mitigated through feasible and appropriate security measures in the receiving country." *Id*.

Second, as to those detainees designated for continued detention (but not referred for prosecution), another executive order prescribes that they receive hearings before a Periodic Review Board ("PRB"). Exec. Order 13,567, 76 Fed. Reg. 13,277 (Mar. 7, 2011); *see also* Exec. Order 13,823, 83 Fed. Reg. 4831, 4831-32 (Feb. 2, 2018) (continuing these procedures for periodic reviews). This process assesses whether continued custody of a detainee is necessary to protect against a significant threat to the security of the United States. Exec. Order 13,567 §2. In making this determination, the PRB considers information relevant to the determination of whether the standard has been met provided by the Department of Defense ("DoD") and other Government agencies, and any relevant information submitted by or on behalf of the detainee. *Id*. § 3(a). Of note, the PRB review "does not address the legality of any detainee's law of war detention" under the AUMF. *Id*. § 8. Rather, these reviews are "intended solely to establish, as a discretionary matter, a process to review on a periodic basis the executive branch's continued, discretionary exercise of existing detention authority in individual cases." *Id*. § 1(b). If a decision is made to recommend the transfer of a detainee, the PRB "shall also recommend any conditions that relate to the detainee's transfer." *Id*. § 3(a)(7); *see also* Nat'l Defense Auth. Act for Fiscal Year 2012 § 1023, Pub. L. No. 112-81, 125 Stat. 1298, 1564 (2012) ("2012 NDAA") (requiring submission to Congress of procedures for implementing the periodic-review process required by Executive Order 13,567).

Pursuant to section 3(a) of Executive Order 13,567, all eligible detainees have received an initial review by a PRB. *See* www.prs.mil (Periodic Review Secretariat website). Additionally, each detainee who was not recommended for transfer during his initial review is

eligible for another full PRB review every three years.  Exec. Order 13,567 § 3(b).  In the

interim, each is eligible for a file review every six months.  *Id*. § 3(c).  If during a file review, a

PRB determines that a significant question has arisen concerning the need for a detainee's

continued detention, a new full review is to be promptly convened.  *Id*.

## II. EFFECTING DESIGNATIONS APPROVING DETAINEES FOR TRANSFER

Under Executive Order 13,567, once a detainee is approved for transfer, the Secretaries

of State and Defense are to undertake "vigorous" efforts to identify a suitable transfer location

"consistent with the national security and foreign policy interests of the United States," and

subject to "obtaining appropriate security and humane treatment assurances" from the receiving

country.  *Id*. § 4.  Each potential transfer is addressed on a case-by-case basis.

Congress, however, entrusted to the Secretary of Defense any final decision to transfer,

explicitly stating that the Secretary is "not . . . bound by any such [PRB] recommendation."

2012 NDAA § 1023(b)(2).  Additionally, Congress has conditioned the use of appropriations to

effect a transfer upon the Secretary of Defense certifying 30 days in advance of the transfer that:[3]

> (1) the transfer concerned is in the national security interests of the United States;
> (2) the government of the foreign country or the recognized leadership of the foreign entity to which the individual detained at Guantanamo concerned is to be transferred—
>> (A) is not a designated state sponsor of terrorism or a designated foreign terrorist organization;
>> (B) maintains control over each detention facility in which the individual is to be detained if the individual is to be housed in a detention facility;
>> (C) has taken or agreed to take appropriate steps to substantially mitigate any risk the individual could attempt to reengage in terrorist

---

[3]  An exception to this certification requirement exists with respect to "any action taken by the Secretary [of Defense] to transfer any individual detained at Guantanamo to effectuate an order affecting the disposition of the individual that is issued by a court or competent tribunal of the United States having lawful jurisdiction." Nat'l Defense Auth. Act for Fiscal Year 2016 § 1034(a)(2), Pub. L. No. 114-92, 129 Stat. 726, 969-970 (2015) ("2016 NDAA").

activity or otherwise threaten the United States or its allies or interests; and

      (D) has agreed to share with the United States any information that is related to the individual;

    (3) if the country to which the individual is to be transferred is a country to which the United States transferred an individual who was detained at United States Naval Station, Guantanamo Bay, Cuba, at any time after September 11, 2001, and such transferred individual subsequently engaged in any terrorist activity, the Secretary has—

      (A) considered such circumstances; and

      (B) determined that the actions to be taken as described in paragraph (2)(C) will substantially mitigate the risk of recidivism with regard to the individual to be transferred; and

    (4) includes an intelligence assessment, in classified or unclassified form, of the capacity, willingness, and past practices (if applicable) of the foreign country or foreign entity concerned in relation to the certification of the Secretary under this subsection.

2016 NDAA § 1034.[4]  A decision of the Secretary of Defense to effect a transfer would be made with due regard to the relevant considerations under these statutory requirements and Executive Order 13,567, including based on input from other federal agencies with expertise, as appropriate.  As the President noted in his recent executive order, the Secretary of Defense remains empowered to transfer individuals out of Guantanamo.  Exec. Order 13,823 § 3, 83 Fed. Reg. at 4832.

## III. TRANSFER AND HABEAS STATUS OF EACH PETITIONER

Pursuant to the requirements of the Court's January 18, 2018, Scheduling and Procedures Order, the following table sets out the current designation regarding eligibility for transfer for

---

[4] These provisions of the 2016 NDAA were not repealed or modified by the National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, 131 Stat. 1283 (2017).  In addition, the 2018 NDAA continues to ban outright the use of appropriated funds for transfer of Guantanamo detainees to four countries, each of which is experiencing unrest, instability, or upheaval: Libya, Somalia, Syria, and Yemen.  *Id.* § 1035.  Further, section 308 of the Intelligence Authorization Act for Fiscal Year 2012, Pub. L. No. 112-87, 125 Stat. 1876, 1883 (2012), requires notice to Congress 30 days in advance of the transfer of a Guantanamo detainee that includes various details of the transfer, including "terms of any agreement with the [receiving] country . . . for the acceptance of such individual."

each Petitioner (two have been determined eligible for transfer or conditional detention, the remainder have been designated for continued detention), the source of that designation, and the status of each Petitioner's habeas case (two have litigated their habeas cases on the merits and lost, one has voluntarily dismissed his case, three have stayed their cases, and five have pending cases).

| Name | ISN | Status |
|------|-----|--------|
| Abdu Latif Nasser | MO-244 | -Habeas case stayed upon joint motion, 05-cv-764, Minute Order (Nov. 14, 2015).<br><br>-PRB initial review: July 11, 2016.<br>  Result: designated eligible for transfer to Morocco.<br><br>-PRB file reviews: not applicable. |
| Suhail Sharabi | YM-569 | -Habeas case stayed by joint stipulation, 04-cv-1194, Minute Order (Aug. 16, 2011).<br><br>-PRB initial review: Mar. 31, 2016.<br>  Result: designated for continued detention.<br><br>- PRB file reviews:<br>  Completed: Oct. 24, 2016; June 8, 2017;<br>  On-going: Jan. 24, 2018. |
| Abdul Razak | AG-685 | -Habeas petition denied, *Ali v. Obama*, 741 F.Supp.2d 19 (D.D.C. 2011) (Leon, J.), *aff'd*, 736 F.3d 542 (D.C. Cir. 2013), *cert. denied*, 135 S.Ct. 118 (2014).<br><br>-PRB initial review: July 6, 2016.<br>  Result: designated for continued detention.<br><br>PRB file reviews:<br>  Completed: Feb. 3, 2017; Sept. 1, 2017.<br>  On-going: Feb. 14, 2018. |

| Said Salih Said Nashir (aka Hani Abdullah) | YM-841 | -Habeas case pending.<br><br>-PRB initial review: Nov. 21, 2016.<br>  Result: designated for continued detention.<br><br>-PRB subsequent full review: Jan. 11, 2017.<br>  Result: designated for continued detention.<br><br>-PRB file reviews:<br>  Completed: Aug. 7, 2017.<br>  On-going: Jan. 24, 2018. |
|---|---|---|
| Tofiq Al Bihani | YM-893 | -Habeas petition denied, *al-Bihani v. Obama*, 2010 U.S. Dist. LEXIS 107590 (D.D.C. Sept. 22, 2010) (Walton, J.), *summ. aff'd*, 2011 U.S. App. LEXIS 2600 (D.C. Cir. Feb. 10, 2011), *cert. denied* 567 U.S. 905 (2012).<br><br>-Designated for conditional detention by the Guantanamo Bay Review Task Force<br><br>-PRB initial review: not applicable. |
| Sanad Al Kazimi | YM-1453 | -Habeas case pending.<br><br>-PRB initial review: June 9, 2016.<br>  Result: designated for continued detention.<br><br>-PRB file reviews:<br>  Completed: Dec. 5, 2016; June 13, 2017. |
| Sharqawi Al Hajj | YM-1457 | -Habeas petition dismissed without prejudice, 05-cv-745 (ECF No. 1696) (Oct. 27, 2011).<br><br>-PRB initial review: Apr. 14, 2016.<br>  Result:  designated for continued detention.<br><br>-PRB file reviews:<br>  Completed: Nov. 1, 2016; Nov. 3, 2017.<br><br>-PRB subsequent full review: Mar. 30, 2017.<br>  Result: designated for continued detention. |
| Abdul Rabbani | PK-1460 | -Habeas case pending.<br><br>-PRB initial review: Aug. 8, 2016.<br>  Result: designated for continued detention.<br><br>-PRB file reviews:<br>  Completed: Feb. 28, 2017; Sep. 15, 2017.<br><br>-PRB subsequent full review: scheduled for Feb. 27, 2018. |

| | | |
|---|---|---|
| Ahmed Rabbani | PK-1461 | -Habeas case pending.<br><br>-PRB initial review: Oct. 3, 2016.<br>  Result: designated for continued detention.<br><br>-PRB file review:<br>  Completed:  Apr. 28, 2017. |
| Abu Zubaydah | GZ-10016 | -Habeas case pending.<br><br>-PRB initial review: Sep. 22, 2016.<br>  Result: designated for continued detention.<br><br>-PRB  file reviews:<br>  Completed: Apr. 28, 2017.<br>  On-going: Jan 24, 2018. |
| Abdul Malik | KE-10025 | -Habeas case stayed,<br>08-cv-1440, Minute Order (Nov. 8, 2017).<br><br>-PRB initial review: June 9, 2016.<br>  Result: designated for continued detention.<br><br>-PRB file reviews:<br>  Completed: Jan. 11, 2017; July 25, 2017. |

## IV. THE TWO DETAINEES DESIGNATED FOR TRANSFER

Consistent with the requirements of the Court's January 18, 2018, Scheduling and Procedures Order, Respondents provide the following additional information regarding Petitioners Nasser (ISN 244) and al-Bihani (ISN 893).  These Petitioners have previously been determined eligible for transfer.  As to Petitioner Nasser, on July 11, 2016, a PRB designated him eligible for transfer.  The PRB recommended that he be transferred "only to Morocco with the appropriate security assurances as negotiated by the Special Envoys and agreed to by relevant USG departments and agencies."  *See*  http://www.prs.mil/Portals/60/Documents/ ISN244/20160711_U_ISN244_FINAL_DETERMINATION_PUBLIC.pdf (PRB determination). Soon thereafter, personnel from the Department of State transmitted a diplomatic note to the Government of Morocco regarding the security assurances required by the U.S. Government for this transfer.  The Government of Morocco finally responded affirmatively to the U.S.

