# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

——————————————————— x
                  :

| | | |
|---|---|---|
| TOFIQ NASSER AWAD AL BIHANI (ISN 893), | : | Case Nos. |
| ABDU LATIF NASSER (ISN 244), | : | 04-cv-1194 (TFH) (ISN 569) |
| SHARQAWI AL HAJJ (ISN 1457), | : | 05-cv-23 (EGS) (ISN 841) |
| SANAD AL KAZIMI (ISN 1453), | : | 05-cv-764 (CKK) (ISN 244) |
| SUHAIL AL SHARBI (ISN 569), | : | 05-cv-1607 (RCL) (ISNs 1460, 1461) |
| HANI SALEH RASHID ABDULLAH (ISN 841), | : | 05-cv-2386 (RBW) (ISNs 893, 1453) |
| ABDUL RABBANI (ISN 1460), | : | 08-cv-1360 (EGS) (ISN 10016) |
| AHMED RABBANI (ISN 1461), | : | 08-cv-1440 (CKK) (ISN 10025) |
| ABDUL RAZAK ALI (ISN 685), | : | 09-cv-745 (RCL) (ISN 1457) |
| ABDUL MALIK (ISN 10025), | : | 10-cv-1020 (RJL) (ISN 685) |
| ABU ZUBAYDAH (ISN 10016), | : | |
| | : | |
| Petitioners, | : | |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, *et al.*, | : | |
| | : | |
| Respondents. | : | |

——————————————————— x

# PETITIONERS' REPLY IN SUPPORT OF
## MOTION FOR ORDER GRANTING WRIT OF HABEAS CORPUS

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

A. President Trump Recently Confirmed His Policy Barring Petitioners' Transfer ................... 2

B. Dissolution of the Office of Special Envoy for Guantánamo Closure .................................... 3

C. The Government Does Not Plan to Transfer Petitioners Cleared for Release ......................... 5

D. Periodic Review Boards Are Ineffectual and Will Not Produce Transfers ............................ 6

ARGUMENT ............................................................................................................................... 7

I. DUE PROCESS FORBIDS THE PERPETUAL, PURPOSELESS DETENTION OF
    PETITIONERS ..................................................................................................................... 7

A. Judicially Imposed Due Process Limitations on Detention at Guantánamo Are Not
    "Impractical or Anomalous" Nor Are They Foreclosed by Circuit Precedent ....................... 7

1. Due Process Applies to Guantánamo in Equal Force as the Suspension and Ex Post
    Facto Clauses ..................................................................................................................... 8

2. Circuit Precedent Does Not Foreclose Petitioners' Due Process Challenge ......................... 10

B. The Due Process Clause Prohibits Perpetual Detention Without Trial, Especially Upon a
    Preponderance of the Evidence Standard, and the AUMF Cannot Be Stretched Beyond
    These Constitutional Limitations ............................................................................................ 13

II. PETITIONERS' CONTINUING DETENTION VIOLATES THE AUMF ON ITS
    OWN TERMS AND AS CONSTRUED AGAINST DUE PROCESS
    REQUIREMENTS .............................................................................................................. 15

A. The Fact of Ongoing Hostilities Does Not Justify Perpetual Detention ................................ 16

B. There Is No Precedent For Petitioners' Perpetual Detention; To the Contrary, the Laws
    of War Support Relief .............................................................................................................. 17

C. Petitioners' Perpetual Detention Serves No Legitimate Purpose ........................................... 21

D.  The Authority that Justified Petitioners' Initial Detention Under the AUMF and Laws of War Has Unraveled ........................................................................................................... 23

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

CASE                                                                    PAGE NO.

*Aamer v. Obama,*
742 F.3d 1023 (D.C. Cir. 2014) ................................................................... 12, 20

*Al Warafi v. Obama,*
2015 WL 4600420 (D.D.C. July 30, 2015) ................................................... 20, 26

*Al-Warafi v. Obama,*
716 F.3d 627 (D.C. Cir. 2013) ........................................................................ 23

*Al Wirghi v. Obama,*
54 F. Supp. 3d 44 (D.D.C. 2014) ..................................................................... 13

*Al-Bahlul v. United States,*
No. 11-1324, 2013 WL 3479237 (D.C. Cir. July 10, 2013) ............................... 9

*Al-Bihani v. Obama,*
590 F.3d 866 (D.C. Cir. 2010) ......................................................................... 20

*Ali v. Obama,*
736 F.3d 542 (D.C. Cir. 2013) ..................................................................... 13, 14

*Al-Kandari v. Obama,*
15-cv-329 (D.D.C. Aug. 31, 2015) ................................................................... 20

*Al-Madhwani v. Obama,*
642 F.3d 1071 (D.C. Cir. 2011) ................................................................... 12, 13

*Al-Qurashi v. Obama,*
733 F. Supp. 2d 69 (D.D.C. 2010) .................................................................... 11

*Ameziane v. Obama,*
58 F. Supp. 3d 99 (D.D.C. 2014) ..................................................................... 13

*Ameziane v. Obama,*
No. 05-cv-392 (D.D.C. Nov. 27, 2013) ............................................................ 22

*Awad v. Obama,*
608 F.3d 1 (D.C. Cir. 2010) ............................................................................. 24

*Basardh v. Obama,*
612 F. Supp. 2d 30 (D.D.C. 2009) ................................................................... 11

*Bond v. United States,*
564 U.S. 211 (2011) ......................................................................................... 10

*Bostan v. Obama,*
674 F. Supp. 2d 9 (D.D.C. 2009) ..................................................................... 13

iii

*Boumediene v. Bush,*
476 F.3d 981 (D.C. Cir. 2007) ........................................................................... 10

*Boumediene v. Bush,*
553 U.S. 723 (2008) ............................................................................... 8, 12, 18

*Clark v. Martinez,*
543 U.S. 371 (2005) ........................................................................................... 17

*Davliatov v. Obama,*
No. 15-cv-1959 (D.D.C. June 17, 2016) ............................................................ 22

*Foucha v. Louisiana,*
504 U.S. 71 (1992) ............................................................................................. 10

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ..................................................................................... *passim*

*Hussain v. Obama,*
134 S. Ct. 1621 (2014) ........................................................................... 18, 19, 23

*In Re Guantanamo Bay Detainee Litigation,*
No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009) ................................................. 21

*INS v. Chadha,*
462 U.S. 919 (1983) ........................................................................................... 10

*Kiyemba v. Obama,* 555 F.3d 1022 (D.C. Cir. 2009),

    *vacated and remanded,* 559 U.S. 131 (2010),

    *reinstated,* 605 F.3d 1046 (D.C. Cir. 2010),

    *cert. denied,* 563 U.S. 954 (2011) .............................................................. *passim*

*Maqaleh v. Hagel,*
738 F.3d 312 (D.C. Cir. 2013) .......................................................................... 20

*Mistretta v. United States,*
488 U.S. 361 (1989) ........................................................................................... 10

*Mohammed v. Obama,*
704 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 11

*New York v. United States,*
505 U.S. 144 (1992) ........................................................................................... 10

*Rabbani v. Obama,*
76 F. Supp. 3d 21 (D.D.C. 2014) ....................................................................... 13

*Rasul v. Myers,*
563 F.3d 527 (D.C. Cir. 2009) ................................................................. 8, 12, 13

*Razak v. Obama,*
174 F.Supp.3d 300 (D.D.C. 2016) ..................................................................... 20

iv

*Reid v. Covert*,
354 U.S. 1 (1957)......................................................................................................... 8

*Salahi v. Obama*,
No. 05-cv-569, 2015 WL 9216557 (D.D.C. Dec. 17, 2015) ....................................... 13

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990)..................................................................................................... 8

*Zadvydas v. Davis*,
533 U.S 678 (2001)....................................................................................................... 17

**STATUTES**                                                                           **PAGE**

Authorization for Use of Military Force (2001), Pub. L. No. 107-40 ................................... *passim*

National Defense Authorization Act (2012), Pub. L. No. 112-81 ............................................... 19

