**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **KHALID AHMED QASSIM,** | ) | |
| | ) | |
| **Petitioner** | ) | |
| | ) | |
| **v.** | ) | **No. 1:04-cv-01194 (TFH)** |
| | ) | |
| **DONALD J. TRUMP,** *et al.*, | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

**PETITIONER'S REPLY TO RESPONDENTS' OPPOSITION
TO PETITIONER'S MOTION TO MODIFY SECTION I OF THE
CASE MANAGEMENT ORDER AS IT PERTAINS TO PETITIONER'S CASE**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY .......................................................................................... 1

ARGUMENT ......................................................................................................................... 4

   I.  Qassim's Habeas Case Should Go Forward Right Now ......................................................... 4

  II.  The Court Should Grant Qassim's Modifications To The Current CMO ........................... 7

     A.  The government has repeatedly denied Qassim and his counsel access to documents
        and information to which Qassim is entitled by due process ............................................ 7

     B.  Qassim's Proposed Modifications to the CMO are Reasonable ....................................... 9

 III.  Mr. Qassim is Entitled to Have His Habeas Proceeding Conducted in Accordance with
     Those Fundamental Requirements of Fairness that are the Essence of Due Process in a
     Judicial Proceeding .......................................................................................................... 16

CONCLUSION ...................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Al Bahlul v. United States,*
    767 F.3d 1 (D.C. Cir. 2014) ..........................................................................................20

*Alderman v. United States,*
    394 U.S. 165 (1969) ....................................................................................................15

*Balzac v. Puerto Rico,*
    258 U.S. 298 (1922) ....................................................................................................19

*Boles v. Jenkins,*
    No. 14-cv-903, 2018 WL 3421702 (S.D. Ohio Jul 16, 2018) ................................13

*Boumediene v. Bush,*
    476 F.3d 981 (D.C. Cir. 2007) ............................................................... *passim*

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ..........................................................................4, 17, 19

*Bracy v. Gramley,*
    520 U.S. 899 (1997) ..............................................................................13, 14

*Gaitan-Campanioni v. Thornburgh,*
    777 F. Supp. 1355 (E.D. Tex. 1991) ..................................................................13

*In re Gault,*
    387 U.S. 1 (1967) ........................................................................................22

*In re Guantanamo Detainees Cases,*
    355 F. Supp. 2d 443 (D.D.C. 2005) .....................................................................4

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ....................................................................................21

*Harris v. Nelson,*
    394 U.S. 286 (1969) ..............................................................................13, 14

*Kiyemba v. Obama,*
    555 F.3d 1022 (D.C. Cir. 2009) ...........................................................4, 17

*Lennear v. Wilson,*
    937 F.3d 257 (4th Cir. 2019) ..............................................................................16

*Lopez v. Beard,*
    No. 04-cv-4181, 2019 WL 2162300 (E.D. Pa. May 16, 2019) ...............................13

*McDaniel v. U.S. Dist. Court for the Dist. of Nevada,*
   127 F.3d 886 (9th Cir. 1997) ............................................................13

*Morgan v. McCann,*
   No. 08-cv-3378, 2009 WL 781103 (N.D. Ill. Mar. 23, 2009) ..................14

*Morgan v. United States,*
   304 U.S. 1 (1938)............................................................................21

*Morrissey v. Brewer,*
   408 U.S. 471 (1972)........................................................................16

*Murphy v. Ramsey,*
   114 U.S. 15 (1885)..........................................................................18

*U.S. ex rel. Pecoraro v. Page,*
   No 97-cv-3378, 1998 WL 708856 (N.D. Ill. Sept. 30, 1998)................14

*Ponte v. Real,*
   471 U.S. 491 (1985)........................................................................15

*Qassim v. Trump,*
   927 F.3d 522 (D.C. Cir. 2019) ................................................. *passim*

*Rasul v. Bush,*
   542 U.S. 466 (2004)........................................................................17

*Roviaro v. United States,*
   353 U.S. 53 (1957)....................................................................15, 16

*Shaughnessy v. United States ex rel. Mezei,*
   345 U.S. 206 (1953)........................................................................22

*Smith v. Illinois,*
   390 U.S. 129 (1968)........................................................................15

*United States v. Barnett,*
   418 F.2d 309 (6th Cir. 1969) ............................................................15

*United States v. Opager,*
   589 F.2d 799 (5th Cir. 1979) ............................................................16

*United States v. Ordones,*
   772 F.2d 530 (9th Cir. 1983) ............................................................16

*United States v. Roberts,*
   388 F.2d 646 (2d Cir. 1968)............................................................15

**Statutes**

18 U.S.C. App. III § 6(c)(1)...........................................................................................................12

## INTRODUCTION AND SUMMARY

The government's 47-page opposition, with its 136 pages of exhibits, can be boiled down to three groundless arguments.  First, the government contends that Qassim's motion reflects his "misapprehension" that his habeas case should go forward now and on the basis of the government's 2008 amended factual return.[1]  The government pleads instead for indefinite delay, claiming it needs time to review "1.8 million pages" of documents it compiled since 2008 to determine whether it should again amend its 2008 amended factual return to justify Qassim's detention in 2002.[2]  The government asserts that, "[t]o confine the Government's case now to the 2008 factual return would amount to penalizing Respondents for the manner in which Petitioner has chosen to litigate his case."[3]