9

Government regarding those assurances through a diplomatic note transmitted on December 28, 2016.  Because of the timing of this response, which was less than 30 days before then-Secretary of Defense Carter would leave office, the Secretary did not make a final decision regarding the transfer, including whether the requirements of § 1034 of the 2016 NDAA were satisfied and whether the transfer was in the national-security and foreign-policy interests of the United States. Rather, the Secretary elected to leave that decision to his successor.  To date, no decision has been made as to whether to proceed with this transfer.

As to Petitioner al-Bihani, he was one of the approximately 30 Yemenis designated in 2010 by the Guantanamo Review Task Force for conditional (as opposed to continued) detention, a designation that could allow for his transfer under certain conditions.  *See supra* 3 n.2.  Any potential transfer of Petitioner al-Bihani, as with the potential transfer of any detainee, remained subject to approval by the Secretary of Defense.  In January 2017, Secretary Carter determined that Petitioner al-Bihani should not be transferred based on a variety of substantive concerns relevant to Petitioner's circumstances, including factors not related to Petitioner himself.  Petitioner remains eligible for transfer, as described above.

## ARGUMENT

## I.  PETITIONERS' DETENTION IS LAWFUL UNDER THE AUMF BECAUSE ACTIVE HOSTILITIES REMAIN ONGOING

### A.  Precedent and the Laws of War Establish That Unprivileged Enemy Combatants Held at Guantanamo Bay May Be Detained While Hostilities Continue

As a matter of international and domestic law, the United States currently remains in an armed conflict with al-Qaeda, Taliban, and associated forces.  In accordance with the law of armed conflict and the precedents of both the Supreme Court and the Court of Appeals, Petitioners' law of war detention remains lawful while hostilities continue.  Because active

hostilities against al-Qaeda, Taliban, and associated forces are currently ongoing, including in

Afghanistan, Petitioners' detention is lawful under the AUMF, as informed by the laws of war.

Indeed, four judges of this Court have issued decisions over the last three years reaffirming that

the AUMF continues to authorize the detention of Guantanamo Bay detainees based on the

existence of ongoing hostilities and rejecting arguments identical to those that Petitioners raise

here regarding the status of the current conflict and the length of their detention.  *See Al-Warafi*

*v. Obama*, No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *decision vacated,*

*appeal dismissed*, No. 15-5266 (D.C. Cir. Mar. 4, 2016); *Al-Kandari v. United States*, No. 15-

CV-329 (CKK) (D.D.C. Aug. 31, 2015) (ECF No. 24) (Ex. 1), Unclassified Mem. Op., *decision*

*vacated, appeal dismissed*, No. 15-5268 (D.C. Cir. Mar. 4, 2016); *Razak v. Obama*, 174 F. Supp.

3d 300, 302 (D.D.C. 2016) (Kessler, J.), *decision vacated, appeal dismissed*, No. 16-5074 (D.C.

Cir. Apr. 12, 2017); *Al-Alwi v. Trump*, 236 F. Supp. 3d 417, 418 (D.D.C. 2017) (Leon, J.) *appeal*

*filed*, (D.C. Cir. Apr. 12, 2017).[5]  Furthermore, the Court of Appeals is scheduled to hear oral

argument in the *Al-Alwi* case on March 20, 2018, on many of the same issues that Petitioners

raise in this case.  *See Al-Alwi v. Trump*, 17-5067 (D.C. Cir.).  For the reasons explained in these

---

[5] As noted, the decisions in *Al-Warafi*, *Al-Kandari*, and *Al-Razak* were subsequently vacated by
the Court of Appeals because the detainees in those cases were released from United States
custody while the cases were on appeal, thereby rendering the cases moot.  Although vacated,
Circuit precedent establishes that these decisions still retain their persuasive value on the factual
and legal issues decided.  *See Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346,
354 (D.C. Cir. 1997) ("Moreover, since the district court's opinion will remain 'on the books'
even if vacated, albeit without any preclusive effect [between the parties], future courts will be
able to consult its reasoning."); *Rabbani v. Obama*, 76 F. Supp. 3d 21, 24-25 n.3 (D.D.C. 2014)
("even if [Guantanamo detainee] Dhiab's release subjects Judge Kessler's Memorandum
Opinion to vacatur, the persuasiveness of Judge Kessler's factual findings and legal reasoning
remains intact."); *see Razak*, 174 F. Supp.3d at 304 n.2 (relying on *Al-Warafi* and *Al-Kandari*
post-vacatur for their "persuasive value").

prior decisions, and as explained further below, this Court should conclude that the AUMF, as informed by the laws of war, authorizes Petitioners' continued law-of-war detention.

The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks [of September 11, 2001]" or who "harbored such organizations or persons." AUMF § 2(a).  In *Hamdi v. Rumsfeld*, the Supreme Court held that the AUMF authorized law of war detention of a U.S. citizen captured in Afghanistan, with a plurality concluding that "[i]t is a clearly established principle of the law of war that detention may last no longer than active hostilities."  542 U.S. at 520.[6]  The plurality based this conclusion on, among other things, Article 118 of the Third Geneva Convention of 1949, which provides that "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities."  *Id.* (citing the GC III).  The Court explained that this view was consistent with the "fundamental" purpose of law-of-war detention, which is "to prevent a combatant's return to the battlefield." *Hamdi*, 542 U.S. at 519; *see* 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 547 (J. Pictet ed., 1960) 546-47 ("In time of war, the internment of captives is justified by a legitimate concern—to prevent military personnel from taking up arms once more against the captor State.").  Based on this understanding of "longstanding law-of-war principles," the *Hamdi* plurality held that "Congress' grant of authority for the use of 'necessary and appropriate force'" in the AUMF "include[s] the authority to detain for the duration of the relevant conflict."  *Hamdi*, 542 U.S. at 521.

---

[6] Justice Thomas wrote separately and provided a fifth vote for upholding law-of-war detention authority under the AUMF, but he would have gone further than the plurality, stating that "the power to detain does not end with cessation of formal hostilities."  *See Hamdi*, 542 U.S. at 587-88 (Thomas, J., dissenting).

Congress has ratified this understanding of the President's detention authority.  The 2012 NDAA "affirm[ed]" that the President's authority under the 2001 AUMF includes the power to detain individuals who were "part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces."  2012 NDAA §§ 1021(a) & (b)(2).  Congress also affirmed that the President's authority includes "[d]etention under the law of war without trial until the end of the hostilities authorized by" the AUMF.  *Id.* § 1021(c)(1).

In reaching the conclusion that law-of-war detention may last until the cessation of active hostilities, the plurality in *Hamdi* noted that "[a]ctive combat operations against Taliban fighters apparently are ongoing in Afghanistan." 542 U.S. at 521 (citing a news article and government press release to support position that between 13,500 and 20,000 U.S. military personnel remained in Afghanistan at the time and operations continued there). "If the record establishes that United States troops are still involved in active combat in Afghanistan, those detentions [of Taliban forces] are part of the exercise of 'necessary and appropriate force' and therefore authorized by the AUMF." *Id.*  Because active hostilities remained ongoing, the Court concluded that Hamdi's detention was lawful "for the duration of these hostilities." *Id.*

For its part, the Court of Appeals has consistently followed *Hamdi*'s holding that law-of-war detention is authorized under the AUMF while active hostilities remain ongoing.  *See, e.g., Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) ("[T]his court has repeatedly held that under the [AUMF] individuals may be detained at Guantanamo so long as they are determined to have been part of al-Qaeda, the Taliban, or associated forces, and so long as hostilities are

ongoing."); *Ali v. Obama*, 736 F.3d at 544 ("Detention under the AUMF may last for the duration of hostilities.").

Additionally, the Court of Appeals in *Al-Bihani v. Obama,* 590 F.3d 866, 874 (D.C. Cir. 2010), interpreted the meaning of the active hostilities standard and held that detention under the AUMF may continue until the "fighting stops."  The Court of Appeals considered in that case a challenge by a Guantanamo Bay detainee who argued that he was entitled to release because "the conflict with the Taliban has allegedly ended" given that the conflict had become one "against the Taliban reconstituted in a non-governmental form."  *Id.*  The Court of Appeals rejected that argument on both "factual and practical grounds."  *Id.*  Citing a NATO press release, the Court stated that hostilities were ongoing because "there are currently 34,800 U.S. troops and a total of 71,030 Coalition troops in Afghanistan."  *Id.*  The Court also rejected the detainee's argument, which the Court described as requiring release at the conclusion of "each successful campaign of a long war."  *Id.*  That principle, if accepted, would be "a Pyrrhic prelude to defeat" because it "would trigger an obligation to release Taliban fighters captured in earlier clashes" and result in "constantly refresh[ing] the ranks" of enemy forces.  *Id.*  In making this "commonsense observation," the Court of Appeals referred to Article 118 of the Third Geneva Convention and explained "[t]hat the Conventions use the term 'active hostilities' instead of the terms 'conflict' or 'state of war' found elsewhere in the document is significant.  It serves to distinguish the physical violence of war from the official beginning and end of a conflict, because fighting does not necessarily track formal timelines.  The Conventions, in short, codify what common sense

tells us must be true: release is only required when the fighting stops." *Id.* (internal citations omitted).[7]

The Court of Appeals in *Al-Bihani* also held that "[t]he determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war." *Al-Bihani,* 590 F.3d at 874. The Court of Appeals emphasized that, under separation of powers principles, the judiciary is obligated to give the political branches "wide deference" on questions concerning the cessation of hostilities. *Id.* at 875. "In the absence of a determination by the political branches that hostilities in Afghanistan have ceased, Al-Bihani's continued detention is justified." *Id.*