**REGULATIONS**                                                                        **PAGE**

76 Fed. Reg. 13,277 (Exec. Order No. 13,567)(Mar. 7, 2011)........................................ 4

83 Fed. Reg. 4,831 (Exec. Order No. 13,823)(Feb. 2, 2018)................................... 7, 24

**OTHER AUTHORITIES**                                                                  **PAGE**

Additional Protocol I to the Geneva Conventions, Article 75(3) ................................................ 21

Geneva Convention III Relative to the Treatment of Prisoners
of War, art. 118, (Aug. 12, 1949), 6 U.S.T. 3316 ......................................................... 20

Guantanamo Review Task Force, Final Report (2010) ................................................ 22

Jean-Marie Henckaerts & Louise Doswald-Beck,
*Customary International Humanitarian Law* (2009).................................................... 21

Jennifer K. Elsea & Michael J. Garcia, Cong. Research Serv.,
Wartime Detention Provisions in Recent Defense Authorization Legislation (2016)................. 19

Law of Armed Conflict Documentary Supplement (5th ed.) ....................................... 22

U.S. Dep't of Defense Law of War Manual § 8.14.3.1 (June 2015) ........................... 21

William Winthrop, *Military Law and Precedents* (rev.2d ed.1920)........................... 22

**PRELIMINARY STATEMENT**

The government's opposition proceeds as if the continuing detention of Petitioners for up to 16 years without charge or trial and without prospect of release by the Trump administration is utterly normal. It is not normal—as a matter of fact and law.

First, despite its platitudes and narrow caveats, the government cannot dispute the Trump administration's stated determination to foreclose any transfers, regardless of individual facts and circumstances—including of those Petitioners cleared for transfer. The policy, clear from Trump's campaign commitments and his thorough-going hatred and suspicion of Muslims, has only been reconfirmed since Petitioners' filing through a February 2018 Executive Order and the President's bellicose pronouncements during his State of the Union address. The Periodic Review Board process (part of which was revived only *after* the filing of Petitioners' motion) is an exercise in futility; it is feckless and corrupted by command influence and, in any event, as the cleared Petitioners prove, meaningless in light of the President's policy against transfers.

Second, there is no legal support for perpetual detention of this sort. The government repeats as mantra the proposition that detention may continue as long as active hostilities are ongoing. That maxim, however, cannot so readily dispose of the actual question presented or the human lives at stake. The government's self-serving conception of "active hostilities"—depending (as it says it does) either upon the actual surrender of all Al Qaeda forces or the decimation of various Al Qaeda splinter groups across the world—will likely *never* cease. Thus, under the government's own standards, it can and may well detain Petitioners in perpetuity—in violation of the Constitution and properly construed detention authority under the AUMF.

Perpetual non-criminal detention violates due process. The Due Process Clause applies to Guantánamo because identifying limits on the duration of detention would not be "improper or

anomalous" under governing Supreme Court precedent—a proposition the government does not contest—and should have as much force as do the Suspension and Ex Post Facto Clauses, which the government concedes do apply to Guantánamo. Nor is such a due process challenge to duration foreclosed by a proper reading of the actual holdings of the Circuit's cases the government relies upon. Similarly, the AUMF—on its own terms and read, as it must be, to avoid conflict with the constitutional limitations on detention—cannot permit the perpetual detention Petitioners' face. The Supreme Court in *Hamdi v. Rumsfeld*, authorized only limited military detention, cautioned that any such authorization may not extend indefinitely, and *expressly* prohibited perpetual detention.

Petitioners have been detained without charge at Guantánamo for between 12 and 16 years—longer than the duration of any prior military conflict in U.S. history; and, as a consequence of Trump's policy, may not have a chance at release for up to seven years. The experiment in indefinite detention at Guantánamo has run its course. The judicial branch cannot cede the legality of these continuing and perpetual detentions to this executive branch. The Court should grant the writ.

## **BACKGROUND**

### A.     **President Trump Recently Confirmed His Policy Barring Petitioners' Transfer**

In the face of glaring evidence to the contrary, the government half-heartedly asks the Court to believe that the facts and circumstances of Petitioners' detention at Guantánamo under President Trump are unchanged from that of his predecessors. Its opposition studiously avoids any mention of the President's past statements regarding Guantánamo—though they unmistakably indicate *no one* will leave the prison during his tenure. *See* Pet'r Br. at 11-15 (outlining Trump's publicly stated opposition to transfers including his Twitter post that "there should be no further releases from Guantánamo."). The government also avoids addressing a dominant, animating feature of this policy, as in other policy areas: President Trump's undifferentiated suspicion and animus toward Mus-

2

lims as a class of humans. *See* Pet'r Br. at 13-15; *see also* Br. Am. Cur. Muslim Advocates, et al., (filed Jan. 22, 2018).

The government only passingly acknowledges that, two weeks before its opposition was filed, President Trump issued Executive Order 13,823. That order not only revokes President Obama's ten-year-old directive to close the prison, it also paves the way for the transfer of new detainees to Guantánamo in the future. Exec. Order 13,823 § 2(c), 83 Fed. Reg. at 4831-32. President Trump himself was not as understated as his counsel: he announced the order during his January 30, 2018 State of the Union address by openly deriding Presidents Bush and Obama for their willingness to release Guantánamo prisoners. As he bluntly put it,

> [i]n the past, we have foolishly released hundreds of dangerous terrorists, only to meet them again on the battlefield … So today, I am keeping another promise.  I just signed an order … to keep open the detention facilities at Guantánamo Bay.[1]

Nevertheless, the government pretends that "there is no Government policy barring transfer of detainees from Guantanamo Bay." Gov't Br. at 1. To paper over these irreconcilable positions, the government points to the continuation of the Periodic Review Boards ("PRBs")—which are now meaningless rituals, *see infra* Part D—and leans heavily on a caveat in the Executive Order that permits the Secretary of Defense to transfer prisoners "when appropriate." *See e.g.*, Gov't Br. at 40 (citing Exec. Order 13,823 § 3(a), 83 Fed. Reg. at 4832). But this vague side-note, which would require the Defense Secretary to defy his Commander-in-Chief, is no safeguard against perpetual detention.

### B.      Dissolution of the Office of Special Envoy for Guantánamo Closure

The Trump administration's dissolution of the State Department's Office of the Special Envoy for Guantánamo Closure ("Guantánamo Envoy's Office") only further confirms the administra-

---

[1]      Donald J. Trump, President of the United States, State of the Union Address (Jan. 30, 2018).

tion's policy against prisoner transfers. The Guantánamo Envoy's Office has historically been responsible for executing the essential diplomatic, policy and administrative steps incident to a prisoner transfer.[2] But shortly after his appointment by President Trump—and seamlessly consistent with the Trump Administration's policy against transfers—Secretary of State Rex Tillerson unceremoniously shuttered the Envoy's office.[3] Accordingly, in the months since, the administrative capacity to effect transfers from Guantánamo has been purposefully hollowed-out: the role of the envoy itself has been eliminated; the office is entirely unstaffed;[4] and important functions—such as monitoring host-country performance under past transfer agreements—no longer occur.[5]

Reflecting the petty intensity of this administration's contempt for its predecessors' Guantánamo policy, the State Department now appears to have sought "political" retribution against certain highly-praised officials in the National Security Council through demotion to data entry posi-

---

[2]     Carol Rosenberg, Guantánamo *Policy Is In Limbo, Waits for Trump*, Miami Herald (Feb. 17, 2017), http://hrld.us/2oHvX5K. For a detailed description of the process for transferring detainees, see The Administration's Plan to Close the Guantánamo Bay Detention Facility: At What Foreign Policy and National Security Cost?: Hearing Before the H.  Foreign Affairs Comm., 114th Cong. *3-5 (2016) (statement of former Department of State Special Envoy for Guantánamo Closure Lee S. Wolosky), *available at* http://bit.ly/2FE1dtB.

[3]     Josh Lederman, *Tillerson to Abolish Most Special Envoys, Including* Guantánamo *"Closer,"* Miami Herald (Aug. 28, 2017), http://hrld.us/2Fd7b13; Charlie Savage, *U.S. Misses Deadline to Repatriate Detainee Who Plead Guilty*, N.Y. Times (Feb. 20, 2018), http://nyti.ms/2CyweK1.