Second, the government argues that there is no need to determine whether the Due Process Clause applies in this proceeding and requires the modifications of the current Case Management Order ("CMO") which Qassim seeks.[4]  According to the government: "In reality, an examination of the current framework reveals that, even if the Due Process Clause extended to Petitioner, those rights would be satisfied by the process currently available to him."[5]  The

---

[1] Respondents' Opposition to Petitioner's Motion to Modify Section I of the Case Management Order as it Pertains to Petitioner's Cases at 15 (ECF No. 1166) ("Opp.").

[2] *Id*. at 16.

[3] *Id*. at 17.

[4] *Id*. at 18.

[5] *Id*.

government claims that the modest CMO modifications which Qassim requests are unreasonable.[6]

Third, the government rehashes its argument that, because Qassim is an alien it has chosen to detain outside the area of *de jure* U.S. sovereign territory, the protections of the Due Process Clause do not apply to him.[7]

As shown below, the government's arguments have no merit.  First, it is the government, not Qassim, who suffers a "misapprehension" about how this case should proceed.  Qassim was detained and imprisoned in Guantánamo in 2002.  His detention must be adjudicated on the basis of the reasons the government had in 2002 to detain him, and those were set forth in the government's comprehensive 2008 amended factual return.  Since Qassim revived his habeas petition in February 2017, the government has had more than two and a half years to review all post-2008 documents it has compiled to determine whether any of them are exculpatory or otherwise relevant.  Instead, in November 2017, the government opposed this Court's expressed intention to conduct a prompt merits hearing, pleading that it needed time to review voluminous post-2008 documents. On November 15 and 16, 2017, this Court expressly rejected that justification for delay.  In the teeth of this ruling, the government has apparently sat on its hands throughout the ensuing twenty-four months of proceedings in this Court and in the Court of Appeals, doing nothing to examine the records which it now insists it is obligated to review. Perhaps this neglect resulted from overconfidence that the government's now-demolished legal arguments were bound to prevail on appeal.  Even so, the government has only itself to blame for procrastination.

---

[6] *Id*. at 18-34.

[7] *Id*. at 34-39.

Second, if the government means what it says – namely, that Qassim will be provided all documents and information that the Due Process Clause would require – the parties have no dispute.  However, the history of these proceeding suggests otherwise.  The last time the parties were before this Court, the government not only refused to provide Qassim with his own statements but even refused to provide Qassim's security-cleared counsel with access to exhibits upon which it relies to justify his detention.  Then on appeal, the government represented that, if Qassim had "used the process available to him in district court" (instead of agreeing to the Government's proposal to adjudicate the case on the basis of a joint stipulation), Qassim could have been granted the documents and information he needed.[8]  The Court of Appeals found this maneuver reprehensible.[9]  Qassim's present motion accordingly added a fourth category to the three categories of disclosure required by section I.E.1 of the extant CMO: "(4) all of the materials to which the government referred when it represented to the United States Court of Appeals for the District of Columbia Circuit that the petitioner 'might [receive] most or all of the information to which he . . . claims due process entitles him[,]' Brief of Respondents-Appellees at 14, *Qassim v. Trump, et al.*, 927 F.3d 522 (D.C. Cir. 2019) (No. 15-5148)."[10]  It bears noting that this is the only substantive modification of section I.E.1 that Qassim has requested.  But, in a culminating bait-and-switch performance, the government now opposes even this self-evidently appropriate CMO amendment.

---

[8]  Brief for Appellees at 14, *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019) (No. 18-5148).

[9]  "Of course, we would have expected the government to have told Qassim and the district court that before proposing that the parties set up an appeal to this court based on an incomplete record." *Qassim v. Trump*, 927 F.3d 522, 531 (D.C. Cir. 2019).

[10] ECF No. 1162, Ex. 1 at 2.

<u>Third</u>, this Court, in a masterful opinion written by Judge Green, already has held that the Due Process Clause applies to the Guantánamo detainees. *In re Guantanamo Detainees Cases*, 355 F. Supp. 2d 443, 453-464 (D.D.C. 2005). That opinion was vacated by the D.C. Circuit in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), because Congress purported to withdraw the jurisdiction of this Court to entertain habeas petitions by Guantánamo detainees. But the Supreme Court reversed the D.C. Circuit in *Boumediene v. Bush*, 553 U.S. 723 (2008). The Supreme Court's opinion in *Boumediene* can only be read as a ringing endorsement of the proposition that the Due Process Clause applies to Guantánamo detainees. And, as the D.C. Circuit held in the appeal in this case, the contrary language in *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009), *vacated*, 559 U.S. 131, *and judgment reinstated as amended*, 605 F.3d 1045 (D.C. Cir. 2010), is non-binding *dicta*. The government's perseveration in a thoroughly discredited legal position provides no basis for its further stonewalling against discovery.