---

[7] Other international law commentators agree with this interpretation of Article 118, explaining that "cessation of active hostilities" is "a situation of complete end of the war, if not in a legal sense, at least in a material one with *clearly no probability of resumption of hostilities in a near* future." *See* Christiane Shields Delessert, Release and Repatriation of Prisoners of War at the End of Active Hostilities: A Study of Article 118, Paragraph 1 of the Third Geneva Convention Relative to the Treatment of Prisoners of War 71-72 (1977) (emphasis in original); *id.* ("The end of war for the purpose of the application of Article 118, meant the end of military operations."); *id.* at 75 ("Article 118 clearly envisaged the factual end of the fighting as the event establishing the obligation of each Party to repatriate its prisoners."); *see also* 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, art. 118 at 547 (J. Pictet ed., 1960) (release is only required when "the fighting is over"); 2 L. Oppenheim, International Law § 275 (H. Lauterpacht 7th ed. 1952) ("Probably the phrase "cessation of active hostilities" in the sense of Article 118 refers not to suspension of hostilities in pursuance of an ordinary armistice which leaves open the possibility of a resumption of the struggle, but to a cessation of hostilities as the result of total surrender or of such circumstances or conditions of an armistice as render it out of the question for the defeated party to resume hostilities."); 1 G. Schwarzenberger, International Law 216 (5th ed. 1967) (stating that Article 118 "prescribes repatriation . .. on cessation of active hostilities, that is, when, in good faith, neither side expects a resumption of hostilities."); The Handbook of Humanitarian Law in Armed Conflicts § 732 (Dieter Fleck ed., 1995) (explaining that "'cessation of active hostilities'" involves a situation where "the fighting has stopped" as reflected by "lasting peace" and "demobilization of the parties to the conflict" as opposed to "merely an interruption in the hostilities").

The Court of Appeals reaffirmed this conclusion several years later in *Maqaleh v. Hagel*, 738 F.3d 312, 341 (D.C. Cir. 2013), holding that "[w]hether an armed conflict has ended is a question left exclusively to the political branches" and accepting the government's representation that "the United States remains at war in Afghanistan."  In that case the Court of Appeals concluded that hostilities in Afghanistan remained ongoing because "the political branches [have] yet to announce an end to the war in Afghanistan" and "the President has repeatedly declared that it is ongoing."  *Id*; *see also Hamdi v. Rumsfeld*, 337 F.3d 335, 341 n.l (4th Cir. 2003) (Wilkinson, J.,) (concurring in the denial of rehearing en banc) ("It would be an intrusive venture into international relations for an inferior federal court to declare a cessation of hostilities and order a combatant's release when an American military presence remained in the theater of combat and when the status of combatants, their terms of release, and the mutuality of exchanges may all remain subjects for negotiation and diplomacy.").

### B.  Active Hostilities Remain Ongoing

Here, Petitioners' detention is lawful under the AUMF, as informed by the laws of war, because active hostilities against al-Qaeda, Taliban, and associated forces remain ongoing. Indeed, the President and Congress agree that the United States is engaged in such active hostilities.  Presidents Trump and Obama have reported to Congress on a regular basis, mostly recently in December 2017, that "[t]he United States currently remains in an armed conflict against al-Qaeda, the Taliban, and associated forces, and active hostilities against those groups remain ongoing."  *See* Letters from the President, Six Month Consolidated War Powers Resolution Reports (June 11, 2015) (Ex. 2); (December 11, 2015) (Ex. 3); (June 13, 2016) (Ex. 4); (Dec. 5, 2016) (Ex. 5); (June 6, 2017) (Ex. 6); (Dec. 11, 2017) (Ex. 7).  The AUMF, which authorizes the use of force against al-Qaeda, Taliban, and associated forces, remains in effect,

and it has not been repealed or amended by Congress.  *See Ali*, 736 F.3d at 552 ("the 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities").  Further, as noted above, Congress reaffirmed *Hamdi*'s interpretation of the President's detention authority in the 2012 NDAA by authorizing "[d]etention under the law of war without trial until the end of the hostilities authorized by the Authorization for the Use of Military Force."  *See* Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. 1562; *cf. Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

The Presidents' conclusions that active hostilities remain ongoing are amply supported by the facts on the ground in Afghanistan.[8]  As explained above, four different judges of this Court evaluated the state of hostilities in Afghanistan as they existed in 2015, 2016, and 2017, and concluded that the detention of Guantanamo Bay detainees was lawful under the AUMF because active hostilities remain ongoing.  *See al Warafi*, 2015 WL 4600420, at *2, 7 ("the Court concludes that active hostilities continue" and "Respondents have offered convincing evidence that U.S. involvement in the fighting in Afghanistan, against al-Qaeda and Taliban forces alike,

---

[8] While, as set out above, active hostilities are ongoing against al Qaeda, Taliban, and associated forces including in Afghanistan, Circuit precedent establishes that the lawfulness of detention under the AUMF is based not on where a detainee's activities took place, but rather on whether the detainee was part of or substantially supported al Qaeda, Taliban, or associated forces.  *Ali*, 736 F.3d at 547 (relying on activities outside Afghanistan); *Alsabri v. Obama*, 684 F.3d 1298, 1301 (D.C. Cir. 2012) (same).  This is consistent with long-standing precedent and law-of-war principles that have recognized that members of enemy forces can be detained even if "they have not actually committed or attempted to commit any act of depradation or entered the theatre or zone of active military operations."  *Ex parte Quirin*, 317 U.S. 1, 38 (1942); *see also* GC III art. 4 (contemplating detention of members of state armed forces and militias without making a distinction as to whether they have engaged in combat).

has not stopped"); *al Kandari*, Slip Op. at 21 ("A review of the documents submitted by Respondents supports the President's assertion that fighting has not stopped in Afghanistan and that active hostilities remain ongoing at this time."); *Razak*, 174 F. Supp. 3d at 305 ("the Court agrees with Respondents' position that active hostilities continue in Afghanistan"); *Al-Alwi*, 236 F. Supp. 3d at 421 ("the record establishes clearly that both Congress and the President agree that the military is engaged in active hostilities in Afghanistan against al-Qaeda, the Taliban, and their associated forces").[9]

Indeed, recent events since these decisions fully support that active hostilities continue in Afghanistan. In August 2017, the President announced an increase of in the number of U.S. military personnel in Afghanistan along with expanded authorizations for U.S. forces to engage enemy forces. *See* Remarks by President Trump on the Strategy in Afghanistan and South Asia (Aug. 21, 2017) (Ex. 8). The United States currently maintains approximately 14,000 military

---

[9] In concluding that active hostilities remain ongoing, Judges Lamberth, Kollar-Kotelly, and Kessler stated that it was not necessary to resolve whether the Court should conduct its own independent factual examination of that question or defer to the Executive's determination because, under either standard of review, the Government would prevail. *See Al Warafi*, 2015 WL 4600420 at *2; *Razak*, 174 F. Supp.3d at 305; *Kandari*, Slip Op. at 9 ("the court need not address the contours of the appropriate judicial inquiry because the Court finds that the evidence supports Respondents' position and the Court declines to accept the Petitioners' interpretation of the President's statements"). Judge Leon, relying on *Al-Bihani*, concluded that the court must defer to the determination of the political branches regarding whether active hostilities have ceased and expressly rejected the argument that the Court must "undertake its own wide-ranging evidentiary review of the facts on the ground in Afghanistan and determine for itself whether and when active hostilities ended." *Al-Alwi*, 236 F. Supp. 3d at 420. Judge Leon's approach is correct and consistent with the law of this Circuit under *Al-Bihani*. But even if this Court were to conduct its own deferential examination of the facts on the ground, the evidence submitted here is more than sufficient to establish that active hostilities remain ongoing, as Judges Lamberth, Kollar-Kotelly, and Kessler found. In any event, as noted above, the Court of Appeals is scheduled to hear oral argument in the *Al-Alwi* case on March 20, 2018, and one of the issues raised in that case is the standard of review for a claim that hostilities have ceased.

personnel in Afghanistan, an increase of approximately 3,500 military personnel since early

2017.  *See* Dep't of Defense Report on Enhancing Security and Stability in Afghanistan at 3

(December 2017) (Ex. 9) (DoD Afghanistan Report).[10]  These personnel maintain a presence

across Afghanistan at bases in Kabul and Bagram as well as regional outstations in Nangarhar

Province in the east, Kandahar Province in the south, Herat Province in the west, and Balkh

Province in the north.  *See id.* at 3.

United States military personnel currently serve as part of the North Atlantic Treaty

Organization's ("NATO's") Resolute Support mission and the United States' Operation

Freedom's Sentinel.  *See id.*  NATO's Resolute Support mission is focused on training, advising,

and assisting Afghan forces and security institutions in a variety of security and governance

operations.  *See* NATO Resolute Support Mission, at www.rs.nato.int/about-us/mission.aspx;

DoD Afghanistan Report at 7.  Military personnel from 39 nations, including the United States,

are deployed in support of the Resolute Support mission.  *Id.*

Operation Freedom's Sentinel is the United States' counterterrorism mission in

Afghanistan, and its goals are to defeat al-Qaeda, Taliban, and associated forces; protect United

States forces operating in Afghanistan; and prevent Afghanistan from becoming a safe-haven for

terrorists to plan attacks against the United States and its allies and partners.  *See* DoD

Afghanistan Report at 5-6; *see also* Testimony of General Joseph F. Dunford, Chairman of the

Joint Chiefs of Staff, Political and Security Situation in Afghanistan: Hearing before United

States Senate Committee on Armed Services (Oct. 3, 2017) (Ex. 10) ("Our military objectives

---

[10] The Department of Defense is required to submit biannual reports to Congress about the status of the United States' efforts to enhance security and stability in Afghanistan in accordance with the section 1225 of the National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, 128 Stat. 3292, 3350-51.

for this new strategy are clear, and they are achievable: defeat ISIS and al-Qaeda in Afghanistan and ensure other terrorist groups are unable to launch attacks against the homeland, U.S. citizens, or our allies;" and "put pressure on the Taliban and have them understand they will not win a battlefield victory, so they will enter an Afghan-led peace process to end the conflict.").[11]

In support of these missions, the United States continues to engage in traditional uses of military force consistent with prior armed conflicts, such as air strikes, ground operations, and combat enabler support to coalition partners in active combat zones.  *See* DoD Afghanistan Report at 3-7, 22-29.  From June 1, 2017, to November 24, 2017, United States special operations forces components conducted 2,175 ground operations and 261 kinetic strikes in which they enabled or advised Afghan forces.  *See* DoD Afghanistan Report at 6.  In 2017, the United States conducted over 1,248 air sorties with at least one weapon release and fired more weapons during aerial missions (4,361) than in any year since 2012.  *See* United States Air Forces Central Command 2012-2017 Airpower Statistics (Ex. 11) (listing United States air sorties, and weapons releases in Afghanistan by month from January 2012 to December 2017), at www.afcent.af.mil/About/Airpower-Summaries.[12]  These recent aerial and ground operations have targeted both Taliban and al-Qaeda forces.  *See* NATO Resolute Support Press Release, *Afghan and US Forces-Afghanistan Kill Top Terrorist Leaders* (Dec. 5, 2017) (reporting joint operations by Afghan and U.S. forces that resulted in the death of senior al-Qaeda and Taliban leaders along with multiple al-Qaeda and Taliban operatives) (Ex. 13); NATO Resolute Support

---

[11] Since the beginning of Operation Freedom's Sentinel in January 2015, thirty-one U.S. service members have died in action and 239 have been wounded in action.  *See* Operation Freedom's Sentinel (OFS) U.S. Casualty Status, at www.defense.gov/casualty.