[4]     Letter from Eliot Engel, Ranking Democratic Member, House Committee on Foreign Affairs, on Guantánamo Bay Policy, to Rex Tillerson, Secretary of State (Mar. 1, 2018) (available at http://bit.ly/2FcP4st).  Undersigned counsel has also made recent attempts to contact officials in the Envoy's office regarding the detention status of Petitioners.  Each attempt went unanswered, save for automated notices explaining that critical staff have been reassigned or have otherwise departed the office, but have not been replaced.

[5]     Lee Wolosky, former Department of State Special Envoy for Guantánamo Closure, Remarks at Fordham University Law School Center on National Security Symposium: Revisiting Guantánamo Bay: Where We've Come, Where We're Headed (Feb. 17, 2018) *available at* http://bit.ly/2H184ut.

tions.[6] By destroying the institutional infrastructure and expertise necessary to negotiate and enforce transfer agreements, the State Department has ensured none will happen."[7]

### C.     The Government Does Not Plan to Transfer Petitioners Cleared for Release

As detailed in Petitioners' opening brief, two of the 11 Petitioners, Tofiq Nasser Awad Al Bihani and Abdul Latif Nasser, have already been approved for transfer by the Guantánamo Review Task Force and a PRB, respectively. Both came agonizingly close to release from Guantánamo in the months and weeks before President Trump assumed office. *See* Pet'r Br. at 11. The Court's Scheduling and Procedures Order of January 18, 2018 required the government to inform the Court "whether [it] *intends* to transfer the Petitioners previously designated for transfer…" (emphasis added). The government's response is as revealing as it is unresponsive. With respect to Petitioner Nasser, the government confirms that "no decision has made been made as to whether to proceed with this transfer", Gov't Br. at 10—a position Petitioners know all too well: it is what prompted this litigation to begin with. Linguistic avoidance aside, "[n]o decision" to transfer *is* a decision to continue Petitioner Nasser's imprisonment indefinitely, especially in the context of President Trump's policy against transfers.

The government's answer on Petitioner Al Bihani is even more opaque, stating only that he "remains eligible for transfer…." Gov't Br. at 10. It states that Al Bihani was not transferred because of "a variety of substantive concerns relevant to Petitioner's circumstances, including factors

---

[6]     Elise Labott, *Lawmakers Want Answers After State Department Employees Claim 'Political Retribution,'* CNN (Jan. 27, 2018), http://cnn.it/2nkbbW9. This triggered House Representatives to demand a State Department review of whether State Department personnel are being "unlawfully targeted" for their prior work. *Id.*

[7]     President Bush admittedly transferred prisoners without the benefit of a Special Envoy. But that was the result of a concerted exercise of executive discretion in favor of releases and the ultimate closure of Guantanamo, contrary to the Trump administration.

not related to Petitioner himself" but that he "remains eligible for transfer." *Id*. at 10. This response only reaffirms the manifest presumption that this administration's intent is never to transfer Al Bihani, in part for reasons unrelated to Al Bihani himself, even as it does not challenge his transfer status or identify any new information that would justify continuing detention. Moreover, because Al Bihani has already been cleared for transfer, he is not even eligible for a PRB.

Indeed, the prior administration disclaimed any interest in continuing to hold Petitioners Al Bihani and Nasser when it took virtually all of the functional steps required to effect their release. *See* Pet'r Br. at 11. Under their unique circumstances, the government's inability at least to confirm that it remains committed to their release speaks volumes about the President's hostility to all transfers, whether of cleared prisoners or those yet seeking clearance through the Period Review Boards.

### D.    The Periodic Review Boards Are Ineffectual and Will Not Produce Transfers

For all the attention PRBs receive in the government's brief, *see* Gov't Br. at 4-5, they are wholly inadequate to displace the judiciary's obligation to review the legality of ongoing detention under the Constitution and the AUMF.[8]  Moreover, it cannot be presumed that the officials carrying out future PRB hearings can overcome the President's stated antipathy to the remaining population at Guantánamo and blanket determination of dangerous without regard to individual consideration.[9] Even if they could, and were to determine a detainee eligible for transfer, any men cleared in the future by PRBs, just like *all* the men currently cleared, are ultimately trapped under the President's

---

[8]    Admittedly, many prisoners have received notice of forthcoming reviews; tellingly, this step was taken only *after* Petitioners filed their motion.

[9]    *See, e.g.*, Executive Order 13,823 § 1(e) ("Given that some of the current Guantanamo detainee population represent the most difficult and dangerous cases … *there is significant reason for concern regarding their reengagement in hostilities should they have the opportunity*.") (emphasis added).

6

policy barring transfers. Transfer pursuant to PRB clearance, unlike by judicial order, is at the discretion of the administration.

**ARGUMENT**

**I.  DUE PROCESS FORBIDS THE PERPETUAL, PURPOSELESS DETENTION OF PETITIONERS.**

    **A.  Judicially Imposed Due Process Limitations on Detention at Guantánamo Are Not "Impractical or Anomalous" Nor Are They Foreclosed by Circuit Precedent.**

As the Supreme Court's *Boumediene* decision makes perfectly clear, the application of the Suspension Clause to Guantánamo is governed by the "impracticable or anomalous" test first suggested by Justice Harlan in *Reid v. Covert* and applied to non-citizens in Justice Kennedy's decisive concurrence in *U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990). Pet'r Br. at 16-17. The "constant jurisdiction of the United States" over this place where we exercise "unchallenged and indefinite control" extends the "'implied protection' of the United States" to it, and demands that the Suspension Clause apply there; the Due Process Clause, whose protections are so closely intertwined with habeas, inescapably follows. *Id.* at 17 (quoting *Boumediene*, 533 U.S. at 768-69; *Rasul*, 542 U.S. at 487 (Kennedy, J., concurring)).

The government does not address this clear and authoritative line of Supreme Court precedent. It also does not dispute that due process and habeas corpus are inextricably intertwined, as recognized in *Boumediene* and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). *See* Pet'r Br. at 17. In addition, the government does not argue that it would be impractical or anomalous to grant Petitioners due process rights, or that there are any practical barriers to the application of due process rights at Guantánamo, at least to the extent necessary to limit the duration of Petitioners' detention. The government has thus effectively conceded that the application of this test would compel the application of due process rights in Guantanamo.

7

Rather than engaging with these Supreme Court precedents on their merits, the government reflexively states that D.C. Circuit precedent forecloses recognition of any measure of constitutional due process rights at Guantánamo under any circumstance, relying primarily upon dictum in *Kiyemba*.

**1. Due Process Applies to Guantánamo in Equal Force as the Suspension and Ex Post Facto Clauses.**

As noted above, the government does not actually articulate any reasons why it would be impractical or anomalous to apply the Due Process Clause to Guantanamo.[10] Instead, imagining that the Constitution draws artificially bright lines, the government merely asserts that *Boumediene*'s functional analysis extending the Suspension Clause to Guantánamo does not apply to other constitutional provisions—including the Due Process Clause. *See* Gov't. Br. at 33-34. But, in so doing, it fails to distinguish effectively its own concession in *Al Bahlul v. United States* that the Ex Post Facto Clause also applies at Guantánamo after *Boumediene*. *See* 767 F.3d 1 (D.C. Cir. 2014) (en banc); *see also id.* at 63 (Kavanaugh, concurring in the judgment in part and dissenting in part) (explaining agreement of majority of judges, and government concession, about applicability of Ex Post Facto Clause to Guantanamo).