## ARGUMENT

### I. Qassim's Habeas Case Should Go Forward Right Now

The government contends that Qassim suffers under the "misapprehension" that this case is ready to move forward to an evidentiary hearing right now. Opp. at 15. The government opposes that course, begging the Court for an indefinite delay so that it can review "1.8 million pages" of documents compiled since 2008 to determine whether to amend the amended factual return it filed in this case in 2008 to justify Qassim's detention. *Id*. 16-18.

Qassim indeed maintains that his habeas case should go forward now, but this is no misapprehension. It is a simple reflection of a determination that this Court has already made.

The government warehoused Qassim in Guantánamo on May 1, 2002, seventeen and a half years ago. After Qassim filed his habeas petition on July 15, 2004 (ECF No. 1) and an

4

amended petition on October 1, 2004 (ECF No. 22), the government filed a factual return on October 6, 2004 (ECF No. 34).  Nearly four years later, on September 19, 2008, the government moved for leave to file an amended factual return (ECF No. 244).  The Court granted that motion on November 7, 2008 (ECF No. 287).  The government's comprehensive amended factual return of 2008 provides the government's entire justification for detaining Qassim in 2002.

The government cites no legal precedent to support its contention that it should be granted an indefinite delay to determine whether to amend its factual return 11 years after it was submitted to this Court.  The justification, if any, for Qassim's detention must be based on the facts known to the government at the time of his detention, in 2002.  Those facts were provided by the government to the Court in its amended factual return of 2008.  The government cannot justify Qassim's detention in 2002 on the basis of facts not known to it in 2002.

To be sure, the government is duty-bound to disclose to Qassim any exculpatory evidence in its possession, including evidence that has come into the government's possession after it filed its amended factual return in 2008.  Opp. at 16-17.  And it is true that, at Qassim's request, the Court stayed his habeas case on December 12, 2008 (ECF No. 312), and that the case remained stayed until Qassim revived it on February 13, 2017 (ECF No. 1093). Nevertheless, the government does not explain why, in the two and a half years since Qassim's habeas case was revived, it has not reviewed the documents it compiled after 2008 to determine whether any were exculpatory and had to be disclosed to Qassim, or whether any were otherwise relevant to the purported justification for his detention in 2002.  Even if the government believed it would prevail in Qassim's case, both in this Court and on appeal, that belief would not excuse the government's decision to sit on its hands and do nothing in this regard while it continued to imprison Qassim.

The plain fact is that in November 2017 this Court considered and rejected the exact same plea the government now makes for delay.  At the status conference on November 15, 2017, the Court announced its intention to have a merits trial within a month or so.  Transcript of Proceedings, Nov. 15, 2017, at 15.  The government objected, arguing – as it does now – that, since Qassim's case was stayed in 2008, "exponentially more documents are at play here," and that a delay was warranted because the government was "responsible for those in the event of any merits trial to have reviewed those and determine what is exculpatory and what is inculpatory," which "is not something that can happen very quickly."  *Id.* at 15-16.

The Court did not buy the government's argument.  Instead, the Court directed the parties to prepare for a merits trial in mid-to-late February 2018, and it allowed the government to "provide whatever additional facts they think they have, but in a very tight time frame," and to "file whatever documents they wish to file as long as they do it promptly."  *Id.* at 31.  The Court added: "The government will have to be satisfied and promptly collect whatever it needs or is convinced it has enough to go on without doing a lot more collection, whatever documents they think they found."  *Id*.  For good measure, the Court repeated this admonition in its written Order of November 16, 2017, saying: "The Court urges the government to make all haste in reviewing whatever documents it must and in setting a schedule."[11]

The arguments the government made in November 2017, which did not persuade the Court then, have even less force today, given the additional two and a half years the government has had to review the documents it has compiled.

---

[11] ECF No. 1107.

## II.  The Court Should Grant Qassim's Modifications To The Current CMO

The government scoffs at Qassim's proposed modifications to the current CMO, contending that, "even if the Due Process Clause extended to [Qassim]," the "current framework" reveals that Qassim's due process rights "would be satisfied by the process currently available to him."  Opp. at 18.  If the government means that it is now willing and able to provide Qassim with all the documents and information to which he is entitled by due process, the parties have no dispute.  However, in light of the history of this litigation, Qassim has good reason to be skeptical of the government's latest representation, and the Court should be equally skeptical.

### A.  The government has repeatedly denied Qassim and his counsel access to documents and information to which Qassim is entitled by due process

Throughout this case, the government has repeatedly switched positions to suit its tactical purposes.  On December 5, 2017, after Qassim filed a 115-page traverse to the government's amended factual return of 2008, Qassim drafted and served the government with Proposed Pre-Trial and Trial Procedures for the then-contemplated February 2018 merits trial.  Qassim specifically requested disclosure of all documents relevant and material to his habeas petition, either referenced in the government's amended factual return or otherwise relied upon by the government to justify Qassim's detention, as well as any statements Qassim had made or adopted.  In the event that such information was classified, Qassim requested, consistent with the CMO, that the government provide him with an adequate substitute and provide his security-cleared counsel with access to the classified information.