[12] The Washington Post recently ran a front page article highlighting the recent increase in aerial strikes in Afghanistan.  *See* Max Bearak, *No Rest for U.S. Air Blitz in Afghanistan*, WASHINGTON POST, January 17, 2018, at A1 (Ex. 12).

Press Release, *Afghan, U.S. Forces Launch New Campaign to Destroy Taliban Funding Networks* (Nov. 20, 2017) (announcing multiple United States strikes against Taliban targets utilizing F22A Raptors, B52 bombers, Hellfire missiles fired from drones, and High-Mobility Rocket Systems as part of a new campaign of attacks) (Ex. 14); Department of Defense Press Briefing by Army General John W. Nicholson, Jr., Commander, Resolute Support and U.S. Forces Afghanistan (Nov. 28, 2017) (explaining the continued cooperation between Taliban and al-Qaeda forces in Afghanistan and stating that U.S. forces have "recently been doing operations against al-Qaeda.  We continue to hunt them and strike them whenever we find them, primarily in the eastern party of the country.") (Ex. 15).

Afghanistan has the "the highest regional concentration of terrorist groups in the world" and remains a sanctuary for these groups.  *See* DoD Afghanistan Report at 18 (Ex. 9).  The United Nations reported in December 2017 that the security situation in Afghanistan remained highly volatile due to violent armed clashes, increased air operations, and multiple large-scale attacks by Taliban forces.  *See* Report of the Secretary-General, The Situation in Afghanistan and its Implications for International Peace and Security at 5 (Dec. 15, 2017) (Ex. 16).  These security threats have continued into 2018, as the Taliban recently launched a series of large-scale attacks that killed hundreds, including U.S. citizens.  *See* Associated Press, *U.S. Says Multiple Americans Among Casualties in Kabul Attack*, WASHINGTON POST, January 23, 2018 (Ex. 17) (reporting that the Taliban conducted an attack on an upscale hotel in Kabul that left 22 dead, including multiple U.S. citizens); Sayed Salahuddin, Pamela Constable and Sharif Hassan, *Suicide Bomber in Ambulance Kills at Least 95, wounds 158, Kabul officials Say*, WASHINGTON POST, January 27, 2018 (Ex. 18) (reporting that the Taliban claimed responsibility for a suicide bomber that detonated an ambulance packed with explosives outside a hospital in central Kabul).

In response to these and other threats, it is anticipated that United States forces will continue military operations in 2018, as hostilities are expected to intensify during the upcoming spring fighting season. *See* Department of Defense Press Briefing by Army General John W. Nicholson, Jr., Commander, Resolute Support and U.S. Forces Afghanistan (Nov. 20, 2017) (Ex. 19) (discussing the military impact of the President's new expanded targeting authorities and the new campaign of offensive operations; explaining that the Taliban currently controls or contests approximately one-third of the Afghan population centers and the United States' goal over the next two years is to reduce Taliban control to less than twenty per cent); Nicholson Press Briefing (Nov. 28, 2017) (Ex. 15) (stating that air and ground operations will continue into 2018 and explaining that approximately 1,000 additional U.S. ground troops will be deployed alongside Afghan forces conducting offensive operations during the spring 2018 fighting season); DoD Afghanistan Report at 6 (discussing anticipated security conditions in 2018 and stating that attacks by enemy forces will continue).[13]

In summary, because active hostilities against al Qaeda, Taliban, and associated forces remain ongoing, Petitioners' continued detention under the AUMF, as informed by the laws of war, is lawful.

---

[13] A U.S. Air Force Brigadier General recently described the impact of the President's expanded operational authorities as follows:  "What we do inside Afghanistan, is we look for any opportunity to target enemies of Afghanistan wherever we find them in theater.  And we have the authorities we need now to be able to target them.  Whereas before we could only target essentially in defense or in close proximity to Afghan forces . . ., now with our new authorities we're able to target networks, not just individual fighters."  *See* Department of Defense Press Briefing by U.S. Air Force Brigadier General Lance Bunch, Jr., Director of Future Operations, Resolute Support and Operation Freedom's Sentinel (Dec. 13, 2017) (Ex. 20) ("What I can tell you is that the new strategy highlights that this is a new war.  And that the gloves are off, if you will, and that we've got now these authorities we need to be able to go and target the Taliban network.").

### C.  Petitioners' Arguments Otherwise are Erroneous

In the face of the overwhelming evidence and binding precedent that support Petitioners' continued detention, Petitioners' contrary arguments cannot withstand scrutiny.

### 1. Continued detention under the AUMF is not "perpetual" or "indefinite"

Petitioners erroneously contend that their detention violates the AUMF because they are subject to "perpetual" and "indefinite" detention.  *See* Mot. at 30-31.  But Petitioners' continued detention is not indefinite, as it is bounded by the cessation of active hostilities, as discussed above.  In *Hamdi,* the detainee argued that the AUMF did not authorize "indefinite or perpetual detention," and the plurality replied that the AUMF grants the authority to detain for the duration of active hostilities.  *See* 542 U.S. at 520-21.  That rationale is appropriate here:  Petitioners are detained because of their affiliation with al-Qaeda, Taliban, or associated forces, and they remain detained today because active hostilities against those groups remain ongoing.  *See al-Wirghi v. Obama*, 54 F. Supp. 3d 44, 47 (D.D.C. 2014) (Lamberth, J.) (rejecting same argument raised by Petitioners and concluding that "detention is not unconstitutionally indefinite").[14]

Petitioners' argument that they are subject to indefinite detention under the AUMF essentially boils down to the assertion that they should be released because hostilities have been ongoing for too long.  But the notion that Petitioners must be released even though hostilities

---

[14]  Because Petitioners are being held consistent with *Hamdi*'s requirement that law of war "detention may last no longer than active hostilities," 542 U.S. at 520, there is no basis for the argument set forth in the *amicus* brief by the Due Process Scholars that Petitioners' detention is indefinite and unsupported by the AUMF.  *See* Due Process Scholars *Amicus* Brief at 18-25. Further, the Due Process Scholars' argument that Congress has not spoken with a sufficiently clear statement regarding the President's detention authority should be rejected because the Scholars completely ignore the 2012 NDAA, which affirmed that the President's authority under the AUMF includes "[d]etention under the law of war without trial until the end of the hostilities authorized by" the AUMF.  2012 NDAA § 1021(c)(1), 125 Stat. at 1562.

continue ignores binding precedent and turns the law respecting wartime detention on its head;
Petitioners effectively ask this Court to reward enemy forces for extending the length of the
conflict by persistently continuing their attacks.  There is no support for that position, and the
Court of Appeals has expressly rejected the argument that courts should alter the standard for
law-of-war detention due to the length of detention.  *See Ali*, 736 F.3d at 552.  The AUMF "does
not have a time limit" and "absent a statute that imposes a time limit or creates a sliding-scale
standard that becomes more stringent over time, it is not the Judiciary's proper role to devise a
novel detention standard that varies with the length of detention."  *Id.* (and noting further that
"Congress and the President may choose to make long-term military detention subject to
different, higher standards," while acknowledging the Executive's conduct of periodic reviews
regarding the need for ongoing detention).[15]

### 2. Petitioners' continued detention prevents their return to the battlefield

Petitioners also erroneously contend that they should be released because the purpose
underlying their law of war detention – *i.e.*, to prevent their return to the battlefield – "has
evaporated" and no longer exists.  *See* Mot. at 32-34.  As explained above, there is no merit to
this claim because active hostilities against Al-Qaeda, Taliban, and associated forces remain on-
going.  The law of war expressly ties the authority to detain enemy belligerents to the duration of
active hostilities because the very purpose of law of war detention is "to prevent captured
individuals from returning to the field of battle and taking up arms once again."  *Hamdi*, 542
U.S. at 518.  Accordingly, longstanding law-of-war principles and "common sense" dictate that

---

[15] Nevertheless, the Government does not have an interest in detaining enemy combatants longer
than necessary, which is why it has reviewed, and continues to review, whether individual
Guantanamo detainees need to remain detained, as discussed above.  *See supra* 2-5 (explaining
Guantanamo Review Task Force and PRB reviews).

"release is only required when the fighting stops." *Al-Bihani*, 590 F.3d at 874. Here, active hostilities against al-Qaeda, Taliban, and associated forces continue, and therefore, the AUMF, as informed by the laws of war, continues to authorize Petitioners' detention to prevent Petitioners from returning to the fight.

Petitioners also argue that even if they were "once part of a targetable group, their past membership alone is no longer enough, if it ever was, to presume a threat of return to the battlefield." *See* Mot. at 32. Petitioners attempt to support this view by selectively and misleadingly quoting from an international law treatise to contend that detention is not authorized "where a detainee is no longer likely to take part in hostilities against the Detaining Power (in the case of combatants)." *See* Mot. at 32 n.57. What the treatise actually says is that "the Third Geneva Convention requires the repatriation of **seriously wounded and sick prisoners of war** because they are no longer likely to take part in hostilities against the Detaining Power." 1 Jean-Marie Henckaerts & Louise Doswald–Beck, Customary International Humanitarian Law 345 (2005) (emphasis added). None of the Petitioners here raise claims based on Articles 109 and 110 of the Third Geneva Convention, which addresses the repatriation of sick and wounded prisoners of war—privileged belligerents detained in international armed conflict. Further, Petitioners notably omit that their cited treatise recognizes "the long-standing custom that prisoners of war may be interned for the duration of active hostilities," at least in international armed conflicts. *Id.* at 344, 451-56 (citing Article 118 of the Third Geneva Convention).