The government simply asserts without support in theory or doctrine that its concession resulted from a "unique combination of circumstances," Gov't Br. at 35 (quoting Br. of the United States, *al-Bahlul v. United States*, No. 11-1324, 2013 WL 3479237 at *64 (D.C. Cir. July 10, 2013)), based on the special status of the Ex Post Facto Clause as a "structural" limit on the federal

---

[10]    Nor could the government argue that it is anomalous to assert constitutional protections where they are asserted *defensively* against intrusions on individual liberties by actions of our government abroad. Habeas petitions are unique in that the first filer, the petitioner, invokes the writ and, once jurisdiction is established, forces the state to affirmatively justify detention. The jailer's return chooses the field of battle; the petitioner who asserts Due Process rights in response invokes constitutional rights defensively.

legislature's powers.   But the distinction between structural limits on government powers and rights conferred on individuals alluded to by the government is entirely artificial.[11] Of course, the Due Process Clause (like the Ex Post Facto Clause) serves both as an individual protection *and* as a structural, separation-of-powers limitation on the ability to aggregate near-complete power over Petitioners' continuing non-criminal detention into the Executive branch. *See, e.g. Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (explaining that the Due Process Clause "contains a substantive component that bars certain arbitrary, wrongful government actions"). Indeed, while the government claims that it conceded in *Bahlul* only that the Ex Post Facto Clause operated at Guantánamo "as a check on the Legislature's power to punish criminally," Gov't Br. at 35, both the Ex Post Facto Clause and the Due Process Clause confer on the particular person suffering a liberty deprivation the individual *right*, that is to say, *standing*, to challenge executive branch conduct that, absent an individual with a tangible interest to be vindicated, would be effectively immune to judicial review.[12]

---

[11]     *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual as well."); *see also New York v. United States*, 505 U.S. 144, 181 (1992) ("the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." (quotation marks and citations removed)). The fact that the Supreme Court has frequently recognized an individual's claims as a "Separation of Powers" cause of action is perhaps the surest sign that the distinction between structural limitations and individual rights is a false dichotomy. *See INS v. Chadha*, 462 U.S. 919, 935-36, 939-40 (1983); *Mistretta v. United States*, 488 U.S. 361, 380-81 (1989).

[12]     Indeed, the very author of the *Kiyemba* panel opinion on which the government relies has expressly reasoned that the Due Process Clause is fundamentally analogous to the Suspension and Ex Post Facto Clauses. *See Boumediene v. Bush*, 476 F.3d 981, 993 (D.C. Cir. 2007) (Randolph, J.) ("There is the notion that the Suspension Clause is different from the Fourth, Fifth, and Sixth Amendments because it does not mention individuals and those amendments do .... That cannot be right."), *rev'd*, 553 U.S. 723 (2008); *see also* 476 F.3d at 993 ("The dissent's point cannot be that the Bill of Attainder Clause and the Ex Post Facto Clause do not protect individual rights. Numerous courts have held the opposite.").

### 2.   Circuit Precedent Does Not Foreclose Petitioners' Due Process Challenge.

The government's primary authority for its position that Petitioners may not invoke the pro-
tections of the Due Process Clause in any respect, whatever the context or application, is one line in
*Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131,
*reinstated in relevant part*, 605 F.3d 1046 (D.C. Cir. 2010): "the due process clause does not apply
to aliens without property or presence in the sovereign territory of the United States." The govern-
ment acknowledges that *Kiyemba* "involved a putative right of release into the United States,"
Gov't Br. at 34—surely a "context in which the executive's authority to regulate immigration is
maximal," Pet'r Br. at 18—but simply ignores the fact that the full scope of the holding required to
resolve that case is that Due Process would not "authorize[ ] entry and release into the United
States." Pet'r Br. at 18 (citing clarifying language in various *Kiyemba II* and *III* opinions). The ines-
capable conclusion is that the language on which the government's entire argument rests is dic-
tum.[13]

It is true that *Kiymeba* has not been overruled, Gov't Br. at 36, but that is also irrelevant be-
cause, as a case fundamentally about executive control of immigration, the actual holding of *Ki-
yemba* does not range any further than that narrow question. Indeed, the government appears to
concede that this Court would be entitled to "assume that the Due Process Clause extends in some
manner" to Petitioners, Gov't Br. at 37, as the Court of Appeals did years after the release of the

---

[13]    Moreover, while the government erroneously claims "judges of this district have repeatedly"
followed its broad reading of *Kiyemba*, Gov't Br. at 33 n.19 (citing cases distinguished *infra* note
16), others have treated the *Kiyemba* language as dictum. *See Al-Qurashi v. Obama*, 733 F. Supp.
2d 69, 78 n.14 (D.D.C. 2010) (describing reinstated Kiyemba opinion as "stating in dicta" that Due
Process Clause does not apply); *Basardh v. Obama*, 612 F. Supp. 2d 30, 33 (D.D.C. 2009) (same);
*see also Mohammed v. Obama*, 704 F. Supp. 2d 1, 24–25 (D.D.C. 2009) (citing Supreme Court
precedent on due process rights in the context of evaluating petition).

*Kiyemba* petitioners, *see Aamer v. Obama*, 742 F.3d 1023, 1039 (D.C. Cir. 2014) (cited in Pet'r Br. at 18). Neither undertaking would be possible if the crucial *Kiyemba* language were binding rather than dictum.[14]

The government claims the circuit's decisions in *Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009), and *Al-Madhwani v. Obama*, 642 F.3d 1071 (D.C. Cir. 2011), suggest the continued vitality of the supposed *Kiyemba* "holding." Gov't Br. at 35-36. But neither case rested on application of the due process clause, as the government acknowledges. *See id.* at 36 ("both the *Rasul* and *al-Mad[hwan]i* decisions from the Court of Appeals ultimately rested on non-due-process grounds"). *Rasul*, a damages action by former detainees for their torture and abuse at Guantánamo, was dismissed on qualified immunity grounds after concluding that, for conduct *prior* to the Supreme Court's decision in *Boumediene*, it was not clearly established that detainees at Guantánamo have due process rights. *See* 563 F.3d at 530-32. The *Rasul* court expressly declined to address the plaintiffs' due process claims. *Id.* It did not, and could not, hold that *Boumediene* limited the Constitution's extraterritorial reach to the Suspension Clause, as the government implies, *see* Gov't Br. at

---

[14]    The government suggests that "many of the same issues" Petitioners raise are currently before the D.C. Circuit on appeal in *Al-Alwi v. Trump*, No. 17-5067, perhaps to suggest (without so moving) that these (unspecified) questions should await resolution by that court. Gov't Br. at 11. Other than a passing reference to "the standard of review for a claim that hostilities have ceased," *id.* at 18 n.9, which is *not* raised by the instant motion, the government does not specify which (if any) issues pending in *Al-Alwi* are of general significance or specifically shared in common with the instant motion. That omission is especially curious given that the government has argued that at least part of Al-Alwi's due process arguments were forfeited. *See* Public Br. for Appellees, *Al-Alwi v. Trump*, No. 17-5067 (D.C. Cir. Nov. 3, 2017) (doc. #1703075) at 33-35. In any event, Petitioners here have freestanding constitutional rights that cannot and should not await resolution of even a fully parallel proceeding in the Court of Appeals. *See Boumediene v. Bush*, 553 U.S. 723, 783, 795 (2008) (holding "the costs of delay can no longer be borne by those who are held in custody," "[t]he detainees in these cases are entitled to a prompt habeas corpus hearing," and "the writ must be effective"); *see also Harris v. Nelson*, 394 U.S. 286, 291-92 (1969) ("[H]abeas corpus proceeding must not be allowed to founder in a 'procedural morass.'").

33-34; the government's concession in *Bahlul* regarding the Ex Post Facto Clause proves this could not be the case. *Al-Madhwani* concerned a detainee's objection to consideration of evidence outside the record during a habeas corpus hearing. The panel deemed the legal basis for the objection "obscure," noted that Al-Madhwani cited a due process case as the basis for it, but then stated that it need not decide what the legal basis for the objection was because, as a factual matter, the district court did not rely on the contested evidence at all. *Al-Madhwani*, 642 F.3d at 1077. The panel's passing reference to the *Kiyemba* dictum, *id.*, is thus itself dictum.

Similarly, the government's claim that *Ali v. Obama*, 736 F.3d 542 (D.C. Cir. 2013), forecloses a due process challenge to duration of detention, or resolves the question of whether due process requires that evidentiary rules should vary with time, is superficial and does not withstand scrutiny. To be clear, Petitioner Ali—who joins the instant motion—did not argue that the duration of his detention violated due process or was otherwise unlawful, nor did he argue the constitutionality of the procedures applied in his habeas case. Judge Leon therefore did not address due process, duration of detention, or applicable habeas procedures in his rulings denying Ali's petition for a writ of habeas corpus. *See Ali v. Obama*, 741 F.Supp.2d 19 (2011).[15] Petitioner Ali also did not make these arguments on appeal. *See* Br. of Appellant, *Ali v. Obama*, No. 11-5102 (D.C. Cir. Jan.