The government never responded to this request.  In fact, on December 13, 2017, government counsel formally declined to respond at all to Qassim's Proposed Pre-Trial and Trial Procedures or to negotiate joint pre-trial and trial procedures.  Instead, the government suggested

that the parties simply and exclusively develop a set of fact stipulations upon which the Court could make findings and reach conclusions of law.  In the interest of expedition, Qassim agreed with this suggestion.  The government took the lead in drafting a stipulated factual record, which it drew from its amended factual return and supporting exhibits.

However, the government never furnished to Qassim all the statements he made or adopted upon which the government relied to justify his detention.  The government also blacked out virtually the entirety of two of the exhibits (Exhibits 17 and 18) which it attached to the stipulation and upon which it had relied in its amended factual return to justify Qassim's detention, thereby denying Qassim's security-cleared counsel access to them.  The government also refused to disclose classified exculpatory information under the modified CMO procedures Qassim had proposed.

Then, on appeal in this case, the government suddenly asserted that it might have provided most or all of the documents and information Qassim sought if he had only "used the process available to him in district court" to obtain them.[12]  Thus, after successfully employing a procedural maneuver in this Court to obstruct Qassim's access to documents and information required by due process, the government unsuccessfully tried to defeat his appellate due-process contentions by a "belated concession, made for the first time on appeal, that some of the sought-after information may properly be disclosed in this case."  *Qassim v. Trump*, 927 F.3d 522, 525 (D.C. Cir. 2019).

Now that the case is back before this Court, the government once again insists that Qassim should not receive the information he seeks – even if that information comprises his *own*

---

[12] *See* text at note 7 *supra*.

statements.[13]  By continuing to take obstructionist positions and by shifting positions when

convenient, the government has unnecessarily prolonged this case.  It has demonstrated the

implausibility of assuming that Qassim will receive the documents and information to which he

is entitled by due process unless this Court orders the government to provide it.

### B.  Qassim's Proposed Modifications to the CMO are Reasonable

The government contends that Qassim's proposed modifications to the current CMO –

modifications which are aimed at assuring that the CMO procedures are applied consistently

with due process in the current posture of Qassim's individual case – are unjustified.  Opp. at 18.

This argument rests on a mistaken premise: that Qassim is saying that due process requires the

precise language changes he proposes.  But Qassim has merely proposed some particular,

practicable, changes that would satisfy due process. Although there are doubtless other potential

ways to accommodate the specific provisions of the CMO and the overarching requirements of

due process, the existence of alternatives should not preclude the adoption of any single

proposal.

For the sake of efficiency, Qassim addresses below certain groups of his proposed

changes, in broad categories.

*a.  Deletion of Obsolete Provisions – Sections I.A., I.B., I.C., I.G., and portions of others*

Qassim proposed deleting sections I.A., I.B., I.C., and I.G. from the CMO because these

sections deal with the filing of a factual return and a traverse, both of which have already been

filed.  Qassim has also deleted similar language from other provisions referencing the filing of a

factual return, because such a return has already been filed in this case.

*b.  Automatic and Additional Discovery – Sections I.E.1. and I.E.2*

---

[13] *See* Opp. at 21 (contending that Qassim may receive *only* a redacted version of *certain* of his
statements, i.e., those "that formed the heart of the stipulated record.").

Qassim's proposed changes to these sections accomplish two goals:  (i) to require the government to disclose the information that it told the D.C. Circuit that it might have produced to Qassim if Qassim had only asked for it, and (ii) to better facilitate Qassim's ability to request narrowly tailored discovery.

The government disputes as "puzzling" Qassim's request for the information that the government explicitly declared to the Court of Appeals that it might be required to provide, if he were to ask for it.  Opp. at 20-21.  This is a quibble that serves only to confuse the issue and delay the litigation.  Simply put, if the government has information to which it believes Qassim would be entitled on request, it should be ordered to provide it.  His present motion is request enough.  If the Government has no such information and was merely pettifogging in the Court of Appeals, it should so state.  This is exactly what Qassim's proposed addition to Section I.E.1 accomplishes.

Second, Qassim proposes removing the requirement that he seek leave of the Court to pursue any additional discovery.  This barrier to discovery is not necessary if the Court adopts Qassim's proposed modifications to the CMO.

As the government has acknowledged, the D.C. Circuit held on appeal in this case that "[w]ithout a decision from the district court addressing the constitutional question in the particular context of a concrete discovery dispute, it would be 'premature' for [the Court of Appeals] to resolve Qassim's due process claim."  Opp. at 23 (quoting *Qassim*, 927 F.3d at 532) (internal quotation marks omitted).  The government also recognizes that the D.C. Circuit expressly noted that this Court retains authority to modify its case management order "as necessary to facilitate resolution of the constitutional questions raised in this case[.]"  *Id.*  The

10

government argues, however, that nothing should follow from these passages, and that the D.C.

Circuit did not "suggest[] any particular changes to the existing framework." Opp. at 23.