In the absence of any authority to support their position, the Court should reject Petitioners' invitation to re-write the laws of war to impose a new, unspecified detention standard or time limit that would conflict with longstanding authority that detention is authorized

for the duration of active hostilities.  *See Ali*, 736 F.3d at 552.  Nor is there any basis for

Petitioners' contention that their detention under the AUMF entitles them to an individualized

judicial determination whether they are likely to return to the battlefield or continue to pose a

threat to the national security.  The Court of Appeals has expressly rejected that position.  *See*

*Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010) ("the United States's authority to detain an

enemy combatant is not dependent on whether an individual would pose a threat to the United

States or its allies if released but rather upon the continuation of hostilities."); *id.* ("Whether a

detainee would pose a threat to U.S. interests if released is not at issue in habeas corpus

proceedings in federal courts concerning aliens detained under the authority conferred by the

AUMF.").  Rather, that assessment is to be made by the Executive Branch through its

administrative processes, which continue.

### 3.  Continued detention of Petitioners under the AUMF does not implicate due-process concerns

The Court also should reject Petitioners' argument that the President's detention authority

under the AUMF, as informed by the laws of war, should be construed narrowly to avoid raising

constitutional issues with Petitioners' ongoing detention.  *See* Mot. at 33-34.  Because

Petitioners' continued detention neither implicates the Due Process clause nor violates it, *see*

*infra* 32-42, there is no need to reinterpret the detention authority under the AUMF in a manner

that would conflict with longstanding law-of-war principles to avoid alleged constitutional issues

with that authority.  *See Hamdi*, 542 U.S. at 520 (AUMF authorizes law-of-war detention while

active hostilities continue for a U.S. citizen detainee with due process rights); *Ali*, 736 F.3d at

552 ("the Constitution allows detention of enemy combatants for the duration of hostilities").

**4. The conflict with al Qaeda, Taliban, and associated forces remains ongoing**

There is also no basis for Petitioners' argument that the Government's detention authority under the AUMF has lapsed because of alleged changes in the nature of the ongoing armed conflict against al-Qaeda, Taliban, and associated forces.  Petitioners point to language used by the *Hamdi* plurality in reaching its conclusion that law-of-war detention may last until the end of active hostilities: "If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel." *Hamdi*, 542 U.S. at 521.   Petitioners contend that the AUMF's detention authority has now "unraveled" because the circumstances of the current conflict can no longer justify their detention.  *See* Mot. at 35-37.  But just as *Hamdi* concluded, "that is not the situation we face as of this date."  *Hamdi*, 542 U.S. at 521 (noting "active combat operations against Taliban fighters apparently are ongoing in Afghanistan.").

Consistent with the President's determination as Commander-in-Chief that active hostilities remain ongoing, approximately 14,000 military personnel are currently deployed to Afghanistan, and they engage, when and where appropriate, in uses of force against al-Qaeda, Taliban, and associated forces, consistent with the laws of war in a context similar to that presented to the Supreme Court in *Hamdi* and to that presented in other, traditional military operations.  *See supra* 16-23; *Hamdi*, 542 U.S. at 521.  Indeed, the United States is still actively fighting al-Qaeda, Taliban, and associated forces, in the same geographic locations, because these groups continue to attack United States forces and plot to inflict harm on the United States and its allies and partners.  This case, thus, does not present a situation in which Petitioners' detention would be inconsistent with the "clearly established principle of the law of war that detention may last no longer than active hostilities" or the rationales underlying that principle.

*Hamdi*, 542 U.S. at 520.  For these reasons, Judges Kollar-Kotelley and Leon previously rejected

the same argument that Petitioners assert here.  *See Al-Alwi*, 236 F. Supp. 3d at 423 (rejecting

argument that "that the unusual nature and length of the conflict in Afghanistan have caused

conventional understandings of the law of war to unravel completely"); *Al-Kandari*, Slip Op. at

18 ("while the plurality in *Hamdi* did caution that the facts of a particular conflict may unravel

the Court's understanding of the Government's authority to detain enemy combatants, the Court

does not agree with Petitioner that such a situation exists at this point in time").

Petitioners offer no new evidence or argument that would justify a different conclusion in

this case.  Petitioners point to the length of their detention, *see* Mot. at 35, but "the duration of a

conflict does not somehow excuse it from longstanding law of war principles."  *Al-Alwi*, 236 F.

Supp. 3d at 423.  If Petitioners' point is that the current armed conflict is different because

enemy forces have prolonged the fighting by not laying down their arms, that is more reason for

the United States to continue to detain enemy forces, not less.  Indeed, in *Boumediene v. Bush*,

the Supreme Court observed that the conflict in Afghanistan "is already among the longest wars

in American history," but never suggested that the duration of a conflict might vitiate the

Government's authority to detain enemy belligerents.  553 U.S. 723, 771 (2008).  More recently,

the Court of Appeals has noted that it was "of course aware that this is a long war with no end in

sight" but nonetheless reaffirmed the "detention of enemy combatants for the duration of

hostilities."  *Ali*, 736 F.3d at 552.  Any holding to the contrary would result in a judicially-

imposed system of fixed-term detention that would undermine longstanding law-of-war

principles and establish an arbitrary catch-and-release system in which enemy fighters could

return to the battlefield while fighting remains ongoing.  It is not open to this Court to create

such a regime.  *Id.*

Petitioners also erroneously contend that the President's detention authority has unraveled because al-Qaeda "has been decimated" and, as a result, Petitioners are "no longer being held in connection with any ongoing armed conflict involving an organized armed group responsible for 9/11." *See* Mot. at 35-37. As a threshold matter, the Court has neither the authority nor the expertise to evaluate the operational capacity and future threat posed by an enemy of the United States, especially when that enemy is a transnational terrorist organization such as al-Qaeda. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) ("whether the terrorist activities of foreign organizations constitute threats to the United States are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry") (citations omitted); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) ("America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore."). Here, where the President and Congress agree that the United States is engaged in active hostilities against al-Qaeda, the Court is required to give "wide deference" to that determination and cannot second-guess it. *See Al-Bihani*, 590 F.3d at 875.

In any event, there is no basis in fact on which to conclude that the United States' military and counterterrorism operations have destroyed al-Qaeda to such an extent that active hostilities have ceased. To be sure, the United States has acknowledged the many achievements of the U.S. military and counterterrorism operations against al-Qaeda in recent years, including the killing of Osama Bin Laden and other senior al-Qaeda leadership. *See* Pet'rs' Mot at 36 n.61. But as the materials cited by Petitioner make clear, neither President Obama nor President Trump has ever stated that al-Qaeda has unconditionally surrendered, or no longer poses a

continuing threat to the United States warranting hostilities against it, or has been destroyed to such an extent that it cannot engage in hostilities against the United States. *Id.* To the contrary, both Presidents have consistently stated that al-Qaeda continues to pose a continuing threat. *See, e.g.*, Statement by the President on the End of the Combat Mission in Afghanistan (Dec. 28, 2014) (Ex. 21); Remarks by President Trump on the Strategy in Afghanistan and South Asia (Aug. 21, 2017) (Ex. 8).[16]

Indeed, al-Qaeda continues to pose a threat to the United States and its allies and partners. Among other things, al-Qaeda continues to operate in Afghanistan, it actively collaborates with the Taliban at the tactical level, and U.S. forces are continuing to conduct operations against it. *See* Department of Defense Press Briefing by Army General John W. Nicholson, Jr., Commander, Resolute Support and U.S. Forces Afghanistan (Nov. 28, 2017) (Ex. 15); DoD Afghanistan Report at 23 (Al-Qaeda has a sustained presence concentrated in east and northeast Afghanistan, with smaller elements in the southeast). Al-Qaeda's forces have proven to be resilient, and they aspire to conduct attacks against the United States, both large-scale attacks against the homeland and smaller-scale attacks against U.S. forces in Afghanistan. *See*

---

[16] Although President Obama announced an end to the United States' combat mission in Afghanistan in December 2014, he was clear that active hostilities would continue as U.S. forces remained in Afghanistan to train, advise, and assist Afghan forces, and to conduct and support counterterrorism operations against al-Qaeda, Taliban, and associated forces. *See* Statement by the President on the End of the Combat Mission in Afghanistan (Dec. 28, 2014) (Ex. 21); Letter from the President, Six Month Consolidated War Powers Resolution Reports (June 13, 2015) (Ex. 4). For this reason, multiple judges of this Court have rejected the argument that President Obama's statements announcing the end of the combat mission in 2014 constituted an official declaration that active hostilities ceased. *See Al-Alwi*, 236 F. Supp. 3d at 422 ("when viewed in their proper context, [the President's] statements cannot reasonably be construed as a presidential declaration that active hostilities have ended in Afghanistan"); *al Kandari*, Slip Op. at 16 ("these statements do not necessarily signal the end of 'active hostilities,' and notably no evidence has been presented that any government official, including the President, has stated that there has been an end to active hostilities in Afghanistan"); *Razak*, 174 F. Supp.3d at 307 ("The end of the combat mission is not synonymous with the end of active hostilities.").

Testimony of Nicholas J. Rasmussen, Director, National Counterterrorism Center, Threats to the

Homeland: Hearing before United States Senate Committee on Homeland Security and

Governmental Affairs at 1, 4-5 (Sept. 27, 2017) (Ex. 22); Testimony of Christopher A. Wray,

Director, Federal Bureau of Investigation, Threats to the Homeland: Hearing before United

States Senate Committee on Homeland Security and Governmental Affairs at 2 (Sept. 27, 2017)

(Ex. 23).  Further, as the United Nations reported in August 2017, "the Taliban, through the Al-

Qaeda core, continues to wield substantial influence over regional Al-Qaeda affiliates" and

"[m]any Al-Qaeda-affiliated fighters from the Afghanistan-Pakistan border area have integrated

into the Taliban, leading to a marked increase in the military capabilities of the movement." *See*

United Nations Security Council, Twentieth Report of the Analytical Support and Sanctions

Monitoring Team Concerning al-Qaeda and Associated Individuals and Groups at 14-15 (August

7, 2017) (Ex. 24) (noting estimates that 7,000 foreign fighters are fighting in Afghanistan for

Taliban and al-Qaeda affiliates).