---

[15]     Nor, contrary to the government's contention, have the judges of this Court decided such a challenge to the duration of detention. *See* Gov't Br. at 33-34 & n.19. *Rabbani v. Obama*, 76 F. Supp. 3d 21 (D.D.C. 2014), was a force-feeding challenge by a detainee not approved for transfer. *Ameziane v. Obama*, 58 F. Supp. 3d 99 (D.D.C. 2014), was an action in habeas to recover personal property retained by the government at the time of the detainee's forced transfer to Algeria. *Al Wirghi v. Obama*, 54 F. Supp. 3d 44 (D.D.C. 2014), was decided on questionable standing grounds—so much so that he was quickly transferred to Uruguay to moot his appeal—rather than statutory or constitutional grounds. And *Bostan v. Obama*, 674 F. Supp. 2d 9 (D.D.C. 2009), was an unclear detainee's challenge to the reliability of evidence that, as in *Al Madhwani*, was ultimately resolved on other grounds. *Salahi v. Obama*, No. 05-cv-569, 2015 WL 9216557 (D.D.C. Dec. 17, 2015), which involved a motion to compel a PRB hearing and the return to petitioner's cell of personal property such as "his computer, books, family photographs, and gifts from prison guards," is also wholly irrelevant to Petitioners' duration of detention arguments.

31, 2012) (doc. #1440689). Instead, as before the district court, the central issue framed by the appeal was whether brief presence in a guesthouse, standing alone, was itself sufficient to justify detention under the AUMF. The government nonetheless tries to make very much of a coda to the *Ali* opinion, *see* 736 F.3d at 552, which appears to have been designed to respond to the Petitioners' rhetorical protest regarding the *sufficiency of evidence* in the case—*i.e.*, that it would be "absurd" to detain someone indefinitely based on mere presence in a guesthouse. The court signals that this protest is not without merit, but would be better taken up with Congress. *Id*. In any event, because Ali presented no legal arguments concerning application of the Due Process Clause, the duration of his detention, or applicable habeas procedures, the Court's commentary is simply dictum. The sentence is not a holding that forecloses a due process challenge to indefinite detention.

**B.      The Due Process Clause Prohibits Perpetual Detention Without Trial, Especially Upon a Preponderance of the Evidence Standard, and the AUMF Cannot be Stretched Beyond these Constitutional Limitations.**

The government argues that Petitioners' detention does not violate due process because it is "not unconstitutionally indefinite"—merely "indeterminate" rather than "perpetual." Gov't Br. at 37-39. But everything the government uses to define the duration of the relevant conflict here shows that these detentions are in fact indefinite. That is, if under the government's legal and factual standard, the duration of "active hostilities" that will permit continuing detention will end only when "al-Qaeda has unconditionally surrendered," Gov't Br. at 29, it ensures Petitioners' detentions will be perpetual. Absent judicial intervention, detention until the government says hostilities have ended *means* lifetime detention—without the safeguards of a judicial trial that due process would demand for a lifetime sentence

The government fails to address the extensive Supreme Court precedent concluding that due process forbids the executive branch from holding individuals in *noncriminal* detention—of the

kind that is at issue here—indefinitely. *See* Pet'r Br. at 21-22 (collecting cases); *see also* Br. Am. Cur. Due Process Scholars at 6-14 (filed Jan. 22 2018) (explaining long line of Supreme Court cases limiting duration and bases of noncriminal detention). In addition, the government does not refute that the Due Process Clause imposes a requirement that noncriminal detention be reasonably tied to the ostensible purpose of the detention. *See* Pet'r Br. at 24-25, 26. The detention of all Petitioners violates this due process norm because their detention is arbitrary collective punishment driven by executive fiat and animus; it does not turn on any individual facts and circumstances.

The unlawfulness of Petitioners' detention comes into starker relief through the lens of the cleared Petitioners—Nasser and Al Bihani. The prior administration disclaimed any interest in continuing to hold Petitioners Al Bihani and Nasser when it took virtually all of the functional steps required to effect their release. *See* Pet'r Br. at 11. The determination that their continued law-of-war detention is no longer warranted, as the government concludes when approving a detainee for transfer, cannot be squared with the law's requirement that a deprivation as serious as Petitioners suffer serve a legitimate purpose. And, under their unique circumstances, the government's inability at least to confirm that it remains committed to their releases underscores the President's antipathy to all transfers, be they cleared prisoners or those seeking clearance through the PRBs.[16]

In addition, as set forth in Petitioners' opening brief, *see* Pet'r Br. 31-37, and as the government does not seriously dispute, there is simply no precedent in U.S. or international law, including the laws of war, either for a war without apparent end or for lifetime detention without charge or trial at Guantanamo. Indeed, we are aware of no court anywhere—and the government points to

---

[16]     As explained above, even if one were cleared for transfer through the PRB process, it would not mean release, as the case of Petitioner Nasser illustrates all too clearly. As the case of Petitioner Al Bihani further makes plain, detainees who are approved for transfer through any administrative process may continue to be detained without charge, possibly life, based on "factors not related to Petitioner[s]" themselves. Gov't Br. at 10.

none—that has upheld indefinite detention for 16 years based on a preponderance of the evidence standard.[17]

Instead of meaningfully engaging with these arguments, the government attempts to dismiss Petitioners' substantive due process claim by relying on a reading of *Hamdi* that it believes would authorize detention for as long as hostilities continue regardless of the circumstances or length of detention. But *Hamdi*, which was decided more than a decade ago under very different circumstances, *see infra* Part II, did not involve a challenge to perpetual detention authority continuing 16 years as here. To the contrary, *Hamdi* expressed concern about the possibility of prolonged detention and held that "indefinite or perpetual detention" was impermissible. 542 U.S. at 521.[18]

## II.   PETITIONERS' CONTINUING DETENTION VIOLATES THE AUMF ON ITS OWN TERMS AND AS CONSTRUED AGAINST DUE PROCESS REQUIREMENTS.

The plain text of the AUMF authorizes only "necessary and appropriate force" in service of its ends.  Pub. L. No. 107-40, § 2(a), 115 Stat. 224. That authorization must be read narrowly in order to avoid the serious constitutional concerns that would be raised by lifelong non-criminal detention. *See Zadvydas v. Davis*, 533 U.S 678, 689-90 (2001) (construing statute authorizing detention of admitted aliens to contain reasonable time limitation in order to avoid serious constitutional concerns raised by indefinite detention); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (constru-

---

[17]      The government argues repeatedly throughout its opposition that detention until the end of hostilities is permitted under the laws of war, including the Third Geneva Convention. As discussed below, *see infra* Part II, the government misinterprets the laws of war, particularly as applied in the context of non-international armed conflict, but in any event its arguments in this regard miss the point entirely. The issue here is whether domestic law—the Due Process Clause—applies and limits the Executive's detention authority even if it were otherwise permitted by the laws of war (which it is not).

[18]      Like Hamdi, Petitioner's central challenge is "not to the lack of certainty regarding the date on which the conflict will end, but to the substantial prospect of perpetual detention." *Id.* at 520.

ing statute to limit detention of aliens not formally admitted to the United States to avoid constitutional issues). While the government argues against a narrow construction by denying that Petitioners' ongoing detention implicates the Due Process Clause, *see* Gov't Br. at 26, the government is wrong, as addressed above. Narrowly construed, the AUMF cannot be understood to authorize perpetual detention—as these detentions plainly are today, 16 years after Petitioners' capture, with still no end in sight. Pet'r Br. at 33-34; *see also* Br. Am Cur. Due Process Scholars at 18-24 (explaining that canon of constitutional avoidance requires the court to read the AUMF narrowly so that it does not authorize perpetual detention and conflict with due process constraints).