Of course the D.C. Circuit would not have suggested any particular changes after stating

explicitly that such changes are in the province of this Court on remand. Its opinion plainly

anticipates that this Court will implement a discovery process and resolve discovery disputes in

the manner which the Circuit held essential to sharpen Qassim's due process claims. Qassim's

proposed CMO modifications offer one reasonable way to do just that. They simply facilitate the

resolution of those discovery disputes that the D.C. Circuit envisioned and wanted to have

concretized as the basis for informed, timely adjudication of Qassim's due process contentions.[14]

   c.   *Classified Information – Section I.F.*

The government also argues that Qassim has failed to explain the connection between (i)

the due process requirement that he be informed of the purported factual grounds for his

detention with sufficient specificity to enable him to respond to them, and (ii) Qassim's proposed

modifications that require that Qassim be provided with the classified information (or a sufficient

substitute) on which the government relies.  Qassim explained this connection in his opening

brief.  *See* Br. at 11 (noting the "need of an accused person to be informed of the allegations and

purported evidence against him in sufficient detail so that he can adequately defend himself.").

Moreover, no explanation should be necessary because the point is so patent.  Due

process requires that an accused be given fair notice of the charges and evidence against him.

---

[14] Under Qassim's proposed framework, the government retains its ability to resist discovery requests.  In response to any given discovery request, the government can object, putting the onus on Qassim to file a motion to compel.  Then, to prevail on such a motion, Qassim must demonstrate at least that his requests are narrowly tailored and are either (i) *likely* to produce evidence that demonstrates that his detention is unlawful or (ii) *likely* to enable Qassim to rebut the factual basis for his detention without unduly burdening the government.

Qassim's proposed changes to Section I.F provide nothing more or less than that.  The government appears to suggest that, because much of the evidence on which it relies has been declassified, there is no need to share the *other* evidence it relies upon with Qassim or even with his counsel, or to amend the CMO to require that such evidence be shared.  Opp. at 25 ("[S]ixteen of the eighteen exhibits involved in the stipulated record justifying Petitioner's detention . . . are now . . . publically available, with only minimal redactions.") (emphasis omitted).  This makes no sense.  If Qassim is entitled to know the charges and evidence against him – and he is – there is no excuse for denying him and his counsel access to multiple exhibits which allegedly support his detention, simply because other exhibits have been revealed in at least partial form.

In suggesting changes to Section I.F, Qassim did not ignore CIPA, as the government claims.  Opp. at 28.  To the contrary, Qassim's proposed formulation requiring a substitute for classified information (and judging the adequacy of that substitute) is taken directly from the CIPA statute itself.  Specifically, CIPA provides the following:

> The court shall grant such a motion [by the government to provide a statement or summary to a defendant in lieu of disclosure] if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information.
>
> 18 U.S.C. App. III § 6(c)(1).

Thus, Qassim's proposed language requiring the government to provide him a substitute for classified information requires that the substitute "provide petitioner with substantially the same ability to make his defense as would full disclosure of the specific classified information."  ECF No. 1162, Ex. 1 at 3.

Two other matters in the government's opposition are noteworthy for their lack of substance:

(1) In resisting any updating of the CMO, the government recites at page 7 that "[a]s to additional discovery, . . . [the Government's 2008 filing] explained that settled habeas practice would preclude such discovery and there had never been a suggestion that the Constitution requires discovery in habeas proceedings. *See* ECF No. 217 at 16–19 (discussing domestic habeas cases)."  This was and is half false and half irrelevant.

As the Supreme Court confirmed in *Bracy v. Gramley*, 520 U.S. 899 (1997), "settled habeas practice" has provided for discovery at least since *Harris v. Nelson*, 394 U.S. 286 (1969).  *See*, *e.g.*, *McDaniel v. U.S. Dist. Court for the Dist. of Nevada*, 127 F.3d 886, 888 (9th Cir. 1997) (in *Bracy* "the Supreme Court recently reconfirmed the right of capital habeas petitioners to obtain discovery upon a showing of 'good cause.'")  Since 1976, a federal habeas petitioner's discovery rights have been codified in Rule 6(a) of the Rules Governing Habeas Corpus Cases under Section 2254 and in Rule 6(a) of the Rules on Motion Attacking Sentence under Section 2254.  Because the lower courts have consistently afforded such discovery, there has never been a need to address the question of what "the Constitution requires."  *See*, *e.g.*, *Lopez v. Beard*, No. 04-cv-4181, 2019 WL 2162300, at \*2 (E.D. Pa. May 16, 2019) ("The history of this rule 'makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief.'") (citation omitted); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by the leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim."); *see also Boles v. Jenkins*, No. 14-cv-903, 2018 WL 3421702 (S.D. Ohio Jul 16, 2018).

"The [Harris-Bracy] standard . . . [for granting discovery] is not a demanding one." *U.S. ex rel. Pecoraro v. Page*, No 97-cv-3378, 1998 WL 708856, at *1 (N.D. Ill. Sept. 30, 1998). Under *Bracy* and Rule 6, a federal habeas petitioner must:

> (1) identify the essential elements of his constitutional claims, showing that the underlying facts, if established, "constitute a constitutional violation;" and (2) show good cause for the discovery requested. . . . To establish "good cause" for purposes of Rule 6, . . . [the petitioner] must show that "specific allegations before the court show reason to believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Bracy*, 520 U.S.at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300. . . (1969)). Where such facts are shown, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 909.