 Here, active hostilities against al-Qaeda continue, both in fact and as declared by the

President, and there is no merit to Petitioners' contention that U.S. forces have decimated al-

Qaeda beyond its capacity to engage in active hostilities.  As the President recently explained,

"an effective military effort" is necessary to address the "immense" security threats to U.S.

national security that "we face in Afghanistan." *See* Remarks by President Trump on the

Strategy in Afghanistan and South Asia (Aug. 21, 2017) (Ex. 8).  And, to suppress those threats

and preserve the hard-earned successes that U.S. and coalition forces have achieved, the

President stated in December 2017 that active hostilities remain ongoing and counterterrorism

operations against al-Qaeda as well as Taliban and associated forces in Afghanistan will

continue.  *See* Letter from the President, Six Month Consolidated War Powers Resolution Report

(Dec. 11, 2017) (Ex. 7).  Accordingly, Petitioners' detention remains lawful under the AUMF as informed by the laws of war.[17]

## II. PETITIONERS' CONTINUED DETENTION DOES NOT VIOLATE DUE PROCESS

In *Boumediene v. Bush*, the Supreme Court granted Guantanamo Bay detainees the privilege of habeas corpus.  553 U.S. at 797.  In particular, the Court stated that the detainees were entitled to a "meaningful opportunity" to challenge the basis for their detention.  *Id*. at 779. In doing so, however, the Court also directed that both "the procedural and substantive standards" used to adjudicate these cases must accord appropriate deference to the political branches.  *Id*. at 796-797.  Over the years, the judges of this District and the Court of Appeals have developed a well-settled body of law that implements that directive.

Petitioners now challenge several aspects of this well-settled precedent, asserting that the passage of time has rendered Petitioners' continued detention in violation of substantive due process and the procedural regime established by the Court of Appeals in violation of procedural due process.  For the reasons stated below, those challenges are not well-founded.  Most fundamentally, Petitioner may not challenge here what has been foreclosed by the Court of Appeals and the Supreme Court.  *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir.

---

[17] Petitioners' argument is directed only to al-Qaeda, not the Taliban or associated forces of those organizations.  That distinction is important because Petitioners' argument would not affect the detention authority of any detainee held on the basis of an affiliation with the Taliban or associated forces of al-Qaeda or the Taliban.  Because of Petitioners' focus on the status of hostilities in Afghanistan and the fact that active hostilities against al-Qaeda remain ongoing there, there is no need for the Court to address whether U.S. counterterrorism efforts against al-Qaeda in countries other than Afghanistan would be sufficient, either alone or collectively, to justify Petitioners' continued detention under the AUMF, which does not limit the geographic scope of its authorization.  Nevertheless, Respondents reserve the right to present additional facts and argument regarding alternative grounds for Petitioners' detention should the Court determine that active hostilities against al-Qaeda in Afghanistan have ceased.

1997) (district courts are obligated to apply controlling Circuit precedent unless that precedent

has been overruled by the Court of Appeals *en banc* or by the Supreme Court).  Accordingly,

Petitioner's claims that their continued detention violates due process should be rejected.

### A.  Petitioners May Not Invoke Due Process Clause Protections

The law of this Circuit is that the Due Process Clause does not apply to unprivileged alien

enemy combatants detained at Guantanamo Bay.  *Kiyemba v. Obama*, 555 F.3d 1022, 1026

(D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131, *reinstated in relevant part*, 605 F.3d

1046, 1047, 1048 (D.C. Cir. 2010), *cert. denied*, 563 U.S. 954 (2011).  This holding has been

reiterated subsequently by the Court of Appeals, including in *al Madhwani v. Obama*, 642 F.3d

1071, 1077 (D.C. Cir. 2011),[18] and has been applied repeatedly by the judges of this District.[19]

Most importantly, that holding has never been overruled.  *Salahi*, 2015 WL 9216557 at *5.

Consequently, Petitioners' due-process arguments are foreclosed here.  *See Torres*, 115 F.3d at

1036.

Petitioner's attempts to circumvent this binding precedent fail.  First, the Court of

Appeals has already rejected Petitioners' argument, *see* Mot. at 18-19, that the functional

analysis relied upon by the Supreme Court in *Boumediene* in assessing application of the

Suspension Clause requires that the Due Process clause be extended to Petitioners.  In *Rasul v.*

*Myers*, a case specifically remanded by the Supreme Court to the D.C. Circuit with an instruction

to reconsider a prior opinion in light of *Boumediene*, the Court of Appeals declined to apply the

---

[18] *See also Bahlul v. United States*, 840 F.3d 757, 796 (D.C.C. 2016) (Millet, J., concurring); *al Bahlul v. United States*, 767 F.3d 1, 33 (D.C. Cir. 2014) (Henderson, J., concurring).

[19]  *See Salahi v. Obama*, 2015 WL 9216557 (D.D.C.) * 5 (Lamberth, J.); *Rabbani v. Obama*, 76 F.Supp.3d 21, 25 (D.D.C. 2014) (Lamberth, J.);  *Ameziane v. Obama*, 58 F. Supp. 3d 99, 103 n.2 (D.D.C. 2014) (Huvelle, J.); *Bostan v. Obama*, 674 F. Supp. 2d 9, 29 (D.D.C. 2009) (Walton, J.).

functional test to the constitutional claims asserted there, citing its prior holding that

Guantanamo detainees do not have due-process rights arising under the Fifth Amendment.  563

F.3d 527, 529 (D.C. Cir. 2009).  The Court of Appeals explained that the Supreme Court in

*Boumediene* had "explicitly confined its constitutional holding 'only' to the . . . Suspension

Clause," thereby "disclaim[ing] any intention to disturb existing law governing the

extraterritorial reach of any constitutional provisions."  563 F.3d at 529 (quoting *Boumediene*,

553 U.S. at 795, "Our decision today holds only that petitioners before us are entitled to seek the

writ; . . ..").  Accordingly, the Court of Appeals concluded that until the Supreme Court ruled

otherwise, it was bound to adhere to prior precedent, which until *Boumediene* had uniformly held

that constitutional due-process rights did not run to aliens located overseas.  *Id.* (citing, among

other cases*, United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Kiyemba*).

Consequently, application of the *Boumediene* functional test is precluded here.  *See Rabbani*, 76

F.Supp.3d at 25 n.5 (rejecting functional-approach argument); *Bostan*, 674 F.Supp.2d at 29 n.10

(same).

Second, Petitioners interpret the holding of *Kiyemba* too narrowly.  Mot. at 18.  To be

sure, that case involved a putative due-process right of release into the United States.  555 F.3d at

1024.  But the Court of Appeals addressed the matter more broadly:

> But the due process clause cannot support the court's order of release. Decisions
> of the Supreme Court and of this court . . . hold that the due process clause does
> not apply to aliens without property or presence in the sovereign territory of the
> United States. [555 F.3d at 1026 (citations omitted)].[20]

---

[20] *See also Bahlul*, 840 F.3d at 796 (Millet, J., concurring) (citing *Kiyemba*, noting categorically, "Due Process Clause of Fifth Amendment does not apply to aliens at Guantanamo."); *al Bahlul*, 767 F.3d at 33 (Henderson, J., concurring) (citing *Kiyemba*, noting "Indeed, it remains the law of this circuit that, after *Boumediene*, aliens detained at Guantanamo may not invoke the protections of the Due Process Clause of the Fifth Amendment.").

As noted above, the Court of Appeals and the judges of this District have cited this decision while denying multiple claims or challenges by Guantanamo detainees asserting various due-process rights. *See supra* 33 nn.18 & 19. Hence, contrary to Petitioners' reading, the plain meaning of the holding in *Kiyemba*, as consistently explained by the judges in this District and in the Circuit, is: Petitioners may not ground any putative right of release in the Due Process Clause.

Third, contrary to Petitioners' assertions, *see* Mot. at 18-19, the Government's position, noted in *al-Bahlul*, 767 F.3d at 18, that the Ex Post Facto clause applies to criminal trials of detainees at Guantanamo Bay before military commissions, does not vitiate the Due Process Clause holding of *Kiyemba*. The controlling *en banc* opinion in *al-Bahlul* accepted the Government's position regarding the Ex Post Facto clause, but merely assumed without deciding that the clause applied to detainee criminal trials. *Id.* (further noting that "[i]n doing so, we are 'not to be understood as remotely intimating in any degree an opinion on the question'" (quoting *Petite v. United States*, 361 U.S. 529, 531 (1960)).[21] Importantly, the Government's position in *Bahlul* was premised on "the unique combination of circumstances in th[e] case." *al-Bahlul v. United States*, No. 11-1324, Br. of the United States, 2013 WL 3479237 at *64 (D.C. Cir. July 10, 2013) (quoting *Boumediene*, 553 U.S. at 755). The primary "circumstance" related to the Ex Post Facto Clause's "structural function in U.S. law" as a check on the Legislature's power to punish criminally. *Id.* Additionally, that the appeal of al-Bahlul's conviction lay ultimately with the Court of Appeals, an Article III court, counseled strongly in favor of applying the Clause just

---

[21] A majority of the judges on the *en banc* court indicated, however, apparently in *dictum*, that they would apply the Ex Post Facto clause to Guantanamo detainees in such cases. 767 F.3d at 18 n. 9.

as it would apply in any criminal appeal in that Court. *Id*. But the United States never conceded that *Boumediene*—or its functional analysis—compelled a finding that the Ex Post Facto Clause must apply. *See id*. Indeed, the United States referred to *Boumediene* solely for the proposition that the United States "maintains de facto sovereignty" of Guantanamo Bay. *Id*. Accordingly, the Government's position in *al-Bahlul* does not support Petitioner's argument.

Fourth, that both the *Rasul* and *al-Madwahi* decisions from the Court of Appeals ultimately rested on non-due-process grounds does not vitiate those opinions applicability here. Mot. at 19 n.47; *see al-Madhwani*, 642 F.3d at 1077; *Rasul*, 563 F.3d at 529. For, by explicitly and approvingly citing *Kiyemba*, both opinions acknowledged that the case remained good law.

And lastly, Petitioners erroneously rely on a series of opinions in which either panels or individual judges of the Court of Appeals have assumed without deciding that Guantanamo detainees may have certain due-process rights. *See* Mot. at 18. At best, those opinions stand for the proposition that those petitioners failed to state a due-process claim at all, for no relief was granted even given the assumption. But more importantly, none of the opinions stand for the proposition that *Kiyemba* has been overruled, for not one of the cases purported to do so. *See Salahi*, 2015 WL 9216557 at *5.