### A.     The Fact of Ongoing Hostilities Does Not Justify Perpetual Detention.

The government largely avoids—or fundamentally misconstrues—Petitioners' arguments concerning the laws of war, which inform the government's AUMF detention authority. The government spends the bulk of its argument alleging that Petitioners are lawfully detained under the laws of war because active hostilities against Al Qaeda, the Taliban and associated forces are ongoing. *See* Gov't Br. at 10-22. But Petitioners' challenge to the legality of their detention under the AUMF does not depend upon the end of active hostilities against Al Qaeda, or even the changing nature of hostilities over the 16 years Petitioners have been held captive. *See* Pet'r Br. at 30-31. *Even assuming* the continuation of active hostilities, that condition—which Petitioners obviously dispute—does not answer the central question Petitioners pose: whether there is any limit to the duration of their detention under the AUMF, as informed by the laws of war, if those hostilities *never* end. *See Hussain v. Obama*, 134 S. Ct. 1621, 1622 (2014) (Statement of Breyer, J.) (the Court has not yet considered whether the AUMF limits the duration of detention).[19]

---

[19]     The government asserts that Petitioners' argument "is directed only to al-Qaeda, not the Taliban or associated forces of those organizations," and, thus, that Petitioners' argument would not affect the government's detention authority with respect to detainees alleged to be part of the Tali-

To that question, the government reflexively responds that Petitioners' detention is not indefinite or perpetual because "it is bounded by the cessation of active hostilities," Gov't Br. at 23; and, yet, in the same breath it concedes that hostilities will only end when Al Qaeda—amorphous as it is—"has unconditionally surrendered," *id*. at 29; in other words, never. *See Boumediene*, 553 U.S. at 729 (noting that hostilities against Al Qaeda "may last a generation or more"); *Hamdi*, 542 U.S. at 520 (noting the government's position that the conflict with Al Qaeda will not be won for two generations). In reality, and not in the circularly constructed world of the government, Petitioners are subject to perpetual detention, which is prohibited both by U.S. and international law, including the laws of war.

**B.     There Is No Precedent For Petitioners' Perpetual Detention; To the Contrary, the Laws of War Support Relief.**

The government relies on *Hamdi* in repeating that detention is permissible for the duration of active hostilities. *See* Gov't Br. at 12-13. But *Hamdi* does not stand for the unbounded rule the government wants—that the AUMF and the law of war permit detention for the duration of hostilities, even if the implication is perpetual and potentially permanent detention.[20] *See Hussain*, 134 S.

---

ban or associated forces. Gov't Br. at 32, n.17. The government misstates Petitioners' argument. As discussed above, Petitioners' argument does not depend on the cessation of hostilities against any one group; it is concerned with the duration of detention even assuming any alleged hostilities continue. But even if the court were to need to reach the question of whether in fact active hostilities have ended, Petitioners' argument is not "directed only to al-Qaeda." *See, e.g.*, Pet'r Br. at 35 ("To the extent an armed conflict with the Taliban, Al Qaeda or associated forces continues today, which Petitioners do not concede, the practical circumstances of that conflict have plainly become entirely unlike those of the conflicts that have informed the development of the laws of war.").

[20]     Nor has Congress ratified such an understanding, as the government asserts. Gov't Br. at 13. Section 1021 of the 2012 NDAA intended solely to codify existing law at the time of passage, when no Supreme Court or lower court decision had addressed whether the AUMF limits the duration of detention. *See* Jennifer K. Elsea & Michael J. Garcia, Cong. Research Serv., R42143, Wartime Detention Provisions in Recent Defense Authorization Legislation 8 (2016). As discussed above, that remains an open question. Section 1021(e) also expressly provides that "[n]othing in this section is

Ct. at 1622 (discussing *Hamdi*'s limited holding). The *Hamdi* plurality made clear that its opinion was confined to the "narrow circumstances" before it, where Hamdi, captured on a recognized battlefield allegedly holding a rifle, was only *two years* into his detention. *See* 542 U.S. at 509. Specifically recognizing the validity of Hamdi's concern that the Court's theory might permit perpetual detention, the plurality cautioned that its understanding of the law-of-war rule permitting detention for the duration of hostilities under the AUMF—far from remaining fixed—might change, indeed, unravel. *Id.* at 521; *see also Hussain*, 134 S. Ct. at 1622 ("[Justice O'Connor] explained … that the President's power to detain under the AUMF may be different" in novel circumstances.).

Nor do the Court of Appeals and district court decisions the government cites stand for a rule authorizing Petitioners' perpetual detention under the AUMF. Indeed, the question whether the AUMF limits the duration of detention has yet to be asked and answered by the D.C. Circuit in any case. While the government cites *Ali* as a bar to Petitioners' argument, *see* Gov't Br. at 24, as explained above, the only issue in *Ali* was whether the petitioner was properly determined to be "part of" an enemy force under the AUMF, 736 F.3d 542, 545-46 (2013); the petitioner raised no question about the durational limits of his detention under the AUMF, and the language the government cites as an answer to that unasked question is dicta.[21] *See supra* I.A.2.

---

intended to limit or expand the authority of the President or the scope of the [AUMF]." National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1562 (2011).

[21]     Nor are the D.C. Circuit's decisions in *Aamer*, *Al-Bihani* and *Maqaleh* on point, Gov't Br. at 13-16, nor did this court consider and reject "identical" arguments in *Al-Warafi*, *Al-Kandari* or *Razak*. *id.* at 11.  None of the petitioners in these cases were situated as Petitioners are here—16 years into their detention, under an administration where the indefinite nature of detention has never been clearer—nor did any challenge the legality of their detention under the AUMF on the basis of the duration of their detention; indeed, in some cases, the nature of the challenges were wholly dissimilar. *See Aamer v. Obama*, 742 F.3d 1023, 1026 (D.C. Cir. 2014) (addressing preliminary injunction motion to bar force-feeding); *Al-Bihani v. Obama*, 590 F.3d 866, 871 (D.C. Cir. 2010) (addressing argument that the international armed conflict in which he was captured had ended); *Maqaleh v. Hagel*, 738 F.3d 312, 328 (D.C. Cir. 2013) (whether habeas jurisdiction extends to Bagram detain-

Remarkably, the government claims that Petitioners' argument turns the law of war "on its head," Gov't Br. at 24, even as they argue that the laws of war readily authorize 16 years of detention and beyond, outside of the high range of criminal sentencing after trial; it is the government who distorts the law of war beyond recognition – and certainly beyond reason. As a basic matter, the notion that a military can detain individuals until the end of hostilities—no matter whether or when an end—is based on a principle not even meant for situations of non-international armed conflict, which is the classification the government itself gives the conflict with Al Qaeda.[22] In non-international armed conflicts, there are no traditional combatants, only civilians, and the scope of detention authority is accordingly far less permissive. *See, e.g.*, Jean-Marie Henckaerts & Louise Doswald-Beck, *Customary International Humanitarian Law*, Rule 128(C), at 451 (Int'l Comm. of the Red Cross, Cambridge Univ. Press reprtg. 2009) ("Persons deprived of their liberty in relation to a non-international armed conflict must be released as soon as the reasons for the deprivation of their liberty cease to exist."); *id*. Rule 99, at 348 ("[T]he need for a valid deprivation of liberty con-

---

ees); *Al-Warafi v. Obama*, No. 09-cv-2368 , 2015 WL 4600420 *1 (D.D.C. July 30, 2015) (addressing argument that active combat in Afghanistan ended in 2014 in light of President Obama's statements); *Al-Kandari v. Obama*, No. 15-cv-329  (D.D.C. Aug. 31, 2015), ECF No. 24 at 4 (same); *Razak v. Obama*, 174 F.Supp.3d 300, 301 (D.D.C. 2016) (Kessler, J.) (same). In addition, the portion of *Al-Bihani* cited by the government, that detention under the AUMF may continue until the "fighting stops," is dicta, as later explained by a majority of judges of the D.C. Circuit in *Al-Bihani v. Obama*, 619 F.3d 1, 1 (D.C. Cir. 2010) ("[A]s the various opinions issued in the case indicate, the panel's discussion of [the role of international law-of-war principles in interpreting the AUMF] is not necessary to the disposition of the merits." (citing *Al-Bihani*, 590 F.3d at 871, 873-74)).