*Morgan v. McCann*, No. 08-cv-3378, 2009 WL 781103, at *4 (N.D. Ill. Mar. 23, 2009).

The development of a robust process of discovery in federal habeas corpus proceedings dating from *Harris v. Nelson* has occurred in the context of criminal postconviction litigation, where the petitioner has already had the benefit of several layers of judicial safeguards aimed at providing "a full and fair opportunity to develop the factual predicate of his claims[.]"[15]  It would be anomalous to grant any less extensive disclosure of the basis for the accusations that purportedly justify an individual's detention where, as *Boumediene* said with specific reference to Guantánamo, "a person is detained by executive order, rather than, say, after being tried and convicted in a court" so that "the need for collateral review is most pressing."[16]

(2) The government's root position regarding discovery is that Guantánamo cases are *sui generis* because they involve national security issues that require the concealment of some materials in order to protect confidential sources and information.  But the need to

---

[15] *Boumediene*, 533 U.S. at 790.

[16] *Id*. at 783.

protect confidential sources and information is not limited to Guantánamo

cases.  *See*, *e.g.*, *Alderman v. United States*, 394 U.S. 165, 181 (1969) ("The Government

concedes that it must disclose to petitioners any surveillance records which are relevant . . . . And

it recognizes that this disclosure must be made even though attended by potential danger to the

reputation or safety of third parties or to the national security – unless the United States would

prefer dismissal of the case to disclosure of the information.").  Security concerns abound in

cases involving confidential informers, in cases involving parole revocation, and in cases

involving in-prison disciplinary proceedings where the safety of informants is constantly at

stake. *See Ponte v. Real*, 471 U.S. 491, 495 (1985) (recognizing "the very real dangers in prison

life which may result from violence or intimidation directed at either other inmates or staff.").

> Yet, in informer's-privilege cases, the rule is long settled that a
>
> limitation on the applicability of the privilege arises from the fundamental
> requirements of fairness. Where the disclosure of an informer's identity, or of the
> contents of his communication, is relevant and helpful to the defense of an
> accused, or is essential to a fair determination of a cause, the privilege must give
> way.  In these situations the trial court may require disclosure and, if the
> Government withholds the information, dismiss the action.

*Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).  *Cf. Smith v. Illinois*, 390 U.S. 129

(1968); *and see*, *e.g.*, *United States v. Roberts*, 388 F.2d 646, 648-649 (2d Cir. 1968) ("The law

is clear that when an informant's testimony is 'essential to a fair determination of a cause,' the

Government may be required to disclose his identity and address, if known.") (citation

omitted); *accord United States v. Barnett*, 418 F.2d 309, 311 (6th Cir. 1969) ("The generally

recognized privilege of the Government not to disclose its informer's identity to encourage

citizens to communicate their knowledge of the commission of crimes to law-enforcement

officials is limited in scope. When on the facts of the individual case the 'fundamental

requirements of fairness' indicate that the informer's identity would be 'relevant and helpful to

15

the defense of the accused, or essential to a fair determination of a cause, the privilege must give way.'") (citation omitted); *United States v. Ordones*, 772 F.2d 530, 540 (9th Cir. 1983) ("If the district court believed that disclosure was relevant and helpful to the defense of the appellants, it was error of constitutional dimension to deny disclosure solely because of the potential danger to the informer.  If disclosure is essential to a fair determination of the case **"the trial court may require disclosure, and, if the government withholds the information, dismiss the action.'"** (citing *Roviaro*, 353 U.S. at 61) (emphasis added))**.**

And in the parole-revocation and prison-discipline settings, the courts have followed the lead of *Morrissey v. Brewer,* 408 U.S. 471 (1972), in holding that safety concerns do not justify withholding information that even a criminal convict or inmate needs in order to test the factual basis of the government's case for depriving him of liberty interests protected by due process – let alone for incarcerating him for 17 years and counting. *See Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) (summarizing the caselaw dealing with due process restrictions on prison disciplinary proceedings).

In all situations where confidentiality is justified by security interests, the Government can protect its confidences by refusing to disclose them or it can reveal them to the extent necessary for testing their accuracy and reliability.  It cannot both refuse to disclose them and insist that they suffice to justify an inmate's detention. *See United States v. Opager*, 589 F.2d 799 (5th Cir. 1979).

### III.  Mr. Qassim is Entitled to Have his Habeas Proceeding Conducted in Accordance with Those Fundamental Requirements of Fairness that are the Essence of Due Process in a Judicial Proceeding

The government devotes the final 10 pages of its brief to the argument that, because Mr. Qassim is an alien outside the *de jure* sovereign territory of the United States, he has no due process rights or other rights under the United States Constitution, except those rights guaranteed

16

him by the Constitution's Suspension Clause.  It asserts that the law in this Circuit is that aliens "without property or presence" in the *de jure* sovereign territory of the United State lack constitutional rights (with the odd exception of the rights guaranteed by the Suspension Clause), and that this conception remains unchanged by the Court of Appeals' decision in Mr. Qassim's appeal.  It thus argues in effect that *Kiyemba*[17] was correct, and that *Kiyemba* and other decisions of this Circuit establish that aliens such as Petitioner lack Fifth Amendment due process rights.