In summary, the binding law of this Circuit remains that enemy combatants detained at Guantanamo Bay may not claim rights under the Fifth Amendment's Due Process Clause. *See Kiyemba*, 555 F.3d at 1026. Unless and until that decision is reversed by either the Court of Appeals sitting *en banc* or the Supreme Court, this Court is bound to follow that controlling precedent. *Torres*, 115 F.3d at 1036. Consequently, Petitioners may not invoke the Due Process Clause to support their claim for release.

**B. Petitioners' Continued Detention Does Not Violate Substantive Due Process**

Even were the Court to assume that the Due Process Clause extends in some manner to detainees such as Petitioners at Guantanamo Bay, binding Supreme Court and Circuit precedent also establishes that Petitioners' continued detention is fully consistent with due process. As explained *supra*, five Justices in *Hamdi* determined that the AUMF authorized detention until the cessation of active hostilities. 542 U.S. at 518 (plurality op.) (detention "for the duration of the particular conflict in which . . . [detainees] were captured[] is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress [] authorized the President to use"); *id.* at 587-588 (Thomas, J., dissenting).

There can be no question but that the due-process question was squarely presented in *Hamdi*, for Hamdi himself was a U.S. citizen detained within the United States. *Id.* at 510. And the Court specifically considered the due-process issue, balancing Hamdi's substantial liberty interest and the Government's interest in ensuring that he did not return to the battlefield against the United States. *Id.* at 531.

Acknowledging *Hamdi*, the Court of Appeals has held that Guantanamo Bay detainees may be held under the AUMF until the end of hostilities. *Ali*, 736 F.3d at 544, 552; *see also Aamer*, 742 F.3d at 1041; *al-Bihani*, 590 F.3d at 875. Consequently, even were this Court to find, contrary to Circuit precedent, that Petitioners might have some due-process rights, binding Supreme Court and Circuit precedent establishes that those rights are not violated by Petitioners continuing detention. *See Torres*, 115 F.3d at 1036.

Petitioners' arguments to the contrary—(1) that due process places time-specific limits on their detention and (2) that their continued detention is now unconstitutional based on an

arbitrary Executive policy not to release any Guantanamo detainees—do not counsel a different

result: the former is inapplicable in the context here, the second is factually wrong.

### 1.  Petitioners' continued detention is not unconstitutionally indefinite

First, due process does not place time-specific limits on wartime detention.  *Hamdi* and

the law of war make clear that enemy combatants such as Petitioners may be detained for the

duration of the hostilities.  542 U.S. at 518; *accord Aamer*, 742 F.3d at 1041; *Ali*, 736 F.3d at

544, 552; *al-Bihani*, 590 F.3d at 875.   Consequently, as long as the relevant conflict continues—

and it does, *see supra* 16-23—no constitutional issue arises as to Petitioners' continued

detention.  That the duration of that detention may be currently indeterminate—because the end

of hostilities cannot be predicted—does not render the detention "perpetual" or

unconstitutionally "indefinite."  Mot. at 20, 22.  Rather, Petitioners' detention remains, as it

always was, bounded by the ultimate cessation of hostilities.  *See* 542 U.S. at 518.  That limit,

even though currently not determinable, renders Petitioners' detention sufficiently definite to

satisfy due process.  *See*, *e.g.*, *Ali*, 736 at 552 (acknowledging that the conflict with al-Qaeda, the

Taliban, and associated forces "has no end in sight" but that, nevertheless, "the Constitution

allows detention of enemy combatants for the duration of hostilities").

Petitioners' cited authorities do not support a different result.  None concern the unique

context at issue here, the detention of adjudged enemy combatants.[22]   *See Ali*, 736 F.3d at 545

---

[22] To further support their argument for durational limits on their continued detention, Petitioners
miscite *Hamdi* itself, asserting the plurality's opinion held "that 'indefinite or perpetual
detention' is impermissible."  Mot. at 21-22 (quoting 542 U.S. at 521).  That quote from the
opinion, however, refers not to a position of the Supreme Court but to Hamdi's own contention
regarding the limits of AUMF detention.  *See* 542 U.S. at 521.  The plurality's position, stated in
the next sentence of the opinion, was that "Certainly, we agree that indefinite detention for the
purpose of interrogation is not authorized."  *Id*.  But there is no contention here that Petitioners
have been detained solely for ongoing interrogation.  Rather, as permitted under *Hamdi*,

(noting that preponderance of evidence standard for conflict-long detention is permissible due to purpose and nature of that detention); *see also Foucha v. Louisiana*, 504 U.S. 71, 79 (1992) (to satisfy due process, detention must bear "some reasonable relation to the purpose for which the individual is committed"); *Kansas v. Hendricks*, 521 U.S. 346, 363-64 (1997) (holding civil commitment statute did not violate due process because, although the end of an individual's commitment could not be calculated, statute required the release of the committed individuals once they no longer posed a threat). Two of the three cases cited by Petitioners—*Zadvydas v. United States*, 533 U.S. 678 (2001) and *Clark v. Martinez*, 543 U.S. 371 (2005), addressed a presumptive limit on pre-deportation immigration detention.[23]  The third, *United States v. Salerno*, 481 U.S 739 (1987), addressed the constitutionality of pre-trial criminal detention. Thus, none of these cases impugn the Government's authority to hold Petitioners until the cessation of hostilities, as permitted by *Hamdi* and the laws of war.

### 2.  Petitioners' continued detention is not arbitrary

Petitioners' continued detention still serves the purpose justifying it: to prevent Petitioners' return to the battlefield.  Accordingly, Petitioners' detention is not unconstitutionally arbitrary.  *See al Wirghi*, 54 F. Supp. 3d at 47.

Petitioners' argument otherwise is grounded on a false premise, specifically that their continued detention is based solely on a policy barring the release of any detainees from

---

Petitioners' continued detention seeks solely to prevent their return to the battlefield.  542 U.S. at 518.

[23] Notably, in *Zadvydas*, the Supreme Court specifically stated that it was not announcing a rule that would necessarily apply to cases involving "terrorism or other special circumstances where . . . [there would be a need for] heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 696.  And in *Clark* the Court employed a similar disclaimer, noting that the interpretation of the immigration-detention law before it would not prevent the "sustained detention" of alien terrorists under other authority.  543 U.S. at 379 n.4.

Guantanamo Bay.  Mot. at 21.  As explained above (*see supra* at 2-6), however, the policy of the United States was and has remained that detainees will be provided periodic reviews to determine whether their continued, lawful law-of-war detention by the United States may be ended by transfer without endangering security interests of the United States.  This policy was reiterated by the Deputy Secretary of Defense just last fall.  *See* Policy Mem., Implementing Guidelines for Periodic Review of Detainees Held at Guantanamo Bay per Exec. Order 13567 Attach. 3 ¶ 2.a (Nov. 27, 2017) (available at http://www.prs.mil/Portals/60 /Documents/POLICY_MEMORANDUM_IMPLEMENTING _GUIDELINES.pdf).

   Moreover, the President confirmed the vitality of that policy by Executive Order just two weeks ago, when he instructed that the periodic-review process instituted by Executive Order 13,567 would continue and would apply to any detainees transferred to Guantanamo Bay in the future.  Exec. Order 13,823 §2(e), 83 Fed. Reg. at 4831-32.  At the same time, the President dispelled any doubt that detainees designated as eligible for transfer may be transferred, subject to appropriate security conditions, if deemed appropriate by the Secretary of Defense:

> Nothing in this order shall prevent the Secretary of Defense from transferring any individual away from the U.S. Naval Station Guantanamo Bay when appropriate . . .. [*Id*. § 3(a), 83 Fed. Reg. at 4832.]

Thus, the policy of the United States remains that Guantanamo Bay detainees may be transferred prior to the end of active hostilities when it is determined that their continued law of war detention is no longer necessary to protect against a continuing significant threat to the security of the United States.  *See id*. § 2(e).

   In furtherance of this policy, Guantanamo Bay detainees have continued to receive periodic reviews of their detention.  *See supra* 7-9 (table); *see generally* www.prs.mil (Periodic Review Secretariat website).  And the issuance of the recent Executive Order confirms that

governmental processes needed to make transfers possible will occur.  Whether any transfers

may actually result will depend—as it always has—on the specifics of particular cases, as

explained *supra* 2-6.

Furthermore, that two of the Petitioners were previously approved for transfer does not

render their continued detention unnecessary or unconstitutionally arbitrary.  Mot. at 25-27.  To

the extent Petitioners' argument to the contrary is premised on the supposed policy not to

transfer any Guantanamo detainees, such a policy does not exist.  But more fundamentally,

Petitioners' argument ignores the meaning of a detainee's designation for transfer.  Such a

designation does not render continued detention unlawful.  *Almerfedi v. Obama*, 654 F.3d 1, 4

n.3 (D.C. Cir. 2011) ("whether a detainee has been cleared for release is irrelevant to whether a

petitioner may be lawfully detained"); *accord* GTMO Task Force Report at 17 (explicitly

denying that designation as eligible for transfer established detainee's detention was unlawful);

*al-Wirghi*, 54 F. Supp. 3d at 47 (Lamberth, J.) (designation for transfer does not reflect a

decision that the detainee poses no threat or render continued detention unconstitutionally

arbitrary).

Indeed, more specifically as to these two petitioners, their designations as eligible for

transfer explicitly disclaimed any concession that the detainees did not pose any threat to the

security of the United States.  As to Petitioner Nasser, that disclaimer was contained in the

unclassified summary of the final determination by Periodic Review Board, which provided that

the board:

> recognize[d that] the detainee presents some level of threat in light of his past
> activities, skills, and associations; however, the Board found that . . . the threat the
> detainee presents can be adequately mitigated."  [Unclass. Summ. Of Final
> Determination, available at http://www.prs.mil/Portals/60/Documents/ISN244/
> 20160711_U_ISN244_FINAL_DETERMINATION_PUBLIC.pdf]

Consequently, the board recommended

> Transfer only to Morocco, with the appropriate security assurances as negotiated by the Special Envoys [for Guantanamo Detention Closure at DoD and for Guantanamo Closure at the Department of State] and agreed to by relevant U[nited]S[tates]G[overnment] departments and agencies.  *Id.*

And as to Petitioner al-Bihani, that disclaimer was contained in the Final Report of the Guantanamo Bay Review Task Force, which stated that designations for transfer did not "reflect a decision that the detainee poses no threat or risk of recidivism" but rather reflected a judgement that "any threat posed by the detainee can be sufficiently mitigated through feasible and appropriate security measures in the receiving countr[ies]."  GTMO Task Force Final Report 17.  Thus, Petitioners Nasser and al-Bihani's designations as eligible for transfer do not make their continued detention unnecessary or arbitrary.  Rather, all those designations imply is that, if appropriate security conditions may be negotiated, their transfer is permissible.  *See al-Wirghi*, 54 F.Supp.3d at 47.