[22]     The concept that detention is permissible until the end of hostilities is derived from Article 118 of the Third Geneva Convention, which applies only to prisoners of war in international armed conflict. Geneva Convention Relative to the Treatment of Prisoners of War art. 118, Aug. 12 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities"). Yet the government itself describes the conflict with Al Qaeda as a non-international armed conflict. *See* Resp'ts' Mem. Regarding the Gvt's Detention Authority Relative to Detainees Held at Guantánamo Bay at 1, *In Re Guantánamo Bay Detainee* Litigation, No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009).

cerns both the initial reason for such deprivation *and the continuation* of such deprivation") (emphasis added).

While the government's approach of selectively borrowing international armed conflict principles and applying them to Guantánamo detainees has been endorsed by certain panels of the D.C. Circuit, it has not been addressed *en banc* or by the Supreme Court. Indeed, in *Hamdi*, while the plurality held that Hamdi could be detained for the duration of active hostilities, he was captured in the context of what was then an international armed conflict. Application of that traditional law-of-war principle was, therefore, not inconsistent with the circumstances of his capture, and does not translate into a rule for the sprawling, never-ending, allegedly non-international armed conflict of today.[23]

Moreover, whatever the context of armed conflict—whether international or non-international—wartime detention is meant to be an exceptional, non-punitive measure. *See, e.g.*, William Winthrop, Military Law and Precedents 788 (rev.2d ed.1920) (military detention during wartime "is neither a punishment nor an act of vengeance, but merely a temporary detention which is devoid of all penal character"). The court cannot continue to countenance the government's reflexive invocation of a detention standard that did not envision the circumstances here—of perpetu-

---

[23]     While the government has borrowed international armed conflict rules applicable to combatants for purposes of prolonging the detention of Guantánamo detainees, when it comes to affording them protections from that same body of law—for example, Article 75(3) of Additional Protocol I to the Geneva Conventions, which provides that detainees "shall be released with the minimum delay possible and in any event as soon as the circumstances justifying the arrest, detention or internment have ceased to exist"—the government conveniently counters that such rules are inapplicable because detainees are being held pursuant to a non-international armed conflict.  *See, e.g.*, Resp'ts' Combined Mot. to Dismiss at 26, *Davliatov v. Obama*, No. 15-cv-1959 (D.D.C. June 17, 2016), ECF No. 32-1. The government has conceded that Article 75(3) is legally binding on the United States and other nations as a matter of customary international law. *See* Dep 't of Defense, Law of War Manual § 8.1.4.2, at 490 & n.17 (June 2015), available at http://bit.ly/2p6HKb0; *see also* Law of Armed Conflict Documentary Supplement 234 (5th ed.), *available at* http://bit.ly/2Hmg8ps.

al detention—and that flies in the face of the broader principles underscoring the limited nature of military detention, to hold Petitioners for 16 years to life. Indeed, there is no Supreme Court, D.C. Circuit or law-of-war precedent for Petitioners' ongoing, unending detention.

### C.    Petitioners' Perpetual Detention Serves No Legitimate Purpose.

The government fails adequately to address, as a matter of international law, the most blatant example of how its proposed continued detention of Petitioners defies any law-of-war purpose: Petitioners cleared for transfer. Elsewhere in its brief, the government says that a designation of transfer merely means that transfer "is permissible," not required.[24] Gov't Br. at 42. But a designation for transfer constitutes a determination that "continued law of war detention is [no longer] warranted … to protect against a significant threat to the security of the United States." Exec. Order 13,567, Sec. 2; *see also* Guantánamo Review Task Force, Final Report 7 (2010) ("a detainee should be deemed eligible for transfer if any threat he poses could be sufficiently mitigated through feasible and appropriate security measures").

If the only legitimate purpose of law-of-war detention is to prevent return to the battlefield, then a determination that detention is no longer necessary must mean that a detainee no longer poses the requisite threat of return—that is, his continued detention no longer serves its only purpose. That necessarily bears on the legality of Petitioners' detention under the AUMF.[25] While the gov-

---

[24]    In prior litigation, the government moved to stay the habeas petitions of Guantánamo detainees on the basis of its decisions clearing them for transfer, insisting that a designation for transfer affords the same practical relief – release – as a habeas grant. *See, e.g.,* Mot. for Order of Release at 2, *Ameziane v. Obama*, No. 05-cv-392 (D.D.C. Nov. 27, 2013), ECF No. 343-1.  In so arguing, the government repeatedly disclaimed any military reasons to continue to detain cleared detainees. *See, e.g.*, Petr's Reply Br. at 1, *Davliatov v. Obama*, No. 15-cv-1959 (D.D.C. June 27, 2016), ECF No. 35-1.

[25]    Here, of course, as discussed above, there is not only no effort to transfer cleared Petitioners, but the institutional systems that would allow any transfer to occur have been dismantled in what appears to be a directed effort to prevent any transfers from ever occurring.

ernment repeats that detention is authorized until the end of hostilities, *see* Gov't Br. at 24-25, nothing about that presumptive end point suggests that the presumption cannot be overcome based on the government's own discretionary actions, or that release of some detainees may not otherwise be required before the end of hostilities. *See. e.g.*, *Al-Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) (expressly recognizing that there may be circumstances where a detainee who is determined by a court to be "part of" the Taliban may nonetheless be entitled to a grant of his habeas petition because his release is required by the laws of war).

As to other Petitioners, they maintain that the conflict against the core Al Qaeda organization in connection with which they were captured—assuming they were all captured in those circumstances—has largely been taken over by disparate battles involving a string new global actors; the battlefield of their particular conflict is thus no more, and the only lawful purpose of their detention, to prevent return to *that* battlefield, has dissolved. *See Hamdi,* 542 U.S. at 518 (detention of enemy combatant is permissible for the duration of the "particular conflict" in which he was captured); *Hussain*, 134 S.Ct. at 1622 (emphasizing that *Hamdi*'s holding authorized "detention of individuals falling into the *limited category we are considering, for the duration of the particular conflict in which they were captured*") (emphasis in original). President Trump's stated and demonstrated opposition to any detainee transfer—cleared or not, which the government simply ignores—only confirms that Petitioners' ongoing indefinite detention is not pursuant to any legitimate military need, but rather based wholly in this president's particular brand of politics and animus. *See, e.g.*, Exec. Order 13,823, Sec. 1(e) ("finding," without differentiation, that with respect to "some of the current detainee population … there is significant reason for concern regarding their reengagement in hostilities should they have the opportunity").

*Even assuming* a cognizable conflict relevant to Petitioners continues 16 years after 9/11, a determination that 16 years ago, Petitioners were "part of" Al Qaeda, is wholly inadequate to presume a threat of return to arms that may have existed at the time *Hamdi* was decided, and satisfy a continuing lawful purpose for Petitioners' detention today.[26] The laws of war make clear that a detainee must be released in circumstances where detention is no longer tied to an ostensible need to prevent his return to battle. *See* Pet'r Br. 32-33, n.57. In response, the government parses an excerpted portion of Petitioners' cited sources, missing the broader point, and fails to address Petitioners' cited authorities on the law applicable to non-international armed conflict entirely. *See* Gov't Br. at 25.