That assertion, of course, is directly contrary to the D.C. Circuit's decision in this case.[18] The Court expressly held that this interpretation of *Kiyemba* was "in error" and that neither it nor any other decision of this Circuit establishes a prohibition on affording Mr. Qassim constitutional procedural protections.[19]

The Government's assertion is also directly contrary to the express holdings of the Supreme Court.  The argument the Government makes here – that the Guantánamo detainees lack U.S. legal rights because they are aliens without property or presence in U.S. sovereign territory — is exactly the argument it made in *Rasul v. Bush*[20] and in *Boumediene v. Bush*,[21] first, in contending that the detainees lack access to the U.S. courts and, then, in contending that they have no constitutional right to seek the writ of habeas corpus.  That argument has been squarely rejected by the Supreme Court.  No matter what force it might have in other geographic areas

---

[17]  *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010), *and judgment reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010).

[18]  *Qassim v. Trump*, 927 F.3d 522 (D.C. Cir. 2019).

[19]  *Id.* at 524, 528-29.

[20]  542 U.S. 466 (2004).

[21]  553 U.S. 723 (2008).

around the world, it has no force with respect to Mr. Qassim and the other men the United States

government has chosen to imprison at the U.S. naval base at Guantánamo.

As explained in Petitioner's opening brief, the Court in *Boumediene* explicitly rejected

the contention that, "as applied to noncitizens, the Constitution necessarily stops where *de*

*jure* sovereignty ends."[22]  It acknowledged that the United States lacks formal, *de jure*

sovereignty over Guantánamo, but emphasized "the obvious and uncontested fact that the United

States, by virtue of its complete jurisdiction and control over the base, maintains *de*

*facto* sovereignty over this territory."[23]  That was sufficient for the Constitution to apply. As the

Court pointed out, adopting a categorical rule limiting the Constitution's reach to areas of *de*

*jure* sovereignty would contradict "fundamental separation-of-power principles," effectively

granting the Executive Branch the power to switch the Constitution on and off by manipulating

the sites of its detentions to avoid legal restraint over its actions.  That was impermissible.[24]  As

the Court explained:

> The Constitution grants Congress and the President the power to acquire, dispose
> of, and govern territory, not the power to decide when and where its terms apply.
> Even when the United States acts outside its borders, its powers are not "absolute
> and unlimited" but are subject "to such restrictions as are expressed in the
> Constitution."[25]

The Supreme Court also found the Government's argument inconsistent with a long line

of precedents.  The Court reviewed the so-called Insular Cases, which had addressed the

---

[22]  *Boumediene*, 533 U.S. at 755.

[23]  *Id.*

[24]  *Id.* at 755, 764-66.

[25]  *Id.* at 765 (quoting *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885)).

application of constitutional provisions to noncitizens in overseas territories controlled by the United States following the Spanish-American war.  The Court pointed out that, even in "unincorporated territories" such as the Philippines, which were destined for independence rather than incorporation into the United States, "[t]he Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution.'"[26]  And the case cited by the *Boumediene* Court made clear that the prime example of those guaranteed "fundamental personal rights declared in the Constitution" was the principle "that *no person could be deprived of life, liberty, or property without due process of law*, [which] had from the beginning full application in the Philippines . . . ."[27]

It is simply not credible to say that the *Boumediene* Court's analysis applies only to the Suspension Clause and to no other provision of the Constitution.  The Executive can no more switch the Due Process Clause off by spiriting its prisoners to Guantánamo than it can the Suspension Clause.  And the men imprisoned by the United States in that U.S.-controlled territory can no more be deprived of the fundamental personal right of due process than could the foreign inhabitants of the Philippines when it was under U.S. control.[28]

---

[26]  *Id.* at 758 (quoting *Balzac v. Puerto Rico*, 258 U.S. 298, 312 (1922)).

[27]  *Balzac,* 258 U.S. at 312–13 (emphasis added).

[28]  Indeed, as *Boumediene* explained, there is even greater reason to ensure that fundamental constitutional guarantees apply at Guantánamo because, unlike the Philippines and other unincorporated territories, which "the United States did not intend to govern indefinitely[,] Guantánamo Bay . . . is no transient possession. In every practical sense, Guantánamo is not abroad; it is within the constant jurisdiction of the United States." *Boumediene*, 553 U.S. at 768-69.