## C. The Judicially Crafted Procedures Governing Petitioners' Habeas Cases Do Not Violate Due Process

In *Boumediene*, the Supreme Court explicitly left to the "expertise and competence of the District Court[s]" the task of determining appropriate evidentiary and procedural rules for these Guantanamo habeas cases.  553 U.S. at 796.  In doing so, the courts were instructed to balance the detainees' need for meaningful access to the writ against the burden on the Executive and, in particular the military, in responding to these wartime petitions.  *See id.* at 795-96.  Specifically, the Court noted that these habeas proceedings "need not resemble a criminal trial."  *Id.* at 783.

In response, the judges of this District and the Court of Appeals have addressed numerous evidentiary and procedural issues in these cases as those issues have arisen.  The result is a comprehensive body of case law including:

(1) that when deciding whether to admit government intelligence reports as evidence, a district court is to afford the Government the usual rebuttable presumption of regularity in the recording of the information in government documents, *Latif v. Obama*, 666 F.3d 746, 755 (D.C. Cir. 2011);

(2) that when deciding whether a detainee is legally detained, a district court must consider the evidence as a whole and not piecemeal, *al-Adahi v. Obama*, 613 F.3d 1102, 1105-06 (D.C. Cir. 2010);

(3) that when considering hearsay evidence, a district court must determine the weight to be accorded that evidence, *al-Bihani*, 590 F.3d at 879; and

(4) that when presented with evidence a detainee stayed at an al Qaeda guesthouse, a district court was entitled to draw an inference the detainee was a member of al Qaeda, for one does not generally end up staying at a terrorist guesthouse by mistake—either by the guest or the host, *Ali*, 736 F.3d at 546.

And, of primary concern to Petitioners, the governing case law provides

(5) that the Government must demonstrate by a preponderance of the evidence that a detainee was part of or substantially supported al Qaeda, Taliban, or associated forces.  al-Bihani, 590 F.3d at 878.

Petitioners now call into question the constitutionality of these and other unnamed decisions, asserting that they collectively set the bar too low to justify Petitioners' continued detention. Mot. at 22-25.

As an initial matter, here again, this is the wrong forum for these arguments.  Simply put, Petitioners again ask this Court to reverse or ignore binding Circuit precedent.  To do so would be error.  *Torres,* 115 F.3d at 1036.  For this reason alone, this claim should be denied.

As to Petitioners' more fundamental challenges, the constitutionality of the preponderance-of-the-evidence standard in this wartime detention context has been thoroughly and explicitly discussed in multiple opinions by the Court of Appeals.  Petitioners cite none of these opinions, and elide the fact that the Court has not questioned whether that standard required the Government to prove too little, but rather whether it required the Government to prove too

much.  "Our cases have stated that the preponderance of the evidence standard is constitutionally sufficient and have left open whether a lower standard might be adequate to satisfy the Constitution's requirement for wartime detention."  *Uthman v. Obama*, 637 F.3d 400, 403 n.3 (D.C. Cir. 2011); *see also Hussain v. Obama*, 718 F.3d 964, 967 n.3 (D.C. Cir. 2013) ("[i]n *al-Adahi* we wrote that although the standard is 'constitutionally permissible . . . we have yet to decide whether [it] is required.'") (quoting *al-Adahi*, 613 F.3d at 1103).  Petitioners' call for a clear-and-convincing evidence standard to justify their continued detention, therefore, has already been rejected.

Petitioners nevertheless suggest that, whatever the initial constitutionality of the collective decisions they challenge, the passage of time has rendered unconstitutional procedures previously determined to be appropriate.  But this argument, too, has been rejected by the Court of Appeals.  In *Ali*, the Court rejected the notion that the Government's evidentiary burden is somehow contingent on the duration of detention.  Rather, that burden of proof remains temporally fixed, because it is grounded in (1) the purpose of military detention (to keep enemy combatants from returning to the battlefield) and (2) the fact that military detention ends with the end of hostilities.  *See Ali*, 736 F.3d at 544; *see id*. at 552 (noting that the standards it applied in 2013 were the same it would have applied in 2002).  This logic applies with full force to the remaining evidentiary decisions, either individually or collectively.  Petitioners' complaint that the preponderance burden of proof either separately or in combination with the Court of Appeals' other evidentiary rulings has due to the passage of time become unconstitutional is simply unsupported.

44

## CONCLUSION

Accordingly, for the foregoing reasons, Petitioners' Motion for Order Granting Writ of

Habeas Corpus should be denied.

16 February 2018                          Respectfully submitted,

                                         CHAD A. READLER
                                         Acting Assistant Attorney General, Civil Division

                                         TERRY M. HENRY
                                         Assistant Director
                                         Civil Division, Federal Programs Branch

                                         _/s/ Ronald J. Wiltsie_____
                                         ANDREW I. WARDEN (IN Bar #23840-49)
                                         RONALD J. WILTSIE (DC Bar #431562)
                                         Senior Trial Counsel
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Avenue, NW
                                         Washington, DC 20530
                                         Tel: (202) 307-1401
                                         Fax: (202) 616-8470
                                         ronald.wiltsie@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| TOFIQ NASSER AWAD AL-BIHANI (ISN 893), | ) | Case Nos. |
| | ) | |
| ABDU LATIF NASSER (ISN 244), | ) | 04-cv-1194 (TFH) (ISN 569) |
| | ) | |
| SHARQAWI AL HAJJ (ISN 1457), | ) | 05-cv-23 (EGS) (ISN 841) |
| | ) | |
| SANAD AL KAZIMI (ISN 1453), | ) | 05-cv-764 (CKK) (ISN 244) |
| | ) | |
| SUHAIL SHARABI (ISN 569), | ) | 05-cv-1607 (RCL) (ISNs 1460,1461) |
| | ) | |
| SAID NASHIR (ISN 841), | ) | 05-cv-2386 (RBW) (ISNs 893, 1453) |
| | ) | |
| ABDUL RABBANI (ISN 1460), | ) | 08-cv-1360 (EGS) (ISN 10016) |
| | ) | |
| AHMED RABBANI (ISN 1461), | ) | 08-cv-1440 (CKK) (ISN 10025) |
| | ) | |
| ABDUL RAZAK (ISN 685), | ) | 09-cv-745 (RCL) (ISN 1457) |
| | ) | |
| ABDUL MALIK (ISN 10025), | ) | 10-cv-1020 (RJL) (ISN 685) |
| | ) | |
| ABU ZUBAYDAH (ISN 10016) | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official capacity | ) | |
| as President of the United States, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

**RESPONDENTS' OPPOSITION TO PETITIONERS'
MOTION FOR ORDER GRANTING WRIT OF HABEAS CORPUS
<u>EXHIBIT LIST</u>**

1

| Tab | Description |
|:---:|:---|
| 1 | *Al-Kandari v. United States*, 15-CV-329 (CKK), Classified Memorandum Opinion (D.D.C. Aug. 31, 2015) |
| 2 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (June 11, 2015) |
| 3 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (Dec. 11, 2015) |
| 4 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (June 13, 2016) |
| 5 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (Dec. 5, 2016) |
| 6 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (June 6, 2017) |
| 7 | Letter From The President To The Speaker of the House, Six Month Consolidated War Powers Resolution Report (Dec. 11, 2017) |
| 8 | Remarks by President Trump on the Strategy in Afghanistan and South Asia (Aug. 21, 2017) |
| 9 | Department of Defense Report on Enhancing Security and Stability in Afghanistan (Dec. 2017) |
| 10 | Testimony of General Joseph F. Dunford, Chairman of the Joint Chiefs of Staff, Political and Security Situation in Afghanistan: Hearing before United States Senate Committee on Armed Services (Oct. 3, 2017) |
| 11 | United States Air Forces Central Command 2012-2017 Airpower Statistics (December 2017) |
| 12 | Max Bearak, *No Rest for U.S. Air Blitz in Afghanistan*, WASHINGTON POST, January 17, 2018, at A1 |
| 13 | NATO Resolute Support Press Release, *Afghan and US Forces-Afghanistan Kill Top Terrorist Leaders* (Dec. 5, 2017) |

| 14 | NATO Resolute Support Press Release, *Afghan, U.S. Forces Launch New Campaign to Destroy Taliban Funding Networks* (Nov. 20, 2017) |
| 15 | Department of Defense Press Briefing by Army General John W. Nicholson, Jr., Commander, Resolute Support and U.S. Forces Afghanistan (Nov. 28, 2017) |
| 16 | Report of the Secretary-General, The Situation in Afghanistan and its Implications for International Peace and Security (Dec. 15, 2017) |
| 17 | Associated Press, *U.S. Says Multiple Americans Among Casualties in Kabul Attack*, WASHINGTON POST, January 23, 2018 |
| 18 | Sayed Salahuddin, Pamela Constable and Sharif Hassan, *Suicide Bomber in Ambulance Kills at Least 95, wounds 158, Kabul officials Say*, WASHINGTON POST, January 27, 2018 |
| 19 | Department of Defense Press Briefing by Army General John W. Nicholson, Jr., Commander, Resolute Support and U.S. Forces Afghanistan (Nov. 20, 2017) |
| 20 | Department of Defense Press Briefing by U.S. Air Force Brigadier General Lance Bunch, Jr., Director of Future Operations, Resolute Support and Operation Freedom's Sentinel (Dec. 13, 2017) |
| 21 | Statement by the President on the End of the Combat Mission in Afghanistan (Dec. 28, 2014) |
| 22 | Testimony of Nicholas J. Rasmussen, Director, National Counterterroristm Center, Threats to the Homeland: Hearing before United States Senate Committee on Homeland Security and Governmental Affairs (Sept. 27, 2017) |
| 23 | Testimony of Christopher A. Wray, Director, Federal Bureau of Investigation, Threats to the Homeland: Hearing before United States Senate Committee on Homeland Security and Governmental Affairs (Sept. 27, 2017) |
| 24 | United Nations Security Council, Twentieth Report of the Analytical Support and Sanctions Monitoring Team Concerning al-Qaeda and Associated Individuals and Groups (August 7, 2017) |
| | No other entries |
| | |