### D.     The Authority that Justified Petitioners' Initial Detention Under the AUMF and Laws of War Has Unraveled.

The government thinks it should reassure the court that U.S. military personnel are *still* deployed to Afghanistan and engage in uses of force against Al Qaeda, such that the circumstances of the conflict today are no different than those presented in *Hamdi* 14 years ago. *See* Gov't Br. at 27. That cannot reliably calm the court.  *Hamdi*'s caution—that the Presidents' power to detain under the AUMF may unravel if the practical circumstances of the relevant conflict are entirely unlike those of the conflicts that informed the development of the law of war—was expressly about the prospect of indefinite and perpetual detention. *See* 542 U.S. at 521. The prospective concern in *Hamdi* is now the reality for Petitioners, 14 years later, in the context of a conflict that under the government's standards may last another generation. The government can only try to argue that today's conflict has yet to present any significant changes that would affect the government's deten-

---

[26]     Petitioners' argument concerns the need for a continuing lawful purpose for their detention under the laws of war that inform the AUMF. While the government raises *Awad v. Obama* as a bar to Petitioners' argument, Gov't Br. at 26, even if the court is not required to make a "specific factual finding" that a detainee would pose a threat to the United States if he were released, 608 F.3d 1, 11 (D.C. Cir. 2010), it is obligated to ensure that ongoing detention serves a lawful purpose.

tion authority by omitting the entirely novel circumstance—perpetual hostilities and detention—that so concerned the *Hamdi* plurality.[27]

Separate from this obvious omission, the government also has no response to Petitioners' other points about the changed nature of today's conflict as compared to the circumstances before the *Hamdi* court in 2004. *See* Gov't Br. at 27 (the context of today's conflict is "similar to that presented to the Supreme Court in *Hamdi* and to that presented in other, traditional military operations"). The government's basic position—that *nothing* has changed over the course of more than a decade, and approaching two, despite the elimination of key Al Qaeda leadership, the declaration of the end of active combat in Afghanistan, the emergence of new "associated forces," and the spread to new battlefields, *see* Pet'r Br. at 35-36, and, indeed, that the circumstances here are no different than of any other "traditional military operations"—strains credulity.

The government also conflates Petitioners' unraveling argument with an argument about the end of active hostilities against Al Qaeda. *See* Gov't Br. at 29. Petitioners do not argue that they must be released because active hostilities with Al Qaeda have ended, but because the practical circumstances of any ongoing hostilities—their perpetual nature and otherwise—bear no resemblance to those that informed the development of the laws of war. Petitioners' argument does not involve political questions as the government contends, *see* Gov't Br. at 29, but the interpretation of the AUMF and international law—matters squarely within the province of the judiciary. *See Hamdi*, 542 U.S. at 548-51 (interpreting the AUMF and laws of war to determine the scope of the President's detention authority). Even if the court were to need to determine whether active hostilities

---

[27]     The government cites *Ali* once again for the proposition that the perpetual nature of this conflict does not affect the government's authority to detain for the duration of hostilities. *See* Gov't Br. at 28. But *Ali* did not address any argument by the petitioner about the unraveling of the government's authority under *Hamdi* or, as previously noted, the durational limits of detention authority under the AUMF.

are ongoing, that is not a political question. *See id*. 542 U.S. at 521 (examining the factual record determine the existence of active hostilities against Al Qaeda); *see also Al Warafi v. Obama*, 2015 WL 4600420 *2 ("At the hearing on petitioner's motion, the government conceded that whether there are active hostilities sufficient to justify AUMF detention is not a political question, but suggested that the Court could not contradict the President's litigation position on that issue. The Court is inclined to disagree.").

## CONCLUSION

For the foregoing reasons, Petitioners' Motion for Order Granting the Writ of Habeas should be granted.

Dated: March 9, 2018

Respectfully submitted,

/s/ Darold W. Killmer ___
Darold W. Killmer CO Bar #16056
Mari Newman CO Bar #30192
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street
Suite 400
Denver, CO 80202
(303) 571-1000
Fax: (303) 571-1001
dkillmer@killmerlane.com
mnewman@killmerlane.com

*Counsel for Petitioner Suhail Abdu Anam Sharabi
(ISN 569), Case No. 04-cv-1194 (UNA)*

/s/ George M. Clarke III
George M. Clarke III, DC Bar No. 480073
815 Connecticut Avenue, N.W.
Washington, DC 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
clive@reprieve.org.uk
shelby@reprieve.org

*Counsel for Petitioner Tofiq Nasser Awad Al Bihani*
*(ISN 893), Case No. 05-cv-2386 (RBW)*

/s/ Thomas A. Durkin
Thomas Anthony Durkin (IL. Bar No. 697966)
Robin V. Waters (IL. Bar No. 6317340)
DURKIN & ROBERTS
2446 N. Clark St.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
clive@reprieve.org.uk
shelby@reprieve.org

*Counsel for Petitioner Abdul Latif Mohammed Nasser*
*(ISN 244), Case No. 05-cv-764 (CKK)*

/s/ Pardiss Kebriaei
Baher Azmy (Pursuant to LCvR 83.2(g))
Pardiss Kebriaei (Pursuant to LCvR 83.2(g))
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Shayana D. Kadidal (D.D.C. Bar No. 454248)
Omar A. Farah (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6452
Fax:  (212) 614-6499
bazmy@ccrjustice.org

26

pkebriaei@ccrjustice.org
wdixon@ccrjustice.org
skadidal@ccrjustice.org
ofarah@ccrjustice.org

*Counsel for Petitioner Sharqawi Abdu Ali Al-Hajj (ISN 1457), Case No. 09-cv-745 (RCL)*

/s/ Martha Rayner
Martha Rayner
Clinical Associate Professor of Law
Fordham University School of Law
150 West 62nd Street, 9th Floor
New York, New York 10023
mrayner@lsls.fordham.edu
212-636-6941

*Counsel for Petitioner Sanad Ali Yislam Al-Kazimi (ISN 1453), Case No. 05-cv-2386 (RBW)*

/s/ Stephen M. Truitt
Stephen M. Truitt
600 Fourteenth Street NW
Hamilton Square, Suite 500
Washington, DC 20005
(202) 220-1452
truittsm@gmail.com

Charles H. Carpenter
CARPENTER LAW FIRM plc
210 North Higgins Avenue, Ste. 336
Missoula, Montana  59802
(406)543-0511
carpentc@carpenterlawfirmplc.com

*Counsel for Petitioner Hani Saleh Rashid Abdullah (ISN 841), Case No. 05-cv-23 (EGS)*

/s/ Agnieszka M. Fryszman
John R. Holland
Anna Holland Edwards
Erica T. Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, P.C.
1437 High Street
Denver, CO 80218

27

Tel: (303) 860-1331
john@hheglaw.com
anna@hheglaw.com
erica@hheglaw.com

Agnieszka M. Fryszman, DC Bar No. 459208
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
afryszman@cohenmilstein.com

*Counsel for Petitioner Abdul Raheem Rabbani (ISN 1460), Case No. 05-cv-1607 (RCL)*

/s/ Shelby Sullivan-Bennis
REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
clive@reprieve.org.uk
shelby@reprieve.org

*Counsel for Petitioner Ahmed Ghulam Rabbani (ISN 1461), Case No. 05-cv-1607 (RCL)*

/s/ H. Candace Gorman
H. Candace Gorman
Law office of H. Candace Gorman
220 S. Halsted, Suite 200
Chicago Il. 60661
312.427.2313

*Counsel for Petitioner Abdul Razak Ali (ISN 685), Case No. 10-cv-1020 (RJL)*

/s/ Darin Thompson
Darin Thompson
Assistant Federal Public Defender
Office of the Federal Public Defender
Skylight Office Tower, Ste 750
1660 W. 2nd St., NW

28

Cleveland, Ohio 44113
(216) 522-4856
Fax (216) 522-4321

REPRIEVE
Clive Stafford-Smith
Shelby Sullivan-Bennis
PO Box 3627
New York, NY 10163
(929) 376-8446
clive@reprieve.org.uk
shelby@reprieve.org

*Counsel for Petitioner Mohammed Abdulmalik (ISN 10025), Case No. 08-cv-1440 (CKK)*

- and -

/s/ Joseph Margulies
Joseph Margulies
Professor of Law and Government
Cornell University
238 Myron Taylor Hall
Ithaca, NY 14850

George Brent Mickum IV [Bar No. 396142]
Erin Herro
5800 Wiltshire Drive
Bethesda, Maryland 20816

Mark Denbeaux
Charles Church
Denbeaux & Denbeaux
366 Kinderkamack Rd.
Westwood, NJ 07675

Amanda L. Jacobsen
University of Copenhagen, Faculty of Law,
Studiestraede 6
Copenhagen, Denmark 1455 K

*Counsel for Petitioner Zayn Al Abidin Muhammad Husayn (ISN 10016), Case No. 08-cv-1360 (EGS)*

29