In fact, the Circuit has recognized that the *Boumediene* decision guarantees the Guantánamo detainees fundamental constitutional protections.  In *Al Bahlul v. United States*,[29] the *en banc* Court considered the application of the Constitution's Ex Post Facto Clause to the detainees at Guantánamo.  The government conceded and the Court assumed that the Clause applies. In his concurring opinion, then Judge Kavanaugh stated that the government "concedes (correctly)" that the Clause applies,[30] and that five of the seven members of the Court "agree in light of *Boumediene v. Bush* that the Ex Post Facto Clause applies at Guantánamo."[31]  "In light of *Boumediene v. Bush*," the Due Process Clause applies as well.  Indeed, Judge Kavanaugh assumed that the Guantánamo detainees were covered by the Due Process Clause, although the equal protection claim made under that Clause failed on the merits in that case.[32]

But even if *Boumediene* could somehow be read to apply only to the Suspension Clause, and even if the Guantánamo detainees had only the right to habeas corpus guaranteed by that Clause, they would have the right to have their habeas proceedings conducted – and any discovery disputes resolved – in accordance with familiar due process standards and jurisprudence.  As explained in Petitioner's opening brief, the habeas right guaranteed by the Suspension Clause inherently includes the right to due process of law.  Justice Scalia documented this point historically: "The two ideas central to Blackstone's understanding" of habeas corpus as the critical protection against arbitrary imprisonment were "due process as the

---

[29]   767 F.3d 1 (D.C. Cir. 2014).

[30]   *Id.* at 65.

[31]   *Id*. at 63.

[32]   *See id*. at 75.

right secured, and habeas corpus as the instrument by which due process could be insisted upon."[33]  Without the truth-testing procedures required by due process, habeas corpus is an empty instrument.

Moreover, what is at stake in these proceedings is not only the rights of individual detainees but the fairness and integrity of the process followed by United States courts in conducting federal habeas proceedings.  In the words of Justice O'Connor's plurality opinion in *Hamdi v. Rumsfeld*, "a court that receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself ensure that the minimum requirements of due process are achieved[,]" with a "fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."[34]  And the Court of Appeals emphasized in this case that a detainee seeking habeas review "must be afforded those 'procedural protections' necessary (i) to 'rebut the factual basis for the Government's assertion that he is an enemy combatant,' . . .  (ii) to give the prisoner 'a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law' . . . and (iii) to create a record that will support 'meaningful review' by the district court . . . ."[35]  Those basic procedural protections are all essential to the right to habeas corpus guaranteed by the Suspension Clause.  They constitute "those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature."[36]

---

[33]  *Hamdi v. Rumsfeld*, 542 U.S. 507, 555 (2004) (Scalia, J. dissenting).

[34]  *Id.* at 533, 538.

[35]  *Qassim*, 927 F.2d at 528-29 (citation omitted).

[36]  *Morgan v. United States*, 304 U.S. 1, 18-19 (1938) (Hughes, C.J.).

There is never a reason for a United States Court to depart from these requirements – to be less than fair in conducting a judicial inquiry. Due process does not impose a set of rigid rules that must be followed inflexibly in every situation. Rather, due process jurisprudence has been developed over the years to strike a balance between protecting sensitive information from disclosure and the need for an accused person to be fairly informed of the accusations and purported evidence against him so that he can adequately defend himself.   The judiciary's adherence to that jurisprudence makes our nation stronger, not weaker. It increases both the accuracy and the reliability of the results of the judicial inquiry and the credibility of those results around the world.[37]

---

[37]  As Justice Jackson cautioned: "Let it not be overlooked that due process of law is not for the sole benefit of an accused. It is the best insurance for the Government itself against those blunders which leave lasting stains on a system of justice but which are bound to occur on ex parte consideration." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224-225 (1953) (Jackson, J., dissenting). *See In re Gault*, 387 U.S. 1, 19-21 (1967) ("Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact. . . . [T]he procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data.").

## **CONCLUSION**

For the foregoing reasons, the Court should grant Petitioner's Motion to Amend Section I of the Case Management Order as it Pertains to Petitioner's Case should be granted.

Respectfully Submitted,

Dated:  October 18, 2019

*/s/ Thomas B. Wilner*

Shelby Sullivan-Bennis                    Thomas B. Wilner
Durkin & Roberts                          Neil H. Koslowe
2446 N. Clark Street                      Alyssa Pont
Chicago, IL 60614                         Cole Pritchett
Telephone:  (401) 660-6538                Shearman & Sterling LLP
E-mail: ssullivan@durkinroberts.com       401 9th Street, N.W., Suite 800
                                          Washington, DC 20004
                                          Telephone: (202) 508-8050
                                          E-mail: twilner@shearman.com
                                          E-mail: nkoslowe@ptomaclaw.com
                                          E-mail: alyssa.pont@shearman.com
                                          E-mail: cole.pritchett@shearman.com

*Counsel for Petitioner  Khalid Ahmed Qassim*

Anthony G. Amsterdam
University Professor Emeritus
New York University School of Law
245 Sullivan Street, 5th Floor
New York, NY 10012
Telephone: (212) 990-6632
E-mail: aal@nyu.edu

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 18, 2019, I caused the foregoing to be filed

electronically with the Court's CM/ECF system, which will automatically send notice of such

filing to all registered CM/ECF users.

<div style="margin-left: 40%;">

/s/ <u>*Neil H. Koslowe*</u>
Neil H. Koslowe
Shearman & Sterling, LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Telephone:  (202) 508-8000
E-mail:  nkoslowe@ptomaclaw.com

</div>